# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO.2:16-cv-14072-ROSENBERG/HOPKINS


VIOLA BRYANT, as Personal            )
Representative of the Estate of      )
GREGORY VAUGHN HILL, JR.,            )
                                     )
              Plaintiff,             )
vs.                                  )
                                     )
SHERIFF KEN MASCARA, in his          )
Official Capacity as Sheriff of      )
St. Lucie County, and               )
CHRISTOPHER NEWMAN,                  )
                                     )
              Defendants.            )
_____ )



VIDEOTAPED DEPOSITION OF CHRISTOPHER NEWMAN


DATE:      October 4, 2016

TIME:      9:10 AM to 11:19 AM

PLACE:     St. Lucie County Sheriff's Office
           4700 West Midway Road
           Fort Pierce, Florida 34981

TAKEN BY:  Attorney for Plaintiff

REPORTER:  SUZANNE K. BADLEY, a Notary Public
           of the State of Florida at Large

                                                                    Page 2

 1     APPEARANCES:

 2

       FOR PLAINTIFF:   JOHN M. PHILLIPS, ESQ.
 3                      T.C. ROBERTS, ESQ.
                        Law Office of John M. Phillips, LLC
 4                      4230 Ortega Boulevard
                        Jacksonville, Fl 32210
 5                      jphillps@floridajustice.com

 6     FOR DEFENDANT:   SUMMER M. BARRANCO, ESQ.
                        Purdy, Jolly, Giuffreda & Barranco, P.A.
 7                      2455 East Sunrise Boulevard, Suite 1216
                        Fort Lauderdale, Fl 33304
 8                      Summer@purdylaw.com

 9     ALSO PRESENT:    JIM YOUNG,
                        Legal Video & Media Specialist
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX

 2

 3

 4   WITNESS:  CHRISTOPHER NEWMAN

 5                                        PAGE
     Direct Examination by Mr. Phillips      4
 6
     Certificate Oath                       87
 7   Reporter's Certificate                 88
     Errata Sheet                           89
 8   Read & Sign Letter                     90

 9

10

11

12

13                       EXHIBITS

14   -None-

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2                      -  -  -

 3   AND THEREUPON,

 4                  CHRISTOPHER NEWMAN,

 5   called as a witness, after having been first duly

 6   sworn, was examined and testified as follows:

 7                  DIRECT EXAMINATION

 8   BY MR. PHILLIPS

 9       Q.   Please state your full name for the

10   record.

11       A.   Christopher Eric Newman.

12       Q.   Is it Deputy Newman?

13       A.   Yes, sir.

14       Q.   My name is John Phillips.  I represent the

15   Estate of Greg Hill and their Personal

16   Representative.  We're going to have some questions

17   for you today.  I'm sure you've gone over, to some

18   extent, the kind of rules that apply to a

19   deposition.  Before I go through them, have you

20   given a deposition before?

21       A.   Yes, sir.

22       Q.   Okay.  Same type things apply.  Try to

23   answer aloud rather than with nonverbal cues, head

24   nods.  Because we're dealing with the written

25   record, try to answer with yeses and nos rather than
```

```
1   uh-huhs or uh-uhs.  I'm sure you do that in your

2   work generally.

3            And, most significantly, in normal

4   conversation we tend to use what I call shorthand.

5   We cut each other off, we know -- we guess what each

6   other is saying, and we can turn a normal

7   conversation into about two-thirds of a

8   conversation.  Here we need it to be, you know,

9   four-thirds of a conversation, we need to let each

10  other take a breath before we answer or ask the next

11  question.  So it's also not an endurance test.  If

12  you need to take a break for any reason, just let us

13  know.

14           How long have you been employed here?

15       A.   October 1st will be three years.

16       Q.   This past October 1st?

17       A.   No, this coming up October 1st.  Yeah,

18  yeah.  It's October 4th, so, yes, I just hit three

19  years.

20                MS. BARRANCO:  2016.

21  BY MR. PHILLIPS

22       Q.   You started October 1st, 2013?

23       A.   Yes, sir.

24       Q.   Okay.  Where did you work before then?

25       A.   I started in 1999 with the City of
```

Page 6

1    Fort pierce Police Department, and I worked from

2    1999 until 2009.  And then from 2009 to 2013 I

3    worked for the Florida Division of Alcoholic

4    Beverages and Tobacco.

5        Q.    Based out of where?

6        A.    I worked out of Fort Pierce and I also

7    worked out of West Palm Beach.

8        Q.    Okay.  Let me back you up even further.

9    And my goal is to not, you know, ask any personal

10   questions; I don't know if you want to get into all

11   that, but are you from -- where are you from?

12       A.    I'm a native Floridian.

13       Q.    Okay.  What part of Florida?

14       A.    I was born Fort Lauderdale.

15       Q.    Okay.  How long have you lived in

16   St. Lucie County?

17       A.    As far as I remember, I think I moved here

18   when I was 17.

19       Q.    Okay.  When did you first develop a idea

20   that you enjoyed law enforcement or wanted to go

21   into law enforcement?

22       A.    When I was like five.

23       Q.    Okay.  Tell me about that.

24       A.    Well, I don't know.  I always liked police

25   and firefighters, and when I got older, I don't like

1  getting burned, so I decided to become a police

2  officer.

3       Q.   Fair enough.  And what education did you

4  pursue to achieve that goal?

5       A.   Got my high school diploma and then went

6  to the police academy.

7       Q.   What year?

8       A.   '98.

9       Q.   Okay.  And you would have started with

10  Fort Pierce Police Department as your first law

11  enforcement job?

12       A.   Yes, sir.  I graduated the academy, I

13  believe, in early '99, and I was hired like a month

14  after I graduated by Fort Pierce.

15       Q.   Very good.  What did you do for, I guess

16  it was, about ten years; what roles did you have

17  with Fort Pierce Police Department?

18       A.   I was a Road Patrol Officer for my first,

19  I think, 20 months, and then I went to the Special

20  Investigations Unit, which was narcotics and gangs,

21  and I did that for almost eight years.

22       Q.   What was your role with the Narcotics and

23  Gangs Unit?

24       A.   I was a Detective.

25       Q.   Okay.  How many Detectives did Fort Pierce

1    Police have in Narcotics and Gangs Unit?

2         A.   At the time I was in there, there was, I

3    believe, six of us.

4         Q.   Tell me about Fort Pierce.  What kind of

5    town is Fort Pierce?

6         A.   It's a lower income, high crime kind of

7    town.

8         Q.   What about St. Lucie County?

9         A.   It has good parts and bad parts like any

10   other county.

11        Q.   What -- how did you go from Fort Pierce

12   Police Department to, was it ATF?  What was the --

13        A.   ABT.

14        Q.   ABT.  Sorry, yes.  How did you make that

15   transition or why did you make that transition?

16        A.   I had some friends that I knew that worked

17   there, and a position came up as an agent, so I went

18   over there.

19        Q.   Okay.  And then same question, how did you

20   transition or why did you transition from there to

21   St. Lucie County Sheriff's Office?

22        A.   When I worked for the State, a lot of

23   times you were shipped around the state.  So

24   sometimes you would be working and you would have to

25   drive and work in Panama City or you would have to

1   work in Miami or West Palm Beach or Jacksonville.

2   Just didn't like the travel.

3        Q.   Okay.  What is your current role with the

4   St. Lucie County Sheriff's Office?

5        A.   Currently assigned to Road Patrol.

6        Q.   And when this incident occurred, what were

7   you assigned?

8        A.   Road Patrol.

9        Q.   Have you had any promotions or demotions

10  since this incident?

11       A.   No.

12       Q.   What is Road Patrol as you know it to be

13  in St. Lucie County with St. Lucie County Sheriff's

14  Office; what are your job duties?

15       A.   Proactively patrol areas, look for

16  enforcement infractions and answer calls for

17  service, provide public assistance.

18       Q.   Okay.  Do you have an assigned police car

19  or squad car?

20       A.   Yes, I do.

21       Q.   Are you able to take that home with you?

22       A.   Yes.

23       Q.   Okay.  Is that the same at the time of

24  this incident?

25       A.   No.

1      Q.   How is it different?

2      A.   I have a new work car now.

3      Q.   Okay.  Were you allowed to take it home

4   then?

5      A.   Yes.

6      Q.   Okay.  It's just a different car?

7      A.   Yes, sir.

8      Q.   Do you have a partner that patrols with

9   you?

10     A.   We really don't have assigned partners,

11   no.

12     Q.   Okay.  Same as the time of this incident?

13     A.   Yes, sir.

14     Q.   What was your familiarity with

15   Officer Lopez at the time of this incident?

16     A.   We'd just been assigned to the same squad,

17   and he worked out west, I believe, at the time, he

18   was assigned out west, and I was -- I don't remember

19   where I was assigned.

20     Q.   Did you know him personally?

21     A.   Not really, just passing roll call.

22     Q.   Okay.  Where are we today?

23     A.   St. Lucie County Sheriff's Office.

24     Q.   How often are you here in this office?

25     A.   Well, I try to make it a point never to

1   come up to this area of the office, I usually stay

2   over on the other side.

3        Q.    What's the distinction?

4        A.    This is where all the Captains and

5   administration is.  I try to stay over -- away from

6   all that.

7        Q.    Yeah.  This usually means trouble, I

8   guess?

9        A.    Yes.

10        Q.    Okay.  But you actually report to this

11   building?

12        A.    Yes, sir.

13        Q.    How often?

14        A.    On Road Patrol, you know, if you're not an

15   early unit, you have to be here every day, so I

16   report here probably four times a week.

17        Q.    And then go out on patrol?

18        A.    Yes, sir.

19        Q.    Do you come back before you finish the

20   day?

21        A.    Yes.

22        Q.    Same procedures, generally, in

23   January of 2014?

24        A.    Yes, sir.

25        Q.    Did you have any discipline reasons that

Page 12

1    you left Fort Pierce Police Department?

2         A.    No.

3         Q.    Okay.  There's the term that floats around

4    occasionally called "gypsy cop" where people leave

5    because they're basically in trouble in one police

6    force and go to a different police force.  That

7    wouldn't describe you?

8         A.    No, sir.

9         Q.    Okay.  Did you have any administrative

10   sanctions or discipline while at Fort Pierce Police

11   Department?

12        A.    I knew I had one when I was -- I think it

13   was like 2008 or 9, I don't remember.  That was for

14   leaving my car running --

15        Q.    Okay.

16        A.    -- on scene.  And I grieved that, and I

17   believe that was removed.

18        Q.    Okay.  What is your understanding of

19   Fort Pierce's Police Department regarding removal of

20   charged discipline?

21        A.    I can't remember.  I couldn't tell you

22   without looking at their policy.

23        Q.    Okay.  That's fine.  Do you know if there

24   was any other discipline that would have been on

25   your record at Fort Pierce Police Department?

Page 13

1        A.    Not that I recall.

2        Q.    Okay.  Same question about with the State

3   employment; did you have any discipline that

4   you're -- on your employment record?

5        A.    No, sir.

6        Q.    Okay.  As we sit here today for

7   three -- just a few days over three years with

8   St. Lucie County Sheriff's Office, have you had any

9   discipline?

10       A.    No, sir.

11       Q.    Have you had any charges that were either

12   found to be unfounded or exonerated?

13       A.    At St. Lucie County?

14       Q.    Yes.

15       A.    Not that I'm aware of.

16       Q.    Okay.  How was this incident investigated?

17       A.    I couldn't answer.  I wasn't part of it.

18       Q.    Okay.  Who did you speak with?

19   Let's -- I guess, let's just -- we'll break that

20   down when we go through the timeline.  Are you aware

21   of any other entity other than St. Lucie County

22   Sheriff's Office that's interviewed you or

23   investigated you related to the shooting of Mr. Hill

24   on January 14, 2014?

25       A.    Not that I'm aware of.

Page 14

1        Q.    Okay.   Before arriving on the scene -- I

2   don't have that address.   Do you recall the address?

3        A.    (Pause).

4                 MR. ROBERTS:   1501 Avenue Q.

5   BY MR. PHILLIPS

6        Q.    1501 Avenue Q.   Does that sound familiar?

7        A.    Yes, sir.

8        Q.    Okay.   Before arriving on the scene at

9   1501 Avenue Q on the afternoon of January 14, 2014,

10  had anything abnormal happened that day to you?

11       A.    No, sir.

12       Q.    Okay.   Do you know what time you reported

13  that morning?

14       A.    We had different shifts then.   We were on

15  rotating eight-hour shifts, and our shift started at

16  3:00.

17       Q.    And this happened fairly shortly after

18  3:00.

19       A.    Yes, sir.

20       Q.    Was this your first call?

21       A.    Pretty much.

22       Q.    Okay.   You don't recall if there was a

23  call before this?

24       A.    I had stopped out with

25  Deputy Paul Pearson before that on Avenue Q, I think

Page 15

1   it was in the 3200 block or 2900 block, something

2   like that, he was out with a suspect that he thought

3   had a warrant.

4        Q.   Okay.  How did that get dispatched or

5   radioed to you?

6        A.   I went in-service and I heard

7   Deputy Pearson asking for a unit with a fingerprint

8   reader because the guy didn't have any ID, and I

9   just responded that way as a backup.

10       Q.   Okay.  And that was how far away from

11  1501 Avenue Q?

12       A.   However many blocks that is from, like,

13  the 3000 block, 15 blocks.

14       Q.   Okay.  Do you recall how long that took?

15       A.   No, I don't.

16       Q.   Do you know what you did in between

17  leaving that scene and arriving at the scene on

18  1501 Avenue Q?

19       A.   Driving.

20       Q.   Okay.  What is your recollection about

21  getting this call initially?

22       A.   My initial reaction was I was I wondering

23  why they gave us a call in the city.

24       Q.   Why is that?

25       A.   Well, usually the City handles their own

Page 16

1    calls for service.

2         Q.   And help me understand, I mean, especially

3    somebody that spent 10 years with Fort Pierce Police

4    Department, the jurisdiction.  Where, kind of, does

5    one jurisdiction -- where does the jurisdiction of

6    Fort Pierce Police and St. Lucie County Sheriff's

7    Office typically -- typically lay?

8         A.   I would have to look at an annex map,

9    because it changes so much.

10        Q.   Okay.  At the time, who handled calls at

11   1501 Avenue Q, that area?

12        A.   I believe that was in the city.

13        Q.   Okay.  And what was the policy, as you

14   were aware, of St. Lucie County Sheriff's Office at

15   handling those calls?

16        A.   We can respond anywhere if somebody

17   requests a Deputy or asks for a Deputy, but I

18   believe that we cover the schools, we provide for

19   the schools, and I believe the caller was calling

20   from the school across the way, which is why, I

21   think, we got dispatched.

22        Q.   Do you know whether that was a 911 type

23   call or a nonemergency number call or something

24   different?

25        A.   I couldn't tell you.

1          Q.   All you know is you got it through

2     dispatch?

3          A.   I was dispatched.

4          Q.   Did your patrol car have any type of

5     camera, dash cam, any recording devices in it?

6          A.   No, sir.

7          Q.   Did St. Lucie County Sheriff's Office, at

8     the time, provide anybody body cams, eye cams, any

9     type of recording devices?

10         A.   No, sir.

11         Q.   Do they now?

12         A.   No, sir.

13         Q.   Do any Officers that you're aware of

14    St. Lucie County Sheriff's Office camera

15    themselves -- let me rephrase that.  Do you know of

16    any Officers locally with the St. Lucie County

17    Sheriff's Office that have personal cameras that

18    they use?

19         A.   That's against policy.

20         Q.   I would suspect, but not everywhere.

21    Okay.  The next set of questions I, kind of, want to

22    get an under -- a personal understanding of your

23    recollection of this, not the detailed recollection,

24    meaning, does this -- do the events of

25    January 14 -- sorry, January 4, 2014 --

1            MR. ROBERTS:  14.

2  BY MR. PHILLIPS

3       Q.   -- yeah, January 14, 2014, stand out in

4  your mind?

5       A.   Yes, sir.

6       Q.   Why?

7       A.   It was pretty traumatic.

8       Q.   Have you -- before this had you had to

9  shoot anybody for any reason?

10      A.   No.

11      Q.   Okay.  Since this have you had to shoot

12  anybody for any reason?

13      A.   No.

14      Q.   On duty or off duty.

15      A.   No.

16      Q.   So this is the only time you've shot

17  somebody?

18      A.   Yes.

19      Q.   Okay.  And memories is kind of a funny

20  thing.  People remember the moments of certain

21  moments in their life because they're just kind of

22  burned in.  There was a cartoon, and I can't

23  remember the name of it now, but it actually does a

24  pretty good job about, you know, kind of showing how

25  memory works, and certain things you almost can

Page 19

1   remember the smell of that day; would you agree with

2   that assessment?

3        A.   Yes, sir.

4        Q.   That certain things -- okay.  How much do

5   you remember about January 14, 2014?

6        A.   Bits and pieces.

7        Q.   Okay.  Where do you wear your radio?

8        A.   On my left shoulder.

9        Q.   Okay.  And you would have gotten a call

10  from dispatch through that radio or through your

11  car?

12       A.   I believe when I got that call I was still

13  outside of my car.

14       Q.   Okay.  Were you -- how do you recall --

15  and, again, if the answer is "I don't know" to any

16  of these questions, that's fine.  How do you recall

17  that call coming in?

18       A.   I just remember, as far as I remember, I

19  was getting a call for a Signal 22, which was a

20  noise disturbance in the area FK Sweet at

21  14th and Q.

22       Q.   Okay.  Was there anything other than a

23  Signal 22 communicated?  I know the Sheriff has

24  mentioned, to some extent, that obscene music was --

25       A.   Yes.  That was the complaint, the music

1  was really loud and vulgar --

2      Q.   Okay.

3      A.   -- and they were worried about the kids.

4      Q.   Okay.  When the call comes through, do

5  they relay it as Signal 22, or did they give the

6  detail?

7      A.   They gave it as a -- as far as I remember,

8  what I recall was that it was a Signal 22 of vulgar

9  music.

10     Q.   Okay.  And what is your understanding, or

11 what was your understanding at the time, either one,

12 of the type of criminal violation that that would

13 be; is that a felony?

14     A.   No.

15     Q.   Is that a misdemeanor?

16     A.   Not that I'm aware of.

17     Q.   Okay.  What is it?

18     A.   Just a complaint.

19     Q.   Okay.  And what did you do?

20     A.   I responded to the call.

21     Q.   We obviously know now that two Officers

22 responded.  Do you know how the other Officer got

23 the call or how they came to respond?

24     A.   Officer Lopez was out with

25 Detective Pearson with me in the 3000 block of

1    Avenue Q because, I believe at the time,

2    Deputy Lopez had a fingerprint reader in his car,

3    which is why he responded.  And then when I got the

4    call for Avenue Q for the loud music, Deputy Lopez

5    just, since he was there with me, responded as a

6    backup.

7        Q.   Okay.  How is it determined who is primary

8    and who is backup?

9        A.   I couldn't tell you.

10       Q.   Is that something official with a call

11   like this, or is it something that just kind of

12   happens; you know, does leadership take over, or do

13   you radio back "I'm taking this call," do you recall

14   how this one happened?

15       A.   Usually if you get a call that's in your

16   zone, if you're assigned to a zone, then you're the

17   primary, and whoever helps, responds, is a backup.

18       Q.   Okay.  Was this Officer Lopez' zone?

19       A.   No, it was not.

20       Q.   This was your zone?

21       A.   I'm not sure if it was my zone.  I know --

22   I could have been a north float.  Without seeing the

23   schedule for the day I don't know where I was

24   typically assigned.

25       Q.   Okay.  The prior call on Avenue Q, was

Page 22

1   that gentleman detained?

2        A.   When I pulled up there he was talking to

3   the Detective, they were standing on the sidewalk

4   together.

5        Q.   Do you know if he was arrested?

6        A.   No, he was not.

7        Q.   Okay.  As we sit here today, do you know

8   that gentleman's name?

9        A.   No, I don't recall.

10       Q.   Do you know whether -- some of the

11  questions I ask are really dumb.  Do you know if he

12  had any relationship or co-relation with

13  Gregory Hill or his family?

14       A.   I could not tell you.

15       Q.   Okay.  They call this discovery because

16  sometimes we've got to just try to discover whatever

17  facts are out there.

18            Ultimately you went from the

19  3000-ish block to the 1500 block of Avenue Q.  Walk

20  me through -- walk me through that, please.

21       A.   I remember pulling into the area and

22  hearing the music.  My windows were rolled up, and I

23  had the police radio on and I could still hear the

24  music.  And as we were pulling up, I seen that the

25  music was coming from 1501, and I remember radioing

1   that in.  And I pulled farther east, and Lopez

2   pulled -- stayed farther west.

3        Q.   Okay.  Neither one of you pulled in the

4   driveway?

5        A.   No.

6        Q.   Why not?

7        A.   Because just as -- I never pull in the

8   driveway, I always park alongside the road.

9        Q.   Okay.  Is that protocol?  Is there

10  protocol related to that?

11       A.   I don't know if there's protocol, it's

12  just what I've always done.

13       Q.   Okay.  I think it makes sense, but why do

14  you do that?

15       A.   Well, most accidents happen while you're

16  backing.  I don't like to back up -- as little as

17  possible.

18       Q.   Fair enough.  Easier to get out as well.

19  Have you, since this incident, listened to any of

20  the CD that was found that was allegedly playing in

21  Greg Hill's stereo?

22       A.   No, I have not.

23       Q.   Have you heard anybody talk about that CD?

24   In other words, they listened to it and they told

25  you what was on it?

Page 24

1              MS. BARRANCO:  I'm just gonna object

2    to the extent you're asking for attorney/client

3    privileged communications.

4              MR. PHILLIPS:  Okay.  Fair.

5    BY MR. PHILLIPS

6         Q.   Yeah, nothing from your attorney.  But

7    other than your attorney, have you had any

8    conversations about that CD since this incident?

9         A.   Not that I recall, no.

10        Q.   Okay.  What do you recall hearing?

11        A.   Pretty foul language, really loud.

12        Q.   And foul language is kind of subjective.

13   There's stuff that's played on the radio that to

14   some people is foul.  There's stuff that can never

15   make the radio.  There's stuff that's just, whether

16   heavy metal hard core or rap hard core, it's just --

17   it's a different -- it's a different level.  Can you

18   help me, kind of, in that subjective interpretation

19   of, you know, what you were hearing?

20        A.   I heard the word "fuck" quite a lot --

21        Q.   Okay.

22        A.   -- "bitch," the N word quite a lot.

23        Q.   Okay.

24        A.   I didn't think that was appropriate.

25

1      Q.    Particularly across the street from a

2   school.

3      A.    Yes.

4      Q.    Yeah.  I understand that.  So continue to

5   walk me through about, you know, what you did.

6      A.    We arrived on scene.  I logged in with

7   dispatch that we had arrived and told them the house

8   number that the music was coming from.

9            Deputy Lopez and I walked up the driveway

10   where the music seemed to be coming out of the

11   garage.  We banged a couple times on the garage, we

12   didn't get response.  So the front door was to the

13   east of the garage.  I walked up the sidewalk to the

14   front door while Deputy Lopez stayed at the garage,

15   and the middle screen on the front door, I'm trying

16   to remember, it didn't have a handle or something

17   like that, so I pulled it open and I knocked, I

18   didn't hear anything.  And because the music was so

19   loud, I took my ASP out and I used the end of my ASP

20   to bang on the door so he could hear me.  Then I

21   heard the music get louder, and I looked, and it's

22   because the garage door was opening.

23      Q.    And then what?

24      A.    I saw Mr. Hill standing a couple feet away

25   from Deputy Lopez, and Lopez was in the driveway

Page 26

1    still on the outside of the garage.  Mr. Hill had

2    his left hand on the garage door, like this

3    (demonstrating), looking at Mr. Lopez, and he had a

4    gun in his right hand.

5         Q.   Did you see the gun in his right hand?

6         A.   Yes, I did.

7         Q.   Okay.  And then what?

8         A.   I yelled "gun" and I drew my gun.  I kept

9    yelling for him to drop the gun.  The music was so

10   loud, I was screaming at the top of my lungs, "gun,

11   drop the gun."

12        Q.   And then what?

13        A.   At that time I had my service weapon

14   pulled, I was aimed at him.  I yelled "gun," I

15   screamed "gun" one more time as loud as I could,

16   "drop the gun".  And Mr. Hill kind of looked my way,

17   and then the garage door started coming down as he

18   was raising the gun.

19        Q.   Okay.  So the left hand pulled the garage

20   door down, and the right, the gun was raising as the

21   garage door was going down?

22        A.   Yes, sir.

23        Q.   Okay.  Then what?

24        A.   I thought, the way the gun was coming up,

25   I thought he was gonna shoot Lopez through the

1  garage, and if he missed Lopez, there's 50 kids

2  behind us.

3  　　　　Q.　　So what did you do?

4  　　　　A.　　I fired my weapon.

5  　　　　Q.　　How many times?

6  　　　　A.　　Four.

7  　　　　Q.　　There's -- have you seen pictures of the

8  garage door since?

9  　　　　A.　　Yes, sir.

10  　　　　Q.　　There's some that are further towards the

11  ground and some -- there's one that's like

12  five-to-six feet up.  Do you know the sequence of

13  what -- of how they were fired?

14  　　　　A.　　Yes, sir.

15  　　　　Q.　　How?

16  　　　　A.　　Just counting up from the bottom, the

17  lowest one was the first, and then two, three, four.

18  　　　　Q.　　Why did you fire like that?

19  　　　　A.　　I was always trained to track vertically,

20  up.

21  　　　　Q.　　Okay.  Were you shooting to kill?

22  　　　　A.　　I was shooting to eliminate a threat.

23  　　　　Q.　　Once the garage door closed, what threat

24  was there?

25  　　　　A.　　A garage door is just concealment, it's

Page 28

1    not cover.  You can shoot through it.

2         Q.    What is the difference between concealment

3    and cover?

4         A.    Concealment just hides you from view,

5    while cover provides protection.

6         Q.    Okay.  Did Mr. Hill ever say anything that

7    you heard?

8         A.    If he did, I didn't hear it over the

9    music.

10        Q.    Okay.  Did Mr -- Officer -- sorry.

11   Deputy Lopez say anything that you heard?

12        A.    Over -- again, over the music, everything

13   I could not hear.

14        Q.    Okay.  So is it fair to say, I mean, I

15   guess one can hear one's own voice.  Did you hear

16   anything else said from the time that garage opened

17   to the time that garage closed; other than what you

18   said, did you hear anybody else say anything?

19        A.    No, I did not.

20        Q.    Okay.  Help me understand, through this

21   sequence, the laws -- before I get there, had you

22   done any background investigation on Mr. Hill before

23   you knocked on the door?

24        A.    I don't understand.

25        Q.    That's probably because it's a -- I think

1    it assumes that you had.  Did you do any background

2    investigation on the residence before you --

3         A.   You mean, like, pull up a call history?

4         Q.   Correct.  Did you do anything to research

5    1501 Avenue Q before you knocked on the door?

6         A.   No, I did not.

7         Q.   Did you do anything to research the

8    residents of 1501 Avenue Q before you knocked on the

9    door?

10        A.   No.

11        Q.   Had you, to your knowledge, encountered

12   Gregory Hill before January 14, 2014?

13        A.   To my knowledge, at that time, no, I did

14   not.

15        Q.   Okay.  Have you since learned that you

16   had?

17        A.   Yes.

18        Q.   Tell us about that.

19        A.   After all this came to light, I,

20   apparently, had arrested Mr. Hill in, I think, it

21   was 2004 during the hurricanes, the aftermath when

22   we had the curfew, for a curfew violation.

23        Q.   Do you have independent recollection of

24   that?

25        A.   I mean, we arrested a couple people during

1   hurricane violations, so nothing about that arrest

2   really stands out in my mind.

3       Q.   Right.  Do you recall what hurricane that

4   was?

5       A.   That was Hurricane Frances and Jeanne, I

6   believe, the year we had the two hurricanes.

7       Q.   Yeah, that's right.  Do you recall or did

8   you since learn what he was doing to cause him to be

9   arrested, what was the probable cause for the

10  arrest?

11      A.   During that time?

12      Q.   Um-hmm.

13      A.   It was he was out past the curfew.  Like I

14  said, I don't really recall the arrest, but it was a

15  curfew violation.

16      Q.   Okay.  Do you recall the terms of the

17  curfew?

18      A.   I would like to say I believe that the

19  curfew violation was in effect that no one was to be

20  on the street after 8:00, it was, 8:00 or 9:00 at

21  night.

22      Q.   And he was, as you recall, he was out

23  after that?

24      A.   Yes, sir.  And I usually gave people like

25  a half-hour leeway to make it home and stuff like

Page 31

1  that, so without seeing the arrest I couldn't tell

2  you exactly what time.

3      Q.    That's fine.  Do you recall whether he was

4  doing anything, you know, nefarious or

5  criminal-like?

6      A.    Like I said, I really don't recall the

7  arrest.

8      Q.    Did you recognize Mr. Hill before you shot

9  him?

10      A.    No.

11      Q.    That arrest would have been while you were

12  at Fort Pierce Police Department?

13      A.    Yes, sir.

14      Q.    Again, I don't want to know about any

15  conversations with your attorney, but how did you

16  learn, how was that association made?

17      A.    I believe I had, you know, during the

18  interviews the next day, the Detectives asked me if

19  I recalled having any, and I said, "no", and they

20  said, "Well, you had arrested him in 2004 for a

21  curfew violation." and I said, "Well, I don't really

22  remember it."

23      Q.    You said you arrested two people for

24  curfew violation?

25      A.    I arrested more than two during that time.

Page 32

1    I think it was like a week-long or almost a

2    month-long curfew.

3         Q.   We started this off where you described

4    Fort Pierce as kind of a -- how did you describe it,

5    I don't want to put words in your mouth.

6         A.   Kind of a low income, high, kind of, crime

7    area.

8         Q.   Okay.  And you have spent most of your law

9    enforcement career working this low-income,

10   high-crime area; is that fair?

11        A.   Yes, sir.

12        Q.   Do you predominantly arrest minorities?

13        A.   I arrest whoever violates the law.

14        Q.   I understand.  The population that you

15   deal with, the people that you're investigating in

16   Fort Pierce during your time in Fort Pierce and

17   St. Lucie County as a whole, I mean, can you

18   estimate what percentage of people that you're

19   investigating or arresting are a minority?

20        A.   No, I really couldn't.  I don't really

21   look at that.

22        Q.   Okay.  From an outsider's standpoint, do

23   you know -- like Jacksonville has 27 percent

24   African American population and, I think,

25   6 or 7 percent Hispanic, just purely objectively,

Page 33

1    do you know what Fort Pierce is?

2         A.    No, I do not.

3         Q.    Okay.  Do you know what St. Lucie County

4    is?

5         A.    I do not.

6         Q.    During your time with Fort Pierce, did

7    anybody, did any suspect or arrestee make any claims

8    that you used excessive force or were racially

9    biased -- strike that.

10            Any time during your Fort Pierce Police

11   history, did anybody make any accusations against

12   you that you were racially biased in your police

13   work?

14        A.    Not that I recall.

15        Q.    Okay.  Did you have any excessive force

16   complaints lobbied against you during your time at

17   Fort Pierce Police?

18        A.    None that stand out to my mind.  Again,

19   without looking at the record, I couldn't really

20   tell you.

21        Q.    Okay.  Did you review your personnel file

22   before today?

23        A.    No.

24        Q.    Do you recall or has your recollection

25   since been refreshed, meaning did you since look at

Page 34

1    a report and kind of refresh your memory from 2004

2    about any of the facts of the encounter where

3    Mr. Hill was arrested for a curfew violation by you?

4         A.    No.  I never looked up the arrest, no.

5         Q.    Okay.  Why not?

6         A.    I didn't see a need to.

7         Q.    Tough question.  Do you admit that you

8    shot and killed Gregory Hill?

9         A.    I shot and eliminated a threat.

10        Q.    Did that shooting result in the death of

11   Gregory Hill?

12        A.    Yes, it did, unfortunately.

13        Q.    Okay.  Thank you for that.  Have you ever

14   had to give a deposition in a civil case?  Do you

15   know what a civil case is?

16        A.    Yes, sir.

17        Q.    Have you ever had to give a deposition in

18   a civil case?

19        A.    As far as being in law enforcement?

20        Q.    Yes.

21        A.    No, I don't believe I have.

22        Q.    Okay.  Have you been under an

23   administrative investigation where statements were

24   taken or depositions held, other than this one?

25                    MS. BARRANCO:  Object to the form.

Page 35

1              MR. PHILLIPS:  I can probably ask

2    that question better.

3              MS. BARRANCO:  I'm just objecting to

4    the use of the word deposition.

5              MR. PHILLIPS:  Yeah.  Yeah.  That's

6    fair.

7    BY MR. PHILLIPS

8        Q.   Have you ever -- have any -- has any of

9    your police work ever been investigated by the FDLE

10   that you're aware of?

11       A.   That I'm aware of?  Not that I'm aware of.

12       Q.   Okay.  Was this ever investigated by the

13   FDLE that you're aware of?

14       A.   I have no clue.

15       Q.   Okay.  You know what the FDLE is?

16       A.   Yes, sir.

17       Q.   Has any of your police work in any

18   department led to, other than this, led to an

19   indefinite suspension?

20       A.   No.

21              MS. BARRANCO:  Object to the form.

22   BY MR. PHILLIPS

23       Q.   Okay.  What did you call the period from

24   the time -- did you go to -- did you go to work the

25   next day after this?

Page 36

1          A.    No, I was out for, I believe, nine days.

2          Q.    And what do you call that?  What was that

3     called?

4          A.    I thought you meant other than this.

5          Q.    That's fine.  No.  No.  No.  And I did

6     mean other than this, but what's that called?  I

7     want to make sure I'm using your words.

8          A.    That's an administrative leave, paid

9     administrative leave.

10         Q.    Okay, paid administrative leave.  Had you

11    ever been on paid administrative leave before this?

12         A.    Not to my recollection, no.

13         Q.    Okay.  And you believe your paid

14    administrative leave related to Greg Hill was nine

15    days?

16         A.    It was nine or 10 days.

17         Q.    Okay.  Was Officer Lopez on the same

18    type -- was he placed on paid administrative leave?

19         A.    Yes.

20         Q.    Do you know if it was shorter or longer or

21    the same duration?

22         A.    I believe it was the same duration,

23    because we both went to the psychologist on the same

24    date to get returned.

25         Q.    Okay.  You ask questions as an attorney,

1  often times without judgment, but the deponent

2  always feels like there's judgment in that.  But I

3  ask this in all these cases, have you ever been a

4  member of any type of white supremacy group --

5      A.   (Laughter).  No.

6      Q.   -- including, but not limited -- I know --

7  the Ku Klux Klan?

8      A.   No.

9      Q.   Okay.  Has any of your close family been?

10     A.   Not that I'm aware of.

11     Q.   Okay.  That's good.  Have you ever been

12  arrested for anything?

13     A.   No.

14     Q.   Okay.  So you have eliminated the threat.

15  Do you know that you've eliminated the threat?

16     A.   No, I did not.

17     Q.   Okay.  So, to you, is it fair that you

18  shot four times into the door, you don't know what

19  the result of that is, and the investigation

20  continues; is that a fair summary of where we are

21  with the narrative?

22     A.   Yes, sir.

23     Q.   Okay.  What happened next?

24     A.    I don't remember if it was myself or

25  Deputy Lopez got on the radio that we alerted where

1    shots were fired.  And I did not know if I had hit

2    my target, and I didn't want an armed suspect coming

3    around the back and coming out to ambush us, so I

4    left Deputy Lopez in the front of the house as he

5    was retreating back to the cars, and I ran onto, I

6    think it's 15th Street, to cover the back of the

7    house to make sure nobody came out to get behind us,

8    and I called out my position.  And I remember saying

9    that I didn't have any cover and that I needed

10   somebody to come over there.

11        Q.   Okay.  At any point before shots were

12   fired did you walk the perimeter of the house?

13        A.   Other than to the front door, no.

14        Q.   Okay.  There's, and I don't know what a

15   home construction person would call it, but this was

16   kind of a cinder block garage; is that fair, do you

17   recall that?

18        A.   Yes.

19        Q.   And sometimes cinder block has patterns

20   carved out where there's free space in between the

21   aspects of the cinder block, it almost looks like a

22   fan.

23        A.   Yes, sir.

24        Q.   And this house had that --

25        A.   Yes.  I do remember that.

Page 39

1     Q.   Yeah -- on the side, I guess that would be

2  the east side --

3     A.   The west side.

4     Q.   -- the west side.  Do you know if anybody

5  attempted to look?

6     A.   No.  No.  That's -- that's all -- for

7  safety, if you have an armed suspect, to go sticking

8  your head in there --

9     Q.   Sure.  Or use mirrors to look?

10    A.   What SWAT did after that -- but as far as

11  Deputy Lopez and I are there, I would never stick my

12  face in window like that.

13    Q.   Certainly.  You would just -- okay.  It's

14  more like a butterfly than a fan; that's what I'm

15  talking about.

16         (Photos tendered.)

17    A.   Yes, sir.  I remember those.

18    Q.   So at any point did you see -- did

19  yourself -- and I know the answer, but now that I'm

20  showing you the picture, did yourself or any Officer

21  that you saw attempt to look, even from a different

22  escalated location, attempt to look through that to

23  see if Mr. Hill was in there?

24    A.   No.

25    Q.   Okay.  Let's -- before we go to, kind of,

Page 40

1    the SWAT call-out and all of that response, we kind

2    of take this frame by frame.  At the time you

3    knocked on the door of 1901 -- 1501 Avenue Q, what

4    were you investigating?

5        A.    Vulgar music.

6        Q.    Okay.  And what violation of

7    Florida Municipal Code was that?

8        A.    Couldn't tell you off the top of my head.

9        Q.    Okay.  Could you tell --

10       A.    Honestly, with any noise complaint, I

11   usually have to look at the county ordinances on the

12   computer.

13       Q.    Okay.  And what were you intending to do

14   about it?

15       A.    Ask him to turn down the music.

16       Q.    Okay.  Not answering the door, was that

17   any sort of crime or violation?

18       A.    No, sir.

19       Q.    Okay.  At what point during the garage

20   door opening, if any, did you see a crime or

21   attempted crime committed by Mr. Hill?

22       A.    Well, when he opened the door and he had a

23   gun in his hand and began to raise that gun in the

24   direction of a Deputy, I took that as an immediate

25   threat.

Page 41

1       Q.   Okay.  Was the possession -- again, based

2  upon the knowledge at the time, was the possession

3  of a firearm in somebody's garage a crime?

4       A.   Without knowing the specifics of who he

5  was, no, which is why we told him to drop the gun so

6  we could figure all that out.

7       Q.   I understand.  Was -- little bit different

8  question -- was the garage door opening and you

9  seeing -- all right, we established there wasn't a

10  crime until it pointed at something.  Was the

11  possession of a firearm by Mr. Hill in his garage a

12  threat to you?

13            MS. BARRANCO:  Object to the form.

14  Go ahead.

15            THE WITNESS:  I took it as a threat.

16  I mean, when you see that you have a uniformed

17  Deputy in front of you and you still have a gun in

18  your hand and then you decide to raise it, a normal

19  person, when they see a Deputy -- I've gone to

20  houses before where people answer the door thinking

21  it's someone else, and when they see the Deputy,

22  they immediately put the gun down and everything is

23  fine.

24       Q.   Certainly.  Have you come to find out how

25  intoxicated Mr. Hill was?

Page 42

1        A.   I don't know.

2                 MR. PHILLIPS:  Was it .3 -- do you

3     remember -- .38 --

4     BY MR. PHILLIPS

5        Q.   Help me understand this.  Again, you know,

6     there were two of you there, and I can show you

7     pictures of the garage or whatever we need to do to

8     get through this, but was it an automatic or a

9     manual garage door opener?

10       A.   The way that it came open -- I couldn't

11    tell you for sure, but I assumed by the way it

12    opened, how fast it opened, and with him keeping his

13    hand on it, looked like he was holding it up, I

14    assumed it was manual.

15       Q.   Okay.  Did you ever, to this day, attempt

16    to lift that garage door?

17       A.   No, sir.

18       Q.   To this day, have you -- other than that

19    time where Mr. Hill lifted it, have you seen that

20    garage door lifted?

21       A.   No, sir.  I stay away from that house.

22       Q.   I assume so.  But later at the scene on

23    subsequent -- you didn't do any subsequent

24    investigation of this, I assume?

25       A.   No, sir.

1      Q.   How long after you fired shots did you

2  leave the scene?

3      A.   Without looking at the CAD, which is what

4  dispatch logs, I don't remember leaving out of there

5  until 9:00 or after 9:00.

6      Q.   Okay.  Okay.  So, you know, going back, do

7  you know how tall that garage door is from the point

8  where the top of the garage door meets the

9  foundation of the house or the house structure?

10     A.   I have no idea.

11     Q.   Okay.  Do you know how tall Mr. Hill is?

12     A.   No.

13     Q.   When Mr. Hill opened the garage door, do

14  you recall whether he was bending, stooping or

15  crouching?

16     A.   He was standing upright.  Like I said, his

17  hand was on the door and he was -- kind of had his

18  head down looking at Deputy Lopez.

19     Q.   Okay.  So at the highest point, and what

20  I'm trying to understand, he could -- I kind of want

21  to see where the highest point of the garage door

22  was in relation to the highest point, you know,

23  basically of what you saw with Mr. Hill.  Did the

24  garage door go all the way up at any point and you

25  no longer saw the garage door?

Page 44

1          A.    I can't -- I couldn't tell you.

2          Q.    Okay.  And I'm asking about minor details

3     of a, you know, pretty quick event, I understand

4     that.

5                Do you know where the garage door reached

6     its apex, meaning where it raised and then lowered?

7     Do you know at what point off the ground it was when

8     it was at its highest point before the shooting?

9          A.    It was high enough that I could see in the

10    whole garage.

11         Q.    Okay.

12         A.    I could see all of him.

13         Q.    All of him, even the tiptop of his hair?

14         A.    Yeah.  Like I said, though he was kind

15    of -- he was standing upright, but he was kind of,

16    like, looking down at Deputy Lopez.

17         Q.    Okay.  How long were his eyes exposed,

18    meaning for what quantity of time could you actually

19    see Mr. Hills eyes?

20         A.    I don't know.  I wasn't in front of him.

21         Q.    Did you ever see Mr. Hill's eyes?

22         A.    Only when he glanced over at me for a

23    second before he closed the door.

24         Q.    Okay.  Is that what we we're talking

25    about, you know, basically a second, one second of

Page 45

1    time from the time that he put it up and put it

2    down, and he was --

3         A.   I couldn't give you a time frame, but it

4    was long enough for me to yell three or four times

5    at him.

6         Q.   Do you know if he could hear you over the

7    music?

8         A.   I'm assuming he did, but I can't tell you

9    for sure.

10        Q.   Okay.  I mean, I would assume, and

11   since -- well, let's not assume.  The speakers were

12   in the garage?

13        A.   Yes, sir.

14        Q.   The garage is made of concrete largely?

15        A.   (Witness nods head up and down.)

16        Q.   And, so, would you agree with me that the

17   stereo would be louder in the garage than outside?

18        A.   I couldn't tell you.

19        Q.   Okay.  And the speakers would have been to

20   the, I'm going to do it again, east of his ear, the

21   speakers would have been east of him?

22        A.   I'm guessing, so I don't know.

23        Q.   Okay.  Do you know how long Mr. Hill's

24   face was exposed by that garage door from the time

25   that it went up to the time it went down over it?

Page 46

1        A.    Again, I couldn't tell you.

2        Q.    Less than a second?

3        A.    It was long enough for me to yell at him

4    three or four times.

5        Q.    Okay.  When you yelled three or four

6    times, were you, I mean, was his -- I know you could

7    see his body, I know you could see parts of him, but

8    for all of your, "gun, gun, drop the gun," comments,

9    do you know if his face was above or below the door,

10   or just his body?

11       A.    This was below the door.

12       Q.    Okay.  For all of that?

13       A.    For me yelling at him, yes, his face was

14   below the door.  I could see his face.

15       Q.    Okay.  And where would you have been to

16   him?

17       A.    I was, kind of, off at a 45 degree angle

18   to the -- it would be northeast, kind of.

19       Q.    And where was Mr -- Deputy Lopez?

20       A.    Directly in front of him.

21       Q.    Where was Greg Hill -- at all times that

22   it -- well, let me go back.  Did Mr. Hill's gun

23   raise -- at what point did Mr. Hill's gun raise?

24       A.    From what I recall, I yelled to him

25   several times to drop the gun.  I'm assuming he

Page 47

1  heard me on the last time, because that's when he

2  looked over at me.  And when he did that, that's

3  when he started looking back towards Lopez, and he

4  did, like, a simultaneous bringing the gun up as he

5  was bringing the garage door down.

6      Q.  Okay.  Okay.  So it's your testimony,

7  because we're dealing with the written record as

8  well as the video, but that left hand on the garage

9  door was coming down as the right hand was coming

10 up?

11     A.  Yes, sir.

12     Q.  At some point they would have crossed.  Do

13 you know where, kind of, the bottom threshold of the

14 door, at what point the gun was raised when the

15 bottom -- when the garage door, kind of, covered or

16 concealed the gun?

17     A.  The garage door came down pretty quick.

18 It was coming down quick.  I lost sight of the gun

19 as it was coming up around his hip area, I believe,

20 is where I last saw it, and, yeah --

21     Q.  Okay.  And what do you mean by, you last

22 saw it as it was coming up around the hip area?

23     A.  Because the door was closing.  And by the

24 time he was still bringing it up, like, it was a

25 slam on the garage door, that's why I assumed it was

Page 48

 1    manual --

 2         Q.    Okay.

 3         A.    -- because the door was coming down quick,

 4    and the gun was coming up, and the door blocked my

 5    view of the gun as it was still coming up --

 6         Q.    Okay.

 7         A.    -- around his hip area.

 8         Q.    So when the gun would have reached

 9    parallel with the ground, you wouldn't have seen

10    that because you never saw the gun parallel,

11    perfectly parallel to the ground; does that make

12    sense?

13         A.    Yes.   And, no, I did not.

14         Q.    Okay.   Did you ever see, therefore, the

15    gun aimed at either Officer, either you or

16    Officer Lopez?

17         A.    I did not see it specifically aimed at

18    anybody.

19         Q.    Okay.   Do you know if the gun was loaded?

20         A.    I have no idea.

21         Q.    Do you know who the owner of the gun was?

22         A.    No.

23         Q.    Did you ever make a determination of

24    either of those facts?

25         A.    I was told eventually that the gun was not

Page 49

1    loaded, and I was also told that the gun was stolen

2    out of Port St. Lucie.

3         Q.   Okay.  The pictures I've seen -- have you

4    seen the photos of Mr. Hill, the deceased Mr. Hill?

5         A.   Yes.

6         Q.   Would you agree with me that there's a gun

7    in his back pocket?

8         A.   Yes.

9         Q.   Was there any other gun that you're aware

10   of that you have seen?

11        A.   No, sir.

12        Q.   Okay.  Was the gun in the back pocket?

13   And you know, I kind of want both certainty and

14   candor here, do you recognize the gun in the back

15   pocket as the gun that he had in his hand, or do you

16   know?

17        A.   It is the gun that was in his hand.

18        Q.   Okay.  Now, the gun that's in his pocket,

19   what part is extruded, what part of the gun is

20   extruding from his pocket?

21        A.   From the pictures, I believe it was the

22   bottom part, butt of the gun, the back end.

23        Q.   Right.  The part that touches --

24        A.   Yes, the back strap --

25        Q.   -- the palm of the hand, which is part of

Page 50

1  the gun you would have never seen?

2      A.   Right.

3      Q.   But, yet, you can affirmatively identify

4  that gun as the --

5      A.   Well, you asked me if I saw the pictures

6  after it was removed.  Yes, it was the gun that was

7  in his hand after it was removed, but just seeing it

8  in his pocket, no, I couldn't tell you.

9      Q.   Oh, so now you're -- you're -- and I'm not

10 trying to trick you, you also saw pictures of the

11 full gun?

12     A.   Yes.

13     Q.   And that's what you're identifying off of,

14 not the pictures, as we --

15     A.   Not the picture of it in his pocket, no,

16 sir.

17     Q.   Okay.  Okay.  What other photos have you

18 seen?

19     A.   The photos of the house, the garage,

20 Mr. Hill, the firearm.

21     Q.   Who turned off, or how did the stereo come

22 to be turned off?

23     A.   I have no answer for that.  I don't know.

24     Q.   In a press conference, Sheriff Mascara --

25 is that your boss?

Page 51

1          A.   That's the boss, yes.

2          Q.   Yeah.  He's the ultimate supervisor, but

3    you have lower supervisors?

4          A.   Yes, sir.

5          Q.   He said something to the effect of, I

6    think the Deputies cut off the music, and then he

7    says, well, who turned it off?  I think he wasn't

8    sure or he misspoke.

9               Did you turn off the music?

10              MS. BARRANCO:  Object to the form,

11   but go ahead.

12              THE WITNESS:  No.

13   BY MR. PHILLIPS

14         Q.   Did Officer -- Deputy Lopez turn off the

15   music?

16         A.   No, sir.

17         Q.   Okay.  Neither one of you went back in

18   that garage?

19         A.   No, sir.

20              MS. BARRANCO:  Object to the form.

21   BY MR. PHILLIPS

22         Q.   When you got there, the entire time until

23   Mr. Hill opened it up, that garage door was closed,

24   right?

25         A.   Yes, sir.

Page 52

1       Q.   Are you aware of, when that complaint came

2   in, if the garage door was open or closed?

3       A.   I have no idea.

4       Q.   When did you, and I'm not trying to impute

5   all of the knowledge of St. Lucie County Sheriff's

6   Office to you, but did you become aware or involved

7   that there might have been a child in the building?

8   Did you have personal knowledge of that at any

9   point?

10      A.   Several hours after they had moved us from

11  the front of the house, somebody was saying, I

12  remember being near the command, waiting, after

13  giving statement and getting pictures taken, that

14  somebody said that a family member called and they

15  were concerned there was a child in the house, so

16  they asked me, and I said that, no, I didn't see a

17  child at the time.

18      Q.   Okay.  And we'll come back.  We're gonna

19  go back through, kind of like we did, probably more

20  briefly, the SWAT call-out in a minute.

21              MR. PHILLIPS:  What time is it?

22              MR. ROBERTS:  10:13.

23              MR. PHILLIPS:  Does anybody need a

24  break?  We've been going an hour.

25

Page 53

1                    THE WITNESS:  I'm good.

2                    MR. PHILLIPS:  Court reporter?

3                    COURT REPORTER:  I'm okay.

4     Thank you.

5                    MR. PHILLIPS:  Okay.  Sometimes I've

6     been known to make court reporters mad with smoky

7     fingers, so just let me know.

8     BY MR. PHILLIPS

9          Q.   And at some point there was a camera or a

10    robotic camera deployed, were you involved with any

11    aspect of that?

12         A.   No, sir.

13         Q.   Did you go back to that scene after you

14    left it on January 14, 2014; have you been on that

15    property for any reason?

16         A.   The following day I did a walk-through

17    with the Detectives.

18         Q.   To show them what happened?

19         A.   Yes, sir.

20         Q.   Okay.  Who was there with you for the

21    walk-through?

22         A.   I believe Detective LeBeau was there.  I

23    couldn't really tell you anybody else.

24         Q.   What is his role with St. John's County

25    Sheriff's Office -- I'm sorry, St. Lucie County

Page 54

1    Sheriff's Office?

2         A.    At the time he was a Detective.

3         Q.    What is he now?

4         A.    He's a Sergeant.

5         Q.    Who was your supervisor at the time?

6         A.    My immediate supervisor at the time was

7    Sergeant Mark Colangelo.

8         Q.    Who is it now?

9         A.    Now my Sergeant is Suzanne Woodward.

10        Q.    Did Sergeant Colangelo come to the scene?

11        A.    I'm sure he did.  I couldn't tell you.

12        Q.    Did you make any call-outs or seek any

13   permissions from Sergeant Colangelo before firing

14   your gun?

15        A.    No.

16        Q.    Okay.  Other than you and Deputy Lopez,

17   who was the next Officer on the scene?

18        A.    Next on scene, as far as I knew, was

19   Detective Paul Pearson, and I believe it was

20   Detective Blatchford was with him.  Because I was

21   standing, like I said, in the middle of 15th Street,

22   and I called for somebody to bring a car over there.

23   Then when they showed up, I had -- Lopez was still

24   in the front of the house by himself, so when they

25   showed up and they covered the back of the house, I

Page 55

1    went to the front of the house with Mr. Lopez.

2        Q.   At that point, you know, base -- obviously

3    it was you and Deputy Lopez who had the firsthand

4    account of what happened.  How was the incident -- I

5    mean, how did you report to fellow Officers -- what

6    would have been the signal, I guess, at the point

7    the garage door closed and you fired shots?  What

8    did that investigation turn into?  Do those

9    questions make sense?  That's kind of -- let me

10   restate all of that.

11           Once the garage door closed and shots were

12   fired, what did you report to fellow Officers or

13   dispatch?

14       A.   That shots were fired and we had a

15   possible barricaded armed suspect.

16       Q.   Okay.  Can one be barricaded in their own

17   home?  What does barricaded mean?

18       A.   It means, basically, you locked yourself

19   in somewhere and you're not coming out.

20       Q.   He was doing that before you fired shots,

21   ostensibly, meaning he didn't hear you or wasn't

22   coming out?

23       A.   (Pause).

24       Q.   I guess my question is, was there anything

25   any more legal about him not coming to the door

Page 56

1    before shots were fired or after shots were fired?

2              MS. BARRANCO:  Object to the form.

3    Go ahead.

4              THE WITNESS:  Well, as far as I know,

5    after shots were fired he had committed a crime, so

6    then it was a criminal act.

7    BY MR. PHILLIPS

8        Q.   What crime had he committed?

9        A.   As far as I was concerned, he committed

10   aggravated assault on a law enforcement Officer.

11       Q.   Even though the gun was never pointed at a

12   law enforcement Officer?

13       A.   It was an immediate threat that was coming

14   in his vicinity.  From my perspective and what I

15   saw, I saw an imminent threat to Deputy Lopez' life.

16       Q.   When did the music stop?

17       A.   I don't know.  It played for a while.

18       Q.   Do you recall Officer Lopez making

19   any -- did you see what Officer Lopez was doing as

20   the garage door went up and down?

21       A.   No, sir.  I did not.

22       Q.   Then that's fair.  Did Officer Lopez draw

23   his revolver?

24       A.   I have no idea.

25       Q.   And I said revolver -- his service weapon?

1      A.   I have no idea.

2      Q.   Did you hear, and I think I asked this,

3  did you hear, at any point, any explanation towards

4  Mr. Hill by Deputy Lopez?

5      A.   I don't recall.

6      Q.   Who was closer to you, Deputy Lopez or

7  Gregory Hill?

8      A.   I was about the same distance from them

9  both.

10      Q.   Have you gone by any other surnames, have

11  you had any other last names?

12      A.   No.

13      Q.   Believe it or not, I've had a couple.

14  You're wearing glasses today; what prescription are

15  you?

16      A.   I'm nearsighted.

17      Q.   Okay.

18      A.   I wear contacts at work.

19      Q.   Okay.  Do you know what your vision is?

20      A.   Not off the top of my head.

21      Q.   Where do you -- who follows your vision

22  care, who do you see?

23      A.   I don't see why my eye doctor has to do

24  anything -- I don't like giving up my doctors and

25  medical unless it's --

1    Q.   Do you agree that your vision is relevant

2  to this incident, what you saw, what you didn't see,

3  what you could see, what you couldn't see?

4    A.   Yeah, but, I mean, I wear my contacts, I

5  wear my glasses, I pass my vision tests every year.

6    Q.   Okay.  You were wearing your contacts at

7  the time of this incident?

8    A.   Yes, sir.

9    Q.   Would your -- do you know when you would

10  have last gone to a vision doctor before

11  January 14, 2014?

12    A.   I would have to get with my doctor to get

13  my records.

14    Q.   Okay.  Were you on the scene the next day

15  when somebody had a metal detector; do you recall

16  that?

17    A.   Not that I recall.

18    Q.   Okay.  Did you ever see anybody on scene

19  with one of those kind of metal detectors you take

20  to the beach?

21    A.   I couldn't tell you, sir.  I was pretty

22  busy.

23    Q.   Okay.  At the time that you fired your

24  shots, did you have any information that there was

25  anybody in that house at all, did you have any idea

1    about how many people, if any, were in that house?

2         A.    No.

3         Q.    Other than seeing Greg Hill?

4         A.    That was all I saw.

5         Q.    Okay.  I asked if you had ever shot

6    anyone, I said overall, but let me limit it to the

7    line of duty, and you said you never shot anyone.

8    Had you ever -- have you ever shot at anyone in the

9    line of duty other than Mr. Hill?

10        A.    No.

11        Q.    Let's, kind of, go to the SWAT call-out

12   portion.  So there was some degree of a report that

13   an armed person was barricaded in their home, fair?

14        A.    Yes, he was barricaded.

15        Q.    Okay.  Did you request any particular

16   assistance related to that?

17        A.    Calling out SWAT and all that is above my

18   pay grade.

19        Q.    Certainly.  Do you know who made those

20   decisions?

21        A.    Couldn't tell you.

22        Q.    Was it -- do you know if it was your

23   Sergeant that made any decisions related to that?

24        A.    Again, I could not tell you.

25        Q.    When did you find out that, for lack of a

Page 60

1   better way to put it, SWAT was coming?

2       A.   I didn't know they were coming until they

3   showed up.

4       Q.   What is SWAT?

5       A.   Special Weapons And Tactics team.

6       Q.   Have you ever been a member of SWAT?

7       A.   No, I have not.

8       Q.   Have you sought to be a member of SWAT?

9       A.   No.

10      Q.   Okay.  Who responded to the scene?

11      A.   I couldn't tell you.

12      Q.   Okay.  How many Officers responded to the

13  scene on January 14, 2014?

14      A.   I have no idea.

15      Q.   Were you involved with the decision to

16  fire tear gas into this residence?

17      A.   No, I wasn't.

18      Q.   I guess, then, you didn't fire tear gas

19  into this residence?

20      A.   No, sir.

21      Q.   That's a SWAT thing?

22      A.   Yes, sir.

23      Q.   Okay.  Did anybody from SWAT speak to you

24  about what you saw before they reacted?

25      A.   No, sir, not that I was aware of.

1        Q.    Okay.  What statements had you given any

2   fellow Officer, other than what we just talked

3   about, about what was going on at Avenue Q?

4        A.    I don't remember how long Deputy Lopez and

5   I were in front of the house when SWAT responded and

6   they finally got there.  They pulled the armored

7   vehicle up and allowed us to walk behind it as

8   cover.  I gave a statement to Detective Briglia and

9   Detective LeBeau.

10       Q.    Are they with SWAT?

11       A.    No.

12       Q.    Are they with --

13       A.    They're with the Detective Bureau CID.

14       Q.    That's like an Internal Affairs, kind of?

15       A.    No.  It was -- they're not Internal

16   Affairs, they're just regular Detectives.

17       Q.    Okay.  Did ultimately you give a statement

18   with some form of Internal Affairs?

19       A.    I can't remember what day it was, but I

20   did give another statement that was recorded and

21   all.

22       Q.    Okay.  Do you know who that was to?

23       A.    Couldn't tell you.

24       Q.    And some departments call them Integrity,

25   Internal Affairs, I've heard everything.  Do you

Page 62

1    know what St. Lucie County Sheriff's Office refers

2    to that unit?

3         A.    Internal Affairs.

4         Q.    Okay.  Do you know what the -- were you

5    informed at any point that evening of why tear gas

6    was injected into the residence?

7         A.    I'm not on SWAT.  I don't know why they

8    did.  I have no idea.

9         Q.    Was there anything that you have firsthand

10   knowledge of from being there that would have

11   warranted tear gas, multiple canisters of tear gas

12   being injected into the residence?

13        A.    I have no control or anything to do with

14   tear gas.

15        Q.    Okay.  Do you know why the tank was called

16   out, or the armored vehicle?

17        A.    I have no -- I could not tell you the

18   beginnings of working with SWAT.  I've never been a

19   member and I don't want to be a member, and their

20   secret society is theirs.

21        Q.    Okay.  Why do you call it

22   "secret society"?

23        A.    Because they train together and they have

24   their own tactics and their own stuff they do, so

25   I'm not trying to learn it.

Page 63

1      Q.   I understand.  And I am trying to learn

2  it.  I kind of want to understand why -- how this

3  evolved from a noise complaint to a helicopter, an

4  armored vehicle, tear gas and snipers -- did you see

5  snipers at some point?

6      A.   I couldn't tell you.

7      Q.   Okay.  How it escalated to that point, do

8  you have any knowledge about that?

9           MS. BARRANCO:  Object to the form.

10  Go ahead.

11           THE WITNESS:  My belief is that when

12  he brought a handgun to the front door, refused to

13  comply and drop it, and began to raise it at a

14  Deputy, that changed the entire situation from loud

15  music to an armed suspect who was threatening a

16  police Officer.

17  BY MR. PHILLIPS

18      Q.   Okay.  Do you have any information that

19  Mr. Hill lived past three to four minutes after he

20  was shot?

21      A.   I have no idea.

22      Q.   Okay.  Have you seen or heard of any

23  evidence to that effect, that Mr. Hill lived -- that

24  the bullets you fired didn't kill him?

25      A.   I have no idea.

Page 64

1      Q.    Other than the four shots you fired, did

2   you see or hear anybody else fire any rounds

3   whatsoever on that night at that scene?

4      A.    To be honest with you, after I fired my

5   first shot, I didn't hear anything.

6      Q.    Okay.  But did you see or hear anybody

7   else fire on that premises at any point during that

8   night, other than the tear gas?

9      A.    Not that I recall.

10     Q.    Okay.  Did you see the tear gas get fired

11  in?

12     A.    No, sir, I did not.

13     Q.    Did you interview any witnesses at the

14  scene?

15     A.    No.

16     Q.    Did Deputy Lopez interview any witnesses

17  at the scene?

18     A.    No, sir.

19     Q.    To the extent --

20     A.    Not that I'm aware of, no.  As far as

21  after it happened and we gave statements, we,

22  basically, sat by a patrol car away from everybody.

23     Q.    What is your understanding of a suspect's

24  constitutional rights, if any?

25              MS. BARRANCO:  Object to the form.

1                THE WITNESS:  As far as what?

2    BY MR. PHILLIPS

3        Q.   What -- when I say the term

4    "constitutional rights" related to a suspect, what

5    comes to mind?

6        A.   I don't -- I try to uphold the

7    Constitution with everybody.  I'm a very -- I'm a

8    big advocate of the Second Amendment, I'm a big

9    advocate of the First Amendment.  I try to never

10   violate anybody's Fourth Amendment.  I think the

11   Constitution is very important.

12       Q.   What is the Fourth Amendment?

13       A.   Search and seizure.

14       Q.   What does that mean, search and seizure?

15       A.   Excuse me?

16       Q.   I said, "What's the Fourth Amendment" and

17   you said, "Search and seizure" and I said, "What

18   does that mean"?

19       A.   Search and seizure, the Fourth Amendment

20   guarantees you the right to be secure in your

21   property and your comings and goings.

22       Q.   Okay.  Do you feel you violated Mr. Hill's

23   Fourth Amendment rights on January 14, 2014?

24       A.   No, sir.

25       Q.   Why not?

Page 66

1        A.    He committed a crime.

2        Q.    And what crime is that?

3        A.    Aggravated assault.

4        Q.    How?

5        A.    As I said before, I've been to calls where

6    homeowners come to the door with gun, and once

7    they've seen me and I told them to drop it, they put

8    the gun down, they apologize, we talk.  I don't take

9    their gun away.

10            Like I said, I'm a big advocate of the

11   Second Amendment.  When I pull people over and they

12   have a conceal permit and they don't have the gun on

13   them, I ask them why they don't have it.  But when

14   you fail to comply and you see that you're

15   confronted with uniformed Officers, and instead of

16   acting as a responsible citizen and placing the gun

17   on the ground and speaking with the Deputies and

18   just talking it through, when you begin to raise it

19   up and close a door and begin to point it at those

20   Deputies, that you don't have a constitutional right

21   to do that.

22       Q.    Okay.  And what I'm trying to understand

23   is, do you have any evidence that Mr. Hill heard

24   you?  You don't know what he heard.

25       A.    I don't know what he heard.  I couldn't

Page 67

1    testify to that.

2         Q.   Okay.  And you've testified that you don't

3    even know if Deputy Lopez, who was an equal distance

4    away, said anything, because the music was so loud?

5         A.   I can't testify as to what Deputy Lopez

6    did.  I'm assuming he would have, but, like I said,

7    you will have to ask him.

8         Q.   Okay.  If he testified he yelled "gun" and

9    you didn't hear it, is that because the music was so

10   loud?

11            MS. BARRANCO:  Object to the form.

12   Go ahead.

13            THE WITNESS:  It could be the music,

14   and it, actually, sir, it was very stressful.

15   BY MR. PHILLIPS

16        Q.   Okay.

17        A.   I don't know if you've ever been in that

18   situation, but it is very stressful.

19        Q.   I understand.  And I appreciate the line

20   of work that you do; you do put yourself out there

21   for the protection of us.  And what I'm -- my job is

22   to find out the details and determine, or let a jury

23   determine, you know, whether there was a breach of

24   rights based upon this particular set of facts.

25   And, so, I need to know those facts in as much

Page 68

1    detail as possible.

2              And I think what we have is extremely loud

3    music playing during the entire duration of this

4    incident, correct?

5         A.   Yes, sir.

6         Q.   That music would have gotten louder when

7    that door opened to the exterior, to people outside,

8    correct?

9         A.   Yes, sir.

10        Q.   And a gentleman was entirely within his

11   home possessing a firearm at all times during this?

12        A.   Okay.

13        Q.   Is that true?

14        A.   Yes, he did have a firearm the entire

15   time.

16        Q.   And he was in his home entirely for the

17   entire duration of this incident?

18        A.   Yes, sir.

19        Q.   Okay.  He was shot and killed in his home,

20   although you claim justifiable use of force?

21        A.   It's not a claim, it's the truth.

22        Q.   Certainly.  I understand that.  And I

23   don't mean claim as in allegation or something

24   false; that's your defense, right?

25        A.   It's facts.

Page 69

1        Q.   Certainly.  And that gun was never

2   pointed -- that gun was never raised to be parallel

3   with the ground, it was never fully raised?

4                MS. BARRANCO:  Object to the form.

5                THE WITNESS:  Not that I saw.

6   BY MR. PHILLIPS

7        Q.   Okay.  The gun was never pointed at any

8   Officer or human being?

9                MS. BARRANCO:  Object to the form.

10  Go ahead.

11               THE WITNESS:  I did not see it

12  directly pointed.

13  BY MR. PHILLIPS

14       Q.   Okay.  Do you know, you know, at its

15  ultimate point where you lost contact because of the

16  garage door, at what degree it was pointed, or what,

17  you know, kind of level it was aimed, like at the

18  knees or lower, do you have any idea?

19       A.   The muzzle would have been aiming towards

20  Deputy Lopez' thigh area.

21       Q.   Okay.  But I think you indicated it wasn't

22  directly aimed at Lopez --

23       A.   It wasn't at center mass.

24       Q.   Okay.

25       A.   Sorry about that.

Page 70

1      Q.   Did you undergo a drug test after that?

2      A.   I don't recall.

3      Q.   Were you under the influence of any

4   alcohol or drug at the time of this incident?

5      A.   No, sir.

6      Q.   Do you recall what you had done before

7   coming on shift at 3:00 p.m. on January 14, 2014?

8      A.   If I followed my normal routine, I

9   probably would have slept until like 11:00 or 12:00,

10  gotten up, got myself something to eat and come into

11  work.

12     Q.   Okay.  Do you work out before shift?

13     A.   No, I do not, I work out afterwards.

14     Q.   Okay.  Do you take any caffeines, not just

15  like Coke, but like a caffeine supplement or any

16  stimulant before going on shift, or did you that

17  day?

18     A.   No.

19          MR. PHILLIPS:  Let me take a little

20  break, and we should be able to wrap up fairly soon

21  after I come back on.

22          (Break from 10:38 a.m. to 10:52 a.m.)

23  BY MR. PHILLIPS

24     Q.   There's a robot depicted in photos that

25  apparently cut the hole in the door, do you recall

Page 71

1   that?

2       A.   No.

3       Q.   Do you know if you were there for that?

4       A.   I was on scene for that, but I didn't

5   witness it, I did not have anything to do with that.

6   I was actually, at that point, still over by a

7   patrol car being kept away from everything.

8       Q.   Certainly.  Have you ever had any

9   involvement with that robot at any other scenes?

10      A.   Before that, no, sir.

11      Q.   After that or before that.

12      A.   After that I believe they've used it a

13  couple times.

14      Q.   Do you know if that robot does some form

15  of taking pictures or video, do you know?

16      A.   I have no idea.  As -- all I know about

17  that robot is it is part of, I think, the bomb unit

18  that actually runs that, and I have no idea what

19  it's used for or what it's capable of.

20      Q.   Okay.  Did you ever see, other than him

21  opening the door and closing the door, did you ever

22  see Mr. Hill at any point -- well -- strike that.

23          Other than your time with him in 2004

24  related to the curfew incident, and him raising and

25  closing the door in 2014, to your knowledge, have

Page 72

1    you ever seen Mr. Hill?

2         A.    Not to my knowledge, no, sir.

3         Q.    Again, some of those questions that I

4    gotta ask.  Were you investigating Mr. Hill before

5    2014, between 2004 and 2014 for anything?

6         A.    Not that I'm aware of, no, sir.

7         Q.    Okay.  Are you aware of whether you or

8    another Officer was conducting any investigation of

9    him or his family?

10        A.    I can't answer for other Officers, but I

11   know I wasn't.

12               (Photograph tendered to witness.)

13        Q.    It's a black and white Google photo of the

14   residence.  Can you hold that up to me and show me

15   where you were when you fired?

16        A.    In this grassy area here, (indicating)

17   kind of towards the corner.

18        Q.    Okay.  And where was Officer Lopez or

19   Deputy Lopez?

20        A.    He would have been where this (indicating)

21   car is towards the front of the garage.

22        Q.    Okay.

23               MS. BARRANCO:  And just for the

24   record, that picture, to clarify, that wasn't taken

25   on the day of the subject incident, right?

Page 73

1                 THE WITNESS:  No.

2    BY MR. PHILLIPS

3        Q.   No.  No.  No.  I think that's a Google

4    photo.  Thank you.

5             I'm going to present a document to you, or

6    I have presented a document to you.  What is that,

7    if you're aware?

8        A.   It appears to be the transcript from a

9    911 tape or digital, whatever they have now.

10       Q.   Okay.  The 911 tape or a dispatch log?

11       A.   It would be dispatch, I'm sorry, the

12   dispatch tape.

13       Q.   Can you, to some extent, translate this

14   into English for us, meaning, where there are

15   numbers, explain what those numbers are, and just

16   kind of run through the first ten or so entries of

17   that.

18       A.   Well, she calls my number, she says: SO

19   280 10 65, means copy a call.  I told her I would be

20   Llima from my call with Paul Pearson, which means I

21   was back in-service.

22       Q.   Okay.  What number are you?

23       A.   280.

24       Q.   Okay.

25       A.   1400 Avenue Q, Signal 22, which is a

1    disturbance call, across the street from the school

2    on Avenue Q, it was a brown house.  Subjects have

3    the garage open and are playing obscene music very

4    loud.  No 1025, which means the caller does not want

5    me to make contact with them, the caller.

6         Q.    Okay.  The person who made the complaint.

7         A.    And I said I was 51, which means I was en

8    route.

9         Q.    Okay.

10        A.    And she says -- she repeats 51 to

11   acknowledge.  205, which is Justin Jackson, I

12   believe, said he was gonna be heading that way from

13   Orange, and I don't know, it doesn't say.  She

14   acknowledges that.  And then 217, which is

15   Deputy Lopez, says that he's right with me, that she

16   can 66 the other unit, which means cancel it.

17        Q.    Okay.  Keep going, please.

18        A.    So Justin Jackson says 26, which means he

19   understands, and he says 10 8, he's back in-service.

20   And then I call out that we're both going 97, which

21   is on scene, and then I call out, it's going to be

22   1501 Avenue Q.  She says 10-4.  And then the next

23   thing is, shots fired, and she says that the man is

24   gonna be 1034, which is limited traffic.

25        Q.    What does that mean?

1        A.   That means no calling out traffic stops,

2   or checking out with this or -- that's when they

3   reserve channels, so if something serious is going

4   on, that they only want limited traffic of that

5   event on that channel so nobody gets hurt.

6        Q.   Okay.  Let me see that.  What number were

7   you?

8        A.   280.

9        Q.   Okay.  So it was Officer Deputy Lopez that

10  said "shots fired" first, reported it?

11       A.   Yes, sir.

12       Q.   Were you involved, it looks like: 280, can

13  you advise the school they need to get everybody

14  inside; did you do anything else other than, you

15  know --

16       A.   I just told them they need to get the kids

17  inside, just in case, they shouldn't be outside.

18       Q.   Okay.

19       A.   As far as the lockdown goes, I was not

20  involved in the lockdown.

21       Q.   Who is 417?

22       A.   I don't know.

23       Q.   Who was 217?

24       A.   217 is Deputy Lopez.

25       Q.   That's right, sorry.

Page 76

1      A.    What does it say about 417?

2            (Document tendered to witness.)

3            That would probably be, from the context,

4    I would think that would be Deputy Pearson pulling

5    onto 15th Street.

6      Q.    Is there any significance to the numbers?

7      A.    100 numbers are Supervisors, 200 and 300

8    numbers are just regular Deputies, and 400 numbers

9    are Detectives.

10     Q.    Moving for 15:28:14 where you describe the

11   gun, tell us about that.  What was your

12   transmission?

13     A.    Signal 14, which means information, it

14   was -- that's supposed to be little -- I don't know

15   why they misspelled it -- handgun, and I said, maybe

16   like a Kel-Tec model.

17     Q.    How did you know that?  Or what led you to

18   deduce that?

19     A.    When I saw the gun -- the couple nights

20   previously, each night I had been looking at guns

21   for another -- as a backup or on off duty, and I was

22   looking at some of the Kel-Tecs.  And I just

23   remember looking at them, thinking I didn't like

24   them, I didn't like the look of them, so they stuck

25   in my head.

1    Q.   So within 24 to 48 hours before this you

2  had been shopping Kel-Tecs?

3    A.   Yes.

4    Q.   And that's how you recognized it?

5    A.   Yes, sir.

6    Q.   Did you purchase one?

7    A.   No, I did not.

8    Q.   Would that have been for personal use?

9    A.   It would have been for personal use, yes.

10   Q.   Okay.  Can you use anything other than a

11  service-issued firearm in conjunction with work?

12   A.   You are allowed to use, but your primary

13  one they assign you is your primary, but you're

14  allowed to carry a backup that meets the

15  requirements.

16   Q.   Okay.  What are the requirements?

17   A.   It has to be of certain caliber, you still

18  have to qualify with it, and there has to be a

19  certain action on the gun.

20   Q.   At this time what was

21  your -- January 14, 2014, what was your service

22  weapon?

23   A.   The same service weapon as now, different

24  gun, of course, but the Glock .45.

25   Q.   Okay.  Moving down to 15:29:06 it looks

Page 78

1    like Officer Lopez disagrees with you what the gun

2    was or looked like, am I reading that correctly?

3                    MS. BARRANCO:   Object to the form.

4    Go ahead.

5                    THE WITNESS:   Yes, sir.

6    BY MR. PHILLIPS

7        Q.   Just help me understand the, kind of, the

8    dispatch report, any police-ese in there.

9        A.   Just information.  He thought it looked

10   more like a Glock .30 or .22, which is the model, or

11   a .27, which is a small .40.

12       Q.   Do you know what it turned out to be?

13       A.   I believe it was a Kel-Tec.

14       Q.   There's a point where it says take

15   everybody over to TAC 1.  What does that mean?

16       A.   TAC 1, that is an off channel that they

17   would have just specifically used for this event so

18   they could have the main channel back so they could

19   dispatch emergency calls for service.

20       Q.   Okay.  Have you ever been on the T.V. show

21   10-8?

22       A.   No, I have not.

23       Q.   Are you aware of it?

24       A.   Yes, I am.

25       Q.   What is your understanding of it?

1        A.   As far as I -- from what I understand what

2   I've seen on YouTube a while ago, I haven't kept up

3   with it, but as far as I know it's like a version of

4   Cops, locally, put on by the police department here.

5        Q.   Who is that gentleman, if you know?

6             (Photograph tendered.)

7        A.   That's Major Rothman.

8        Q.   What is his role with the

9   St. John -- St. Lucie -- good grief, St. Johns is on

10  my mind today -- St. Lucie County Sheriff's Office?

11       A.   Now he is the Major over, I think,

12  administration.

13       Q.   Do you know what he was at the time?

14       A.   At the time I don't know if he was still

15  the Captain over the investigative CI, Criminal

16  Investigations or not, I don't know.

17       Q.   You can't really see all of these three

18  gentlemen (indicating), but to the extent you can

19  identify them from left to right or right to left,

20  just tell me which one you're using.

21       A.   From left to right it looks like

22  Deputy Chief Wilson, Major Thompson, and

23  Captain Scavuzzo.

24       Q.   Okay.  Who are they?

25       A.   That's the Deputy Chief, he's the main

Page 80

1    Deputy -- Major Thompson is over law enforcement and

2    Captain Scavuzzo, at the time, was over Road Patrol.

3         Q.   Did you see Sheriff Mascara at the scene

4    on January 14, 2014?

5         A.   Yes, I did.

6         Q.   Did you have any conversations with him

7    that evening?

8         A.   Other than the fact that he just asked if

9    I was okay, if I needed anything, and I said no, and

10   that was it.

11        Q.   Okay.  Do you know what his role was on

12   scene on that evening?

13        A.   I do not know.

14        Q.   Did you see him or hear him giving orders

15   or directives?

16        A.   I did not.

17        Q.   Is that you (indicating)?

18        A.   Yes, sir.

19        Q.   On the night -- do you know if that was

20   the day in question?

21        A.   Yes, that was.

22        Q.   Okay.  Are you right-hand or left-hand

23   dominant?

24        A.   Right-hand.

25        Q.   When you fired your service firearm, did

Page 81

1    you do it with one hand or two hands?

2         A.   Two handed grip.

3              MR. PHILLIPS:  TC, you've got some

4    questions?

5    BY MR. PHILLIPS

6         Q.   We've talked about this a little bit.  Do

7    you know why St. Lucie County Sheriff's Office

8    responded to this incident and not Fort Pierce

9    Police Department?

10        A.   I couldn't tell.  Like I said, my

11   assumption was because it came from the school area,

12   and we cover the schools.

13        Q.   When did you first pull your firearm from

14   your holster, at what point in the sequence of

15   events?

16        A.   When I saw the gun.

17        Q.   Okay.  As the door was coming up?

18        A.   I didn't see the door coming up.  When I

19   turned -- when I -- because I was at the front door,

20   when I had turned, the door was already open and he

21   was standing there.

22        Q.   Okay.  Do you know how long from the time

23   you pulled your firearm out of your holster to the

24   time you shot?

25        A.   I couldn't tell you.  It was not

Page 82

 1    immediate.

 2         Q.    Why not, or what do you mean?

 3         A.    I was giving him orders to place the gun

 4    down, I just didn't pull my gun and shoot.

 5         Q.    Okay.  Do you know if you'd ever responded

 6    to any call of any type at 1501 Avenue Q before

 7    this?

 8         A.    None that sticks out in my mind.  I'm sure

 9    over my course of my career in the City of

10    Fort Pierce I might have been there for one reason

11    or another, or in the area, but nothing that I

12    recall ever being there for.

13         Q.    Okay.  Since this do you recall going

14    there or any neighboring houses?

15         A.    No, sir.

16         Q.    At what point did you feel threatened?

17         A.    At the point he was not placing the

18    firearm down and complying.

19         Q.    You didn't feel threatened when you saw

20    the gun?

21         A.    Not at first, no, sir.

22         Q.    Do your or Deputy Lopez' shoes indicate

23    that you're with St. Johns -- I did it again -- do

24    yours or Deputy Lopez' shoes indicate that you're

25    with St. Lucie Sheriff's Office?

Page 83

1      A.    Mine, do not, no.

2      Q.    Do your pants?

3      A.    My pants?  Not that I'm aware of, they

4  don't say anything.

5      Q.    Does your belt?

6      A.    Belt does not, no.

7      Q.    Does anything below your belt indicate

8  you're an Officer of the law?

9      A.    Nothing specifically says St. Lucie County

10  Sheriff's Office, but it's a typical police-issued

11  uniform, gear, duty belt.

12      Q.    Okay.  Is there, other than it's probably

13  a matching color, on the -- on the -- on the uniform

14  you were wearing January 14, 2014, what is

15  the -- going from bottom up, what's the first thing

16  that shows that you're a member of law enforcement?

17      A.    Badge.

18      Q.    Anything else?

19      A.    We have shoulder patches.

20      Q.    Do you recall or did -- well, we know you

21  didn't hear Officer Lo -- Deputy Lopez say it, but

22  do you recall saying that you were a member of law

23  enforcement or just, "gun, gun, put down the gun"?

24      A.    I'm sure at one point I said,

25  "Sheriff's Office."  I always announce who I am.

Page 84

1    Q.   Do you have a specific recollection of

2    what you said other than:  Gun, gun, put down the

3    gun?

4    A.   I believe I said something like:

5    Sheriff's Office; drop the gun.

6    Q.   Okay.  Every one of the bullets you fired

7    went through the garage door?

8    A.   I assume so.

9    Q.   Did you only fire four?

10   A.   I only fired four.

11   Q.   Who would be the best person to ask about,

12   or who would have been in charge of SWAT that

13   evening?

14   A.   Whoever the SWAT commander is.  I have no

15   idea.

16   Q.   Okay.  Was Officer threat -- was

17   Officer Lopez closer to the threat, closer to

18   Mr. Hill than you were?

19   A.   Yes, sir.

20   Q.   And you don't know if he pulled his gun?

21   A.   I could not testify to that, no.

22   Q.   And I know you said you usually do, but

23   can you testify that you identified, that you yelled

24   that you were a member of law enforcement or the

25   Sheriff's Office before firing at Greg Hill?

Page 85

1       A.   I can testify to that, because even

2   knocking on the doors and I'm yelling,

3   "Sheriff's Office, Sheriff's Office,

4   Sheriff's Office, Sheriff's Office."

5       Q.   Okay.  Certainly, when you were knocking,

6   and I want to -- that's 100 percent fair and I

7   appreciate that.  Now, when the door is coming up

8   and going down, do you have a specific recollection

9   of identifying yourself as law enforcement at that

10  point?

11      A.   I can't recall, but, like I said, that's

12  my standard, is to identify myself and give a

13  command.

14      Q.   Certainly.  Do you guys carry any type of

15  bullhorn or any voice amplification device in your

16  cruisers?

17      A.   No, we do not.  In the, like, handheld,

18  no, there's not, but in your patrol car, as part of

19  your siren bar and light capability, is a PA.

20      Q.   Correct.  You can sit in your car and

21  speak on the microphone and it will come through.  I

22  have had the unfortunate time of hearing that, "pull

23  over."

24           Okay.  Did you use that application at all

25  on January 14, 2014?

Page 86

1      A.   I did not, no.

2      Q.   Did anybody else that you heard?

3      A.   I do not remember.

4      Q.   Did you have any -- again, obvious

5  question, did you have any warrants with you related

6  to Mr. Hill or the occupants on January 14, 2014?

7      A.   No, I didn't.

8      Q.   Was he being investigated for any other

9  criminal activity?

10     A.   Not by me.

11     Q.   Okay.  We have gone about two hours.  Is

12 there anything you want to add to your statement,

13 anything that you feel that I have missed that I

14 need to know?

15     A.   No, sir.

16          MR. PHILLIPS:  Okay.  Thank you.

17 That's all I have.

18          MS. BARRANCO:  I have no questions,

19 and he will read.

20          (Deposition concluded at 11:19 a.m.)

21

22

23

24

25

Page 87

1    STATE OF FLORIDA        )
                             :  SS
2    COUNTY OF ST. LUCIE  )

3

4                  CERTIFICATE OF OATH

5        I, SUZANNE K. BADLEY, a Notary Public of the

6    State of Florida at Large, authorized to administer

7    oaths, certify that Christopher Newman was by me

8    first duly sworn to tell the truth.

9        Dated this 4th day of October, 2016.

10

11                         _____
                          SUZANNE K. BADLEY
12                         My Commission Expires:
                          August 16, 2019
13

14

15

16

17

18

19

20

21

22

23

24

25

Page 88

1    STATE OF FLORIDA        )
                             :  SS
2    COUNTY OF ST. LUCIE  )

3

4                 REPORTER'S CERTIFICATE

5

6         I, SUZANNE K. BADLEY, a Shorthand Reporter,

7    certify that the foregoing deposition, Pages 1

8    through 86 inclusive, of Christopher Newman was

9    stenographically reported by me and is a true and

10   accurate transcription of said deposition of

11   Christopher Newman. .

12            I certify further I am neither

13   attorney nor counsel for, nor related to, nor

14   employed by any of the parties to the action

15   in which the deposition is taken and, further,

16   that I am not a relative or an employee

17   of any attorney or counsel employed in this

18   case, nor am I financially interested in the

19   outcome of this action.

20        Dated this 31st day of October, 2016.

21

22        _____
                 SUZANNE K. BADLEY

23

24

25

```
1    VIOLA BRYANT v. SHERIFF KEN MASCARA

2    DEPOSITION OF CHRISTOPHER NEWMAN

3                        ERRATA SHEET

4    PAGE LINE   READS              SHOULD READ

5    ____ ____  _____    _____

6    ____ ____  _____    _____

7    ____ ____  _____    _____

8    ____ ____  _____    _____

9    ____ ____  _____    _____

10   ____ ____  _____    _____

11   ____ ____  _____    _____

12   ____ ____  _____    _____

13   ____ ____  _____    _____

14   ____ ____  _____    _____

15   ____ ____  _____    _____

16   ____ ____  _____    _____

17   ____ ____  _____    _____

18   ____ ____  _____    _____

19   ____ ____  _____    _____

20

21   Under penalties of perjury, I declare that I have read the
     foregoing document and that the facts stated in it are
22   true.

23

     _____
24   DATE                     CHRISTOPHER NEWMAN

25   CC:
```

Page 90

1                                        October 31, 2016

2    Christopher Newman c/o
     Summer M. Barranco, Esq.
3    Purdy, Jolly, Giuffreda & Barranco, P.A.
     2455 East Sunrise Boulevard, Suite 1216
4    Fort Lauderdale, Fl 33304

5    In Re:  October 4, 2016 deposition of Christopher Newman
                Viola Bryant, et al v. Sheriff Ken Mascara, et al.
6
     Dear Sir:
7
          This letter is to advise that the transcript for the
8    above-referenced deposition has been completed and is
     available for review.  Please contact our office at
9    (800)635-9193 to make arrangements for read and sign or
     sign below to waive review of this transcript.
10
          It is suggested that the review of this transcript be
11   completed within 30 days of your receipt of this letter,
     as considered reasonable under Federal Rules*; however,
12   there is no Florida Statute to this regard.

13        The original of this transcript has been forwarded to
     the ordering party and your errata, once received, will be
14   forwarded to all ordering parties for inclusion in the
     transcript.
15
                                    Sincerely,
16

17
                                    Suzanne K. Badley
18                                  Court Reporters, Inc.

19   CC:

20   Waiver:

21   I, _____, hereby waive the reading &
     signing of my deposition transcript.
22

23   _____    _____
     Deponent Signature                  Date

24   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e).

25

**A**

**a.m** 70:22,22 86:20
**able** 9:21 70:20
**abnormal** 14:10
**above-referenced** 90:8
**ABT** 8:13,14
**academy** 7:6,12
**accidents** 23:15
**account** 55:4
**accurate** 88:10
**accusations** 33:11
**achieve** 7:4
**acknowledge** 74:11
**acknowledges** 74:14
**act** 56:6
**acting** 66:16
**action** 77:19 88:14 88:19
**activity** 86:9
**add** 86:12
**address** 14:2,2
**administer** 87:6
**administration** 11:5 79:12
**administrative** 12:9 34:23 36:8,9 36:10,11,14,18
**admit** 34:7
**advise** 75:13 90:7
**advocate** 65:8,9 66:10
**Affairs** 61:14,16,18 61:25 62:3
**affirmatively** 50:3
**African** 32:24
**aftermath** 29:21
**afternoon** 14:9
**agent** 8:17
**aggravated** 56:10 66:3
**ago** 79:2
**agree** 19:1 45:16 49:6 58:1
**ahead** 41:14 51:11 56:3 63:10 67:12 69:10 78:4
**aimed** 26:14 48:15

48:17 69:17,22
**aiming** 69:19
**al** 90:5,5
**alcohol** 70:4
**Alcoholic** 6:3
**alerted** 37:25
**allegation** 68:23
**allegedly** 23:20
**allowed** 10:3 61:7 77:12,14
**alongside** 23:8
**aloud** 4:23
**ambush** 38:3
**Amendment** 65:8,9 65:10,12,16,19,23 66:11
**American** 32:24
**amplification** 85:15
**angle** 46:17
**annex** 16:8
**announce** 83:25
**answer** 4:23,25 5:10 9:16 13:17 19:15 39:19 41:20 50:23 72:10
**answering** 40:16
**anybody** 17:8 18:9 18:12 23:23 28:18 33:7,11 39:4 48:18 52:23 53:23 58:18,25 60:23 64:2,6 86:2
**anybody's** 65:10
**apex** 44:6
**apologize** 66:8
**apparently** 29:20 70:25
**APPEARANCES** 2:1
**appears** 73:8
**application** 85:24
**apply** 4:18,22
**appreciate** 67:19 85:7
**appropriate** 24:24
**area** 11:1 16:11 19:20 22:21 32:7 32:10 47:19,22 48:7 69:20 72:16

81:11 82:11
**areas** 9:15
**armed** 38:2 39:7 55:15 59:13 63:15
**armored** 61:6 62:16 63:4
**arrangements** 90:9
**arrest** 30:1,10,14 31:1,7,11 32:12 32:13 34:4
**arrested** 22:5 29:20 29:25 30:9 31:20 31:23,25 34:3 37:12
**arrestee** 33:7
**arresting** 32:19
**arrived** 25:6,7
**arriving** 14:1,8 15:17
**asked** 31:18 50:5 52:16 57:2 59:5 80:8
**asking** 15:7 24:2 44:2
**asks** 16:17
**ASP** 25:19,19
**aspect** 53:11
**aspects** 38:21
**assault** 56:10 66:3
**assessment** 19:2
**assign** 77:13
**assigned** 9:5,7,18 10:10,16,18,19 21:16,24
**assistance** 9:17 59:16
**association** 31:16
**assume** 42:22,24 45:10,11 84:8
**assumed** 42:11,14 47:25
**assumes** 29:1
**assuming** 45:8 46:25 67:6
**assumption** 81:11
**ATF** 8:12
**attempt** 39:21,22 42:15
**attempted** 39:5

40:21
**attorney** 1:18 24:6 24:7 31:15 36:25 88:13,17
**attorney/client** 24:2
**August** 87:12
**authorized** 87:6
**automatic** 42:8
**available** 90:8
**Avenue** 14:4,6,9,25 15:11,18 16:11 21:1,4,25 22:19 29:5,8 40:3 61:3 73:25 74:2,22 82:6
**aware** 13:15,20,25 16:14 17:13 20:16 35:10,11,11,13 37:10 49:9 52:1,6 60:25 64:20 72:6 72:7 73:7 78:23 83:3

**B**

**back** 6:8 11:19 21:13 23:16 38:3 38:5,6 43:6 46:22 47:3 49:7,12,14 49:22,24 51:17 52:18,19 53:13 54:25 70:21 73:21 74:19 78:18
**background** 28:22 29:1
**backing** 23:16
**backup** 15:9 21:6,8 21:17 76:21 77:14
**bad** 8:9
**Badge** 83:17
**Badley** 1:19 87:5 87:11 88:6,22 90:17
**bang** 25:20
**banged** 25:11
**bar** 85:19
**Barranco** 2:6,6 5:20 24:1 34:25 35:3,21 41:13

51:10,20 56:2 63:9 64:25 67:11 69:4,9 72:23 78:3 86:18 90:2,3
**barricaded** 55:15 55:16,17 59:13,14
**base** 55:2
**based** 6:5 41:1 67:24
**basically** 12:5 43:23 44:25 55:18 64:22
**beach** 6:7 9:1 58:20
**began** 40:23 63:13
**beginnings** 62:18
**belief** 63:11
**believe** 7:13 8:3 10:17 12:17 16:12 16:18,19 19:12 21:1 30:6,18 31:17 34:21 36:1 36:13,22 47:19 49:21 53:22 54:19 57:13 71:12 74:12 78:13 84:4
**belt** 83:5,6,7,11
**bending** 43:14
**best** 84:11
**better** 35:2 60:1
**Beverages** 6:4
**biased** 33:9,12
**big** 65:8,8 66:10
**bit** 41:7 81:6
**bitch** 24:22
**Bits** 19:6
**black** 72:13
**Blatchford** 54:20
**block** 15:1,1,13 20:25 22:19,19 38:16,19,21
**blocked** 48:4
**blocks** 15:12,13
**body** 17:8 46:7,10
**bomb** 71:17
**born** 6:14
**boss** 50:25 51:1
**bottom** 27:16 47:13 47:15 49:22 83:15
**Boulevard** 2:4,7

90:3
**breach** 67:23
**break** 5:12 13:19
  52:24 70:20,22
**breath** 5:10
**briefly** 52:20
**Briglia** 61:8
**bring** 54:22
**bringing** 47:4,5,24
**brought** 63:12
**brown** 74:2
**Bryant** 1:4 89:1
  90:5
**building** 11:11 52:7
**bullets** 63:24 84:6
**bullhorn** 85:15
**Bureau** 61:13
**burned** 7:1 18:22
**busy** 58:22
**butt** 49:22
**butterfly** 39:14

**C**

**C** 4:1
**c/o** 90:2
**CAD** 43:3
**caffeine** 70:15
**caffeines** 70:14
**caliber** 77:17
**call** 5:4 10:21 14:20
  14:23 15:21,23
  16:23,23 19:9,12
  19:17,19 20:4,20
  20:23 21:4,10,13
  21:15,25 22:15
  29:3 35:23 36:2
  38:15 61:24 62:21
  73:19,20 74:1,20
  74:21 82:6
**call-out** 40:1 52:20
  59:11
**call-outs** 54:12
**called** 4:5 12:4 36:3
  36:6 38:8 52:14
  54:22 62:15
**caller** 16:19 74:4,5
**calling** 16:19 59:17
  75:1
**calls** 9:16 16:1,10

16:15 66:5 73:18
  78:19
**cam** 17:5
**camera** 17:5,14
  53:9,10
**cameras** 17:17
**cams** 18:8,8
**cancel** 74:16
**candor** 49:14
**canisters** 62:11
**capability** 85:19
**capable** 71:19
**Capacity** 1:8
**Captain** 79:15,23
  80:2
**Captains** 11:4
**car** 9:18,19 10:2,6
  12:14 17:4 19:11
  19:13 21:2 54:22
  64:22 71:7 72:21
  85:18,20
**care** 57:22
**career** 32:9 82:9
**carry** 77:14 85:14
**cars** 38:5
**cartoon** 18:22
**carved** 38:20
**case** 1:3 34:14,15
  34:18 75:17 88:18
**cases** 37:3
**cause** 30:8,9
**CC** 89:25 90:19
**CD** 23:20,23 24:8
**center** 69:23
**certain** 18:20,25
  19:4 77:17,19
**Certainly** 39:13
  41:24 59:19 68:22
  69:1 71:8 85:5,14
**certainty** 49:13
**Certificate** 3:6,7
  87:4 88:4
**certify** 87:7 88:7,12
**changed** 63:14
**changes** 16:9
**channel** 75:5 78:16
  78:18
**channels** 75:3
**charge** 84:12

**charged** 12:20
**charges** 13:11
**checking** 75:2
**Chief** 79:22,25
**child** 52:7,15,17
**Christopher** 1:9,13
  3:4 4:4,11 87:7
  88:8,11 89:2,24
  90:2,5
**CI** 79:15
**CID** 61:13
**cinder** 38:16,19,21
**citizen** 66:16
**city** 5:25 8:25 15:23
  15:25 16:12 82:9
**civil** 34:14,15,18
  90:24,24
**claim** 68:20,21,23
**claims** 33:7
**clarify** 72:24
**close** 37:9 66:19
**closed** 27:23 28:17
  44:23 51:23 52:2
  55:7,11
**closer** 57:6 84:17
  84:17
**closing** 47:23 71:21
  71:25
**clue** 35:14
**co-relation** 22:12
**Code** 40:7
**Coke** 70:15
**Colangelo** 54:7,10
  54:13
**color** 83:13
**come** 11:1,19 38:10
  41:24 50:21 52:18
  54:10 66:6 70:10
  70:21 85:21
**comes** 20:4 65:5
**coming** 5:17 19:17
  22:25 25:8,10
  26:17,24 38:2,3
  47:9,9,18,19,22
  48:3,4,5 55:19,22
  55:25 56:13 60:1
  60:2 70:7 81:17
  81:18 85:7
**comings** 65:21

**command** 52:12
  85:13
**commander** 84:14
**comments** 46:8
**Commission** 87:12
**committed** 40:21
  56:5,8,9 66:1
**communicated**
  19:23
**communications**
  24:3
**complaint** 19:25
  20:18 40:10 52:1
  63:3 74:6
**complaints** 33:16
**completed** 90:8,11
**comply** 63:13 66:14
**complying** 82:18
**computer** 40:12
**conceal** 66:12
**concealed** 47:16
**concealment** 27:25
  28:2,4
**concerned** 52:15
  56:9
**concluded** 86:20
**concrete** 45:14
**conducting** 72:8
**conference** 50:24
**confronted** 66:15
**conjunction** 77:11
**considered** 90:11
**Constitution** 65:7
  65:11
**constitutional**
  64:24 65:4 66:20
**construction** 38:15
**contact** 69:15 74:5
  90:8
**contacts** 57:18 58:4
  58:6
**context** 76:3
**continue** 25:4
**continues** 37:20
**control** 62:13
**conversation** 5:4,7
  5:8,9
**conversations** 24:8
  31:15 80:6

**cop** 12:4
**Cops** 79:4
**copy** 73:19
**core** 24:16,16
**corner** 72:17
**correct** 29:4 68:4,8
  85:20
**correctly** 78:2
**counsel** 88:13,17
**counting** 27:16
**county** 1:9,16 6:16
  8:8,10,21 9:4,13
  9:13 10:23 13:8
  13:13,21 16:6,14
  17:7,14,16 32:17
  33:3 40:11 52:5
  53:24,25 62:1
  79:10 81:7 83:9
  87:2 88:2
**couple** 25:11,24
  29:25 57:13 71:13
  76:19
**course** 77:24 82:9
**court** 1:1 53:2,3,6
  90:18
**cover** 16:18 28:1,3
  28:5 38:6,9 61:8
  81:12
**covered** 47:15
  54:25
**crime** 8:6 32:6
  40:17,20,21 41:3
  41:10 56:5,8 66:1
  66:2
**criminal** 20:12 56:6
  79:15 86:9
**criminal-like** 31:5
**crossed** 47:12
**crouching** 43:15
**cruisers** 85:16
**cues** 4:23
**curfew** 29:22,22
  30:13,15,17,19
  31:21,24 32:2
  34:3 71:24
**current** 9:3
**Currently** 9:5
**cut** 5:5 51:6 70:25

**D**

**D** 4:1
**dash** 17:5
**date** 1:14 36:24
  89:24 90:23
**Dated** 87:9 88:20
**day** 11:15,20 14:10
  19:1 21:23 31:18
  35:25 42:15,18
  53:16 58:14 61:19
  70:17 72:25 80:20
  87:9 88:20
**days** 13:7 36:1,15
  36:16 90:11
**deal** 32:15
**dealing** 4:24 47:7
**Dear** 90:6
**death** 34:10
**deceased** 49:4
**decide** 41:18
**decided** 7:1
**decision** 60:15
**decisions** 59:20,23
**declare** 89:21
**deduce** 76:18
**DEFENDANT** 2:6
**Defendants** 1:10
**defense** 68:24
**degree** 46:17 59:12
  69:16
**demonstrating**
  26:3
**demotions** 9:9
**department** 6:1
  7:10,17 8:12 12:1
  12:11,19,25 16:4
  31:12 35:18 79:4
  81:9
**departments** 61:24
**depicted** 70:24
**deployed** 53:10
**deponent** 37:1
  90:23
**deposition** 1:13
  4:19,20 34:14,17
  35:4 86:20 88:7
  88:10,15 89:2
  90:5,8,21
**depositions** 34:24

**Deputies** 51:6
  66:17,20 76:8
**Deputy** 4:12 14:25
  15:7 16:17,17
  21:2,4 25:9,14,25
  28:11 37:25 38:4
  39:11 40:24 41:17
  41:19,21 43:18
  44:16 46:19 51:14
  54:16 55:3 56:15
  57:4,6 61:4 63:14
  64:16 67:3,5
  69:20 72:19 74:15
  75:9,24 76:4
  79:22,25 80:1
  82:22,24 83:21
**describe** 12:7 32:4
  76:10
**described** 32:3
**detail** 20:6 68:1
**detailed** 17:23
**details** 44:2 67:22
**detained** 22:1
**Detective** 7:24
  20:25 22:3 53:22
  54:2,19,20 61:8,9
  61:13
**Detectives** 7:25
  31:18 53:17 61:16
  76:9
**detector** 58:15
**detectors** 58:19
**determination**
  48:23
**determine** 67:22,23
**determined** 21:7
**develop** 6:19
**device** 85:15
**devices** 17:5,9
**difference** 28:2
**different** 10:1,6
  12:6 14:14 16:24
  24:17,17 39:21
  41:7 77:23
**digital** 73:9
**diploma** 7:5
**Direct** 3:5 4:7
**direction** 40:24
**directives** 80:15

**directly** 46:20
  69:12,22
**disagrees** 78:1
**discipline** 11:25
  12:10,20,24 13:3
  13:9
**discover** 22:16
**discovery** 22:15
**dispatch** 17:2 19:10
  25:7 43:4 55:13
  73:10,11,12 78:8
  78:19
**dispatched** 15:4
  16:21 17:3
**distance** 57:8 67:3
**distinction** 11:3
**DISTRICT** 1:1,1
**disturbance** 19:20
  74:1
**Division** 6:3
**doctor** 57:23 58:10
  58:12
**doctors** 57:24
**document** 73:5,6
  76:2 89:21
**doing** 30:8 31:4
  55:20 56:19
**dominant** 80:23
**door** 25:12,14,15
  25:20,22 26:2,17
  26:20,21 27:8,23
  27:25 28:23 29:5
  29:9 37:18 38:13
  40:3,16,20,22
  41:8,20 42:9,16
  42:20 43:7,8,13
  43:17,21,24,25
  44:5,23 45:24
  46:9,11,14 47:5,9
  47:14,15,17,23,25
  48:3,4 51:23 52:2
  55:7,11,25 56:20
  63:12 66:6,19
  68:7 69:16 70:25
  71:21,21,25 81:17
  81:18,19,20 84:7
  85:7
**doors** 85:2
**draw** 56:22

**drew** 26:8
**drive** 8:25
**driveway** 23:4,8
  25:9,25
**Driving** 15:19
**drop** 26:9,11,16
  41:5 46:8,25
  63:13 66:7 84:5
**drug** 70:1,4
**duly** 4:5 87:8
**dumb** 22:11
**duration** 36:21,22
  68:3,17
**duties** 9:14
**duty** 18:14,14 59:7
  59:9 76:21 83:11

**E**

**E** 4:1,1
**ear** 45:20
**early** 7:13 11:15
**Easier** 23:18
**east** 2:7 23:1 25:13
  39:2 45:20,21
  90:3
**eat** 70:10
**education** 7:3
**effect** 30:19 51:5
  63:23
**eight** 7:21
**eight-hour** 14:15
**either** 13:11 20:11
  48:15,15,24
**eliminate** 27:22
**eliminated** 34:9
  37:14,15
**emergency** 78:19
**employed** 5:14
  88:14,17
**employee** 88:16
**employment** 13:3,4
**en** 74:7
**encounter** 34:2
**encountered** 29:11
**endurance** 5:11
**enforcement** 6:20
  6:21 7:11 9:16
  32:9 34:19 56:10
  56:12 80:1 83:16

**83**:23 84:24 85:9
**English** 73:14
**enjoyed** 6:20
**entire** 51:22 63:14
  68:3,14,17
**entirely** 68:10,16
**entity** 13:21
**entries** 73:16
**equal** 67:3
**Eric** 4:11
**errata** 3:7 89:3
  90:13
**escalated** 39:22
  63:7
**especially** 16:2
**Esq** 2:2,3,6 90:2
**established** 41:9
**Estate** 1:5 4:15
**estimate** 32:18
**et** 90:5,8
**evening** 62:5 80:7
  80:12 84:13
**event** 44:3 75:5
  78:17
**events** 17:24 81:15
**eventually** 48:25
**everybody** 64:22
  65:7 75:13 78:15
**evidence** 63:23
  66:23
**evolved** 63:3
**exactly** 31:2
**Examination** 3:5
  4:7
**examined** 4:6
**excessive** 33:8,15
**Excuse** 65:15
**EXHIBITS** 3:13
**exonerated** 13:12
**Expires** 87:12
**explain** 73:15
**explanation** 57:3
**exposed** 44:17
  45:24
**extent** 4:18 19:24
  24:2 64:19 73:13
  79:18
**exterior** 68:7
**extremely** 68:2

extruded 49:19
extruding 49:20
eye 17:8 57:23
eyes 44:17,19,21

**F**

face 39:12 45:24
46:9,13,14
fact 80:8
facts 22:17 34:2
48:24 67:24,25
68:25 89:21
fail 66:14
fair 7:3 23:18 24:4
28:14 32:10 35:6
37:17,20 38:16
56:22 59:13 85:6
fairly 14:17 70:20
false 68:24
familiar 14:6
familiarity 10:14
family 22:13 37:9
52:14 72:9
fan 38:22 39:14
far 6:17 15:10
19:18 20:7 34:19
39:10 54:18 56:4
56:9 64:20 65:1
75:19 79:1,3
farther 23:1,2
fast 42:12
FDLE 35:9,13,15
Federal 90:11,24
feel 65:22 82:16,19
86:13
feels 37:2
feet 25:24 27:12
fellow 55:5,12 61:2
felony 20:13
figure 41:6
file 33:21
finally 61:6
financially 88:18
find 41:24 59:25
67:22
fine 12:23 19:16
31:3 36:5 41:23
fingerprint 15:7
21:2

fingers 53:7
finish 11:19
fire 27:18 60:16,18
64:2,7 84:9
firearm 41:3,11
50:20 68:11,14
77:11 80:25 81:13
81:23 82:18
fired 27:4,13 38:1
38:12 43:1 55:7
55:12,14,20 56:1
56:1,5 58:23
63:24 64:1,4,10
72:15 74:23 75:10
80:25 84:6,10
firefighters 6:25
firing 54:13 84:25
first 4:5 6:19 7:10
7:18 14:20 27:17
64:5 65:9 73:16
75:10 81:13 82:21
83:15 87:8
firsthand 55:3 62:9
five 6:22
five-to-six 27:12
FK 19:20
Fl 2:4,7 90:4
float 21:22
floats 12:3
Florida 1:1,17,20
6:3,13 40:7 87:1,6
88:1 90:12
Floridian 6:12
followed 70:8
following 53:16
follows 4:6 57:21
force 12:6,6 33:8
33:15 68:20
foregoing 88:7
89:21
form 34:25 35:21
41:13 51:10,20
56:2 61:18 63:9
64:25 67:11 69:4
69:9 71:14 78:3
Fort 1:17 2:7 6:1,6
6:14 7:10,14,17
7:25 8:4,5,11 12:1
12:10,19,25 16:3

16:6 31:12 32:4
32:16,16 33:1,6
33:10,17 81:8
82:10 90:4
forwarded 90:13
90:14
foul 24:11,12,14
found 13:12 23:20
foundation 43:9
four 11:16 27:6,17
37:18 45:4 46:4,5
63:19 64:1 84:9
84:10
four-thirds 5:9
Fourth 65:10,12,16
65:19,23
frame 40:2,2 45:3
Frances 30:5
free 38:20
friends 8:16
front 25:12,14,15
38:4,13 41:17
44:20 46:20 52:11
54:24 55:1 61:5
63:12 72:21 81:19
fuck 24:20
full 4:9 50:11
fully 69:3
funny 18:19
further 6:8 27:10
88:12,15

**G**

G 4:1
gangs 7:20,23 8:1
garage 25:11,11,13
25:14,22 26:1,2
26:17,19,21 27:1
27:8,23,25 28:16
28:17 38:16 40:19
41:3,8,11 42:7,9
42:16,20 43:7,8
43:13,21,24,25
44:5,10 45:12,14
45:17,24 47:5,8
47:15,17,25 50:19
51:18,23 52:2
55:7,11 56:20
69:16 72:21 74:3

84:7
gas 60:16,18 62:5
62:11,11,14 63:4
64:8,10
gear 83:11
generally 5:2 11:22
gentleman 22:1
68:10 79:5
gentleman's 22:8
gentlemen 79:18
getting 7:1 15:21
19:19 52:13
Giuffreda 2:6 90:3
give 20:5 34:14,17
45:3 61:17,20
85:12
given 4:20 61:1
giving 52:13 57:24
80:14 82:3
glanced 44:22
glasses 57:14 58:5
Glock 77:24 78:10
go 4:19 6:20 8:11
11:17 12:6 13:20
35:24,24 39:7,25
41:14 43:24 46:22
51:11 52:19 53:13
56:3 59:11 63:10
67:12 69:10 78:4
goal 6:9 7:4
goes 75:19
going 4:16 26:21
43:6 45:20 52:24
61:3 70:16 73:5
74:17,20,21 75:3
82:13 83:15 85:8
goings 65:21
gonna 24:1 26:25
52:18 74:12,24
good 7:15 8:9 18:24
37:11 53:1 79:9
Google 72:13 73:3
gotta 72:4
gotten 19:9 68:6
70:10
grade 59:18
graduated 7:12,14
grassy 72:16
Greg 4:15 23:21

36:14 46:21 59:3
84:25
Gregory 1:5 22:13
29:12 34:8,11
57:7
grief 79:9
grieved 12:16
grip 81:2
ground 27:11 44:7
48:9,11 66:17
69:3
group 37:4
guarantees 65:20
guess 5:5 7:15 11:8
13:19 28:15 39:1
55:6,24 60:18
guessing 45:22
gun 26:4,5,8,8,9,10
26:11,14,15,16,18
26:20,24 40:23,23
41:5,17,22 46:8,8
46:8,22,23,25
47:4,14,16,18
48:4,5,8,10,15,19
48:21,25 49:1,6,9
49:12,14,15,17,18
49:19,22 50:1,4,6
50:11 54:14 56:11
66:6,8,9,12,16
67:8 69:1,2,7
76:11,19 77:19,24
78:1 81:16 82:3,4
82:20 83:23,23,23
84:2,2,3,5,20
guns 76:20
guy 15:8
guys 85:14
gypsy 12:4

**H**

hair 44:13
half-hour 30:25
hand 26:2,4,5,19
40:23 41:18 42:13
43:17 47:8,9
49:15,17,25 50:7
81:1
handed 81:2
handgun 63:12

76:15
**handheld** 85:17
**handle** 25:16
**handled** 16:10
**handles** 15:25
**handling** 16:15
**hands** 81:1
**happen** 23:15
**happened** 14:10,17
21:14 37:23 53:18
55:4 64:21
**happens** 21:12
**hard** 24:16,16
**head** 4:23 39:8 40:8
43:18 45:15 57:20
76:25
**heading** 74:12
**hear** 22:23 25:18
25:20 28:8,13,15
28:15,18 45:6
55:21 57:2,3 64:2
64:5,6 67:9 80:14
83:21
**heard** 15:6 23:23
24:20 25:21 28:7
28:11 47:1 61:25
63:22 66:23,24,25
86:2
**hearing** 22:22
24:10,19 85:22
**heavy** 24:16
**held** 34:24
**helicopter** 63:3
**help** 16:2 24:18
28:20 42:5 78:7
**helps** 21:17
**hides** 28:4
**high** 7:5 8:6 32:6
44:9
**high-crime** 32:10
**highest** 43:19,21,22
44:8
**Hill** 1:5 4:15 13:23
22:13 25:24 26:1
26:16 28:6,22
29:12,20 31:8
34:3,8,11 36:14
39:23 40:21 41:11
41:25 42:19 43:11

43:13,23 46:21
49:4,4 50:20
51:23 57:4,7 59:3
59:9 63:19,23
66:23 71:22 72:1
72:4 84:18,25
86:6
**Hill's** 23:21 44:21
45:23 46:22,23
65:22
**Hills** 44:19
**hip** 47:19,22 48:7
**hired** 7:13
**Hispanic** 32:25
**history** 29:3 33:11
**hit** 5:18 38:11
**hold** 72:14
**holding** 42:13
**hole** 70:25
**holster** 81:14,23
**home** 9:21 10:3
30:25 38:15 55:17
59:13 68:11,16,19
**homeowners** 66:6
**honest** 64:4
**Honestly** 40:10
**hour** 52:24
**hours** 52:10 77:1
86:11
**house** 25:7 38:4,7
38:12,24 42:21
43:9,9 50:19
52:11,15 54:24,25
55:1 58:25 59:1
61:5 74:2
**houses** 41:20 82:14
**human** 69:8
**hurricane** 30:1,3,5
**hurricanes** 29:21
30:6
**hurt** 75:5

**I**
**ID** 15:8
**idea** 6:19 43:10
48:20 52:3 56:24
57:1 58:25 60:14
62:8 63:21,25
69:18 71:16,18

84:15
**identified** 84:23
**identify** 50:3 79:19
85:12
**identifying** 50:13
85:9
**immediate** 40:24
54:6 56:13 82:1
**immediately** 41:22
**imminent** 56:15
**important** 65:11
**impute** 52:4
**in-service** 15:6
73:21 74:19
**incident** 9:6,10,24
10:12,15 13:16
23:19 24:8 55:4
58:2,7 68:4,17
70:4 71:24 72:25
81:8
**including** 37:6
**inclusion** 90:14
**inclusive** 88:8
**income** 8:6 32:6
**indefinite** 35:19
**independent** 29:23
**INDEX** 3:1
**indicate** 82:22,24
83:7
**indicated** 69:21
**indicating** 72:16,20
79:18 80:17
**influence** 70:3
**information** 58:24
63:18 76:13 78:9
**informed** 62:5
**infractions** 9:16
**initial** 15:22
**initially** 15:21
**injected** 62:6,12
**inside** 75:14,17
**Integrity** 61:24
**intending** 40:13
**interested** 88:18
**Internal** 61:14,15
61:18,25 62:3
**interpretation**
24:18
**interview** 64:13,16

**interviewed** 13:22
**interviews** 31:18
**intoxicated** 41:25
**investigated** 13:16
13:23 35:9,12
86:8
**investigating** 32:15
32:19 40:4 72:4
**investigation** 28:22
29:2 34:23 37:19
42:24 55:8 72:8
**Investigations** 7:20
79:16
**investigative** 79:15
**involved** 52:6 53:10
60:15 75:12,20
**involvement** 71:9

**J**
**Jackson** 74:11,18
**Jacksonville** 2:4
9:1 32:23
**January** 11:23
13:24 14:9 17:25
17:25 18:3 19:5
29:12 53:14 58:11
60:13 65:23 70:7
77:21 80:4 83:14
85:25 86:6
**Jeanne** 30:5
**JIM** 2:9
**job** 7:11 9:14 18:24
67:21
**John** 2:2,3 4:14
79:9
**John's** 53:24
**Johns** 79:9 82:23
**Jolly** 2:6 90:3
**jphillps@floridaj...**
2:5
**JR** 1:5
**judgment** 37:1,2
**jurisdiction** 16:4,5
16:5
**jury** 67:22
**justifiable** 68:20
**Justin** 74:11,18

**K**
**K** 1:19 87:5,11 88:6

88:22 90:17
**Keep** 74:17
**keeping** 42:12
**Kel-Tec** 76:16
78:13
**Kel-Tecs** 76:22
77:2
**Ken** 1:8 89:1 90:5
**kept** 26:8 71:7 79:2
**kids** 20:3 27:1
75:16
**kill** 27:21 63:24
**killed** 34:8 68:19
**kind** 4:18 8:4,6
16:4 17:21 18:19
18:21,24 21:11
24:12,18 26:16
32:4,6,6 34:1
38:16 39:25 40:1
43:17,20 44:14,15
46:17,18 47:13,15
49:13 52:19 55:9
58:19 59:11 61:14
63:2 69:17 72:17
73:16 78:7
**Klan** 37:7
**Klux** 37:7
**knees** 69:18
**knew** 8:16 12:12
54:18
**knocked** 25:17
28:23 29:5,8 40:3
**knocking** 85:2,5
**know** 5:5,8,13 6:9
6:10,24 9:12
10:20 11:14 12:23
14:12 15:16 16:22
17:1,15 18:24
19:15,23 20:21,22
21:12,21,23 22:5
22:7,10,11 23:11
24:19 25:5 27:12
31:4,14,17 32:23
33:1,3 34:15
35:15 36:20 37:6
37:15,18 38:1,14
39:4,19 42:1,5
43:6,7,11,22 44:3
44:5,7,20,25 45:6

45:22,23 46:6,7,9
47:13 48:19,21
49:13,16 50:23
53:7 55:2 56:4,17
57:19 58:9 59:19
59:22 60:2 61:22
62:1,4,7,15 66:24
66:25 67:3,17,23
67:25 69:14,14,17
71:3,14,15,16
72:11 74:13 75:15
75:22 76:14,17
78:12 79:3,5,13
79:14,16 80:11,13
80:19 81:7,22
82:5 83:20 84:20
84:22 86:14
**knowing** 41:4
**knowledge** 29:11
29:13 41:2 52:5,8
62:10 63:8 71:25
72:2
**known** 53:6
**Ku** 37:7

**L**

**lack** 59:25
**language** 24:11,12
**Large** 1:20 87:6
**largely** 45:14
**Lauderdale** 2:7
6:14 90:4
**Laughter** 37:5
**law** 2:3 6:20,21
7:10 32:8,13
34:19 56:10,12
80:1 83:8,16,22
84:24 85:9
**laws** 28:21
**lay** 16:7
**leadership** 21:12
**learn** 30:8 31:16
62:25 63:1
**learned** 29:15
**leave** 12:4 36:8,9
36:10,11,14,18
43:2
**leaving** 12:14 15:17
43:4

**LeBeau** 53:22 61:9
**led** 35:18,18 76:17
**leeway** 30:25
**left** 12:1 19:8 26:2
26:19 38:4 47:8
53:14 79:19,19,21
**left-hand** 80:22
**legal** 2:9 55:25
**let's** 13:19,19 39:25
45:11 59:11
**letter** 3:8 90:7,11
**level** 24:17 69:17
**life** 18:21 56:15
**lift** 42:16
**lifted** 42:19,20
**light** 29:19 85:19
**liked** 6:24
**limit** 59:6
**limited** 37:6 74:24
75:4
**line** 59:7,9 67:19
89:4
**listened** 23:19,24
**little** 23:16 41:7
70:19 76:14 81:6
**lived** 6:15 63:19,23
**LLC** 2:3
**Llima** 73:20
**Lo** 83:21
**loaded** 48:19 49:1
**lobbied** 33:16
**locally** 17:16 79:4
**location** 39:22
**lockdown** 75:19,20
**locked** 55:18
**log** 73:10
**logged** 25:6
**logs** 43:4
**long** 5:14 6:15
15:14 43:1 44:17
45:4,23 46:3 61:4
81:22
**longer** 36:20 43:25
**look** 9:15 16:8
32:21 33:25 39:5
39:9,21,22 40:11
76:24
**looked** 25:21 26:16
34:4 42:13 47:2

78:2,9
**looking** 12:22 26:3
33:19 43:3,18
44:16 47:3 76:20
76:22,23
**looks** 38:21 75:12
77:25 79:21
**Lopez** 10:15 20:24
21:2,4 23:1 25:9
25:14,25,25 26:3
26:25 27:1 28:11
36:17 37:25 38:4
39:11 43:18 44:16
46:19 47:3 48:16
51:14 54:16,23
55:1,3 56:18,19
56:22 57:4,6 61:4
64:16 67:3,5
69:22 72:18,19
74:15 75:9,24
78:1 83:21 84:17
**Lopez'** 21:18 56:15
69:20 82:22,24
**lost** 47:18 69:15
**lot** 8:22 24:20,22
**loud** 20:1 21:4
24:11 25:19 26:10
26:15 63:14 67:4
67:10 68:2 74:4
**louder** 25:21 45:17
68:6
**low** 32:6
**low-income** 32:9
**lower** 8:6 51:3
69:18
**lowered** 44:6
**lowest** 27:17
**Lucie** 1:9,16 6:16
8:8,21 9:4,13,13
10:23 13:8,13,21
16:6,14 17:7,14
17:16 32:17 33:3
49:2 52:5 53:25
62:1 79:9,10 81:7
82:25 83:9 87:2
88:2
**lungs** 26:10

**M**

**M** 2:2,3,6 90:2
**mad** 53:6
**main** 78:18 79:25
**Major** 79:7,11,22
80:1
**making** 56:18
**man** 74:23
**manual** 42:9,14
48:1
**map** 16:8
**Mark** 54:7
**Mascara** 1:8 50:24
80:3 89:1 90:5
**mass** 69:23
**matching** 83:13
**mean** 16:2 28:14
29:3,25 32:17
36:6 41:16 45:10
46:6 47:21 55:5
55:17 58:4 65:14
65:18 68:23 74:25
78:15 82:2
**meaning** 17:24
33:25 44:6,18
55:21 73:14
**means** 11:7 55:18
73:19,20 74:4,7
74:16,18 75:1
76:13
**meant** 36:4
**Media** 2:9
**medical** 57:25
**meets** 43:8 77:14
**member** 37:4 52:14
60:6,8 62:19,19
83:16,22 84:24
**memories** 18:19
**memory** 18:25 34:1
**mentioned** 19:24
**metal** 24:16 58:15
58:19
**Miami** 9:1
**microphone** 85:21
**middle** 25:15 54:21
**Midway** 1:17
**mind** 18:4 30:2
33:18 65:5 79:10
82:8
**Mine** 83:1

**minor** 44:2
**minorities** 32:12
**minority** 32:19
**minute** 52:20
**minutes** 63:19
**mirrors** 39:9
**misdemeanor**
20:15
**missed** 27:1 86:13
**misspelled** 76:15
**misspoke** 51:8
**model** 76:16 78:10
**moments** 18:20,21
**month** 7:13
**month-long** 32:2
**months** 7:19
**morning** 14:13
**mouth** 32:5
**moved** 6:17 52:10
**Moving** 76:10
77:25
**multiple** 62:11
**Municipal** 40:7
**music** 19:24,25
20:9 21:4 22:22
22:24,25 25:8,10
25:18,21 26:9
28:9,12 40:5,15
45:7 51:6,9,15
56:16 63:15 67:4
67:9,13 68:3,6
74:3
**muzzle** 69:19

**N**

**N** 4:1 24:22
**name** 4:9,14 18:23
22:8
**names** 57:11
**narcotics** 7:20,22
8:1
**narrative** 37:21
**native** 6:12
**near** 52:12
**nearsighted** 57:16
**need** 5:8,9,12 34:6
42:7 52:23 67:25
75:13,16 86:14
**needed** 38:9 80:9

nefarious 31:4
neighboring 82:14
neither 23:3 51:17
88:12
never 10:25 23:7
24:14 34:4 39:11
48:10 50:1 56:11
59:7 62:18 65:9
69:1,2,3,7
new 10:2
Newman 1:9,13 3:4
4:4,11,12 87:7
88:8,11 89:2,24
90:2,5
night 30:21 64:3,8
76:20 80:19
nights 76:10
nine 36:1,14,16
NO.2:16-cv-1407...
1:3
nods 4:24 45:15
noise 19:20 40:10
63:3
None- 3:14
nonemergency
16:23
nonverbal 4:23
normal 5:3,6 41:18
70:8
north 21:22
northeast 46:18
nos 4:25
Notary 1:19 87:5
number 16:23 25:8
73:18,22 75:6
numbers 73:15,15
76:6,7,8,8

O

O 4:1
Oath 3:6 87:4
oaths 87:7
object 24:1 34:25
35:21 41:13 51:10
51:20 56:2 63:9
64:25 67:11 69:4
69:9 78:3
objecting 35:3
objectively 32:25

obscene 19:24 74:3
obvious 86:4
obviously 20:21
55:2
occasionally 12:4
occupants 86:6
occurred 9:6
October 1:14 5:15
5:16,17,18,22
87:9 88:20 90:1,5
office 1:16 2:3 8:21
9:4,14 10:23,24
11:1 13:8,22 16:7
16:14 17:7,14,17
52:6 53:25 54:1
62:1 79:10 81:7
82:25 83:10,25
84:5,25 85:3,3,4,4
90:8
officer 7:2,18 10:15
20:22,24 21:18
28:10 36:17 39:20
48:15,16 51:14
54:17 56:10,12,18
56:19,22 61:2
63:16 69:8 72:8
72:18 75:9 78:1
83:8,21 84:16,17
Officers 17:13,16
20:21 55:5,12
60:12 66:15 72:10
official 1:8 21:10
Oh 50:9
okay 4:22 5:24 6:8
6:13,15,19,23 7:9
7:25 8:19 9:3,18
9:23 10:3,6,12,22
11:10 12:3,9,15
12:18,23 13:2,6
13:16,18 14:1,8
14:12,22 15:4,10
15:14,20 16:10,13
17:21 18:11,19
19:4,7,9,14,22
20:2,4,10,17,19
21:7,18,25 22:7
22:15 23:3,9,13
24:4,10,21,23
26:7,19,23 27:21

28:6,10,14,20
29:15 30:16 32:8
32:22 33:3,15,21
34:5,13,22 35:12
35:15,23 36:10,13
36:17,25 37:9,11
37:14,17,23 38:11
38:14 39:13,25
40:6,9,13,16,19
41:1 42:15 43:6,6
43:11,19 44:2,11
44:17,24 45:10,19
45:23 46:5,12,15
47:6,6,21 48:2,6
48:14,19 49:3,12
49:18 50:17,17
51:17 52:18 53:3
53:5,20 54:16
55:16 57:17,19
58:6,14,18,23
59:5,15 60:10,12
60:23 61:1,17,22
62:4,15,21 63:7
63:18,22 64:6,10
65:22 66:22 67:2
67:8,16 68:12,19
69:7,14,21,24
70:12,14 71:20
72:7,18,22 73:10
73:22,24 74:6,9
74:17 75:6,9,18
77:10,16,25 78:20
79:24 80:9,11,22
81:17,22 82:5,13
83:12 84:6,16
85:5,24 86:11,16
older 6:25
once 27:23 55:11
66:6 90:13
one's 28:15
open 25:17 42:10
52:2 74:3 81:20
opened 28:16 40:22
42:12,12 43:13
51:23 68:7
opener 42:9
opening 25:22
40:20 41:8 71:21
Orange 74:13

ordering 90:13,14
orders 80:14 82:3
ordinances 40:11
original 90:13
Ortega 2:4
ostensibly 55:21
outcome 88:19
outside 19:13 26:1
45:17 68:7 75:17
outsider's 32:22
overall 59:6
owner 48:21

P

P 4:1
P.A 2:6 90:3
p.m 70:7
PA 85:19
PAGE 3:5 89:4
Pages 88:7
paid 36:8,10,11,13
36:18
palm 6:7 9:1 49:25
Panama 8:25
pants 83:2,3
parallel 48:9,10,11
69:2
park 23:8
part 6:13 13:17
49:19,19,22,23,25
71:17 85:18
particular 59:15
67:24
Particularly 25:1
parties 88:14 90:14
partner 10:8
partners 10:10
parts 8:9,9 46:7
party 90:13
pass 58:5
passing 10:21
patches 83:19
patrol 7:18 9:5,8,12
9:15 11:14,17
17:4 64:22 71:7
80:2 85:18
patrols 10:8
patterns 38:19
Paul 14:25 54:19

73:20
Pause 14:3 55:23
pay 59:18
Pearson 14:25 15:7
20:25 54:19 73:20
76:4
penalties 89:21
people 12:4 18:20
24:14 29:25 30:24
31:23 32:15,18
41:20 59:1 66:11
68:7
percent 32:23,25
85:6
percentage 32:18
perfectly 48:11
perimeter 38:12
period 35:23
perjury 89:21
permissions 54:13
permit 66:12
person 38:15 41:19
59:13 74:6 84:11
personal 1:4 4:15
6:9 17:17,22 52:8
77:8,9
personally 10:20
personnel 33:21
perspective 56:14
Phillips 2:2,3 3:5
4:8,14 5:21 14:5
18:2 24:4,5 35:1,5
35:7,22 42:2,4
51:13,21 52:21,23
53:2,5,8 56:7
63:17 65:2 67:15
69:6,13 70:19,23
73:2 78:6 81:3,5
86:16
photo 72:13 73:4
Photograph 72:12
79:6
photos 39:16 49:4
50:17,19 70:24
picture 39:20 50:15
72:24
pictures 27:7 42:7
49:3,21 50:5,10
50:14 52:13 71:15

**pieces** 19:6
**pierce** 1:17 6:1,6
    7:10,14,17,25 8:4
    8:5,11 12:1,10,25
    16:3,6 31:12 32:4
    32:16,16 33:1,6
    33:10,17 81:8
    82:10
**Pierce's** 12:19
**place** 1:16 82:3
**placed** 36:18
**placing** 66:16 82:17
**Plaintiff** 1:6,18 2:2
**played** 24:13 56:17
**playing** 23:20 68:3
    74:3
**please** 4:9 22:20
    74:17 90:8
**pocket** 49:7,12,15
    49:18,20 50:8,15
**point** 10:25 38:11
    39:18 40:19 43:7
    43:19,21,22,24
    44:7,8 46:23
    47:12,14 52:9
    53:9 55:2,6 57:3
    62:5 63:5,7 64:7
    66:19 69:15 71:6
    71:22 78:14 81:14
    82:16,17 83:24
    85:10
**pointed** 41:10
    56:11 69:2,7,12
    69:16
**police** 6:1,24 7:1,6
    7:10,17 8:1,12
    9:18 12:1,5,6,10
    12:19,25 16:3,6
    22:23 31:12 33:10
    33:12,17 35:9,17
    63:16 79:4 81:9
**police-ese** 78:8
**police-issued** 83:10
**policy** 12:22 16:13
    17:19
**population** 32:14
    32:24
**Port** 49:2
**portion** 59:12

**position** 8:17 38:8
**possessing** 68:11
**possession** 41:1,2
    41:11
**possible** 23:17
    55:15 68:1
**predominantly**
    32:12
**premises** 64:7
**prescription** 57:14
**present** 2:9 73:5
**presented** 73:6
**press** 50:24
**pretty** 14:21 18:7
    18:24 24:11 44:3
    47:17 58:21
**previously** 76:20
**primary** 21:7,17
    77:12,13
**prior** 21:25
**privileged** 24:3
**Proactively** 9:15
**probable** 30:9
**probably** 11:16
    28:25 35:1 52:19
    70:9 76:3 83:12
**Procedure** 90:24,24
**procedures** 11:22
**promotions** 9:9
**property** 53:15
    65:21
**protection** 28:5
    67:21
**protocol** 23:9,10,11
**provide** 9:17 16:18
    17:8
**provides** 28:5
**psychologist** 36:23
**public** 1:19 9:17
    87:5
**pull** 23:7 29:3
    66:11 81:13 82:4
    85:22
**pulled** 22:2 23:1,2
    23:3 25:17 26:14
    26:19 61:6 81:23
    84:20
**pulling** 22:21,24
    76:4

**purchase** 77:6
**Purdy** 2:6 90:3
**purely** 32:25
**pursue** 7:4
**put** 32:5 41:22 45:1
    45:1 60:1 66:7
    67:20 79:4 83:23
    84:2

**Q**
**qualify** 77:18
**quantity** 44:18
**question** 5:11 8:19
    13:2 34:7 35:2
    41:8 55:24 80:20
    86:5
**questions** 4:16 6:10
    17:21 19:16 22:11
    36:25 55:9 72:3
    81:4 86:18
**quick** 44:3 47:17
    47:18 48:3
**quite** 24:20,22

**R**
**R** 4:1
**racially** 33:8,12
**radio** 19:7,10 21:13
    22:23 24:13,15
    37:25
**radioed** 15:5
**radioing** 22:25
**raise** 40:23 41:18
    46:23,23 63:13
    66:18
**raised** 44:6 47:14
    69:2,3
**raising** 26:18,20
    71:24
**ran** 38:5
**rap** 24:16
**reached** 44:5 48:8
**reacted** 60:24
**reaction** 15:22
**read** 3:8 86:19 89:4
    89:21 90:9
**reader** 15:8 21:2
**reading** 78:2 90:21
**READS** 89:4
**really** 10:10,21

20:1 22:11 24:11
    30:2,14 31:6,21
    32:20,20 33:19
    53:23 79:17
**reason** 5:12 18:9,12
    53:15 82:10
**reasonable** 90:11
**reasons** 11:25
**recall** 13:1 14:2,22
    15:14 19:14,16
    20:8 21:13 22:9
    24:9,10 30:3,7,14
    30:16,22 31:3,6
    33:14,24 38:17
    43:14 46:24 56:18
    57:5 58:15,17
    64:9 70:2,6,25
    82:12,13 83:20,22
    85:11
**recalled** 31:19
**receipt** 90:11
**received** 90:13
**recognize** 31:8
    49:14
**recognized** 77:4
**recollection** 15:20
    17:23,23 29:23
    33:24 36:12 84:1
    85:8
**record** 4:10,25
    12:25 13:4 33:19
    47:7 72:24
**recorded** 61:20
**recording** 17:5,9
**records** 58:13
**refers** 62:1
**refresh** 34:1
**refreshed** 33:25
**refused** 63:12
**regard** 90:12
**regarding** 12:19
**regular** 61:16 76:8
**related** 13:23 23:10
    36:14 59:16,23
    65:4 71:24 86:5
    88:13
**relation** 43:22
**relationship** 22:12
**relative** 88:16

**relay** 20:5
**relevant** 58:1
**remember** 6:17
    10:18 12:13,21
    18:20,23 19:1,5
    19:18,18 20:7
    22:21,25 25:16
    31:22 37:24 38:8
    38:25 39:17 42:3
    43:4 52:12 61:4
    61:19 76:23 86:3
**removal** 12:19
**removed** 12:17
    50:6,7
**repeats** 74:10
**rephrase** 17:15
**report** 11:10,16
    34:1 55:5,12
    59:12 78:8
**reported** 14:12
    75:10 88:9
**reporter** 1:19 53:2
    53:3 88:6
**Reporter's** 3:7 88:4
**reporters** 53:6
    90:18
**represent** 4:14
**Representative** 1:5
    4:16
**request** 59:15
**requests** 16:17
**requirements** 77:15
    77:16
**research** 29:4,7
**reserve** 75:3
**residence** 29:2
    60:16,19 62:6,12
    72:14
**residents** 29:8
**respond** 16:16
    20:23
**responded** 15:9
    20:20,22 21:3,5
    60:10,12 61:5
    81:8 82:5
**responds** 21:17
**response** 25:12
    40:1
**responsible** 66:16

**restate** 55:10
**result** 34:10 37:19
**retreating** 38:5
**returned** 36:24
**review** 33:21 90:8,9
90:10
**revolver** 56:23,25
**right** 26:4,5,20 30:3
30:7 41:9 47:9
49:23 50:2 51:24
65:20 66:20 68:24
72:25 74:15 75:25
79:19,19,21
**right-hand** 80:22
80:24
**rights** 64:24 65:4
65:23 67:24
**road** 1:17 7:18 9:5
9:8,12 11:14 23:8
80:2
**ROBERTS** 2:3
14:4 18:1 52:22
**robot** 70:24 71:9,14
71:17
**robotic** 53:10
**role** 7:22 9:3 53:24
79:8 80:11
**roles** 7:16
**roll** 10:21
**rolled** 22:22
**rotating** 14:15
**Rothman** 79:7
**rounds** 64:2
**route** 74:8
**routine** 70:8
**Rule** 90:24,24
**rules** 4:18 90:11
**run** 73:16
**running** 12:14
**runs** 71:18

**S**

**S** 4:1
**safety** 39:7
**sanctions** 12:10
**sat** 64:22
**saw** 25:24 39:21
43:23,25 47:20,22
48:10 50:5,10

56:15,15 58:2
59:4 60:24 69:5
76:19 81:16 82:19
**saying** 5:6 38:8
52:11 83:22
**says** 51:7 73:18
74:10,15,18,19,22
74:23 78:14 83:9
**Scavuzzo** 79:23
80:2
**scene** 12:16 14:1,8
15:17,17 25:6
42:22 43:2 53:13
54:10,17,18 58:14
58:18 60:10,13
64:3,14,17 71:4
74:21 80:3,12
**scenes** 71:9
**schedule** 21:23
**school** 7:5 16:20
25:2 74:1 75:13
81:11
**schools** 16:18,19
81:12
**screamed** 26:15
**screaming** 26:10
**screen** 25:15
**search** 65:13,14,17
65:19
**second** 44:23,25,25
46:2 65:8 66:11
**secret** 62:20,22
**secure** 65:20
**see** 26:5 34:6 39:18
39:23 40:20 41:16
41:19,21 43:21
44:9,12,19,21
46:7,7,14 48:14
48:17 52:16 56:19
57:22,23 58:2,3,3
58:18 63:4 64:2,6
64:10 66:14 69:11
71:20,22 75:6
79:17 80:3,14
81:18
**seeing** 21:22 31:1
41:9 50:7 59:3
**seek** 54:12
**seen** 22:24 27:7

42:19 48:9 49:3,4
49:10 50:1,18
63:22 66:7 72:1
79:2
**seizure** 65:13,14,17
65:19
**sense** 23:13 48:12
55:9
**sequence** 27:12
28:21 81:14
**Sergeant** 54:4,7,9
54:10,13 59:23
**serious** 75:3
**service** 9:17 16:1
26:13 56:25 77:21
77:23 78:19 80:25
**service-issued**
77:11
**set** 17:21 67:24
**Sheet** 3:7 89:3
**Sheriff** 1:8,8 19:23
50:24 80:3 89:1
90:5
**Sheriff's** 1:16 8:21
9:4,13 10:23 13:8
13:22 16:6,14
17:7,14,17 52:5
53:25 54:1 62:1
79:10 81:7 82:25
83:10,25 84:5,25
85:3,3,4,4
**shift** 14:15 70:7,12
70:16
**shifts** 14:14,15
**shipped** 8:23
**shoes** 82:22,24
**shoot** 18:9,11 26:25
28:1 82:4
**shooting** 13:23
27:21,22 34:10
44:8
**shopping** 77:2
**shorter** 36:20
**shorthand** 5:4 88:6
**shortly** 14:17
**shot** 18:16 31:8
34:8,9 37:18 59:5
59:7,8 63:20 64:5
68:19 81:24

**shots** 38:1,11 43:1
55:7,11,14,20
56:1,1,5 58:24
64:1 74:23 75:10
**shoulder** 19:8
83:19
**show** 42:6 53:18
72:14 78:20
**showed** 54:23,25
60:3
**showing** 18:24
39:20
**shows** 83:16
**side** 11:2 39:1,2,3,4
**sidewalk** 22:3
25:13
**sight** 47:18
**sign** 3:8 90:9,9
**signal** 19:19,23
20:5,8 55:6 73:25
76:13
**Signature** 90:23
**significance** 76:6
**significantly** 5:3
**signing** 90:21
**simultaneous** 47:4
**Sincerely** 90:15
**sir** 4:13,21 5:23
7:12 10:7,13
11:12,18,24 12:8
13:5,10 14:7,11
14:19 17:6,10,12
18:5 19:3 26:22
27:9,14 30:24
31:13 32:11 34:16
35:16 37:22 38:23
39:17 40:18 42:17
42:21,25 45:13
47:11 49:11 50:16
51:4,16,19,25
53:12,19 56:21
58:8,21 60:20,22
60:25 64:12,18
65:24 67:14 68:5
68:9,18 70:5
71:10 72:2,6
75:11 77:5 78:5
80:18 82:15,21
84:19 86:15 90:6

**siren** 85:19
**sit** 13:6 22:7 85:20
**situation** 63:14
67:18
**six** 8:3
**slam** 47:25
**slept** 70:9
**small** 78:11
**smell** 19:1
**smoky** 53:6
**snipers** 63:4,5
**society** 62:20,22
**somebody** 16:3,16
18:17 38:10 52:11
52:14 54:22 58:15
**somebody's** 41:3
**soon** 70:20
**sorry** 8:14 17:25
28:10 53:25 69:25
73:11 75:25
**sort** 40:17
**sought** 60:8
**sound** 14:6
**SOUTHERN** 1:1
**space** 38:20
**speak** 13:18 60:23
85:21
**speakers** 45:11,19
45:21
**speaking** 66:17
**Special** 7:19 60:5
**Specialist** 2:9
**specific** 84:1 85:8
**specifically** 48:17
78:17 83:9
**specifics** 41:4
**spent** 16:3 32:8
**squad** 9:19 10:16
**SS** 87:1 88:1
**St** 1:9,16 6:16 8:8
8:21 9:4,13,13
10:23 13:8,13,21
16:6,14 17:7,14
17:16 32:17 33:3
49:2 52:5 53:24
53:25 62:1 79:9,9
79:9,10 81:7
82:23,25 83:9
87:2 88:2

**stand** 18:3 33:18
**standard** 85:12
**standing** 22:3
  25:24 43:16 44:15
  54:21 81:21
**standpoint** 32:22
**stands** 30:2
**started** 5:22,25 7:9
  14:15 26:17 32:3
  47:3
**state** 1:20 4:9 8:22
  8:23 13:2 87:1,6
  88:1
**stated** 89:21
**statement** 52:13
  61:8,17,20 86:12
**statements** 34:23
  61:1 64:21
**STATES** 1:1
**Statute** 90:12
**stay** 11:1,5 42:21
**stayed** 23:2 25:14
**stenographically**
  88:9
**stereo** 23:21 45:17
  50:21
**stick** 39:11
**sticking** 39:7
**sticks** 82:8
**stimulant** 70:16
**stolen** 49:1
**stooping** 43:14
**stop** 56:16
**stopped** 14:24
**stops** 75:1
**strap** 49:24
**street** 25:1 30:20
  38:6 54:21 74:1
  76:5
**stressful** 67:14,18
**strike** 33:9 71:22
**structure** 43:9
**stuck** 76:24
**stuff** 24:13,14,15
  30:25 62:24
**subject** 72:25
**subjective** 24:12,18
**Subjects** 74:2
**subsequent** 42:23

42:23
**suggested** 90:10
**Suite** 2:7 90:3
**summary** 37:20
**Summer** 2:6 90:2
**Summer@purdy...**
  2:8
**Sunrise** 2:7 90:3
**supervisor** 51:2
  54:5,6
**supervisors** 51:3
  76:7
**supplement** 70:15
**supposed** 76:14
**supremacy** 37:4
**sure** 4:17 5:1 21:21
  36:7 38:7 39:9
  42:11 45:9 51:8
  54:11 82:8 83:24
**surnames** 57:10
**suspect** 15:2 17:20
  33:7 38:2 39:7
  55:15 63:15 65:4
**suspect's** 64:23
**suspension** 35:19
**Suzanne** 1:19 54:9
  87:5,11 88:6,22
  90:17
**SWAT** 39:10 40:1
  52:20 59:11,17
  60:1,4,6,8,21,23
  61:5,10 62:7,18
  84:12,14
**Sweet** 19:20
**sworn** 4:6 87:8

_____
        **T**
_____
**T.C** 2:3
**T.V** 78:20
**TAC** 78:15,16
**tactics** 60:5 62:24
**take** 5:10,12 9:21
  10:3 21:12 40:2
  58:19 66:8 70:14
  70:19 78:14
**taken** 1:18 34:24
  52:13 72:24 88:15
**talk** 23:23 66:8
**talked** 61:2 81:6

**talking** 22:2 39:15
  44:24 66:18
**tall** 43:7,11
**tank** 62:15
**tape** 73:9,10,12
**target** 38:2
**TC** 81:3
**team** 60:5
**tear** 60:16,18 62:5
  62:11,11,14 63:4
  64:8,10
**tell** 6:23 8:4 12:21
  16:25 21:9 22:14
  29:18 31:1 33:20
  40:8,9 42:11 44:1
  45:8,18 46:1 50:8
  53:23 54:11 58:21
  59:21,24 60:11
  61:23 62:17 63:6
  76:11 79:20 81:10
  81:25 87:8
**ten** 7:16 73:16
**tend** 5:4
**tendered** 39:16
  72:12 76:2 79:6
**term** 12:3 65:3
**terms** 30:16
**test** 5:11 70:1
**testified** 4:6 67:2,8
**testify** 67:1,5 84:21
  84:23 85:1
**testimony** 47:6
**tests** 58:5
**Thank** 34:13 53:4
  73:4 86:16
**theirs** 62:20
**thigh** 69:20
**thing** 18:20 60:21
  74:23 83:15
**things** 4:22 18:25
  19:4
**think** 6:17 7:19
  12:12 14:25 16:21
  23:13 24:24 28:25
  29:20 32:1,24
  38:6 51:6,7 57:2
  65:10 68:2 69:21
  71:17 73:3 76:4
  79:11

**thinking** 41:20
  76:23
**Thompson** 79:22
  80:1
**thought** 15:2 26:24
  26:25 36:4 78:9
**threat** 27:22,23
  34:9 37:14,15
  40:25 41:12,15
  56:13,15 84:16,17
**threatened** 82:16
  82:19
**threatening** 63:15
**three** 5:15,18 13:7
  13:7 27:17 45:4
  46:4,5 63:19
  79:17
**threshold** 47:13
**time** 1:15 8:2 9:23
  10:12,15,17 14:12
  16:10 17:8 18:16
  20:11 21:1 26:13
  26:15 28:16,17
  29:13 30:11 31:2
  31:25 32:16 33:6
  33:10,16 35:24
  40:2 41:2 42:19
  44:18 45:1,1,3,24
  45:25 47:1,24
  51:22 52:17,21
  54:2,5,6 58:7,23
  68:15 70:4 71:23
  77:20 79:13,14
  80:2 81:22,24
  85:22
**timeline** 13:20
**times** 8:23 11:16
  25:11 27:5 37:1
  37:18 45:4 46:4,6
  46:21,25 68:11
  71:13
**tiptop** 44:13
**Tobacco** 6:4
**today** 4:17 10:22
  13:6 22:7 33:22
  57:14 79:10
**told** 23:24 25:7
  41:5 48:25 49:1
  66:7 73:19 75:16

**top** 26:10 40:8 43:8
  57:20
**touches** 49:23
**Tough** 34:7
**town** 8:5,7
**track** 27:19
**traffic** 74:24 75:1,4
**train** 62:23
**trained** 27:19
**transcript** 73:8
  90:7,9,10,13,14
  90:21
**transcription** 88:10
**transition** 8:15,15
  8:20,20
**translate** 73:13
**transmission** 76:12
**traumatic** 18:7
**travel** 9:2
**trick** 50:10
**trouble** 11:7 12:5
**true** 68:13 88:9
  89:22
**truth** 68:21 87:8
**try** 4:22,25 10:25
  11:5 22:16 65:6,9
**trying** 25:15 43:20
  50:10 52:4 62:25
  63:1 66:22
**turn** 5:6 40:15 51:9
  51:14 55:8
**turned** 50:21,22
  51:7 78:12 81:19
  81:20
**two** 20:21 27:17
  30:6 31:23,25
  42:6 81:1,2 86:11
**two-thirds** 5:7
**type** 4:22 16:22
  17:4,9 20:12
  36:18 37:4 82:6
  85:14
**typical** 83:10
**typically** 16:7,7
  21:24

_____
        **U**
_____
**uh-huhs** 5:1
**uh-uhs** 5:1

**ultimate** 51:2 69:15
**ultimately** 22:18
    61:17
**Um-hmm** 30:12
**undergo** 70:1
**understand** 16:2
    25:4 28:20,24
    32:14 41:7 42:5
    43:20 44:3 63:1,2
    66:22 67:19 68:22
    78:7 79:1
**understanding**
    12:18 17:22 20:10
    20:11 64:23 78:25
**understands** 74:19
**unfortunate** 85:22
**unfortunately**
    34:12
**unfounded** 13:12
**uniform** 83:11,13
**uniformed** 41:16
    66:15
**unit** 7:20,23 8:1
    11:15 15:7 62:2
    71:17 74:16
**UNITED** 1:1
**uphold** 65:6
**upright** 43:16
    44:15
**use** 5:4 17:18 35:4
    39:9 68:20 77:8,9
    77:10,12 85:24
**usually** 11:1,7
    15:25 21:15 30:24
    40:11 84:22

———————————
**V**
———————————
**v** 89:1 90:5
**VAUGHN** 1:5
**vehicle** 61:7 62:16
    63:4
**version** 79:3
**vertically** 27:19
**vicinity** 56:14
**video** 2:9 47:8
    71:15
**VIDEOTAPED**
    1:13
**view** 28:4 48:5

**Viola** 1:4 89:1 90:5
**violate** 65:10
**violated** 65:22
**violates** 32:13
**violation** 20:12
    29:22 30:15,19
    31:21,24 34:3
    40:6,17
**violations** 30:1
**vision** 57:19,21
    58:1,5,10
**voice** 28:15 85:15
**vs** 1:7
**vulgar** 20:1,8 40:5

———————————
**W**
———————————
**waiting** 52:12
**waive** 90:9,21
**Waiver** 90:20
**walk** 22:19,20 25:5
    38:12 61:7
**walk-through**
    53:16,21
**walked** 25:9,13
**want** 6:10 17:21
    31:14 32:5 36:7
    38:2 43:20 49:13
    62:19 63:2 74:4
    75:4 85:6 86:12
**wanted** 6:20
**warrant** 15:3
**warranted** 62:11
**warrants** 86:5
**wasn't** 13:17 41:9
    44:20 51:7 55:21
    60:17 69:21,23
    72:11,24
**way** 15:9 16:20
    26:16,24 42:10,11
    43:24 60:1 74:12
**we'll** 13:19 52:18
**we're** 4:16,24 44:24
    47:7 52:18 74:20
**we've** 22:16 52:24
    81:6
**weapon** 26:13 27:4
    56:25 77:22,23
**Weapons** 60:5
**wear** 19:7 57:18

    58:4,5
**wearing** 57:14 58:6
    83:14
**week** 11:16
**week-long** 32:1
**went** 7:5,19 8:17
    15:6 22:18 36:23
    45:25,25 51:17
    55:1 56:20 84:7
**west** 1:17 6:7 9:1
    10:17,18 23:2
    39:3,4
**whatsoever** 64:3
**white** 37:4 72:13
**Wilson** 79:22
**window** 39:12
**windows** 22:22
**witness** 3:4 4:5
    41:15 45:15 51:12
    53:1 56:4 63:11
    65:1 67:13 69:5
    69:11 71:5 72:12
    73:1 76:2 78:5
**witnesses** 64:13,16
**wondering** 15:22
**Woodward** 54:9
**word** 24:20,22 35:4
**words** 23:24 32:5
    36:7
**work** 5:2,24 8:25
    9:1 10:2 33:13
    35:9,17,24 57:18
    67:20 70:11,12,13
    77:11
**worked** 6:1,3,6,7
    8:16,22 10:17
**working** 8:24 32:9
    62:18
**works** 18:25
**worried** 20:3
**wouldn't** 12:7 48:9
**wrap** 70:20
**written** 4:24 47:7

———————————
**X**
———————————

———————————
**Y**
———————————
**yeah** 5:17,18 11:7
    18:3 24:6 25:4
    30:7 35:5,5 39:1

    44:14 47:20 51:2
    58:4
**year** 7:7 30:6 58:5
**years** 5:15,19 7:16
    7:21 13:7 16:3
**yell** 45:4 46:3
**yelled** 26:8,14 46:5
    46:24 67:8 84:23
**yelling** 26:9 46:13
    85:2
**yeses** 4:25
**YOUNG** 2:9
**YouTube** 79:2

———————————
**Z**
———————————
**zone** 21:16,16,18
    21:20,21

———————————
**0**
———————————

———————————
**1**
———————————
**1** 78:15,16 88:7
**1.310(e)** 90:24
**10** 16:3 36:16 73:19
    74:19
**10-4** 74:22
**10-8** 78:21
**10:13** 52:22
**10:38** 70:22
**10:52** 70:22
**100** 76:7 85:6
**1025** 74:4
**1034** 74:24
**11:00** 70:9
**11:19** 1:15 86:20
**12:00** 70:9
**1216** 2:7 90:3
**14** 13:24 14:9 17:25
    18:1,3 19:5 29:12
    53:14 58:11 60:13
    65:23 70:7 76:13
    77:21 80:4 83:14
    85:25 86:6
**1400** 73:25
**14th** 19:21
**15** 15:13
**15:28:14** 76:10
**15:29:06** 77:25
**1500** 22:19
**1501** 14:4,6,9 15:11

    15:18 16:11 22:25
    29:5,8 40:3 74:22
    82:6
**15th** 38:6 54:21
    76:5
**16** 87:12
**17** 6:18
**1901** 40:3
**1999** 5:25 6:2
**1st** 5:15,16,17,22

———————————
**2**
———————————
**20** 7:19
**200** 76:7
**2004** 29:21 31:20
    34:1 71:23 72:5
**2008** 12:13
**2009** 6:2,2
**2013** 5:22 6:2
**2014** 11:23 13:24
    14:9 17:25 18:3
    19:5 29:12 53:14
    58:11 60:13 65:23
    70:7 71:25 72:5,5
    77:21 80:4 83:14
    85:25 86:6
**2016** 1:14 5:20 87:9
    88:20 90:1,5
**2019** 87:12
**205** 74:11
**217** 74:14 75:23,24
**22** 19:19,23 20:5,8
    73:25 78:10
**24** 77:1
**2455** 2:7 90:3
**26** 74:18
**27** 32:23 78:11
**280** 73:19,23 75:8
    75:12
**2900** 15:1

———————————
**3**
———————————
**3** 42:2
**3:00** 14:16,18 70:7
**30** 78:10 90:11
**30(e)/Florida** 90:24
**300** 76:7
**3000** 15:13 20:25
**3000-ish** 22:19
**31** 90:1

**31st** 88:20
**3200** 15:1
**32210** 2:4
**33304** 2:7 90:4
**34981** 1:17
**38** 42:3

**4**

**4** 1:14 3:5 17:25
 90:5
**40** 78:11
**400** 76:8
**417** 75:21 76:1
**4230** 2:4
**45** 46:17 77:24
**4700** 1:17
**48** 77:1
**4th** 5:18 87:9

**5**

**50** 27:1
**51** 74:7,10

**6**

**6** 32:25
**65** 73:19
**66** 74:16

**7**

**7** 32:25

**8**

**8** 74:19
**8:00** 30:20,20
**800)635-9193** 90:9
**86** 88:8
**87** 3:6
**88** 3:7
**89** 3:7

**9**

**9** 12:13
**9:00** 30:20 43:5,5
**9:10** 1:15
**90** 3:8
**911** 16:22 73:9,10
**97** 74:20
**98** 7:8
**99** 7:13