UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:16-cv-14072-ROSENBERG/HOPKINS

VIOLA BRYANT, as Personal Representative
of the Estate of GREGORY VAUGHN HILL, JR.,

        Plaintiff,

v.

SHERIFF KEN MASCARA, in his Official
Capacity as Sheriff of St. Lucie County and
CHRISTOPHER NEWMAN,

        Defendants.
_____/

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS**

      The Plaintiff, VIOLA BRYANT, as Personal Representative of the Estate of GREGORY VAUGHN HILL, JR., by and through her undersigned counsel, and pursuant to Local Rule 56.1(a) and this Court's Order files this Statement of Material Facts in Opposition to the Motions for Summary Judgment of Defendants [DE 66, 67].

**STATEMENT OF MATERIAL FACTS**

**RESPONSE TO DEFENDANTS' CONTENTIONS**

    1.    Given Defendants' nine pages of "material facts" which starkly omit witness accounts and which fail to account for the proper timeline, Plaintiff will try to address Defendants' alleged statements briefly to have room to add the voluminous accounts in contrast thereto.

    2.    Defendants repeatedly characterize the music Gregory Hill played as "vulgar."

1

Some songs certainly had expletives, but the subjective characterization is otherwise denied. Otherwise, paragraphs 1-13 are generally correct. See below for material facts as to these issues.

3. Witness accounts refute that Mr. Hill had a gun in his hand or that he was fully visible under the quickly moving garage door as contended in paragraphs 14-15, 21, 22, 24 of Defendants' statement. See below for material facts as to these issues.

4. The claims of various utterances of identification and warning located in paragraphs 16-19, 22 of Defendants' statement are all contradicted by other independent witness statements, as well as the opposing statements of Deputies Newman and Lopez. See below for material facts as to these issues.

5. Any claims of a statement by "family" that Mr. Hill was alive and unharmed or that another family member was in the house after the shooting, such as in paragraphs 29-30 of Defendants' statement, are denied, untrue and are not supported by anything other than officer attributed hearsay and should not be considered. There are no material facts supporting these contentions.

6. As for paragraphs 39 – 50 of Defendants' statement, same is an unfair area of exploration. Plaintiff was judicially prohibited from deposing Sheriff Mascara and the Affidavit of Lt. Sheelar, as attached to Defendants' statement presents new facts by a witness not previously identified as having knowledge about these areas. Lt. Sheelar was not named as a policy and custom witness or as a witness who could testify about Deputy Newman's background and thus was not deposed. Discovery is completed and Plaintiff only had seven days to respond. As Plaintiff cannot fairly do so, Plaintiff denies these matters.

7. The training, uses of force, policies, practices or customs of the St. Lucie County

2

Sheriff's Office are not, in fact, appropriate as further detailed herein and in Plaintiff's Opposition. See below and Responses in Opposition.

**PLAINTIFF'S CONTENTIONS OF MATERIAL FACT**

8. Gregory Hill was shot and killed in his home by St. Lucie County Sheriff's Deputy Christopher Newman on January 14, 2014, at approximately 3:15 p.m. – 3:20 p.m. (See Exhibit "A" – Lopez depo. pg. 51/lines 23-25). (See also Exhibit "B" CAD Report).

9. Mr. Hill's cause of death was multiple gunshot wounds: (1) to the right side of the head (which perforated the cerebrum and caused extensive subarachnoid hemorrhage, as well as skull fractures), (2) to the right abdomen (which perforated the small bowel and lacerated a major artery) which exited his left buttock and (3) a gunshot wound to the right lower abdomen (which perforated his bladder and pelvic cavity). (See Exhibit "C" Medical Examiners Report).

10. As a matter of background, Gregory Hill's home (1501 Avenue Q, Fort Pierce, Florida) sits across from the parking lot of Francis K. Sweet Elementary School, where two of his daughters attended school. Parents line up along the street and in the parking lot to pick up their children between 2:45 p.m. and 3:15 p.m. when school lets out.

11. Between 2:45 p.m. and 3:20 p.m. Mr. Hill was listening to music in his garage. According to his cousin, Andrew Brown, who was with Gregory Hill shortly before 3:00 p.m., the music was "pretty loud." (See Exhibit "D" – Brown depo. pg. 44/lines 9-11). Despite that, he was able to talk to and hear Mr. Hill in the cinder-block constructed garage. (See Exhibit "D" – Brown depo. pg. 44/lines 12-14).

12. Andrew Brown confirmed Mr. Hill smelled like beer, and appeared "tipsy," which he described as not sober, not drunk. (See Exhibit "D" – Brown depo. pg. 28/lines 6-14).

However, Mr. Brown only saw him consume one beer in the hours before his death. (See Exhibit "D" – Brown depo. pg. 22/lines 13-15, pg. 22/lines 17-22 and pg. 53/lines 3-5).

13. Andrew Brown left Gregory Hill's home between 2:45 p.m. and 3:15 p.m. to go walk to a nearby store. The garage door was still open when he left. (See Exhibit "D" – Brown depo. pg. 53/line 25 – pg. 54/line 1).

14. According to arriving parent, Stefani Ann Mills, Mr. Hill was listening to a Drake song[1] at his residence with his garage door open (See Exhibit "E" – Mills depo. pg. 15/lines 20-22). Shortly after Ms. Mills got the kids situated in her car, Mr. Hill closed his garage door. Mills depo, (See Exhibit "E" – Mills depo. pg. 24/lines 7-15).

15. The music made Ms. Mills mad and nervous because the music was loud and contained the expletive identified as the "f-word," as she picked up her children even though she "honestly like(s) the song when there are no children around, and it's a good song." (See Exhibit "E" – Mills depo. pg. 15/lines 9-24). Ms. Mills called 911 and reported what she called a "disturbance." (See Exhibit "E" – Mills depo. pg. 50/line 3). Police arrived as she was walking her children back to her car (See Exhibit "E" – Mills depo. pg. 21/lines 7-10).

16. Despite contentions to the contrary, other than the deputies: (1) no one heard music after the garage door was closed and before Mr. Hill was shot, except the officers who were within feet of the garage door; (2) no one saw the garage door raise over waist level / half way or saw Mr. Hill's head or face appear from beneath it; (3) no one saw Mr. Hill with a gun, while some saw him with an empty hand; (4) no one puts Mr. Hill and the Deputies in the same room or same undivided space such that Gregory Hill would have visually been made aware of

---

[1] Drake is a Canadian rapper, singer and songwriter, who initially gained recognition as an actor on the teen drama television series *Degrassi: The Next Generation* in the early 2000s. At the time of the subject incident, Drake had recently received Grammy Award for Best Rap Album, an album which included the song which caused the complaint.

4

who they were; and (5) no one heard the exclamations supposedly made by officers (such as "Gun. Drop the Gun, "Sheriff's office," "gun, gun, gun, drop the gun, drop the gun" or any other statement or order, other than "get on the ground" or "turn down the music."). See below.

17. Parent Stefani Ann Mills (who called 911) said the garage was closed by the time she and the children were back to the car. (See Exhibit "E" – Mills depo. pg. 24/lines 8-10). Then, the garage door came up quick. She saw the police "get startled" and one fired his gun. (See Exhibit "E" – Mills depo. pg. 24/lines 17-20). He visibly "jumped back." (See Exhibit "E" – Mills depo. pg. 26/line 19). And, she felt that the officers clearly "were surprised by him." (See Exhibit "E" – Mills depo. pg. 55/lines 20-23). She never heard the officers say anything "at any point." (See Exhibit "E" – Mills depo. pg. 27/lines 21-23). She never saw anyone on the other side of the garage door and thus never saw a gun. (See Exhibit "E" – Mills depo. pg. 51/lines 9-12, and 18-22).

18. Lizbeth Enriquez-Ruiz picked up her daughter between 3:15 p.m. and 3:25 p.m. on the day in question. She remembers hearing loud music initially. (See Exhibit "F" – Ruiz depo. pg. 10/lines 18-19). She does not remember the type of music. (See Exhibit "F" – Ruiz depo. pg. 10/lines 19-20). She never saw the garage door completely open. (See Exhibit "F" – Ruiz depo. pg. 19/lines 23-25). The door was "like halfway of the door being open, they yelled out something, and (she) remember(s) seeing the garage door. Once it was halfway open, it was going down." (See Exhibit "F" – Ruiz depo. pg. 20/lines 7-12). She said she assumed the garage door was going up automatically because she did not see feet or anyone inside as it was opening. (See Exhibit "F" – Ruiz depo. pg. 21/lines 23- pg. 22/line 8).

19. Parent Joseph Hall was probably the closest to the scene as he was crossing

Avenue Q when he heard an officer shout, "Get on the floor." (See Exhibit "G" – Hall depo. pg. 10/lines 20-22). As he said that, the other officer started shooting. (See Exhibit "G" – Hall depo. pg. 10/lines 21-24). He did not recall hearing loud music. (See Exhibit "G" – Hall depo. pg. 16/lines 15-18). He did not see or hear anyone in the garage. (See Exhibit "G" – Hall depo. pg. 16/lines 19-22). While he watched, the garage door was down or just about all the way down. (See Exhibit "G" – Hall depo. pg. 16/line 23- pg. 17/line 4).

20. Principal Juanita Wright never heard loud music. (See Exhibit "H" – Wright depo. pg. 15/lines 13-15). She said, "If that's why they were called, because the music was loud… we didn't hear any loud music." (See Exhibit "H" – Wright depo. pg. 42/lines 23- pg. 43/line 2). Ms. Wright and the other school staff who were outside the school right before the incident unfolded, did not feel threatened. (See Exhibit "H" – Wright depo. pg. 43/line 11). She's never had problems with anyone in that house. (See Exhibit "H" – Wright depo. pg. 24/lines 7-10). She said police should have waited and not started shooting while kids were around. (See Exhibit "H" – Wright depo. pg. 43/lines 11-13). She saw the garage "maybe a foot" open. (See Exhibit "H" – Wright depo. pg. 39/lines 15-20). She also didn't see the garage door moving. (See Exhibit "H" – Wright depo. pg. 39/lines 11-14). She never saw the door completely open. (See Wright depo. pg. 39/lines 8-10).

21. Before 3:15 p.m., teacher Lisa McGuire was walking towards the parent pick-up line and heard loud music with the garage door "wide open." (See Exhibit "I" – McGuire depo. pg. 9/lines 16-20). By the time she walked over to the principal there was "no more music (and)… the garage door was shut." (See Exhibit "I" – McGuire depo. pg. 11/lines 4-8). While policemen knocked on the front door, "the garage door lifted, and (the police) ran over to the garage door, and then the garage door quickly shut and that's when I heard pops." (See Exhibit

"I" – McGuire depo. pg. 12/lines 11-15). She recalled seeing someone standing behind the garage door with "one arm down and the other one holding the garage door." (See Exhibit "I" – McGuire depo. pg. 6/lines 17-19). The garage raised to the level of "maybe above the waist a little bit." (See Exhibit "I" – McGuire depo. pg.6/lines 19-21). When asked if she ever saw the officers draw their guns, she said, "when the garage door went down." (See Exhibit "I" – McGuire depo. pg. 16/lines 20-22).

22.  Teacher Donna Hellums did not recall hearing any music that day. (See Exhibit "J" – Hellums depo. pg. 7/lines 11-12). She "recall(ed) seeing the garage door start to go up and then come back down." (See Exhibit "J" - Hellums depo. pg. 14/lines 9-13). She did not see the occupant behind the door. (See Exhibit "J" - Hellums depo. pg. 14/lines 18-20). The garage door only went up halfway. (See Exhibit "J" - Hellums depo. pg. 20/lines 16-19).

23.  David Morales did not hear music at any point that day. (See Exhibit "K" – Morales depo. pg. 9/lines 24-25). The garage door was down when police arrived. (See Exhibit "K" – Morales depo. pg. 10/lines 9-11). He did not see it open back up much, but saw the garage going down at one point. (See Exhibit "K" – Morales depo. pg. 10/lines 12-14). As it was going down, he "heard shots fired." (See Exhibit "K" – Morales depo. pg. 10/lines 20-23). The door was about at the knee height at that point (See Exhibit "K" – Morales depo. pg. 21/lines 3-10). He only saw legs inside the garage. (See Exhibit "K" – Morales depo. pg. 11/lines 10-13).

24.  Mr. Hill's daughter, Destiny Hill, was sitting in a bench, "kind of close" to the street when the shooting happened. (See Exhibit "L" – D. Hill depo. pg. 22/lines 6-7). She heard officers say, "cut down the music." (See Exhibit "L" – D. Hill depo. pg. 25/lines 20-25). The garage opened, "halfway." The garage door then closed. (See Exhibit "L" – D. Hill depo. pg. 15/lines 10-17). Then, "after he started letting down the garage, they started shooting." (See

7

Exhibit "L" – D. Hill depo. pg. 20/lines 12-18). Mr. Hill, her dad, had nothing in his hands. (See Exhibit "L" – D. Hill depo. pg. 21/lines 22-25 – pg.22/lines 1-5).

25. In addition to no one seeing a gun or object in Mr. Hill's hand (see above), no one saw one in his pocket at any point that day. When shown a photograph of the gun found in Mr. Hill's pocket, Andrew Brown, who had been with Mr. Hill all day, said he had not seen Greg with a gun or with anything that looks like that in his pocket. (See Exhibit "D" – Brown depo. pg. 88/lines 1-8).

26. As to the gun found in Mr. Hill's pocket, there was no blood or brain splatter found on the gun despite allegedly being near the area Mr. Hill was shot. DNA was inconclusive and no fingerprints of Mr. Hill's were tested or found on the gun. (See Exhibit "M" – Indian River Crime Laboratory Reports).

27. According to forensic analysis, Mr. Hill was incapable of putting a gun back into his pocket of his sagging pants once he sustained the bullet strike to his brain. (See Exhibit "N" - Anderson depo. pg. 62/lines 5-10).

28. One expert, Roy Bedard, discussed an entirely plausible scenario leading to a conclusion that the gun might have been planted on Mr. Hill after he was killed. (See Exhibit "O" – Bedard depo. pg. 40/lines 9-25 – pg.44/lines 1-25).

29. Before the incident, at 3:23:24 p.m., Deputy Lopez confirms the proper address with dispatch, "it's going to be 1501 Avenue Q. In the audio of the dispatch radio broadcast, no music can be heard as of 3:23:24 p.m. (See Exhibit "B" - CAD report).

30. After the incident, Deputy Lopez and Newman took cover behind the patrol car. (See Exhibit "A" – Lopez depo. pg. 44/lines 12-17). He called out "shots fired, shots fired" over the radio." (See Exhibit "A" – Lopez depo. pg. 44/lines 12-17). At 3:24:32 p.m., Deputy Lopez

reports "shots fired" and identifies "black male. Dreads with, with a handgun." (See "Exhibit "B" - CAD report). This was sixty eight (68) seconds after they confirmed the address.

31. Newman confirmed that "The gun was never directly pointed at any officer or human being. (See Exhibit "P" – Newman depo. pg. 69/lines 7-12 and pg. 48/lines 14-18).

32. Lopez did not hear Newman say anything except "hey." (See Exhibit "A" – Lopez depo. pg. 51/lines 18-20).

33. Newman did not hear Lopez or Mr. Hill say anything at all. (See Exhibit "P" – Newman depo. pg. 28/lines 14-19).

34. Hill was shot and killed in his own house. (See Exhibit "A" – Lopez depo. pg. 51/lines 23-25).

35. Hill never fired a shot. (See Exhibit "A" – Lopez depo. pg. 52/lines 1-2).

36. After the incident, deputy Brian Hester, of the St. Lucie County Sheriff's Office said they placed an "armored vehicle" in front of the Hill home." (See Exhibit "Q" – Hester depo. pg. 12/lines 12-21). They used a microphone system in the armored vehicle to deploy "Crisis Negotiation." (See Exhibit "Q" – Hester depo. pg. 12/lines 12-21). After no response, they then used the armored vehicle to place gas teams in different areas. After that, Brian Hester testified that "we actually dispersed or introduced gas into the residence." (See Exhibit "Q" – Hester depo. pg. 13/lines 21-25). That order came from the "Bomb Team commander" Ben Hostetler. (See Exhibit "Q" – Hester depo. pg. 14/lines 1-12). They did so with a 40 millimeter single launcher." (See Exhibit "Q" – Hester depo. pg. 15/lines 20-24). "Sniper Team Leader" leader Sergeant Troy Norman. (See Exhibit "Q" – Hester depo. pg. 14/lines 17-18), and "Immediate Action Team" leader Sergeant Rob Pettit, (See Exhibit "Q" – Hester depo. pg. 14/lines 17-21) also responded. The immediate action team was responsible for "being on

9

standby as close to the residence as possible with a point of cover to handle if the subject comes out and gives up, or if subject comes out and decides that he's gonna shoot at the crowd." (See Exhibit "Q" – Hester depo. pg. 15/lines 6-10). Hester may have had his "H&K UNP .45" "submachine gun" at the ready (See Exhibit "Q" – Hester depo. pg. 20/lines 1-10). They put on gas masks and stormed into the home to find its sole occupant dead with "lividity and rigor mortis" and in a pooling of blood. (See Exhibit "Q" – Hester depo. pg. 35/lines 18-23).

37. Deputy Christopher Cicio was told that "SWAT has a standoff" (See Exhibit "R" – Cicio depo. pg. 15/lines 16-18), and to drive "the bomb truck" over. (See Exhibit "R" – Cicio depo. pg. 13/lines 8-14).

38. Deputy Wade Courtemanche was asked, "do you know what squad responded to this (incident)" and he replied, "all of them." (See Exhibit "S" – Courtemanche depo. pg. 8/lines 14-16). He was told a false narrative at a briefing about an earlier incident with "two Deputies at the front door where he had pulled a gun on them." (See Exhibit "S" – Courtemanche depo. pg. 17/line 18 – pg. 19/line 6). Once in the garage with the SWAT team, he did not remember seeing a gun on or around Mr. Hill "at any point." (See Exhibit "S" – Courtemanche depo. pg. 22/lines 17-21).

39. Deputy Michael Gajewski also responded with the SWAT team as a member thereof. (See Exhibit "T" – Gajewski depo. pg. 9/line 23 – pg. 10/line 2). He went in the back door and entered the garage with the team. (See Exhibit "T" – Gajewski depo. pg. 14/lines 9-16). He saw Greg Hill, who appeared to be "non-responsive" and "stiff and rigid." (See Exhibit "T" – Gajewski depo. pg. 18/lines 15-16). He did not see a gun or would have "absolutely" put it in his report. (See Exhibit "T" – Gajewski depo. pg. 18/lines 19-23). He was about three feet away from Hill. (See Exhibit "T" – Gajewski depo. pg. 19/lines 16-18).

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF and a copy hereof has been furnished to Summer M. Barranco, Esquire, Purdy, Jolly, Giuffreda & Barranco, P.A., 2455 East Sunrise Boulevard, Suite 1216, Fort Lauderdale, FL 33304, by email to summer@purdylaw.com, and melissa@purdylaw.com, this 7th day of April, 2017.

    Law Office of John M. Phillips, LLC

    */s/ John M. Phillips*

    **JOHN M. PHILLIPS, ESQUIRE**
    Florida Bar Number: 0477575
    4230 Ortega Boulevard
    Jacksonville, FL 32210
    (904) 444-4444
    (904) 508-0683 (facsimile)
    Attorney for Plaintiff
    jphillips@floridajustice.com
    michele@floridajustice.com