# EXHIBIT "A"

# DEPOSITION OF EDWARD LOPEZ

Page 4

```
 1              PROCEEDINGS
 2                 - - -
 3   AND THEREUPON,
 4              EDWARD LOPEZ,
 5   called as a witness, after having been first duly
 6   sworn, was examined and testified as follows:
 7              DIRECT EXAMINATION
 8   BY MR. ROBERTS
 9        Q.  Good afternoon, sir.  Could you please
10   introduce yourself?
11        A.  I'm Deputy Lopez, Edward Lopez.  My last
12   name is spelled, L-O-P-E-Z.  I am currently employed
13   with the St. Lucie County Sheriff's Office.  My
14   ID number is 217.
15        Q.  And that ID number, has that always been
16   true for you?
17        A.  While I been on Road Patrol, yes.
18        Q.  Okay.  You qualified that.  Can you tell
19   me why you qualified that?  What I mean, I guess,
20   was it ever -- was your ID number ever anything
21   different than 217?
22        A.  Yes, because when I started with the
23   Sheriff's Office, I started at the -- I started
24   working at the jail over at Rock Road.
25        Q.  Okay.
```

Page 5

```
 1        A.  And back then my number was 538.
 2        Q.  Okay.  I introduced myself earlier.  I'm
 3   T.C. Roberts.  I represent the Estate of
 4   Gregory Hill in an action against Deputy Newman and
 5   the Sheriff in his Official Capacity, and I'm here
 6   to ask you some questions about an event that
 7   happened on January 14, 2014.  My understanding is
 8   that you were at least involved in that somehow, and
 9   I want to ask you a little about that.
10            I'll probably ask you a little about
11   yourself, a little bit about your background, to
12   begin with, and then we'll probably dive in.  I hope
13   we're not here more than an hour, but we could be.
14            The -- there's, sort of, some ground
15   rules, and maybe Ms. Barranco has explained those to
16   you.  I'm going to be asking you some questions.
17   Please let me finish my question before you answer.
18   Sometimes, when we talk conversational, we interrupt
19   each other.  It's never rude, and, trust me, I'm
20   not gonna be -- I'm not rude to you when I correct
21   you or I tell you to stop, I'm just making sure we
22   have a complete record.  I'm also making it easy for
23   this kind lady here that's taking down every word
24   that we're saying.
25            Yeses and nos, if my question calls for a
```

Page 6

```
 1   yes or no, I expect a yes or no.  Head nods and
 2   uh-huhs and uh-uhs, again, make it difficult for
 3   Madam court reporter.  Although we are dealing with
 4   a video, the head nods will come off, but if I
 5   clarify and ask if that's a yes or that's a no, I'm
 6   not being rude, I'm just making sure that we have a
 7   complete record.
 8            So how long have you been employed by the
 9   St. Lucie County Sheriff's Office?
10        A.  12 years.
11        Q.  Okay.  So that would have been 2000 --
12        A.  2004.
13        Q.  2004.  What was your first job here?
14        A.  I started working at the jail.
15        Q.  Okay.  What were you doing at the jail?
16        A.  I was a Deputy.  I was a Deputy at the
17   jail taking care of the inmates.
18        Q.  And before 2004 -- well, let me ask you
19   this:  Was your job, your first job here in
20   St. Lucie County Jail, was that your first job in
21   law enforcement?
22        A.  Yes.
23        Q.  Okay.  What were you doing before you
24   decided to embark on a career in law enforcement?
25        A.  I was a respiratory therapist technician
```

Page 7

```
 1   in Brooklyn, New York.
 2        Q.  What brought you to Florida?
 3        A.  The cleanliness, the beautifulness of it.
 4        Q.  Okay.
 5        A.  It's like paradise.
 6        Q.  Okay.  And I don't need to know your
 7   current address, but do you reside in
 8   St. Lucie County?
 9        A.  Yes, I do.
10        Q.  Okay.  What city do you reside in?
11        A.  Port St. Lucie.
12        Q.  Okay.  That's a little south of
13   Fort Pierce?
14        A.  Yes.
15        Q.  Okay.  And you're wearing a suit today.
16   Are you on duty?
17        A.  No, sir.
18        Q.  What is your normal -- well, what is your
19   current job role now here?
20        A.  I'm with Road Patrol.
21        Q.  Okay.  Were you with Road Patrol on
22   January 14, 2014?
23        A.  Yes.
24        Q.  Okay.  So that job role hasn't changed?
25        A.  No.
```

Page 8

1  Q. What does Road Patrol do?
2  A. We patrol the streets, we answer to calls,
3  disturbances, you know, crimes, any type of crimes
4  on the streets, conduct traffic stops for
5  violations, traffic violations.
6  Q. Okay. And then on January 14, 2014, what
7  was your shift?
8  A. I was working -- we usually start at 2:30
9  but it's a 3:00 to 11:00 shift.
10  Q. And I believe Deputy Newman said he
11  started at 3:00. Would his shift also have been a
12  3:00 to 11:00?
13  A. Yes.
14  Q. Do you remembering working that shift with
15  him?
16  A. Yes.
17  Q. Not necessarily as it relates to this
18  incident in particular, but this time of year do you
19  remember working with --
20  A. I believe, yes, we were both on the
21  same -- yeah, we were both on the same schedule.
22  Q. Okay. Prior to this incident that we're
23  here to talk about today, had you worked -- had you
24  responded to calls with Deputy Newman before?
25  A. I'm not sure, but -- I'm not sure. I

Page 9

1  don't remember if I did or not.
2  Q. As far as any relationship between you and
3  Deputy Newman, how would you describe that
4  relationship, if there is a relationship?
5  A. Well, there isn't. We're coworkers. I
6  mean, we work the same agency, that's about it.
7  Like everybody else, you know, they rotate us in
8  shifts, so we get to work with everybody; however, I
9  have had to work hand in hand with Deputy Newman.
10  Q. And outside your professional relationship
11  with Deputy Newman, do you have any other type of
12  relationship with him?
13  A. No.
14  Q. And, again, we're here to talk about what
15  happened. And let me ask you this question first:
16  Outside of this room today and my questioning of
17  you, how many times have you told this story?
18  A. This story regarding this incident?
19  Q. Yes, sir.
20  A. I don't remember. If I said -- to who, to
21  anybody?
22  Q. Well, let's talk about in your
23  professional capacity as a law enforcement officer.
24  With anybody who may have investigated this
25  accident, how many times have you told it?

Page 10

1  A. I don't remember speaking with anybody
2  about it.
3  Q. Okay. Do you remember giving a statement
4  once?
5  A. Yes, I did at the time of the incident.
6  Q. Do you remember giving five statements?
7  A. I don't remember. I don't remember how
8  many I did. But I did speak to -- I did give
9  statements regarding the incident the day that it
10  occurred and on the walk-through.
11  Q. Do you remember who those statements were
12  given to?
13  A. Detective LeBeau, Detective Briglia, and,
14  I believe, Detective Taylor was there on the
15  walk-through.
16  Q. Have you done anything today to prepare
17  for this deposition other than speaking with
18  Ms. Barranco?
19  A. I looked at the -- I looked at the notes
20  from the day that I spoke to Deputy -- I mean,
21  Sergeant LeBeau.
22  Q. Did you look at a transcript of that
23  statement?
24  A. Right.
25  Q. Okay. Did that help you remember things?

Page 11

1  A. Somewhat.
2  Q. Is there anything that you read you
3  disagreed with in that statement?
4  A. That I disagree with?
5  Q. Yes, sir.
6  A. From that day to today, I believe
7  everything -- I mean, what I said there, I mean, I
8  was nervous that day, and what I said is,
9  you know, I believe that as far as disagreeing, I'm
10  not sure if I disagreed with anything.
11  Q. Okay. And you said you were nervous that
12  day. Why were you nervous?
13  A. Well, I was scared I was gonna get shot,
14  and that was -- that was very frightening to me.
15  Q. Okay. And my understanding is that you
16  gave the statement three hours, more than three
17  hours after the shooting occurred. Were you still
18  nervous and scared then?
19  A. Yes.
20  Q. Scared of what?
21  A. Well, scared may not be the right word,
22  but I was nervous. Based on what happened, I was
23  nervous, I was in shock, I was, you know --
24  Q. When you gave this statement -- I'm sorry,
25  I don't mean to cut you off. Were you saying

5 (Pages 8 to 11)

Page 12

```
 1   something?
 2       A.  No.  Basically that's it.
 3       Q.  When you gave the statement to
 4   Detective LeBeau, Detective Briglia, were you aware
 5   that Gregory Hill was deceased?
 6       A.  No.
 7       Q.  So you gave the statement before it was
 8   determined that he was dead?
 9       A.  Correct.
10       Q.  And the walk-through, my understanding is,
11   that happened the next the day?
12       A.  Correct.
13       Q.  Okay.  Do you remember that?
14       A.  I remember going through the walk-through,
15   yes.
16       Q.  Do you remember -- well, who was at the
17   walk-through?
18       A.  It was Detective LeBeau and
19   Detective Taylor.
20       Q.  That's Timothy Taylor?
21       A.  I believe his first name is Timothy, I'm
22   not --
23       Q.  Not the tool man, but Timothy Taylor, the
24   Officer here for the St. Lucie County Sheriff.
25       A.  Detective Taylor.
```

Page 13

```
 1       Q.  Okay.  When you gave that walk-through,
 2   was that video recorded?
 3       A.  I don't remember if it was being video
 4   recorded.
 5       Q.  Do you remember if it was audio recorded?
 6       A.  I don't remember if it was audio recorded
 7   either.  I was just talking to Detective LeBeau as
 8   he was asking me the questions.
 9       Q.  Did he ever tell you that you didn't
10   really have to talk to him?
11       A.  Yes.  He said it was -- that my statements
12   would be voluntarily, yes.
13       Q.  And you chose to voluntarily give your --
14       A.  Sure.
15       Q.  Okay.  Have you ever had an incident, or
16   have you been involved in an incident where you were
17   required to give a statement to a St. Lucie County
18   Detective?
19       A.  Yes.
20       Q.  How many times?
21       A.  Once.
22       Q.  What was that related to?
23       A.  We were investigating something related to
24   a traffic stop where it involved another Deputy, and
25   I happened to be giving a statement as a witness.
```

Page 14

```
 1       Q.  What happened in that?
 2       A.  What happened --
 3       Q.  What was your statement in that case?
 4       A.  Well, I stopped a vehicle, and we stopped
 5   in the vehicle, another Deputy came up on scene.  It
 6   was busy that day.  There were calls holding.  I
 7   believe I had completed my traffic stop, and the
 8   driver was suspended, so she was waiting for a
 9   licensed driver.  I went back in-service and went to
10   respond to another call.  In doing so, I later found
11   out that the Deputy that stood by waiting for the
12   licensed driver ended up towing the vehicle, which,
13   later on, determined to be not the right thing to
14   do.
15       Q.  Okay.  That incident didn't involve any
16   force or excessive force or force for any reason?
17       A.  No.  No.  No use of force.
18       Q.  Have you ever discharged your firearm in
19   the performance of official law enforcement duties?
20       A.  No.
21       Q.  When you gave the initial statement to
22   Detective LeBeau, where were you?  And what I mean
23   by that is, my understanding is that you were on the
24   scene; is that fair?
25       A.  That's fair.
```

Page 15

```
 1       Q.  Where on the scene were you?
 2       A.  We were sitting inside of one of the
 3   Detective's vehicles.
 4       Q.  Okay.  Do you know where that vehicle was
 5   parked as it relates to the garage door at this
 6   house that you responded to?
 7       A.  It would start on Avenue Q, the next block
 8   over on -- west to where the incident took place.
 9       Q.  Okay.  Do you remember how long you were
10   at that scene that night or that day?
11       A.  I don't remember exactly, no.
12       Q.  Do you remember what time it was when you
13   responded to the house, 1501 Avenue Q?
14       A.  I'm not exactly sure, but I believe it was
15   3:00 to 3:30, sometime within 3:00 and 3:30, that's
16   when we received the call.
17       Q.  And when you departed from that scene, was
18   it dark or daylight?
19       A.  It was dark.
20       Q.  Okay.  But you don't remember the time?
21       A.  No, I don't.
22       Q.  Do you remember what time you got home
23   that night?
24       A.  No.  We went to the -- we came here to the
25   Sheriff's Office, then we went home.  I don't
```

Page 16

```
 1   remember the time now.
 2       Q.  What was the purpose of coming here?
 3       A.  They asked us to come here in case they
 4   had any additional questions or they needed to speak
 5   to us.
 6       Q.  "They" being who?
 7       A.  The Captain asked us to come to the
 8   Sheriff's Office.
 9       Q.  Who is, I believe his name is John Wise,
10   does that name ring a bell?
11       A.  John Wise is another Deputy.
12       Q.  Yes, sir.  Do you remember seeing
13   Deputy Wise that night?
14       A.  No.
15       Q.  The whole night you never saw him?
16       A.  I don't remember seeing him.
17       Q.  Okay.  Because he wrote a report on this,
18   are you aware of that?
19       A.  Yeah.  I was aware he wrote the initial
20   report.
21       Q.  Why is he writing the report, can you help
22   me understand why someone that was not involved was
23   writing the report?
24       A.  I don't know.  My supervisor may have
25   asked him to write the report.
```

Page 17

```
 1       Q.  If you had gone -- well, you responded to
 2   1501 Avenue Q for a loud noise complaint; is that
 3   fair?
 4       A.  Correct.
 5       Q.  A loud, obscene noise complaint?
 6       A.  Correct.
 7       Q.  If that call would have gone otherwise
 8   uneventful, maybe you go, you show up to Mr. Hill's
 9   house, he's got loud music playing, you make contact
10   with him, and he turns the music down --
11       A.  Correct.
12       Q.  -- and you depart from the scene, would
13   there have been a report written?
14       A.  No.
15       Q.  Why not?
16       A.  Because it's not -- nothing took place.
17   We went there, we spoke to him, went to Mr. Hill and
18   he said, all right, he lowers the music, and we
19   leave.  We just advise dispatch that the music was
20   lowered, and that's the extent of that.
21       Q.  Okay.  If you make contact with
22   Gregory Hill, and this is a hypothetical, this is
23   not what happened, but if you make contact with
24   Gregory Hill, he gave you his ID, and you ran a
25   background on him and found that he had warrants,
```

Page 18

```
 1   for instance, and you made an arrest, who would have
 2   wrote that report?
 3       A.  I would have.
 4       Q.  Okay.  But you don't know why John Wise
 5   wrote this report?
 6       A.  I don't know, no.
 7       Q.  Do you know -- well, let me ask you
 8   this:  Did you write any report related to this
 9   incident?
10       A.  No.
11       Q.  Were you asked to?
12       A.  No.
13       Q.  Were you told not to?
14       A.  No.
15       Q.  Do you think that odd that you were not
16   asked to write a report?
17           MS. BARRANCO:  Object to the form.
18   Go ahead.  You can answer.
19           THE WITNESS:  Ask it.
20   BY MR. ROBERTS
21       Q.  Do you think it's odd that you weren't
22   asked to document this incident?
23           MS. BARRANCO:  Object to the form.
24   Go ahead.
25
```

Page 19

```
 1   BY MR. ROBERTS
 2       Q.  Other than giving a recorded statement to
 3   LeBeau and Briglia, do you think it's odd that you
 4   weren't asked to write a report?
 5       A.  No.
 6       Q.  Why not?
 7       A.  Based on the severity of this incident,
 8   unfortunate incident, I believe that the Detectives
 9   are the ones to write the reports when something
10   like this happens.
11       Q.  Okay.  And the Detectives, is there a
12   division that they -- when there's an Officer
13   involved shooting involving St. Lucie County
14   Sheriff's Office, is there a particular department
15   that investigates those incidents, or a division?
16       A.  From the St. Lucie County Sheriff, the
17   Detectives.
18       Q.  The Detectives.  Is there a -- some
19   departments are broke down into theft crime
20   detectives and homicide; is it a particular
21   breakdown like that, or is there a particular sect
22   of this agency that investigates Officer involved
23   shootings?
24       A.  We do have Detectives that handle
25   different areas; however, I don't know which
```

Page 20

1  Detective would be assigned to handle this.
2      Q. Okay. Detective LeBeau, do you know him?
3      A. Yes.
4      Q. If he walked in here, would you be able to
5  recognize him?
6      A. Yes.
7      Q. Do you know what he's in charge of?
8      A. He's a Sergeant now. He's on my squad as
9  a supervisor.
10     Q. Okay. And on January 14, 2014, what
11 department or division was he a part of?
12     A. He was with the Detective Bureau.
13     Q. Okay. What does CID stand for?
14     A. Criminal Investigation Division.
15     Q. Do you know what that division does?
16     A. They investigate the, you
17 know -- investigate the crimes that take place.
18     Q. Okay. Did you ever interview any
19 witnesses related to this incident?
20     A. No.
21     Q. How long do you think, and I'm asking for
22 an estimate here, but how long do you think you
23 spoke with Detectives LeBeau and Briglia when you
24 gave this informal statement, or this formal
25 statement?

Page 21

1      A. I don't know exactly how long it was.
2      Q. Did you have any conversations before that
3  statement was taken with LeBeau or Briglia?
4      A. No.
5      Q. Anybody ever tell you what to say?
6      A. No.
7      Q. Did you make any phone calls from the
8  scene?
9      A. No. I may have called my wife to tell her
10 I was going to be late, but I didn't specify a
11 reason why.
12     Q. Did you have any conversations with
13 Deputy Newman at the scene?
14     A. At the scene we were -- basically they
15 were like strategical conversations. We were behind
16 our patrol car, and it felt like it was forever, and
17 we were just keeping an eye on the garage itself and
18 on the side of the house to make sure that --
19     Q. Okay. Let me help clarify what I'm trying
20 to ask, I guess. After -- scratch that.
21        Who was the next person to arrive at the
22 scene, if you're aware?
23     A. The next the person that I saw arrive on
24 the scene was Deputy Paul Pearson, but he was
25 nowhere near us. He came and started to establish a

Page 22

1  perimeter.
2      Q. Okay.
3      A. Everyone else that responded to the scene,
4  they just established a perimeter. No one came near
5  us.
6      Q. At some point, and let me know if I'm
7  incorrect, but at some point a perimeter is
8  established, and you are not a part of being in
9  charge of that perimeter; is that fair?
10     A. That's correct.
11     Q. All right. After that point did you have
12 any conversations with Deputy Newman?
13     A. Not that I recall. I don't remember.
14     Q. Did you ever see him on the phone that
15 day?
16     A. No.
17     Q. When you gave your statement, was he
18 nearby?
19     A. No.
20     Q. When he gave his statement, were you
21 nearby?
22     A. No.
23     Q. Do you know where he was when you gave
24 your statement?
25     A. Exactly where, I don't know. He was

Page 23

1  outside of the vehicle. When I gave my statement, I
2  was inside of the vehicle. And then when I
3  completed my statement, I got out of the vehicle,
4  then, I believe, that Deputy Newman, if I'm not
5  mistaken, Deputy Newman was asked to go in the
6  vehicle and provide a statement.
7      Q. So you believe you gave your statement
8  first?
9      A. I'm not sure if it was me or
10 Deputy Newman, but I know when I gave my statement
11 I was inside the vehicle and Newman was not there,
12 no.
13     Q. And maybe I should have asked this
14 earlier, you have got a bit of an accent; do you
15 speak English as a first language or a second
16 language?
17     A. Second.
18     Q. Okay. When did you learn English?
19     A. From when I was born. I was born and
20 raised in New York.
21     Q. Okay.
22     A. Maybe that's where the accent comes off.
23     Q. Okay. So you -- do you speak Spanish?
24     A. Yes.
25     Q. When you were growing up, is that the

Page 24

1  first word that you said, was it a Spanish word?
2      A.  That's a good question. I don't remember.
3          MS. BARRANCO: Were you there knowing
4  what you were saying?
5          THE WITNESS: Yeah, I don't remember.
6  BY MR. ROBERTS
7      Q.  Do you have to use your Spanish speaking
8  skills in your work as a law enforcement officer?
9      A.  I do. I've been asked to interpret, yes.
10     Q.  And I believe you were commended by one of
11 your superiors that that was actually a good asset;
12 do you remember that?
13     A.  Um --
14     Q.  That you were a lot of help because you
15 could speak Spanish.
16     A.  I've been commended a few times for that.
17     Q.  Okay. I have your personnel file. Have
18 you ever been reprimanded for anything?
19     A.  Reprimanded for anything? Yes. I
20 received, it was supposed to be a verbal reprimand,
21 but, obviously, they put it on paper; I failed or I
22 forgot to show up on one of my details, off duty
23 details.
24     Q.  Okay. Anything else? Any other
25 discipline?

Page 25

1      A.  No.
2      Q.  Have you ever given a deposition before?
3      A.  For cases in which I have arrested people
4  before.
5      Q.  Criminal prosecution cases?
6      A.  Yes.
7      Q.  That, kind of, comes with the territory, I
8  guess, right?
9      A.  Yeah.
10     Q.  Have you ever given a deposition outside
11 of those proceedings?
12     A.  No.
13     Q.  Have you ever been a plaintiff to a
14 lawsuit?
15     A.  Have I been a plaintiff for a lawsuit,
16 have I sued somebody?
17     Q.  Yes, sir.
18     A.  Yes, I did.
19     Q.  Is that Greenscape?
20     A.  Yes.
21     Q.  Tell me about that.
22     A.  I think it was Greenscape. I don't
23 remember the name of the company, but, yes.
24     Q.  What was that about?
25     A.  I was on my way to work one morning, and I

Page 26

1  was at the light on Orange Avenue and Kings Highway,
2  was traveling westbound on Orange Avenue. It was
3  early in the morning. The roads were wet from the
4  dew, from the morning dew on the roads. One of the
5  employees from Greenscape was in and out of traffic
6  with the lawnmower as he was mowing the lawns. He
7  happened to cut off a white vehicle, it was like a
8  pickup truck that was in front of him. When he cut
9  him off, the pickup truck slammed on the brake, and
10 when the pickup truck slammed on the brake, I
11 attempted to stop, and lost control of the bike,
12 and, you know, because the guy came -- he -- the
13 pickup truck got -- almost hit the lawnmower driver,
14 and I lost control of the bike, and I broke my arm,
15 and had third degree burns.
16     Q.  When you say "bike," you mean motorcycle?
17     A.  Motorcycle, yeah. I'm sorry.
18     Q.  That's okay. I just wanted to clarify.
19 Did you hire a lawyer for that?
20     A.  Yes.
21     Q.  Who was your lawyer?
22     A.  I don't remember his name.
23     Q.  When was this incident?
24     A.  I had just started working. It was back
25 in, I believe it was 2014, I mean 2004.

Page 27

1      Q.  Okay. And were you on duty at the time of
2  the collision?
3      A.  Yes, I was on my way to work.
4      Q.  Okay. You were on your way to work on
5  your motorcycle?
6      A.  On my motorcycle, personal motorcycle.
7      Q.  Okay. So I imagine there was no
8  Workers' Comp claim made for that?
9      A.  No. I had just started work. I didn't
10 even have sick time. I was fortunate that the staff
11 collected some money to help me out.
12     Q.  All right. Let's talk about the incident
13 itself. I know we, kind of, touched on it a little
14 bit, but I want you to essentially walk me through
15 your actions all the way up until the point there
16 are shots fired.
17     A.  (Witness nods head up and down).
18 Deputy Newman was dispatched to the loud noise
19 complaint at 1501 Avenue Q. I happened to be
20 talking with Deputy Newman and Deputy Paul Pearson,
21 which he's now a Detective. Deputy Pearson had
22 called me regarding -- I used to have a fingerprint
23 machine to identify people who were refusing to give
24 their identifications. When I got there,
25 Deputy Pearson no longer needed my services.

ronically signed by Suzanne Badley (301-277-379-1582)

Page 28

1  He -- the person he was out with provided him the
2  information he needed. And we just stopped and we
3  were talking, Deputy Newman, Deputy Pearson and I,
4  we was talking, and that's when Deputy Newman
5  received a call for the loud noise complaint.
6      Q.  Okay. I want to stop you there. Where
7  were you guys when you received that call?
8      A.  It was Avenue Q in the church at, I
9  believe it was, I'm not exactly sure, but I believe
10 it was Avenue Q and N. 32nd Street.
11     Q.  Is that north or is that east -- well,
12 Avenue Q runs east and west; is that fair?
13     A.  Correct.
14     Q.  Was that east of the 1501 location or
15 west?
16     A.  No, that was west.
17     Q.  Okay.
18     A.  It would be around 33rd -- you know,
19 usually N. 33rd is like 33rd Street, 32nd Street, or
20 in that area.
21     Q.  All right. So you guys get a call, or
22 Deputy Newman gets a call?
23     A.  Correct.
24     Q.  And you were saying?
25     A.  Deputy Newman gets a call to the noise

Page 29

1  complaint, and then dispatch also dispatched
2  Deputy Jackson, ID number 205, over as a backup unit
3  for Deputy Newman. However, he was a little ways
4  from the area, and I was already with Deputy Newman,
5  so I advised dispatch that I would go with him and I
6  would be his backup to the noise complaint.
7      Q.  Okay. So you essentially volunteered to
8  go; is that fair?
9      A.  Correct.
10     Q.  Had you ever responded to a noise
11 complaint before?
12     A.  Yes, plenty of them.
13     Q.  Is that pretty common in this area?
14     A.  It's common everywhere.
15     Q.  Sure.
16     A.  People call 911 for noise complaints all
17 the time.
18     Q.  Help me understand a noise violation as it
19 relates to prosection, if any, or some sort of fine.
20 Help me understand how that is penalized by the
21 laws.
22     A.  Well, it's an ordinance violation, but
23 it's usually after 10:00 at night. So whenever we
24 get 'em, we respond to them, because we respond to
25 everything, every call that, you know, is given by

Page 30

1  911. And usually we respond to them and we knock on
2  the door and we ask the people, we let them know
3  that somebody complained about the noise, and all we
4  can do is ask them to be courteous and, maybe, lower
5  the music a little, but that's the extent of that.
6      Q.  Not an arrestable offense?
7      A.  Not unless it -- not unless it was
8  something where the person became violent with law
9  enforcement, no, it's not.
10     Q.  Sure. What happens if they don't turn it
11 down, can you take further action?
12     A.  Can we take further action? Not really.
13 We can ask again and try, in a nice way, to have
14 them lower the music. Most of the times they do.
15     Q.  Okay. And if there's a -- is there a form
16 or, maybe, a citation that you can write them?
17     A.  If it's after 10:00, yes. If it's after
18 10:00 at night, yes, or if it's during the night
19 hours, yes, I believe we can cite them for a noise
20 ordinance. I haven't done it.
21     Q.  Before this incident had you ever
22 responded to a noise ordinance during the daytime?
23     A.  Yes.
24     Q.  Okay. And is there a violation
25 occurred -- I guess, what violation is occurring if

Page 31

1  someone is playing their music loud at 3:00 to 3:30
2  on an afternoon?
3      A.  It's no violation. I don't believe
4  there's a violation; however, depending on the
5  circumstances, like I said, we respond to all calls,
6  and we ask them to lower the music, and, like I
7  said, again, depending on the circumstances.
8      Q.  All right. So Newman gets this call. You
9  decide that you're gonna go with him?
10     A.  Correct.
11     Q.  Who pulls up first?
12     A.  Deputy Newman was in front of me. He
13 pulls up a little past -- a little past the garage
14 door on the east of the garage door, and I pull up
15 right behind him, right where the garage door is.
16     Q.  You came from a westerly direction
17 traveling in an easterly direction?
18     A.  Correct.
19     Q.  And you parked in front of the house?
20     A.  I parked directly in front of the garage
21 door, maybe an inch or two back, I'm not sure, and
22 he parked in front of the garage door, east of the
23 garage door, in front of the house.
24     Q.  You pulled in the driveway?
25     A.  No. No. No. No. We were both parked on

ronically signed by Suzanne Badley (301-277-379-1582)

Page 32

1   the street.
2       Q.  Okay.  And you followed him over to the
3   scene?
4       A.  He exited his vehicle first and started
5   walking to the garage door, and I exited my vehicle
6   and, yes, I was walking behind him toward the garage
7   door.
8       Q.  Okay.  And, so, those cars arrive from the
9   same direction?
10      A.  That's correct.
11      Q.  And they were facing the same direction?
12      A.  Correct.
13      Q.  Okay.  What happened next?
14      A.  Deputy Newman knocks on the garage door.
15  He knocks on the garage door and continues to knock
16  as he's walking in a east direction, continues to
17  knock on the garage door.  The music was extremely,
18  extremely loud.  He got no answer at the garage
19  door.
20          As he walked and knocked on the door
21  towards the east side, I walked up to the garage
22  door and I stood on the west side of the garage door
23  next to the wall that frames the garage door.
24      Q.  Okay.  So the music was playing the entire
25  time up until this point; from the moment you got

Page 33

1   out of your car, the music was playing?
2       A.  Oh, yeah, it continued to play.
3       Q.  What kind of music was it?
4       A.  It was rap music.
5       Q.  Okay.  Do you listen to rap music?
6       A.  No.
7       Q.  So do you know if any -- did you recognize
8   any of the songs?
9       A.  No.
10      Q.  You weren't singing along, I guess?
11      A.  No.  I don't listen to rap music.
12      Q.  Okay.  When Deputy Newman knocked on the
13  garage door, did he use his hand or did he use a
14  device of some sort?
15      A.  His palm.  He was knocking with his palm.
16      Q.  What is an ASP?
17      A.  An ASP is an expandable baton.
18      Q.  How do you spell it?
19      A.  I think it's A-S-P.
20      Q.  A-S-P.  Does it stand for something?
21      A.  You know, I don't remember.
22      Q.  You know what an ASP is, you've probably
23  carried one; is that fair?
24      A.  Yes.
25      Q.  Okay.  He didn't use an ASP or a

Page 34

1   flashlight to knock on the door?
2       A.  I don't remember.
3       Q.  Did you ever knock on the door?
4       A.  Yes.
5       Q.  You knocked on the garage door or the
6   front door?
7       A.  I knocked on the garage door.
8       Q.  Did you use your hand?
9       A.  Yes, I did.
10      Q.  Did you ever -- well, it's my
11  understanding, and I can show you pictures, but
12  there's -- on the west side of that garage, that
13  wall, the outer perimeter wall, you can see through
14  that; is that fair?
15      A.  On the west side of the wall in the
16  garage?
17      Q.  Yes, sir.
18      A.  There was decorative bricks, yes, and you
19  may be able to see through there.
20      Q.  Okay.  Did you ever look in there at any
21  point?
22      A.  No.
23      Q.  Even before the shots were fired?
24      A.  No.
25      Q.  Did you ever announce yourself as law

Page 35

1   enforcement?
2       A.  Yes.
3       Q.  What did you say?
4       A.  I said, "Sheriff's Office, Sheriff's
5   Office."
6       Q.  And you got nothing?
7       A.  Well, when I banged on the gate -- on the
8   garage door, I didn't say anything.  The music was
9   very loud; I didn't say anything --
10      Q.  Okay.
11      A.  -- when the garage door started to come
12  up, that's when I made several loud announcements
13  and I said, "Sheriff's Office, Sheriff's Office."
14      Q.  Okay.  So the garage door started to go
15  up?
16      A.  (Witness nods head up and down.)
17      Q.  How far at its maximum, how far did that
18  garage door go up during this whole event?
19      A.  It went up past Mr. Hill's head.
20      Q.  Okay.  You saw Mr. Hill?
21      A.  Correct.
22      Q.  You saw his face?
23      A.  Yes.
24      Q.  You saw his eyes?
25      A.  Yes.

ronically signed by Suzanne Badley (301-277-379-1582)

Page 36

1    Q.  His hairdo?
2    A.  Yes.
3    Q.  Can you describe it?
4    A.  He had dreads.
5    Q.  Did he have -- what kind of clothes did he
6  have on?
7    A.  He had a dark T-shirt and blue jean
8  shorts.
9    Q.  Okay.  Have you seen -- since this
10 incident, have you seen any photographs from this
11 incident?
12   A.  Yes.
13   Q.  When was that?
14   A.  When I was talking to Attorney Barranco.
15   Q.  Okay.  What photos did you see?
16   A.  I saw photos of the scene, the entire
17 scene, where the car was parked, I mean, the garage
18 door.  I saw a variety of photos.
19   Q.  You didn't take any of those photos, I
20 presume?
21   A.  No.
22   Q.  As we sit here today, have you ever
23 stepped foot in that garage?
24   A.  No.
25   Q.  Not even with the -- in the walk-through?

Page 37

1    A.  No.
2    Q.  I believe you were at the door was
3  starting to go up.  Let's take it from there, if you
4  don't mind.
5    A.  The door started to go up.  As the door
6  was going up I yelled, "Sheriff's Office, Sheriff's
7  Office."  And I yelled because the music was very
8  loud.  When the door came up, as door came up, I see
9  Mr. Hill standing there, and I looked in his right
10 hand, and he had a handgun in his right hand.  When
11 I saw the handgun I immediately starting shouting,
12 "gun, gun, gun, drop the gun, drop the gun, drop the
13 gun."  At that point Mr. Hill raised his right arm
14 with the gun in my direction.  As he raised the gun
15 in my direction with the gun with the right hand,
16 Deputy Newman yelled "hey," and then the gunfire
17 went off.  As soon as the shots started to -- as
18 soon as Deputy Newman yelled hey, I could see Hill
19 look towards Deputy Newman and then start to bring
20 the -- I keep on saying gate.  Forgive me.  It's a
21 garage door.
22   Q.  Sure.
23   A.  As Deputy Newman yelled, "hey," he looked
24 towards Deputy Newman's side and started to drop the
25 garage door.  At that point Deputy Newman was

Page 38

1  already firing.
2    Q.  Okay.  He had his -- Mr. Hill had his left
3  hand on the garage door?
4    A.  He had his left hand on the garage door.
5  He had the right -- he had the handgun on his right
6  hand, right by his right leg.  And when I said,
7  "gun, gun, drop the gun," he raised the gun in my
8  direction.  As he raised the gun in my direction,
9  Deputy Newman yelled "hey" and he looked in
10 Deputy Newman's direction, and then he started to
11 drop the gate, but by then Deputy Newman was already
12 firing off several rounds.
13   Q.  When the first shot was fired, what
14 position was the garage door in?
15   A.  It was just starting to come down.  To
16 be -- I can't exactly tell you where it was.  It was
17 not completely down as he started to fire, no.
18   Q.  Okay.  My understanding is that -- well,
19 let me ask you this:  Are you aware that every
20 bullet fired from Deputy Newman's gun pierced the
21 door?
22   A.  Am I aware?  I saw some pictures and, yes.
23   Q.  Let me ask you this:  Did you see a bullet
24 strike Mr. Hill's body at any time?
25   A.  No.  I was -- I was retreating.  As soon

Page 39

1  as he started to raise the gun in my direction, I
2  started to draw my gun and retrieve back, and it was
3  a very frightening moment in my life.
4    Q.  Can you describe the gun that Mr. Hill
5  had?
6    A.  It was a small, black gun.  It appeared to
7  me as though it was like a compact Glock.
8    Q.  Okay.  And you actually reported that on
9  the radio, are you aware of that?
10   A.  Yes.  Yes, I did.  I said it looked like a
11 black -- a Glock.
12   Q.  Are you aware that Mr. Newman, or
13 Deputy Newman described the exact make of the gun
14 over the radio?
15   A.  Yes, I'm aware of it.
16   Q.  Is that surprising to you?
17   A.  No.
18   Q.  Okay.  Have you ever had conversations
19 with him about guns?
20   A.  No.
21   Q.  Do you know if he's, what I'd call, a gun
22 guy, and that's probably not the exact, but a gun
23 enthusiast, do you know if he's a gun enthusiast?
24   A.  I don't know.
25   Q.  You said -- I believe you said he raised

12 (Pages 36 to 39)

Page 40

```
 1   the gun in your direction. Tell me about that; can
 2   you describe that any further?
 3        A.  As soon as I said, "drop the gun, drop the
 4   gun," he raised it -- the gun was pointing down by
 5   his knee, and as soon as I said, "drop the gun, drop
 6   the gun," he lifted the gun in my direction. He
 7   lifted the gun in my direction. And as he's lifting
 8   his arm with the gun in my direction, that's when
 9   Deputy Newman started -- yelled "hey" and started to
10   fire.
11        Q.  Did he point the gun at you?
12        A.  He was lifting the gun in my direction.
13   I -- like I said, at that point I started -- I
14   started retrieving real fast and drawing my gun. I
15   knew he had the upper hand on me, and all I thought
16   was, I'm gonna get shot. It was bad.
17        Q.  How far were you from Greg Hill when the
18   first shot was fired?
19        A.  I was close to him. I can't tell you
20   exactly how far I was, but I thought I was gonna get
21   shot, definitely thought I was gonna get shot.
22        Q.  Where was his body positioned as it
23   relates to you and your positioning? And what I
24   mean by that, I'm off to an angle of you right now.
25   If I were right here (indicating), I'd be directly
```

Page 41

```
 1   in front of you. If I were sitting by Ms. Barranco,
 2   I'd be off at an angle. Can you describe to me
 3   where Mr. Hill was as it relates to your body?
 4        A.  He was almost directly in front of me,
 5   right there (indicating), and he was bladed
 6   (verbatim) a little, his body was a little bladed,
 7   (verbatim) but he was directly -- almost directly in
 8   front of me.
 9        Q.  Okay. You said "almost directly
10   in front" --
11        A.  The right --
12        Q.  -- was he more to the left or more to the
13   right?
14        A.  Right directly in front of me.
15        Q.  Okay. At what point did you feel
16   threatened?
17        A.  As soon as he started -- well, I felt
18   threatened when I saw the gun, but as soon as he
19   started to lift the gun, that's when I realized I
20   was in trouble.
21        Q.  Did you ever feel threatened as the garage
22   door was coming up?
23        A.  Not as the garage door was coming up.
24   When I saw the gun, that's when I started to feel
25   threatened.
```

Page 42

```
 1        Q.  How would you describe this neighborhood?
 2   You've worked in this area since 2004. How would
 3   you describe this neighborhood?
 4        A.  It's a troubled neighborhood, but there is
 5   a lot of hardworking people there, a lot of very
 6   nice people there. They all get along with law
 7   enforcement very well. The church is always taking
 8   care of us. And, you know, the people welcome law
 9   enforcement there, but it is a troubled
10   neighborhood.
11        Q.  Have you ever -- well, what do you mean by
12   that? What is going on that makes this neighborhood
13   troubled?
14        A.  There's drugs. There's gangs in that
15   neighborhood, there's drugs, there's violence.
16        Q.  Have you ever responded to a call at that
17   house before?
18        A.  There? No.
19        Q.  Are you aware of anybody that responded to
20   a call at that house before this incident?
21        A.  Not that I'm aware of, no.
22        Q.  Did you collet any evidence at the scene?
23        A.  No.
24        Q.  I believe you said Pearson was the next
25   one that you remember showing up.
```

Page 43

```
 1        A.  That's the first person I saw showing up
 2   on the perimeter. I saw him. He was coming north
 3   on the corner of -- right where the house is, on the
 4   east corner of Avenue Q and where the house is, and
 5   he came over the radio and he asked which house it
 6   was. We told him which was the house. He -- I
 7   believe he held his position at that corner there.
 8        Q.  Okay. I believe we got to the point
 9   where -- well, let me ask you this: When did you
10   draw your service gun?
11        A.  As soon as he started lifting his -- as
12   soon as he started lifting the gun in my direction,
13   I started retrieving very quickly and I drew my
14   weapon.
15        Q.  Okay. You didn't fire?
16        A.  No, sir.
17        Q.  Is there any reason why you didn't fire?
18        A.  By the time I drew my weapon,
19   Deputy Newman had already fired, you know, multiple
20   shots, and the gate came down.
21        Q.  But you weren't aware that the threat had
22   been, to use Newman's words, eliminated; you weren't
23   aware of that?
24        A.  No.
25             MS. BARRANCO: Object to the form.
```

13 (Pages 40 to 43)

Page 44

1  BY MR. ROBERTS
2      Q.  So I imagine, and I don't want to put
3  words in your mouth, but as soon as that door goes
4  down completely, after there are shots, you're still
5  on edge; is the fair?
6      A.  I'm still --
7      Q.  You're still fearful?
8      A.  Oh, yes.
9      Q.  'cause you weren't sure that somebody had
10 died.
11     A.  Right.
12     Q.  What did you do next?
13     A.  We both took position -- took cover behind
14 my patrol car.  And we stood there as -- well, I had
15 called.  As soon as the gate came down, as we were
16 taking cover behind my unit, I called over the
17 radio, "shots fired, shots fired, shots fired."
18     Q.  Okay.  You actually got an award for that,
19 right?
20     A.  Yes, I did.
21     Q.  Did you think that that -- you were just
22 doing your job; is that fair?
23     A.  I was just doing my job.
24     Q.  You were happy to, I guess -- were you
25 happy to receive an award for that?

Page 45

1      A.  The award didn't mean anything to me.
2      Q.  Sure.
3      A.  My life was what meant everything to me,
4  and that's what I was happy about, that I was still
5  alive.
6      Q.  Sure.  What was Newman's next action that
7  you observed?
8      A.  We both stood behind my patrol car taking
9  cover, because we were both unsure of the unknown.
10 We didn't know that Mr. Hill was deceased inside the
11 garage.  We didn't know if he was going to run out a
12 back door or a side door.  We didn't know if was
13 gonna shoot through the door.  We didn't know what
14 was gonna happen.  We didn't know -- once that door
15 came down, we didn't know what was going on behind
16 the door.  All we can hear is the continuous loud
17 music.
18     Q.  Are you aware that a gun was found within
19 his back pocket?
20     A.  I was later informed, yes, that the gun
21 was found in his back pocket.
22     Q.  It wasn't found in his hand that you're
23 aware of?
24     A.  It was found in his back pocket.
25     Q.  Okay.  At some point did you guys move

Page 46

1  from behind your cars, or either one of you guys,
2  you and Deputy Newman?
3      A.  We stood behind our -- the car until the
4  SWAT team was called in.  SWAT team took position,
5  and then they sent the tank in to cover us as they
6  took us from the scene, as they removed us from the
7  scene.
8      Q.  How did they remove you from the scene?
9      A.  Like I said, the tank pulled up directly
10 in front of the garage door, covering my vehicle and
11 us.  Several SWAT members called us over to where
12 the tank was, and then the tank proceeded to back up
13 in a westbound direction as we followed the tank
14 taking cover from the residence.
15     Q.  Are you aware of any SWAT team
16 members -- are you aware of any names of SWAT team
17 members that responded that day?
18     A.  One that I can remember was
19 Thomas Johnson.
20     Q.  Okay.  Why do you remember him in
21 particular?
22     A.  Well, he's tall, and he was the one
23 talking to us when they were removing us from the
24 scene.
25     Q.  Okay.  Do you know of any other

Page 47

1  involvement he may have had other than what you just
2  stated?
3      A.  No.  Once they removed us from the scene
4  they took us away from the area
5  to, approximately, a block away.
6      Q.  When you say "us" who are you referring
7  to?
8      A.  Myself and Deputy Newman.
9      Q.  Did you ever see this robot thing that was
10 involved or the Sentinel device; do you know what
11 those are?
12     A.  I have seen pictures of it --
13     Q.  Um-hmm.
14     A.  -- I never seen it in action.
15     Q.  Have you seen pictures of it related to
16 this incident?
17     A.  No.
18     Q.  Have you seen photographs specifically
19 taken by this device as it relates to this incident?
20     A.  I don't remember.  I've seen a few
21 photographs that I viewed with Ms --
22 Attorney Barranco, I apologize -- but I viewed a lot
23 of photographs.
24     Q.  Do you know what the Sentinel device does?
25     A.  I'm not completely aware of it, no.  I

Page 48

1  know it's a robot they send in. I know they have
2  one for bomb units, but I don't know what it is, no.
3      Q. Okay. Were there any cars parked in the
4  driveway of the home, civilian cars?
5      A. No.
6      Q. Do you remember any time when
7  Newman may have secured the back portion of the
8  property?
9      A. No. Newman, I don't recall him going
10 anywhere except standing, taking cover with me in
11 the back of the patrol car.
12     Q. Okay. And how long did this music
13 continue to play?
14     A. For a long while. Exactly how long I
15 wouldn't be able to tell you, and I'm not going to
16 speculate. It just continued to play for a long
17 time.
18     Q. Do you know what caused it to stop
19 playing?
20     A. No.
21     Q. Were you there when it stopped playing?
22     A. Yes, I believe I was.
23     Q. Do you remember what you were doing when
24 it stopped playing?
25     A. We were still behind the car taking cover.

Page 49

1      Q. This is before SWAT showed up?
2      A. Just before.
3      Q. So the music stopped playing before SWAT
4  showed up, you believe?
5      A. Yes.
6          MR. ROBERTS: Can we take a quick
7  break?
8          (Short break from 2:00 to 2:08 p.m.)
9  BY MR. ROBERTS
10     Q. Deputy Lopez, just a few more questions.
11 We won't be here much longer. Do you have any
12 military experience?
13     A. No, sir.
14     Q. Just curious. What made you want to
15 become a law enforcement officer?
16     A. Probably you've heard this story a million
17 times. From a little kid I always wanted to be a
18 law enforcement.
19     Q. Okay.
20     A. I was a fully qualified applicant in
21 New York City, and it was at the time when they
22 were -- when the mayors were being reelected and
23 they cut back the classes. Unfortunately, I was one
24 of those they cut back. So when I moved here I
25 tried it again.

Page 50

1      Q. Okay. Are your right-hand or left-hand
2  dominant?
3      A. Left-hand dominant.
4      Q. And do you have any, what I'd call,
5  concurrent employment or side jobs, do you do any of
6  those now?
7      A. No.
8      Q. You mentioned off duty stuff, off duty
9  employment, earlier, what did you mean by that?
10     A. Details, we have details.
11     Q. Details. That's what you said.
12     A. Right. Right. We have details. The
13 agency puts out details in the computers in which
14 we're allowed to pick two a week. It can range from
15 working at the tag office or working at the
16 commissioner's office when they have the meetings
17 with the blue light details.
18     Q. Do you get paid for that?
19     A. Yes.
20     Q. Okay. Before your shift on
21 January 14, 2014, had you had any alcohol or any
22 drugs?
23     A. No.
24     Q. Any supplements? And what I mean by that,
25 do you take anything for, like, weightlifting?

Page 51

1      A. I do proteins.
2      Q. Were you doing those in 2014?
3      A. I believe so. I'm not sure. I'm not even
4  gonna -- 'cause I take them on and off. If I can
5  afford them, I take them. If I can't afford them, I
6  don't take them.
7      Q. What brands of products do you use?
8      A. I use different products. I usually use
9  MuscleTech, just whey protein.
10     Q. You're a weightlifter, or you had some
11 interest in --
12     A. Yeah, I love weightlifting, yes. I like
13 training.
14     Q. How often do you train?
15     A. I try to train as often as possible, four
16 or five days a week sometimes between cardio and
17 weight training.
18     Q. On the day that this incident occurred,
19 did you hear Newman say anything other than, "hey"?
20     A. No.
21     Q. Never heard Hill say anything, Greg Hill?
22     A. No, sir.
23     Q. Hill was shot and killed in his own house;
24 is that fair?
25     A. Yes.

Page 52

1  Q. He never fired a shot?
2  A. No.
3  Q. Hill was shot and killed through his
4  closed garage door; would you agree with that?
5  A. Yes.
6  Q. Did you ever investigate Officer Newman
7  for any crime related to this incident?
8  A. No.
9  Q. Did you ever go up to the school and talk
10 to any of those witnesses?
11 A. No.
12 Q. Were you aware when you arrived that there
13 were witnesses or people outside of the school?
14 A. Yes. There were kids outside in -- by the
15 front of the school by the parking area. There were
16 also civilians and, I believe, school employees
17 there. There was people -- there was people all
18 over near the school, yes.
19 Q. Okay. Have you ever encountered or
20 investigated Greg Hill prior to this?
21 A. No.
22 Q. My understanding is that the SWAT used
23 tear gas. Have you ever seen that before?
24 A. In an incident itself? No.
25 Q. Yeah. What do you mean by that?

Page 53

1  A. Well, when we train, sometimes they let
2  them off just so we can -- for training purposes.
3  But in an actual, you know, disturbance or any type
4  of incident that they have to respond to, I've never
5  seen them use it.
6  Q. That helps me. Thank you. Have you ever
7  been -- you ever had any on you, tear gas?
8  A. Tear gas? No. We carry pepper spray.
9  Q. Okay. Were you involved -- well, were you
10 ever made aware that there may have been a child
11 inside Greg Hill's home?
12 A. Once -- after the shooting occurred and
13 the gate was closed and we were at the back, taking
14 cover in the back of the patrol car, someone, I
15 don't recall exactly or remember exactly where it
16 came from, but someone mentioned that there may have
17 been a child in the house.
18 Q. And that turned out to be false; is that
19 fair?
20 A. Yes.
21 Q. Did Greg Hill have the right to be free
22 from excessive force at the moment he raised his
23 garage door?
24 A. At the moment he raised his garage door?
25 Q. Yes, sir.

Page 54

1  A. Can you elaborate a little better on that,
2  because --
3  Q. At what time, at what point, did
4  Greg Hill's constitutional rights not matter to you
5  or Deputy Newman?
6      MS. BARRANCO: Object to the form.
7  Go ahead.
8      THE WITNESS: When he --
9  BY MR. ROBERTS
10 Q. Let me fix that. At what point did
11 Greg Hill's constitutional rights not matter to you?
12     MS. BARRANCO: Object to the form.
13 Go ahead.
14     THE WITNESS: When he raised the gun
15 in my direction and my life was threatened.
16 BY MR. ROBERTS
17 Q. What criminal acts did Greg Hill commit
18 before the garage door went up?
19 A. Criminal acts?
20 Q. Yes, sir.
21 A. None.
22 Q. At what point did he commit a criminal act
23 in your opinion as a law enforcement officer?
24 A. When he raised the gun and threatened my
25 life.

Page 55

1  Q. Okay. Let's talk a little bit about
2  training as it relates to firearms. When was the
3  first time you ever fired a firearm?
4  A. I fired rifles in New York way back when I
5  decided to take up hunting. I was not successful in
6  hunting and --
7  Q. Let's talk about your training here with
8  St. Lucie County Sheriff's Office related to firearm
9  use. Can you tell me a little bit about that.
10 A. Well, we have very good firearm training
11 in here. We train four, maybe five, times a year
12 with a scenario, with all types of training.
13 Firearm training usually happens to take a part of
14 all blocks of training. We always do some firing,
15 and it's -- we are always brought up to date on
16 anything new that the training unit has encountered
17 in reference to incidents, other incidents that have
18 taken place. And we get extensive -- I consider it
19 to be extensive firearm training.
20 Q. Where do these train -- at least the
21 firearm aspect of your training, where do these
22 occur?
23 A. They occur in the firing range over on
24 Kirby Loop -- not Kirby Loop, Coolidge Road, which
25 is now considered the Gary Morales Complex.

ronically signed by Suzanne Radley (301-277-379-1582)

Page 56

1  Q. Okay. And has that always been the case
2  since your tenure here at -- has that always been
3  the case since you begin working here in 2004?
4  A. Yes.
5  Q. That's the facility?
6  A. Yes.
7  Q. Okay. Have you ever been trained as it
8  relates to firing to visualize your target before
9  firing?
10  A. Yes.
11  Q. Have you ever been told not to blindly
12  fire, or instructed to do -- to refrain from blindly
13  firing?
14  A. Yes.
15  Q. Is there any policies or procedures that
16  you're aware of with the St. Lucie County Sheriff's
17  Office that relate to blind firing?
18  A. I'm sure that it says -- well, I'm not
19  sure. I don't know. I don't remember. If I read
20  it, I don't remember. But, of course, yes, they
21  always say you don't shoot unless you know what
22  you're shooting at, or you see what you're shooting
23  at. So --
24  Q. Why is that important?
25  A. Because you don't want to -- you don't

Page 57

1  want to shoot or kill an innocent person or wrong
2  person.
3  Q. I want to know a little bit about some
4  timing issues. Can you tell me when Deputy Newman
5  pulled his gun out?
6  A. I couldn't tell you. I was speaking -- I
7  was paying attention to Mr. Hill as he was opening
8  the gate.
9  Q. As he was opening gate, you didn't have
10  your gun out; is that fair?
11  A. No.
12  Q. Can you tell me where Mr. Hill's gun was
13  as it relates to moving in your direction, can you
14  tell me where it was when Newman first fired?
15  A. It was up in midway, pointed in my
16  direction.
17  Q. Okay. Did you ever see the barrel, the
18  very butt end of that gun?
19  A. No. I started to retrieve very quickly.
20  I was -- a lot of things went through my mind right
21  there. It was the most frightening moment of my
22  life.
23  Q. Right. And you felt threatened; is that
24  fair?
25  A. That's correct.

Page 58

1  Q. But you didn't shoot anybody?
2  A. No. I was retrieving and drawing my
3  weapon because I knew Mr. Hill had the upper hand on
4  me, and I knew -- I thought he was gonna kill me.
5  The minute he drew the -- the minute he lifted the
6  gun in my direction and I knew my gun wasn't drawn,
7  I felt he was gonna shoot and kill me.
8  Q. Why do you feel like Greg Hill had the
9  upper hand?
10  A. His gun was out in his hand when I saw it.
11  His gun was already in his hand by his leg when I
12  saw the gun, and he started to raise it, and my arm,
13  my hand was just getting to my gun when he was
14  already raising his gun.
15  Q. But you had a gun?
16  A. Yes, I did.
17  Q. And you had backup who also had a gun?
18  A. Correct.
19  Q. You still feel like Mr. Hill had the upper
20  hand?
21  A. Yes.
22  Q. Do you believe it's possible Mr. Hill was
23  deescalating the situation at the moment he was
24  shot?
25        MS. BARRANCO: Object to the form.

Page 59

1  Go ahead.
2        THE WITNESS: No.
3  BY MR. ROBERTS
4  Q. Why not?
5  A. Because he was raising a gun in my
6  direction.
7  Q. You don't believe he was reaching with his
8  right hand, with a gun in it, to help lower the
9  door?
10  A. No.
11  Q. So you believe Mr. Hill, the threat inside
12  the garage, even after Mr. Deputy Newman fired, or
13  Deputy Newman fired -- in order to shoot you he
14  would have to shoot you through the garage; is that
15  fair?
16  A. He would have to shoot us through the
17  garage door unless there was -- yes, he would have
18  to shoot us through the garage door.
19  Q. Blindly?
20  A. Yes, I guess. I shouldn't be guessing,
21  but, yes.
22  Q. Because he was putting the door down, or
23  he had put the door down; is that fair?
24  A. Yes.
25  Q. Were you in uniform at the moment you

17 (Pages 56 to 59)

Page 60

```
 1   arrived at 1501 Avenue Q?
 2       A.  Yes.
 3       Q.  Tell me about that uniform.  What color is
 4   it?
 5       A.  It's a green uniform.  It's a green
 6   Sheriff's Office uniform.  It has patches on the
 7   sleeves, it has my star, on my left side of my chest
 8   it has my ID, and my little American flag above my
 9   ID on the top -- both are on top of the pockets of
10   my shirt.
11       Q.  Okay.  As it relates to identifying marks,
12   insignia or patches, those are all on the shirt; is
13   that fair?
14       A.  Yes.
15       Q.  There's nothing below your belt all the
16   way down to your shoes that identify you as a
17   Sheriff's Officer?
18       A.  Except the -- no -- no -- no markings, no.
19       Q.  Okay.
20           MR. ROBERTS:  I have nothing further.
21           MS. BARRANCO:  I just have a couple
22   of follow-up questions, Deputy Lopez.
23           THE WITNESS:  Sure.
24
25
```

Page 61

```
 1            CROSS-EXAMINATION
 2   BY MS. BARRANCO
 3       Q.  Just to clarify, a few times you've used
 4   the term "gate," and you mentioned that earlier, but
 5   I just want to clarify.  When you've referred to the
 6   word "gate" in your deposition, what were you
 7   referring to?
 8       A.  The garage door.
 9       Q.  Okay.  So when you were telling us about
10   Mr. Hill "lowering the gate," you meant to say
11   lowering the garage door?
12       A.  Garage door.
13           MR. PHILLIPS:  TC did it too.
14           MS. BARRANCO:  Yeah, but I just want
15   to clarify for the record so there's no confusion.
16   BY MS. BARRANCO
17       Q.  And I know you told us that English is
18   your second language.
19       A.  Well, at home, yes, I mean, we
20   predominantly speak Spanish, but at work it's
21   English, is what I speak.
22       Q.  Okay.  Well, one thing I wanted to clarify
23   with you, Deputy Lopez, is, I recall plaintiff's
24   counsel asking you a question about at what point
25   did Mr. Hill's constitutional rights no longer
```

Page 62

```
 1   matter to you; do you remember that question?
 2       A.  Yes.
 3       Q.  And then your response said something
 4   about at the point that he raised the firearm in my
 5   direction; something along those lines, right?
 6       A.  Correct.
 7       Q.  In terms of Mr. Hill's constitutional
 8   rights, do you understand that he, as are all
 9   citizens, free from unreasonable searches and
10   seizures; is that right?
11           MR. ROBERTS:  Form.
12           THE WITNESS:  That's correct.
13   BY MS. BARRANCO
14       Q.  And in this particular situation, do you
15   believe that Deputy Newman using deadly force on
16   Mr. Hill was in reaction to an imminent threat of
17   deadly force that Mr. Hill had toward you?
18           MR. ROBERTS:  Form.
19           THE WITNESS:  Yes.
20   BY MS. BARRANCO
21       Q.  And I know you're not a lawyer, but would
22   you agree with me that that would not then be an
23   unreasonable seizure?
24           MR. ROBERTS:  Form.
25           THE WITNESS:  I do.
```

Page 63

```
 1           MS. BARRANCO:  I have no further
 2   questions.
 3           MR. ROBERTS:  And, also, one
 4   follow-up.
 5            REDIRECT EXAMINATION
 6   BY MR. ROBERTS
 7       Q.  If you've used "gate" in prior statements,
 8   you mean the garage door?
 9       A.  I mean the garage door, yes.
10       Q.  Do you think in English or Spanish?
11       A.  I think in English.
12           MR. ROBERTS:  Okay.  Thank you.
13           MS. BARRANCO:  No further questions.
14       (Deposition concluded at 2:26 p.m.)
15           MS. BARRANCO:  And he'll read.
```

18 (Pages 60 to 63)

Page 64

```
 1   STATE OF FLORIDA   )
                       : SS
 2   COUNTY OF ST. LUCIE )
 3
 4           CERTIFICATE OF OATH
 5       I, SUZANNE K. BADLEY, a Notary Public of the
 6   State of Florida at Large, authorized to administer
 7   oaths, certify that Edward Lopez was by me first
 8   duly sworn to tell the truth.
 9       Dated this 4th day of October, 2016.
10
11           [signature]
             SUZANNE K. BADLEY
12           My Commission Expires:
             August 16, 2019
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 65

```
 1   STATE OF FLORIDA   )
                       : SS
 2   COUNTY OF ST. LUCIE )
 3
 4           REPORTER'S CERTIFICATE
 5
 6       I, SUZANNE K. BADLEY, a Shorthand Reporter,
 7   certify that the foregoing deposition, Pages 1
 8   through 64 inclusive, of Edward Lopez was
 9   stenographically reported by me and is a true and
10   accurate transcription of said deposition of
11   Edward Lopez.
12           I certify further I am neither
13   attorney nor counsel for, nor related to, nor
14   employed by any of the parties to the action
15   in which the deposition is taken and, further,
16   that I am not a relative or an employee
17   of any attorney or counsel employed in this
18   case, nor am I financially interested in the
19   outcome of this action.
20       Dated this 31st day of October, 2016.
21
22           [signature]
             SUZANNE K. BADLEY
23
24
25
```

Page 66

```
 1   VIOLA BRYANT v. SHERIFF KEN MASCARA
 2   DEPOSITION OF EDWARD LOPEZ
 3           ERRATA SHEET
 4   PAGE LINE    READS           SHOULD READ
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20
21       Under penalties of perjury, I declare that I have read the
         foregoing document and that the facts stated in it are
22   true.
23
         _____   _____
24       DATE                  EDWARD LOPEZ
25   CC:
```

Page 67

```
 1                       October 31, 2016
 2   Edward Lopez c/o
     Summer M. Barranco, Esq.
 3   Purdy, Jolly, Giuffreda & Barranco, P.A.
     2455 East Sunrise Boulevard, Suite 1216
 4   Fort Lauderdale, Fl 33304
 5   In Re: October 4, 2016 deposition of Edward Lopez
         Viola Bryant, et al v. Sheriff Ken Mascara, et al.
 6
     Dear Sir:
 7
         This letter is to advise that the transcript for the
 8   above-referenced deposition has been completed and is
     available for review. Please contact our office at
 9   (800)635-9193 to make arrangements for read and sign or
     sign below to waive review of this transcript.
10
         It is suggested that the review of this transcript be
11   completed within 30 days of your receipt of this letter,
     as considered reasonable under Federal Rules*; however,
12   there is no Florida Statute to this regard.
13       The original of this transcript has been forwarded to
     the ordering party and your errata, once received, will be
14   forwarded to all ordering parties for inclusion in the
             Sincerely,
16
17
             Suzanne K. Badley
18           Court Reporters, Inc.
19   CC:
20   Waiver:
21   I, _____, hereby waive the reading &
     signing of my deposition transcript.
22
     _____   _____
23   Deponent Signature        Date
24   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e).
25
```

19 (Pages 64 to 67)