# EXHIBIT "N"

# DEPOSITION OF WILLIAM ROBERT ANDERSON, M.D.

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

VIOLA BRYANT, as Personal      Case No. 2:16cv14072-
Representative of the Estate          Rosenberg/Hopkins
of GREGORY VAUGHN HILL, JR.,

          Plaintiff,

vs.

SHERIFF KEN MASCARA, in his
official capacity as Sheriff
of St. Lucie County, and
CHRISTOPHER NEWMAN, an
individual,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - -

                    Altamonte Springs, Florida

                    February 22, 2017

                    9:33 a.m.

DEPOSITION OF:

WILLIAM ROBERT ANDERSON, M.D.

---

2

A P P E A R A N C E S:

     JOHN M. PHILLIPS, ESQUIRE
     WILLIAM KENNETH WALKER, III, ESQUIRE
     Law Office of John M. Phillips, LLC
     4230 Ortega Boulevard
     Jacksonville, Florida 32210

          Appearing on behalf of the Plaintiff.

     BRUCE WALLACE JOLLY, ESQUIRE
     Purdy, Jolly, Giuffred & Barranco, P.A.
     2455 East Sunrise Boulevard
     Suite 1216
     Fort Lauderdale, Florida 33304

          Appearing on behalf of the Defendants.

          - - - - -

                    I N D E X

TESTIMONY OF WILLIAM ROBERT ANDERSON, M.D.:

     Direct Examination by Mr. Jolly          4
     Cross Examination by Mr. Phillips       54

CERTIFICATE OF REPORTER                      67

          - - - - -

                    E X H I B I T S

                              Marked     By Reference

Exhibit A                      66             6
Exhibit B                      66            64

---

3

     The deposition of WILLIAM ROBERT
ANDERSON, M.D., was taken on behalf of
the Defendants on Wednesday, February 22,
2017, beginning at 9:33 a.m., at Marge
Raeder Court Reporter, Inc., 999 Douglas
Avenue, Suite 3307, Altamonte Springs,
Florida, before Vicky L. Barwick, Court
Reporter and Notary Public, State of
Florida at Large.

          - - - - -

Whereupon,

     WILLIAM ROBERT ANDERSON, M.D.,
having been first duly sworn by the reporter, testified
as follows:

     MR. JOLLY:  Dr. Anderson, my name is Bruce
Jolly.  I'm a lawyer in Fort Lauderdale.  My
office represents the sheriff, Sheriff Mascara,
and two of his -- actually, only one deputy,
Deputy Newman, in this lawsuit which has been
brought on behalf of, by the estate of -- his name
is Gregory Hill.

     Obviously I have a report that was submitted
to us on your behalf and that is why your
deposition has been scheduled.  I know you've been
deposed before.

---

4

     THE WITNESS:  Yes.  Right.
     MR. JOLLY:  So I'm not going to go over the
rules with you.

                    DIRECT EXAMINATION

BY MR. JOLLY:
     Q     You've been -- you are aware you have
testified against the St. Lucie County Sheriff before.
Did you know that?
     A     Well, I don't know that -- as a forensic
pathologist, we don't testify either for or against
either side, so --
     Q     Well, I got a better question.
     A     We did a second autopsy on a gentleman who
was deceased in a canal.  I remember that one.
     Q     That's the one.
     A     And that was because of the second autopsy.
So it's, more or less, as a second-treating physician,
as opposed to an expert.  So I would say we testified
in that case, but I wouldn't characterize it as
being --
     Q     But you remember that.
     A     -- for either side.
     Q     You knew it was the St. Lucie County Sheriff.
     A     Oh, yes.
     Q     Are those the only matters that you recall in

5

which you were involved as a litigation consultant with respect to the St. Lucie County Sheriff?

A   It's the only time I can recall.  I don't --

Q   Fair enough.  Okay.  All right.  I got ahead of myself a little bit.  What is your full name?

A   William Robert Anderson, A-n-d-e-r-s-o-n.

Q   Business address?

A   My consulting practice is the 1630 Bridgewater Drive, Heathrow, Florida.  I have that in -- my office in my residence.  That's why we're doing this here.

Q   How is your consulting office different from any other office that you have?

A   Well, I'm also laboratory director for two endoscopy centers, one in Ocala and one in Gainesville, and I basically read biopsies, which is primarily my major -- time-wise is the major primary practice now.

Q   You are no longer actively employed by any medical examiner's office.

A   That's correct.  I'm not.

Q   And how long has it been since you did that?

A   Well, I believe in 2003, I was -- after leaving Orange County in 2002, I worked in District 12, which is Sarasota, and then I went into private practice.

6

And in 2006, the Volusia County Medical Examiner, which is the Daytona Beach area, left precipitously and I was contacted by the sheriff's department there and asked to fill in for him and that was about six to eight months during 2006 since I was -- there were no other board-certified pathologists in the office at that time, they felt that the homicide cases and so forth, that they needed someone who was board certified, so agreed to do that, as a contractor basically.

Q   I'm going to show you what will be marked as -- it was Plaintiff's B on the expert witness disclosure of 12/26/16, but it'll just be "A" for ID for our purposes.

A   I have it electronically, of course, too.  Do you have the color?

Q   I do have the color, but I needed to keep that.  That was my -- does it make a difference for you?

A   Yeah.  I think it's better just to have the color, probably is better.

Q   Okay.  I'll probably --

A   And I can provide them to you electronically, so you can print them out in color.  All you need is a color printer.

7

Q   No.  I know.  I just -- this is, you know --

MR. PHILLIPS:  For purposes of attachment, we can attach black and white.  If you can just look at color --

MR. JOLLY:  Fair enough.

MR. PHILLIPS:  Yeah.

MR. JOLLY:  That'll work.

MR. PHILLIPS:  Okay.  By stipulation.

MR. JOLLY:  May I retrieve -- oh, you already sent it back to me.  Then I'll rely on this because I don't need the color.  But to the extent that you --

THE WITNESS:  Well, I've got it here electronically anyways.  That's okay.

BY MR. JOLLY:

Q   Oh, all right.  I'm going to show you what's been marked as "A" for ID and I want you to identify that, if you can.  [Handing]

A   [Examining]  The first four pages are the report which I submitted at the request of Mr. Phillips' office in late December of last year and the rest appears to be my attached curriculum vitae, which is pretty much up to date.

Q   The report does not recite what it is that you reviewed.  What did you review?

8

A   I believe that's not correct.  If you read --

Q   I'm only correct half the time, so that's -- wouldn't -- shouldn't surprise anybody.

A   Okay.  Well, good.  The next one will be good then; right?  The next question will be --

Q   Don't assume that.  It's the great average, not the --

A   At your request -- at your request, I reviewed the medical -- I'm reading from my report.  At your request, I reviewed the medical examiner's records, including autopsy report, scene photos and office files related to the death of Mr. Hill and made the following observations and conclusions.

So that's what I reviewed.

Q   So that recites that you reviewed the medical examiner's records, including autopsy report, scene photos and office files.  Well, that's why I asked.  It doesn't really help.

What is it within --

A   Well, the autopsy report is specifically that, including --

Q   Slow down.  You're ahead of me here.  What is it in the medical examiner's records that you review?

A   Their scene review, their toxicology, the actual autopsy report, the photos taken at autopsy.

9

That's all part of the medical examiner's autopsy or medical examiner's records.

Q    Any other documents that you can specifically refer me to that you reviewed or was that it?

A    That was it.

Q    All right.  Again, Dr. Anderson, you go so fast, I couldn't keep up with you.  What was it?

A    The -- it's in the report, so --

Q    Well, respectfully --

A    -- the autopsy report, medical examiner's records --

Q    Okay.

A    -- scene photos and office files related to the death.

Q    Okay.  But what is that stuff?  That's my point.  You lump it into these general categories, but what were the actual documents?  If you do not break it -- if you did not break it down, if you cannot break it down, then I'll move on.

A    There's the -- as I said, the medical examiner investigative report, which includes the toxicology, the actual autopsy findings, the report, the laboratory toxicology report, it looks like some records, the autopsy dictation, chart diagrams, organ weights, the body diagram with the pathologist's notes,

10

notes from the investigator -- [examining] -- circumstances of death.

It's about, it looks like, 73 pages or so of this, so basically the other records generated by the medical examiner's office related to this case.  There's a scene diagram done by the medical examiner.

Q    All right.  Do you have or did you bring with you today a coy of the specific documents that were reviewed --

A    Yes.

Q    And where are those, sir?

A    They're electronically.

Q    That's all electronic.

A    So I can give them to you on a thumb drive or a CD or whatever.

Q    Fair enough.  That'll work.  Based upon your representation after the fact that you can supply a thumb drive or CD, what's easier for you?

A    The thumb drive.

Q    The thumb drive, which will recite or reflect all of the documents that you reviewed.  I'll move on.

A    Yes.

Q    Fair enough.

MR. PHILLIPS:  I think I even have a thumb drive in the car that we can --

11

MR. JOLLY:  Of what he reviewed?

MR. PHILLIPS:  No.  But to put stuff on that we can --

MR. JOLLY:  Oh, okay.

MR. PHILLIPS:  -- facilitate that.

THE WITNESS:  Well, to be clear, these are the medical examiner public record documents that were sent to me as the medical examiner's total file in this case.

BY MR. JOLLY:

Q    Anything else that you reviewed in connection with this matter?

A    No.  I think I was sent some police reports. I was sent some -- but I did not review them.  I looked at some scene pictures, as I indicated.

Q    And which pictures did you look at?

A    I had, I think, 23 pictures from the --

Q    Who chose what pictures you were to go to in to look at?

A    I just received, it looks like -- [examining].  I was sent a folder named, Hash Tag 23, Photographs Marked, and this appears to be pictures of the scene.  The ones I utilized were essentially just the interior scene, for reference, interior of the garage.

12

Q    Now, those were not photographs that were with or contained in the ME's report.

A    Right.  That's why they were listed as scene photographs.

Q    All right.  And do you know the source or those photos?  Who gave them to you?

A    I received them from the attorney.

Q    Did you play any role in selecting what photographs you were to be shown?

A    No.

Q    I guess we can do that by way of a separate thumb drive or --

A    Sure.  Well --

Q    -- include it on the same thumb drive?

A    -- there might be room on a thumb drive for it.

Q    Okay.  I'm going to ask that the photographs, the 23 photographs also be included in the package responsive to the deposition notice.

Any other documents that you reviewed?

A    No.  That's all I reviewed.  I didn't -- as a forensic consultant, basically I'm just looking for hard evidence.  I don't read depos or police reports or opinion reports or anything like that.

Q    When were those materials provided to you?

13

A   I'm not sure.  Sometime probably middle of last year.

Q   During the summer?

A   I don't recall.  I'd have to go back and see if I could find that.  I could probably get that for you in the next few days.

Q   And, but your general recollection, as we sit here today, is that those materials were provided to you, the materials that you've --

A   Sometime before the report, so I would say I don't --

Q   Well, I know that.

A   Well, not necessarily, but I'd assume you would.  But I would -- I'd have to go look that up.  But I can get that for you later.  I think I can retrieve that.

Q   And from whom did you receive the material?

A   All the materials I received were from the plaintiff's attorney's office.

Q   Have you been to the scene?

A   No.

Q   Do you need to go to the scene?

A   No.

Q   All right.  When were you first contacted regarding this matter?

14

A   Well, again, I'd have to look that up because shortly thereafter, I was contacted.  I received the material, so it was all in the same time frame.

Q   Do you recall how you were contacted; telephonic, email, correspondence?

A   I don't recall.

Q   Do you recall who contacted you?

A   The attorney's office, but I don't know specifically who.

Q   But, I mean, you don't know who from his -- Mr. Phillips' office --

A   No.

Q   -- reached out to you.

Have you worked with Mr. Phillips' office before?

A   Not that I can recall, but I deal with a lot of attorneys and both sides of cases, so I --

Q   What is your understanding of how you came to be contacted?

A   I have no idea.

Q   Okay.  And you were not told.

A   No.

Q   And as we sit here today, whenever it was that you were contacted, however it was that you were contacted, what were you told about this matter?

15

A   I basically wasn't told a whole lot.  I was told that this was a shooting that was being investigated, a law enforcement-related shooting and that -- so I requested the information that related to the death and was asked my -- to come up with opinions as to my findings after review of that material.

Q   What specifically were you asked to do?

A   Look at the facts and give my opinion based on the facts.

Q   Opinion on what, though?  I mean --

A   The characterization of the wounds, the cause of death, the injuries to this individual.

Q   Okay.  Anything else?

A   No.  But as -- when I'm consulted as a forensic pathologist, I look at an overview of the case and come up with, you know, forensic issues that may come up with this -- would be related to this case.

Q   Well --

A   For instance, the fact that two of these appear to be re-entry wounds, as indicated in the report.  The one -- the lower abdomen appears to be a direct wound without the characteristics of re-entry.

Q   And by re-entry, you mean what?

A   Intermediary target was struck before the bullet struck the person, the victim.  This causes a

16

change in the trajectory of the bullet and, therefore, gives a different characteristic than a simply spinning, rotating bullet just coming out of -- not directly hitting the skin.

Q   Well, you're talking about the bullets going through the door, the garage door.

A   Well, some intermediary target, yeah.  And in looking at the scene, it appears that it's --

Q   Looks like it's the door.

A   -- the garage door.

Q   Okay.  Do you recall, what is the date of your report, sir?

A   December 24th, 2016.

Q   All right.  The day before Christmas you're cranking out a report?

A   That would appear to be.  Yeah.  I probably didn't have a hundred biopsies to read that day, so I had a chance to do it.

Q   Okay.  How much time -- do you keep a chronology of what you do and when you did it?

A   No.  Not necessarily.  Conferences and so forth, I do, but not like when I'm doing a report because sometimes it's a question of, you know, putting it together over a period of time.

Q   Well, is there a chronology somewhere in your

17

electronic files as to what you did and when you did it; for example, when the materials were received, when they were reviewed, that kind of a thing?

A    No.  I can tell you when the case was opened. I'll have to look.  As I said, I'll have to research that.  But not necessarily when things are received and so forth.

Q    Well, how much time do you think you've expended on this matter?

A    Oh, probably six, seven hours.

Q    And how do you bill to the retaining law firm?

A    The same as I bill for any consultation, 350 an hour for review, 500 per hour for any depositions or testimony.

Q    So how do you bill if you don't know when it is or what you did?

A    Well, as I said, when I have conferences or depositions or trial testimony, I do record those dates.  But normally I don't specifically say what date.  Let's say it was four hours to put the report together, but that may have been four hours over a number of days.

So it would be cumbersome to have to say, well, 30 minutes was put finding the pictures, 45

18

minutes was -- I mean, that's just -- that's unnecessary minutiae.  So I don't do that.  I figure it's three hours for the report, I'm going to put three hours.

Q    Have you submitted any bills in connection with this matter?

A    I don't recall.  I'd have to look that up, too.  Probably not.  Sometimes I don't bill until the end of the case.

Q    Have you received a retainer?

A    Again, I'd have to look that up.

Q    Do you have any correspondence which has -- between you and the retaining firm in this instance documenting what it is, how it is that you will be charging?

A    No.  I think I probably -- in my CV, which I believe I provided to -- you have it also, my rates are on that, so I figured that's how they know.

Q    In this instance, do you know if you've been paid anything?

A    Again, I'd have to research that.  I usually get a retainer.

Q    Did you get a retainer in this matter?

A    I'd have to research it.  I don't know if I did or not.  Unusually, sometimes I'll take a case if I

19

feel it's significantly, forensically interesting, then I will take a case, even though I may not get a retainer and sometimes I don't even get paid. Sometimes just do it pro bono.

Q    Are you --

A    And I felt that this was an interesting forensic case.

Q    You're not doing it pro bono.

A    No.

Q    As we sit here today during this deposition, you cannot tell me how much you've charged or been paid.

A    No.  I can look it up and tell you for sure.

Q    And that's my next question.  But there's a mechanism by which you can determine that.

A    Yes.

Q    Can you do that while we're sitting here or would you rather do it after the fact?

A    I'll do it afterwards because I have to pull up other files, but.

Q    Since the report is dated December 24, 2016, I'll use that as the date for the rest of my questions.

Since that date, what work-up, if any, have you done?

A    Well, other than review the case to -- for

20

the deposition today, nothing.

Q    What materials, if any, have you received that you reviewed since December 24, 2016?

A    None.

Q    And the work-up involved in preparing for today's deposition, when did you do that and how long did it take?

A    Probably about an hour, two hours.  I did it the last -- the last couple days.

Q    How would you characterize or describe your function in this case?  What were you asked to do? What did you do?

A    Well, I think we've been through that before.

Q    We may have, but I --

A    I was asked to simply review the forensic evidence, which we have listed prior a few minutes ago, and give any opinions as to the type of injury, characteristics of the injuries and effects of the injuries --

Q    And the cause of death.

A    -- that would have occurred from this individual.

Q    My --

A    And also the mechanism of the -- of what those injuries would, for instance, allow an individual

21

to do or not do after they're inflicted.

Q    And with respect to the last thing you just mentioned, were you asked to do that?

A    No.  I do that as part of my -- I've been practicing forensic pathology for a long time, so I basically try to give a complete opinion.

Q    You have not -- you didn't actually perform the autopsy.

A    That's correct.

Q    And you've never examined Mr. Hill's body.

A    That's correct.  But the medical examiner took very good, detailed photos and, as in many forensic situations, even when we have done the autopsy ourselves, we will rely on our photographs and documentation rather than attempting to do it from memory, for instance, on these cases.

So the photos, wounds and so forth were very complete and satisfactory to make the opinions.

Q    Do you know Dr. O'Neil?

A    No.  I don't.

Q    But I think you indicated you reviewed her autopsy report.

A    Yes.

Q    Do you have -- how would you characterize the quality of the autopsy that was performed and the

22

documentation by way of reporting on that work-up?

MR. PHILLIPS:  Objection.

BY MR. JOLLY:

Q    Do you see anything that Dr. O'Neil did that she shouldn't have done or didn't do that she should have done?

MR. PHILLIPS:  Objection.

THE WITNESS:  No.  The autopsy report seems to be complete.

BY MR. JOLLY:

Q    Was there anything about the protocol that she appears to have followed as being insufficient or adequate?

MR. PHILLIPS:  Objection.

THE WITNESS:  I'm sorry.  I lost the last question.

MR. JOLLY:  That's because --

THE WITNESS:  Or adequate or inadequate?

BY MR. JOLLY:

Q    That's because I was making it up and I know better than to do that.

No.  You looked at her report.  Was there anything about her report that suggested to you that the protocols which she utilized were less than adequate?

23

A    No.

Q    How would you characterize the percentage of litigation consult, plaintiff versus defendant?

A    The majority of the cases which I'm presently involved in in criminal cases are for the defense.  The cases that I'm involved in civilly in which I've not done an autopsy are actually pretty few.  They're probably just about equal.

Now, when I do an autopsy on a case and then I'm the subsequent treating physician, if that case comes to litigation, I would tend to be called by the family or whoever contracted with me to get that autopsy done.

Q    I don't think that's what you meant to say.  Perform the autopsy and then the treating physician?  What would a treating physician do to a person --

A    Well, as a subsequent treating physician.  We make diagnoses based on the autopsy.

Q    Uh-huh.

A    The autopsy is clearly the practice of medicine.

Q    Oh, yeah.

A    You, for instance, couldn't go out and do an autopsy.  But --

Q    I couldn't.

24

A    But if an autopsy is done, that's part of the medical treatment and I've always considered that, not as an expert if it becomes litigation, but a subsequent treating physician.  And that has been accepted -- I've testified many times to that and it's always been accepted.  I've never had that challenged.

Q    Have you -- have you -- can you recall on occasion where you have been involved in a civil case as a litigation consultant where you were retained by the law enforcement office being sued?  I should say agency being sued.

A    Well, yeah.  I've done a number of -- now, not as autopsies, but as a consultant.  I've been -- within the last couple of years I've probably had three or four with the Orlando PD and where we looked at the injuries allegedly inflicted by the officer and in the jail, a couple of big profile -- high-profile cases in the last couple years.

Q    Who were -- do you recall the names of the lawyers --

A    No.

Q    -- that retained you?

A    I can probably find that for you, too, actually.

Q    Okay.  I did some of this out of order, but I

25

want to make sure I covered it.

        As I recall your testimony, you are unable
today, as we sit here, to tell me when you were
contacted or when you were formally retained.

    A    Well, as we sit here, I can't pull that up
immediately.  We can certainly do that afterwards and I
can give it to you.  So it's not, like, I don't
necessarily commit all data points to memory because I
don't have a lot of space in there.

    Q    How would you characterize the field of
expertise in which you provide opinions?

        MR. PHILLIPS:  Objection.

        THE WITNESS:  I don't understand the
    question.  As forensic pathologists -- forensic
    pathologists look at cause and mechanism, manner
    of death and injury.

BY MR. JOLLY:

    Q    Have you testified in -- well, I know you've
testified in federal court; correct?

    A    Yes.

    Q    State court.

    A    Yes.

    Q    And those were in the field that you just
described, forensic pathology.

    A    Yes.  The majority of testimony I've given

26

over my career have been as medical examiner and county
depositions and court, of course.  But --

    Q    But that has not been what you have been
doing for the last ten years-plus or so.

    A    Well, but it's the same basic principle.  As
a forensic pathologist, whether I was a medical
examiner or a private consultant, forensic pathology is
forensic pathology.  So we do the same thing.

    Q    Can you -- do you know whether any opinion
you have ever rendered in connection as a litigation
consultant, privately retained, been limited of what
you could say, what you could testify to was limited?

    A    You know, I don't recall any specific time.
I think there was a case in Mississippi that part of
the testimony was not allowed to -- regarding the
survivability of a -- of a patient with pancreatic -- I
think it a pancreatic cancer case.

        But I never was informed of that, actually.
Somebody brought that up at a depo awhile ago, so I
don't know where that came from.

    Q    Have you ever had any opinion excluded?

    A    Not that I can recall.  Other than that was
limited, but --

    Q    Is there -- are there any materials which you
asked to be provided which was not provided in

27

connection with this matter, your review of this
matter?

    A    I don't believe so.  I basically wanted to do
just an objective analysis of the actual hard data and
that was mostly provided -- it looks like it was
provided completely to me.

    Q    Is there any work-up which you anticipate
doing if -- prior to this matter actually being tried?

    A    Probably not.  But depending upon questions
that you may raise here, I'm -- I can't completely
close the door on that possibility.

    Q    Okay.  Is there any specific text materials
upon which you relied in rendering the opinion that
you've rendered?

    A    No.  Basically my experience and knowledge of
all the many, many articles and so forth related to
gunshot wounds and survivability and neurological
injury and so forth, but nothing specific in this case.

        This was really a pretty straight-forward
case.  It didn't take a lot of extraneous research.

    Q    [Pause]  I think you indicated that one of
the documents within the ME's report was the toxicology
report.

    A    Correct.

    Q    You reviewed that.

28

    A    Yes.

    Q    And what information was included -- and I
guess I can ask this two different ways -- would
typically be included in a toxicology report or was
specifically included in this toxicology report?

        MR. PHILLIPS:  Objection.

        THE WITNESS:  Which question do you want
    answered?

BY MR. JOLLY:

    Q    Good point.  What information was disclosed
in this toxicology report?

    A    They did a complete drug screen.  Alcohol was
.328.  And for reference, the legal limit for
intoxication by the state, for driving anyway, is .08.
So we're looking at probably four times the -- what
would be considered the legal limit for driving.  And
this was sampled from the hard blood.

        The other -- the blood was also tested for
numerous other materials and I believe, if I recall,
that was all they found in this case -- [examining] --
yeah, the alcohol.  So --

    Q    You were able to access it electronically?

    A    Yeah.

    Q    The report?

    A    We try to save the trees as much as possible.

29

Q    Would that be -- are you looking at page -- the toxicology report is a two-page report?

A    Well, let's see, two or three.  [Examining] One -- yeah, it looks like two of two.  I'm looking. The alcohol, the vitreous and the blood were pretty much the same, I think.

Q    And the vitreous, what was the reading on the vitreous?

A    Well, actually, the vitreous -- yeah, the vitreous was a little high, .39.

Q    What does that tell you, if anything?

A    Well, it means that at one point prior to his death he was almost a .4.  The vitreous lags behind the blood levels, so this indicates that he actually was coming down from a higher level and it -- but he had at one point, probably an hour or so before, he was at a .39 and now at the time of death he's at a .328 or roughly 60 points lower.

Q    Were you concerned in any respect with the sources of the blood that was drawn?

A    No.  I think the pathologist indicated that it was a hard blood sample, which is fine for alcohol, and the vitreous confirms that that indeed was --

Q    You were not surprised that the two different sources were used.

30

A    No.  It's good practice, actually, particularly if you're concerned about contamination of the blood with gastric content.

Q    And what indication, if any, is there that there was that contamination?

A    Well, no.  Basically there is none and she ruled that out pretty well with the vitreous.

Q    You accept those readings as a part of your analysis.

A    Yes.

Q    As you sit here today, you have reason to believe -- better question.

You have no reason to believe that the samples were unreliable?

A    I believe they were reliable.

Q    From your training and your experience, are you able to testify as to the level of functionality of this man with that blood reading?

A    Well, he --

Q    Blood alcohol reading?

A    Yeah.  By definition, he would be impaired from operating a motor vehicle and from that level, in some individuals the level of a -- near a .4 would be -- actually could be fatal.  It's a high -- it's a high level.

31

Q    I'd be dead.

A    Well, maybe.  I don't know.  You could.

Q    Trust me.

A    I don't know your history.

Q    Trust me.

A    Most people would be severely impaired and at a .32, he's going to be -- you know, he's confused. He's probably not thinking rationally and so forth. But at a .32, he probably would just be impaired significantly and not necessarily close to fatality. But a .4 is pretty close to the level that could --

Q    So how does that translate to behavior, if you're able to testify about that?

MR. PHILLIPS:  Objection.

THE WITNESS:  In an individual case I don't think we could tell, except he probably -- generally, alcohol causes problems with perception and obviously with motor coordination.  Rational thinking can be impaired.  The individual can be confused, sleepy, whatever.  A number of different things could occur.

BY MR. JOLLY:

Q    As you look at the autopsy, the report of the autopsy, what indication, if any -- when you're conducting an autopsy, are there indicia that the

32

forensic pathologist can look for to determine whether a person is an alcoholic?

A    Well, there are certain things that can occur without alcohol like cirrhosis, fatty liver and so forth.  There's not necessarily anything that would be able to say -- in their absence, would necessarily mean they weren't an alcoholic.

Q    As you looked at this autopsy report, what indications, if any, were there in the reporting?

A    Well, he doesn't appear to have any liver disease, either by gross examination or by microscopic. Usually you might see a fatty liver.  You might see cirrhosis and so forth, but --

Q    That was not there.

A    -- that was not there.

Q    You can tell that from the report.

A    Well, yeah, that it was not there.  But that doesn't necessarily -- that doesn't necessarily mean he wasn't addicted to alcohol.

Q    What other indicators could you as a pathologist look to to determine whether he, a deceased person, was addicted to alcohol?

A    Well, those would be positive findings.  In the -- in a situation where there are negative findings, you cannot say -- you could not exclude it,

33

essentially.

Q    Do you have an opinion as to the degree to which alcohol intoxication played a role in this incident?

A    I don't believe the alcohol was related to the cause of death.  Now, whether the alcohol was related to the behavior of this individual, I don't know that I can opine to that, other than to say that people under the influence of this much alcohol can behave erratically in some of the situations that we previously discussed.

Q    In any of the materials that you reviewed, did you make -- were you provided a factual scenario by which this incident occurred?

What's your understanding -- you know, I'm an old lawyer.  I really have done this a long time. You'd think I could ask a decent question.  Here's what I'm getting at instead of going through that craziness that I just went through.

What's your understanding of the facts?

A    Well, from looking at the scene --

Q    You're welcome.

A    -- looking at the scene and --

MR. PHILLIPS:  Saved me two words.

MR. JOLLY:  What can I tell you.

34

THE WITNESS:  Looking at the scene and looking at the injuries, my opinion, as stated in the report, was that at least two of the shots, the one to the upper portion of the abdomen and the one to the head, were caused by bullets passing through the garage door from the outside to the inside and that that is evident from the characteristics of the wound.

It's also present or also indicated by the fact that the head wound, which being tangential, could be and in this case I believe was, associated with a lot of tissue blowing back, if you will, from the wound and we can identify that tissue of the upper portion of the -- mid-portion of the garage door just about slightly lower than where his head would have been in an upright position.

BY MR. JOLLY:

Q    How would an examination of the body in this instance, had you had that opportunity, made a difference for you?

A    I don't think in this particular case, at all because I think she did a fine job of documenting both photographically and in her report and notes the findings.

35

Q    What I was getting at when I asked you the earlier question, so what is it at the incident that you think happened?  Did that play any role in your analysis?

MR. PHILLIPS:  Objection.

THE WITNESS:  Well, other than the fact that clearly two of the shots, in my opinion, were fired through a closed garage door, which means that the shooter, whoever it was, was not able to ascertain at all what the victim was or was not doing at the time.

BY MR. JOLLY:

Q    What do you know about what led up to the incident?

A    I just know basically what the medical examiner report said, that the police were called because of loud music and some -- but essentially everything else, as far as the incident, is essentially opinion; that is, the police report, what they say happened and so forth.

What we can say is that the individual was shot through the garage door at least twice, possibly three times, and that one of the shots, the fatal shot, actually hit the skull, spattering the brain.

And we can see on the photo of the garage

36

door that that material from that gunshot wound is present just about a little lower than head level, which means that the garage door had to have been closed at the time that wound was inflicted.

Q    Have you seen photographs of the garage door?

A    Yes.

Q    Both inside and outside?

A    Yes.

Q    Okay.  Do you have any opinions other than those as contained in the report, Defense Exhibit A, to this deposition?  By the way, you probably have lots of opinions.  I'm talking about relevant or relative to the case.

A    Well, I'm not sure that --

Q    I'm not asking you your political philosophy.

A    Yeah.

Q    I'm talking about opinions --

THE WITNESS:  Go off the -- can we go off the record a minute?

MR. JOLLY:  Sure.

[Whereupon, a discussion was had off the record, after which the following transpired:]

BY MR. JOLLY:

Q    Do you have any opinions other than contained in the report related to your analysis of this

37

incident?

A   Well, some of the questions you asked regarding the garage door and the blood, for instance, or the tissue on the garage door, that was -- I don't know that that was included in the report, but it -- we covered that.

Q   Anything else you can think of?

A   No.  Well, let me go back over this to make absolutely sure.  [Examining]  Oh, good.  We covered that.  Okay.  All right.  No.

Q   Do you know the type of ammunition or bullet that struck Mr. Hill?

A   No.  I mean, I can look it up.  I presume it's somewhere in the forensics report, but it was sort of immaterial due to the fact that the tissue was destroyed regardless of what --

Q   Okay.  You didn't need to know that --

A   No.

Q   -- for what you were doing.

Are you familiar -- not familiar.  Are you aware of the caliber of the bullet or ammunition of this --

A   No.  But looking at the injuries, I can say it's probably a large caliber projectile.  And I believe the medical examiner did describe what it was.

38

Q   Did you need that to know that?  Did that factor into your opinion?

A   No.

Q   Do you know whether the ammunition was bonded or non-bonded?

A   No.

Q   Do you know what that means?

A   Well, jacketed?

Q   Well, I don't know what it means.  I'm asking you.

A   I'm not sure what bonded --

Q   I'm a guy.

A   I don't know, but it doesn't -- I don't know if it was jacketed or not.  I'd have to look at the --

Q   Okay.

A   -- projectiles.

Q   Does that make a difference in your analysis?

A   No.  Because we're looking at the injuries.  We're looking at what actually occurred.

Q   Now, you are not a neurologist.

A   No.  I'm a pathologist.

Q   What does a neurologist do?

A   A neurologist basically is a clinician who studies the nervous system, as opposed to a pathologist who actually looks at tissue.  And particularly as

39

forensic pathologists, we look at injuries.  Large, large numbers of our cases involve brain injuries.

Q   Can you -- would you describe for me the basic brain parts?

MR. PHILLIPS:  Objection.

THE WITNESS:  Well, basic.  There are hundreds of brain parts.

MR. PHILLIPS:  Yeah.

MR. JOLLY:  Well, the big ones.

THE WITNESS:  All right.  The --

MR. JOLLY:  I mean, the cerebrum, the cerebellum -- and I --

THE WITNESS:  The cerebral hemispheres and then there's the mid-brain brain stem and cerebellum.  And this [indicating] is where all the motor tracts go and this --

MR. JOLLY:  Well, you're ahead of me.  You're ahead of me.  You know, I have to follow my script here.  Okay.

THE WITNESS:  Well, I want to make sure you've got everything covered.  You are an attorney, after all.

BY MR. JOLLY:

Q   Now, don't assume that.

What are the basic -- what are the functions

40

of each of those main brain parts that you just described?

A   Well, the cerebellum is basically motor control.

Q   And by that, you mean?

A   In other words, control over the balance, many, many things related to motor functions, integrating motor functions.  The cerebral hemisphere is basically where all these things, including thought, motor sensory, are all originated or end up receiving the information.

The brain stem and mid-brain basically connect those to the rest of the body.

Q   Now, the brain stem and mid-brain were not impacted by this -- in this incident.

A   Let's see.  [Examining]  Well, she describes it as extensive subarachnoid hemorrhage to the cerebrum and cerebellum, linear fractures.

Q   You're referring to --

A   The right brain -- projectile passes through the right frontal cerebrum, basal ganglia, which is the left temporal cerebrum.

Q   Is this from Page 2 of Dr. O'Neil's report?

A   Well, it's the -- it looks like it's -- let's see, yeah, where she describes projectile tract.  So it

41

goes through the basal ganglia, which are connecting to the brain stem that basically are the motor -- or the motor -- where the motor pathways come down from the cerebrum through the basal ganglia into the brain, mid-brain and then brain stem.

The mid-brain basically is the basal ganglia part of the mid-brain.

Q    Of the body or brain parts that you mentioned, which ones were impacted by the trajectory of the bullet?

A    Basically the basal ganglia, the frontal cerebrum and then the posterior temporal cerebrum.  So basically it went across and essentially severed all of -- the basal ganglia are where most of the motor fibers are coming through to connect to the spinal cord from the brain itself, from the upper brain, the cerebrum.

Q    So without actually looking at the brain, based upon the -- your analysis of the report, all of the basal ganglia were severed.

A    That's what she said, goes through the basal ganglia.  That's where the tract of -- ganglia, which means the right and left, and end up in the left temporal cerebrum.  But actually the only way you can get there from here is through the -- through the basal ganglia.

42

And that's going to basically cut all motor function, sensory function out immediately.  So that was the issue.

Now, in addition, of course --

Q    Well, why is that the issue?  Why do you say that?

A    Well, because one of the questions that I brought up in the report was that he would not have had any motor activity after that wound was inflicted.

Q    So what?  Why?  Why is that important to you in this case?

A    It's a fact.  In my opinion, he would not have had any motor activity.  In other words, he couldn't have walked across the garage.  He couldn't have done any purposeful movement following that issue.

Q    So if the projectile, if the bullet struck the basal ganglia, that's going to severe --

A    Yeah.

Q    -- it in its entirety.

A    In addition, right.  And the other thing to remember in a gunshot wound, it isn't just the -- it isn't just the actual path of the bullet.  If you've ever seen a bullet fired into a gel in a test-firing, you see there's a cone of force around the bullet.  So it's not just the projectile.

43

The entire area is involved by an expanding cone of force and what that does, that also injures and shuts down all of the surrounding tissue, even though it may not be lacerated, so that's why a gunshot wound of high caliber to the head, for instance, is going to basically incapacitate the individual immediately.

Q    Were you asked to give an opinion as to the continuation of motor function?  Now, I'm just surprised you picked up on that.  That's why I'm asking.

A    Well, I've practiced forensic pathology for a long time.  So it's come up in many, many cases that I've dealt with.  Almost every homicide case I've ever been involved in with the State, they want to know what the individual could have done after they were shot.  So it's a pretty standard thing, actually.

It's not really something that you should be surprised that a forensic pathologist would come up with.

Q    So you were not asked to do that.

A    No.

Q    Fair enough.  Just pursuing this.

And can I assume that all of your opinions, at least those that you've rendered to this point, are within a reasonable degree of something?

44

MR. PHILLIPS:  Objection.

THE WITNESS:  As I indicated in the report, I believe a reasonable degree of certainty, medical certainty, based upon information available, et cetera, et cetera.

BY MR. JOLLY:

Q    So the parts, according to your analysis of the medical examiner's report, the parts of the brain that were affected are what?

A    Well, basically all of the -- the cerebral cortex, which is going to basically initiate, for our purposes, a perception of pain, perception of consciousness, motor function, conscious voluntary motor function, all those areas have been basically destroyed, either by the direct path of the bullet or the force around the bullet, which would immediately stop everything.

From the scene pictures, it looks as though that he just simply fell to the -- fell to the ground and that is consistent with this type of injury.

Q    By the way, neither of the wounds to the abdomen, do you have an opinion as to whether either of the wounds to the abdomen were fatal?

A    Well, the wound that -- the wound that basically lacerated the renal artery would have, unless

45

immediate medical attention, surgical intervention had taken place, would have resulted in death within a few minutes probably.

But the other wound, the one that simply looks like it went through the bladder, would have been clinically problematic but would probably not have killed him.

Q    Neither of those were incapacitating, such as the bullet that you've described that penetrated the brain.  There would have been motor movement.

A    Re-ask the question.  I don't understand it.

Q    Well, with the exception of the injury to the brain --

A    Right.  The other two would not have incapacitated him immediately; correct.

Q    Can you -- were you able to ascertain the position of the body at the time that the bullets impacted?  Can you do that?  Did you do that?

A    Well, yeah.  I think -- I think for sure we can say that the head wound -- and I think we've been through this already -- the wound to the head caused tissue to be back-spattered basically from the brain.

Q    At the -- before.  I'm talking about, how was he positioned when he was shot?  Do you know?  Can you tell?

46

A    Well, from the head wound we know that he was near the door with his head near that area because that tissue's not going to spatter forever and it's in a fairly close period of time.  So his head was close to the door when that bullet was fired.

Q    How high up on the door; do you know?

A    Well, I don't have the exact measurement. I'd have to -- but it's at a -- looking at his height and looking -- it's about a little below where the top of his head would be and that's consistent with the path of the bullet.

These other bullets to the abdomen, I don't think we can -- well, the one that re-entered the door probably came through one of the holes in the door.  So the door seems to be -- both those appear to be with the door down.

The lower wound to the abdomen does not appear necessarily -- that may have not even gone through the door, may have been inflicted before the door was actually all the way down.  So there was enough room basically for the bullet to go through without hitting the door.

Q    Can you testify as to the decedent, Mr. Hill's, movements just prior to having been impacted by any --

47

A    No.

Q    -- one of the bullets?

A    No.

Q    You don't know what he was doing.

A    No.  And plus the fact that -- and you mentioned order of shots.  We don't necessarily know which order those shots were fired.

Q    Well, you have some reason to believe, do you not, that the wound to the head was not the first shot?

A    Well, depending how rapidly they were.  It could have -- it could have been the first shot if the second one was fired before he falls -- fell to the ground.

Probably -- it depends again on the rapidity of the -- if they're within -- if they're boom, boom, boom, it all could have occurred because it would have taken him a couple of seconds just to fall to the ground.

Q    What is your opinion as to -- do you have an opinion as to which shots were fired first?  Or the sequence, is what I'm asking?

A    No.  I don't think we can tell.  I think we can tell that he was upright by the garage door when the bullet to the head occurred because it had to have been in that position in order to get the blow-back

48

onto the door.

So whether or not he was already wounded or not wounded and that was inflicted, he certainly had not fallen when that was inflicted because he had to have been standing up with his head in that position when that bullet was fired.  But as far as the sequence, no.

Q    You have no opinion as to whether Mr. Hill, at or about the time that he was first impacted by a bullet, had a handgun in his hand.

A    No.  I have no opinion.

I know that after the bullet was -- the head wound was inflicted, he would not have been able to have any purposeful movement of any kind.

Q    But up to that point in time, he was capable, assuming he had the weapon in his hand, of putting it in his pocket.  You don't have an opinion one way or the other?

A    Until the head wound, yeah.  Until the head wound.

Q    Sure.  [Pause]  On Page 4 of your report, the second paragraph, you indicate that no significant movements would have been possible following the infliction of the injury.

A    Yes.

49

Q    What kind of insignificant movements?

A    Well, in other words, he -- well, he fell, so he couldn't have been -- obviously wasn't in that position when he was shot.  But could he have twitched a little bit on the ground, involuntary movement and so forth?  Possibly.

Q    Fourth paragraph, Page 4:

The wound tracts were in a right-to-left direction and downward direction relative to the normal anatomic position.

What did that mean?  What are you telling me?

A    Well, in other words, there's two ways you can have a downward direction is, I think as I pointed this out in the next paragraph, either the victim was leaning forward, so it put him back in the anatomic position.  It looks like it's going downward.

Or the shooter was above the victim shooting downward.

Q    Do you have an opinion as to which of the two, within a reasonable degree of certainty, occurred?

A    I think most likely the former, that the individual was leaning forward.

MR. JOLLY:  [Pause]  I need about three minutes just to go to the bathroom and then I have just some clean-up stuff that I want to cover and

50

we're almost done.  So, I'm sorry.

THE WITNESS:  No problem.

[Whereupon, a recess was taken, after which the following transpired:]

BY MR. JOLLY:

Q    I'm sorry.  [Pause]  If I've understood you, up to the point in time that the bullet penetrated the brain, the decedent had full -- he was able to -- he had full body function to that point.

A    Right.  He would have been in pain from the --

Q    From the first two.

A    Presuming those were the first two, he would have been -- but, again, that's assuming that the -- that was the sequence and I don't think we can necessarily assume that was the sequence, depending upon the rapidity that they may have been inflicted.

But all of them could have been quick enough that he didn't -- he didn't have time to fall if he was shot in the head first.  We know the garage door was closed and his head was in that position.

So the other two might have come through the garage door also, although the lower abdominal wound does not have any characteristics of a re-entry.

Q    But function -- he retained the ability to

51

that point to be able to move his extremities.

A    Yeah.  He would have been able to function, whatever.  I mean, I guess -- yeah.  The answer to that is yes.  He would have had function; pain, but function.

Q    Do you know how much time was utilized in firing the weapon?  Do you have an opinion on that?

A    No.  I don't -- it could have been, three shots could have got away within a second if they're pulling a trigger in a semiautomatic.

Q    How is it that individuals who suffer brain trauma, they get shot in the head, are able to continue to fight?  Why would that ever happen?

A    Well, it depends on -- well, I mean, the brain's a big area.  It depends on what's destroyed.  If it's a graze wound -- I mean, I've had cases where someone has shot themselves with a -- when they committed suicide, shot themselves in the temple with a bullet that basically only penetrated the surface of the brain and they got another gun and shot themselves on the other side.

So it's -- I mean, it depends on the areas that --

Q    Boy, that's dedication.

A    It is.  That was -- but it depends on the

52

area of the brain involved and how much -- also, of course, in addition to the laceration, you have the cone-of-force injury and if that's sufficient -- now, if you've got enough concussion injury, basically that shuts the brain down as well.

Q    Can you -- have you ever seen, been involved in an incident where the ganglia was impacted the way this was --

A    Oh, all the time.

Q    -- where movement continued?

A    No.  Not where movement continued.  Because that's cut -- that cuts off all the brain.  That's why you do the autopsy of a gunshot wound to the head.  But that's why -- in this type of injury, that's why you do the brain examination to tell -- and this was a high caliber that basically destroyed the basal ganglia and in doing that, would have basically cut off all motor function.

Q    Do you have any opinion as to why Hill did not fall forward and appears to have fallen backwards when he finally landed on the garage floor?  I mean, doesn't gravity take over?

MR. PHILLIPS:  Objection.

MR. JOLLY:  I'm trying to figure out how that would have happened.

53

        THE WITNESS:  Well, the gun -- the projectile
hitting him is going to cause him to -- the force
of that is going to tend to make him fall
backward, particularly if he can no longer do
anything as far as motor function.  He's just
going to fall.
BY MR. JOLLY:
        Q    [Pause]  So I am done.  I just want to
inquire whether you now have any additional opinions
other than what you've indicated already today or as
reflected in your four-page report.
        A    No.  I believe we've covered everything.
        Q    Was there any specific methodology that you
utilized in preparing this report in rendering the
opinions that you've rendered?
        A    Well, sure.  As any scientific examination,
you gather the evidence.  You gather the materials you
need to make an opinion and then you arrive at that
opinion.
        MR. JOLLY:  That's all I've got.
        MR. PHILLIPS:  Doctor, John Phillips on
behalf of the estate.  Have we met before today?
        THE WITNESS:  I don't believe so.  We may
have.  I don't recall.
        MR. PHILLIPS:  Okay.

54

        THE WITNESS:  Not often anyway.
        MR. JOLLY:  He's not usually memorable,
though.  That's a joke.  That's a joke.
                CROSS EXAMINATION
BY MR. PHILLIPS:
        Q    I've got an opening statement and your direct
examination.  All right.  So I need to subscribe a
little bit to the -- to the school of Dr. Anderson for
some educational guidance.
        And I'm going to start with this heart blood,
the blood alcohol content and getting an understanding
of what .39 significant is, what .32, the type of
measurements.  Most lay people are -- as a predicate,
are kind of familiar with what cops do in a DUI
situation and even you cited the driving standard.
        A    Right.
        Q    .08 is the kind of intoxication standard in
Florida.  But, and that can be through a blood test or
breath test.  What I want to understand is kind of
what's involved in taking a heart blood sample.  Let me
start with that.
        What is involved in taking a heart blood
sample?
        A    Well, basically it's a --
        MR. JOLLY:  Let me just interrupt for a

55

second.  I'm objecting to that predicate, to the
speech --
        MR. PHILLIPS:  Fair.
        MR. JOLLY:  -- but not to the question.  You
can answer.
        THE WITNESS:  Well, basically it's the same
as a blood draw would be in a clinical situation.
In other words, you take it either from the
peripheral vessels or from the heart and basically
that will reflect the level of the alcohol in the
-- in the heart blood.
        Because there is some possible -- a
possibility of contamination, if you're concerned
at all, then you'll do what the pathologist in
this case did and that was take the vitreous,
which is clearly not going to be contaminated, and
there's a relative -- if there's a relatively
close match between those two, then you can be
confident that that indeed is the level.
BY MR. PHILLIPS:
        Q    Why go to the heart, for example?
        A    Well, because it's one place you can get
blood.  I usually, as a matter of fact, just try to get
blood from the peripheral vessels first, but sometimes
you can't.  Particularly if there's been a lot of

56

hemorrhage and so forth, the blood level's going to be
down.
        So you may go to the heart blood either and
supplement or not.  But that's fine.  The only time
that it's a concern at all is in some of the opiates
and some of the other medications where there can be
actually postmortem change in the levels because of
release from the various organs, but that's not an
issue in this case and it doesn't occur with alcohol.
        Q    Okay.  Is there -- kind of comparing apples
to apples in the results, is there a variance in what
you get from taking heart blood versus blood out of --
out of an extremity?
        A    No.  There should be none.
        Q    Okay.  And what is -- what is vitreous?
        A    Eye fluid from the eye.
        Q    Okay.  And how is that drawn or taken?
        A    Well, you put a needle into the -- through
the conjunctiva and through the sclera into the
posterior chamber of the eye and then you take the
vitreous fluid, which is the fluid that's always in the
-- in the eye.
        Q    Can that be done amongst the living?  Do you
see that sample taken?
        A    Not very often.

57

MR. JOLLY:  Painfully.

THE WITNESS:  People very rarely want to submit to that; no.


MR. PHILLIPS:  Okay.

THE WITNESS:  No.  Essentially, it's a postmortem thing.

BY MR. PHILLIPS:

Q    And so we've got about a .6, .7 difference.  Help me understand why that -- why that is?

A    Well, the level of the vitreous lags behind the blood because of absorption situations and so forth, probably about an hour or so.  So this is a little bit more than I would expect, but I'm not particularly concerned.

Usually you metabolize the alcohol with about a .15 per hour, .015 per hour.  But it's a little bit more than I would expect the difference, but it's certainly not -- it's not particularly unusual and I think what it does, it verifies that the -- he actually at a point earlier in time had a higher alcohol than was actually measured in the heart blood.

But it also indicates that I think both samples' results are acceptable and I don't see any problem with them.

58

Q    Would you -- would you have expected to a reasonable degree of scientific probability or certainty that at the time of this encounter, the time of the shooting, that the blood alcohol content would have been in excess of .39?

A    No.  Not at the time of the shooting.  At the time of the shooting, basically because I think he died very quickly, that his alcohol is going to be what was measured in the heart blood.  What the vitreous indicates is that he would have been higher before.

Q    So he would have been coming down, not getting --

A    Right.

Q    Help me understand --

A    He's coming down, but it doesn't necessarily mean that the effects are reversed.  In other words, if you -- if you get to a .4, even 12 hours later, if you're down to a .08, that doesn't mean you're functioning at the same level that if you had started at zero and just gone up to a .4 because there's brain swelling and all the problems that are associated with that degree of basically near-fatal alcohol intoxication.

Q    What influence would that have on motor impairment?

59

A    Well --

MR. JOLLY:  Let me just object to form.  What influence would what have?

MR. PHILLIPS:  Certainly.

BY MR. PHILLIPS:

Q    A vitreous of .39, how does that correlate to motor impairment?

A    Well, it's going to have all the effects of alcohol.  In other words, his blood -- his blood was at one point, .39.  So he's going to have all the motor and sensory problems of somebody who's fatally intoxicated.

Q    Okay.  And, I mean, we're dealing with the subjective or relative here.  From your expertise, where does .39 compare to .08?  Obviously at .08, the law says somebody is impaired.

Other than saying mathematically it's five times more or whatever, is there a -- is there a way that you, as a scientist, as a pathologist, can kind of correlate the difference between a .08 and a .39 as far as motor impairment?

MR. JOLLY:  Form.  Go ahead.

THE WITNESS:  Well, only in general terms because obviously if somebody is near fatal intoxication, they're not going to be in total

60

command of their functions, sensory or motor.

MR. PHILLIPS:  Okay.

THE WITNESS:  So, I mean, there's going to be all sorts of motor dysfunction potentially, sensory as well, what they perceive, what they think is happening and so forth.  I mean, that's the reason you can't drive at a .4, or not supposed to drive at .4 or a .39 because everything is impaired, essentially.

BY MR. PHILLIPS:

Q    Okay.  Based upon your review of the medical examiner's report, was there anything in there that would have been short-term fatal or of a severe injury such that you wouldn't expect Mr. Hill to live a normal life expectancy?

Was there anything in there, tumors, anything that would have threatened his life that you saw?

A    I really don't understand the question.

Q    Okay.  Fair enough.  You've reviewed the medical examination of Mr. Hill.

A    Right.

Q    Was there any significant illnesses in that medical examination in the medical examiner's report?

A    Well, there was no indication of any existing condition other than the trauma would have -- would

61

have caused any immediate medical problems and that's
the --

Q      That's the question.

A      -- that's what the question was.

Q      And now I kind of want to talk about the
bullet issue and get some understanding of that.
What -- kind of let's look at this like you're drawing
a map and so we're going to -- we're going to follow
the bullet down the road, so to speak.

       From the point that it punctures the skin to
punctures the skull and the path that we know it took,
what I want to know, obviously the skin is the skin and
the skull is the skull, but as it impacted portions of
the organ known as the brain, what did it hit and what
does that do for us as humans?

A      Well, basically I think we've been through
that.  The cerebral hemispheres are the major motor and
sensory consciousness and also control all of where
pain is felt, when motor function is initiated and so
forth.

       When the bullet strikes, it's impacting -- in
fact, as soon as it hits the skin and the bone of the
skull, it's creating a concussion effect.  And as it
goes through the brain, it also got a laceration or
tearing of the tissue and also concussive effect from

62

all of the areas around that.

       So essentially if it cuts the motor tract and
causes a concussion injury, you essentially are going
to have immediate shutdown of neurological function.

Q      Okay.  [Pause]  To a reasonable degree of
medical certainty or scientific certainty, do you feel
like -- or do you have an opinion whether Mr. Hill
could have reholstered -- put a gun in his back pocket
after he sustained a brain injury?

A      No.

       MR. JOLLY:  Form.

       THE WITNESS:  In my opinion, he would have --
as I said in the report, he would have had no
purposeful ability -- no ability for any
purposeful activity.

BY MR. PHILLIPS:

Q      If you could, take a look at the toxicology
report, please.

A      [Examining]  Okay.

Q      Was Mr. Hill tested for things other than
ethanol, a/k/a alcohol?

A      Yes.  They did a complete drug screen.

Q      And --

A      For all drugs of abuse.

Q      Was there -- all drugs of abuse.  That

63

includes cocaine and marijuana, methadone?

A      Yes.

Q      Did -- amphetamines --

A      Yes.

Q      -- barbiturates?  Did Mr. Hill test positive
for any of those?

A      No.

       MR. PHILLIPS:  Okay.  [Pause]  Do you have
anything?

       MR. WALKER:  No.

       MR. PHILLIPS:  [Pause]  Thank you, Doctor.
That's all I have.

       MR. JOLLY:  I don't have any more questions.
I am ordering it.  I'll take an original and a
mini.

       THE WITNESS:  Okay.  Before we go off the
record --

       MR. JOLLY:  But -- but --

       THE WITNESS:  Before we go off the record --

       MR. JOLLY:  Your stuff.

       THE WITNESS:  -- I got the -- I got the case
referred to me on November 16th of 2016 and I got
a $2,000 retainer and that's all I've done so far.

       MR. JOLLY:  That's all you've billed and all
you've been paid.

64

       THE WITNESS:  2,000.

       MR. JOLLY:  Okay.  I am going to ask that you
-- and maybe we can do this now.  I have a thumb
drive of back-up documents, as well as the
materials which you listed that you reviewed.
I'll leave the thumb drive with you, if that's
okay.  That'll be "B for ID.

       And I'm going to ask that you -- if you're
able to then print out all of the documents, in
addition to recreating or making another thumb
drive?  Can you do that, too?

       THE WITNESS:  She can return your thumb
drive.

       THE REPORTER:  I can ask the girls in the
front, but I think so.

       THE WITNESS:  She'll just download it.
She'll just download the stuff and then you can
have your thumb drive back.  Either that or --

       MR. JOLLY:  Download it, you mean, like,
right now?

       THE WITNESS:  Yeah.

       MR. JOLLY:  Okay.

       MR. PHILLIPS:  Well, and I've got a thumb
drive that's basically disposable for purposes of
today.

65

MR. JOLLY:  Let's do that then.

MR. PHILLIPS:  Yeah.

MR. JOLLY:  She keeps it.

MR. PHILLIPS:  I just need to --

MR. JOLLY:  And other than that, I have no more further questions.  And I assume you do not waive?

MR. PHILLIPS:  Read or waive, Doctor?

MR. JOLLY:  I mean, the questioning was so intense --

THE WITNESS:  Yeah.

MR. JOLLY:  -- you may wish to read it.

MR. PHILLIPS:  I'll elect for --

THE WITNESS:  Done with questioning?

MR. PHILLIPS:  I'll elect for him to read.

THE WITNESS:  All right.

MR. JOLLY:  There you go.

THE WITNESS:  I don't usually read it.

THE REPORTER:  A telephone number?

MR. JOLLY:  And I'll take a, you know, regular delivery, you know.  We're fine.

THE REPORTER:  Okay.

THE WITNESS:  And you'll send it to me, of course.  Email it to me.

66

[Whereupon, the reading and signing of the deposition was waived.]

[Whereupon, the foregoing deposition was concluded at 10:56 a.m.]

[Whereupon, Exhibits A and B were marked for identification after the conclusion of the deposition.]

- - - - -

67

C E R T I F I C A T E

STATE OF FLORIDA:

COUNTY OF SEMINOLE:

I, Vicky L. Barwick, Court Reporter and Notary Public, State of Florida at Large, do hereby certify that I reported the deposition of WILLIAM ROBERT ANDERSON, M.D., and that the said witness was first duly sworn by me.

I further certify that the foregoing pages numbered 3 through 66, inclusive, prepared under my direction and supervision, constitute a true, complete and accurate transcript of said witness to the best of my skill and ability.

I further certify that I am not of counsel for, nor related to any party herein or attorney involved herein, nor am I financially interested in the outcome of this action.

WITNESS MY HAND AND OFFICIAL SEAL this 28th day of February 2017.

_____
VICKY L. BARWICK,
Marge Raeder Court Reporter, Inc.
Court Reporter and Notary Public,
State of Florida at Large