EXHIBIT "P"

DEPOSITION OF CHRISTOPHER NEWMAN

Page 4

PROCEEDINGS
- - -

3  AND THEREUPON,
4            CHRISTOPHER NEWMAN,
5  called as a witness, after having been first duly
6  sworn, was examined and testified as follows:
7            DIRECT EXAMINATION
8  BY MR. PHILLIPS
9      Q.  Please state your full name for the
10 record.
11     A.  Christopher Eric Newman.
12     Q.  Is it Deputy Newman?
13     A.  Yes, sir.
14     Q.  My name is John Phillips.  I represent the
15 Estate of Greg Hill and their Personal
16 Representative.  We're going to have some questions
17 for you today.  I'm sure you've gone over, to some
18 extent, the kind of rules that apply to a
19 deposition.  Before I go through them, have you
20 given a deposition before?
21     A.  Yes, sir.
22     Q.  Okay.  Same type things apply.  Try to
23 answer aloud rather than with nonverbal cues, head
24 nods.  Because we're dealing with the written
25 record, try to answer with yeses and nos rather than

Page 5

1  uh-huhs or uh-uhs.  I'm sure you do that in your
2  work generally.
3          And, most significantly, in normal
4  conversation we tend to use what I call shorthand.
5  We cut each other off, we know -- we guess what each
6  other is saying, and we can turn a normal
7  conversation into about two-thirds of a
8  conversation.  Here we need it to be, you know,
9  four-thirds of a conversation, we need to let each
10 other take a breath before we answer or ask the next
11 question.  So it's also not an endurance test.  If
12 you need to take a break for any reason, just let us
13 know.
14          How long have you been employed here?
15     A.  October 1st will be three years.
16     Q.  This past October 1st?
17     A.  No, this coming up October 1st.  Yeah,
18 yeah.  It's October 4th, so, yes, I just hit three
19 years.
20          MS. BARRANCO:  2016.
21 BY MR. PHILLIPS
22     Q.  You started October 1st, 2013?
23     A.  Yes, sir.
24     Q.  Okay.  Where did you work before then?
25     A.  I started in 1999 with the City of

Page 6

1  Fort pierce Police Department, and I worked from
2  1999 until 2009.  And then from 2009 to 2013 I
3  worked for the Florida Division of Alcoholic
4  Beverages and Tobacco.
5      Q.  Based out of where?
6      A.  I worked out of Fort Pierce and I also
7  worked out of West Palm Beach.
8      Q.  Okay.  Let me back you up even further.
9  And my goal is to not, you know, ask any personal
10 questions; I don't know if you want to get into all
11 that, but are you from -- where are you from?
12     A.  I'm a native Floridian.
13     Q.  Okay.  What part of Florida?
14     A.  I was born Fort Lauderdale.
15     Q.  Okay.  How long have you lived in
16 St. Lucie County?
17     A.  As far as I remember, I think I moved here
18 when I was 17.
19     Q.  Okay.  When did you first develop a idea
20 that you enjoyed law enforcement or wanted to go
21 into law enforcement?
22     A.  When I was like five.
23     Q.  Okay.  Tell me about that.
24     A.  Well, I don't know.  I always liked police
25 and firefighters, and when I got older, I don't like

Page 7

1  getting burned, so I decided to become a police
2  officer.
3      Q.  Fair enough.  And what education did you
4  pursue to achieve that goal?
5      A.  Got my high school diploma and then went
6  to the police academy.
7      Q.  What year?
8      A.  '98.
9      Q.  Okay.  And you would have started with
10 Fort Pierce Police Department as your first law
11 enforcement job?
12     A.  Yes, sir.  I graduated the academy, I
13 believe, in early '99, and I was hired like a month
14 after I graduated by Fort Pierce.
15     Q.  Very good.  What did you do for, I guess
16 it was, about ten years; what roles did you have
17 with Fort Pierce Police Department?
18     A.  I was a Road Patrol Officer for my first,
19 I think, 20 months, and then I went to the Special
20 Investigations Unit, which was narcotics and gangs,
21 and I did that for almost eight years.
22     Q.  What was your role with the Narcotics and
23 Gangs Unit?
24     A.  I was a Detective.
25     Q.  Okay.  How many Detectives did Fort Pierce

Page 8

1    Police have in Narcotics and Gangs Unit?
2        A.   At the time I was in there, there was, I
3    believe, six of us.
4        Q.   Tell me about Fort Pierce.  What kind of
5    town is Fort Pierce?
6        A.   It's a lower income, high crime kind of
7    town.
8        Q.   What about St. Lucie County?
9        A.   It has good parts and bad parts like any
10   other county.
11       Q.   What -- how did you go from Fort Pierce
12   Police Department to, was it ATF?  What was the --
13       A.   ABT.
14       Q.   ABT.  Sorry, yes.  How did you make that
15   transition or why did you make that transition?
16       A.   I had some friends that I knew that worked
17   there, and a position came up as an agent, so I went
18   over there.
19       Q.   Okay.  And then same question, how did you
20   transition or why did you transition from there to
21   St. Lucie County Sheriff's Office?
22       A.   When I worked for the State, a lot of
23   times you were shipped around the state.  So
24   sometimes you would be working and you would have to
25   drive and work in Panama City or you would have to

Page 9

1    work in Miami or West Palm Beach or Jacksonville.
2    Just didn't like the travel.
3        Q.   Okay.  What is your current role with the
4    St. Lucie County Sheriff's Office?
5        A.   Currently assigned to Road Patrol.
6        Q.   And when this incident occurred, what were
7    you assigned?
8        A.   Road Patrol.
9        Q.   Have you had any promotions or demotions
10   since this incident?
11       A.   No.
12       Q.   What is Road Patrol as you know it to be
13   in St. Lucie County with St. Lucie County Sheriff's
14   Office; what are your job duties?
15       A.   Proactively patrol areas, look for
16   enforcement infractions and answer calls for
17   service, provide public assistance.
18       Q.   Okay.  Do you have an assigned police car
19   or squad car?
20       A.   Yes, I do.
21       Q.   Are you able to take that home with you?
22       A.   Yes.
23       Q.   Okay.  Is that the same at the time of
24   this incident?
25       A.   No.

Page 10

1        Q.   How is it different?
2        A.   I have a new work car now.
3        Q.   Okay.  Were you allowed to take it home
4    then?
5        A.   Yes.
6        Q.   Okay.  It's just a different car?
7        A.   Yes, sir.
8        Q.   Do you have a partner that patrols with
9    you?
10       A.   We really don't have assigned partners,
11   no.
12       Q.   Okay.  Same as the time of this incident?
13       A.   Yes, sir.
14       Q.   What was your familiarity with
15   Officer Lopez at the time of this incident?
16       A.   We'd just been assigned to the same squad,
17   and he worked out west, I believe, at the time, he
18   was assigned out west, and I was -- I don't remember
19   where I was assigned.
20       Q.   Did you know him personally?
21       A.   Not really, just passing roll call.
22       Q.   Okay.  Where are we today?
23       A.   St. Lucie County Sheriff's Office.
24       Q.   How often are you here in this office?
25       A.   Well, I try to make it a point never to

Page 11

1    come up to this area of the office, I usually stay
2    over on the other side.
3        Q.   What's the distinction?
4        A.   This is where all the Captains and
5    administration is.  I try to stay over -- away from
6    all that.
7        Q.   Yeah.  This usually means trouble, I
8    guess?
9        A.   Yes.
10       Q.   Okay.  But you actually report to this
11   building?
12       A.   Yes, sir.
13       Q.   How often?
14       A.   On Road Patrol, you know, if you're not an
15   early unit, you have to be here every day, so I
16   report here probably four times a week.
17       Q.   And then go out on patrol?
18       A.   Yes, sir.
19       Q.   Do you come back before you finish the
20   day?
21       A.   Yes.
22       Q.   Same procedures, generally, in
23   January of 2014?
24       A.   Yes, sir.
25       Q.   Did you have any discipline reasons that

ronically signed by Suzanne Badley (301-277-379-1582)

Page 12

1   you left Fort Pierce Police Department?
2       A.  No.
3       Q.  Okay.  There's the term that floats around
4   occasionally called "gypsy cop" where people leave
5   because they're basically in trouble in one police
6   force and go to a different police force.  That
7   wouldn't describe you?
8       A.  No, sir.
9       Q.  Okay.  Did you have any administrative
10  sanctions or discipline while at Fort Pierce Police
11  Department?
12      A.  I knew I had one when I was -- I think it
13  was like 2008 or 9, I don't remember.  That was for
14  leaving my car running --
15      Q.  Okay.
16      A.  -- on scene.  And I grieved that, and I
17  believe that was removed.
18      Q.  Okay.  What is your understanding of
19  Fort Pierce's Police Department regarding removal of
20  charged discipline?
21      A.  I can't remember.  I couldn't tell you
22  without looking at their policy.
23      Q.  Okay.  That's fine.  Do you know if there
24  was any other discipline that would have been on
25  your record at Fort Pierce Police Department?

Page 13

1       A.  Not that I recall.
2       Q.  Okay.  Same question about with the State
3   employment; did you have any discipline that
4   you're -- on your employment record?
5       A.  No, sir.
6       Q.  Okay.  As we sit here today for
7   three -- just a few days over three years with
8   St. Lucie County Sheriff's Office, have you had any
9   discipline?
10      A.  No, sir.
11      Q.  Have you had any charges that were either
12  found to be unfounded or exonerated?
13      A.  At St. Lucie County?
14      Q.  Yes.
15      A.  Not that I'm aware of.
16      Q.  Okay.  How was this incident investigated?
17      A.  I couldn't answer.  I wasn't part of it.
18      Q.  Okay.  Who did you speak with?
19  Let's -- I guess, let's just -- we'll break that
20  down when we go through the timeline.  Are you aware
21  of any other entity other than St. Lucie County
22  Sheriff's Office that's interviewed you or
23  investigated you related to the shooting of Mr. Hill
24  on January 14, 2014?
25      A.  Not that I'm aware of.

Page 14

1       Q.  Okay.  Before arriving on the scene -- I
2   don't have that address.  Do you recall the address?
3       A.  (Pause).
4           MR. ROBERTS:  1501 Avenue Q.
5   BY MR. PHILLIPS
6       Q.  1501 Avenue Q.  Does that sound familiar?
7       A.  Yes, sir.
8       Q.  Okay.  Before arriving on the scene at
9   1501 Avenue Q on the afternoon of January 14, 2014,
10  had anything abnormal happened that day to you?
11      A.  No, sir.
12      Q.  Okay.  Do you know what time you reported
13  that morning?
14      A.  We had different shifts then.  We were on
15  rotating eight-hour shifts, and our shift started at
16  3:00.
17      Q.  And this happened fairly shortly after
18  3:00.
19      A.  Yes, sir.
20      Q.  Was this your first call?
21      A.  Pretty much.
22      Q.  Okay.  You don't recall if there was a
23  call before this?
24      A.  I had stopped out with
25  Deputy Paul Pearson before that on Avenue Q, I think

Page 15

1   it was in the 3200 block or 2900 block, something
2   like that, he was out with a suspect that he thought
3   had a warrant.
4       Q.  Okay.  How did that get dispatched or
5   radioed to you?
6       A.  I went in-service and I heard
7   Deputy Pearson asking for a unit with a fingerprint
8   reader because the guy didn't have any ID, and I
9   just responded that way as a backup.
10      Q.  Okay.  And that was how far away from
11  1501 Avenue Q?
12      A.  However many blocks that is from, like,
13  the 3000 block, 15 blocks.
14      Q.  Okay.  Do you recall how long that took?
15      A.  No, I don't.
16      Q.  Do you know what you did in between
17  leaving that scene and arriving at the scene on
18  1501 Avenue Q?
19      A.  Driving.
20      Q.  Okay.  What is your recollection about
21  getting this call initially?
22      A.  My initial reaction was I was I wondering
23  why they gave us a call in the city.
24      Q.  Why is that?
25      A.  Well, usually the City handles their own

ronically signed by Suzanne Badley (301-277-379-1582)

Page 16

1   calls for service.
2        Q.  And help me understand, I mean, especially
3   somebody that spent 10 years with Fort Pierce Police
4   Department, the jurisdiction.  Where, kind of, does
5   one jurisdiction -- where does the jurisdiction of
6   Fort Pierce Police and St. Lucie County Sheriff's
7   Office typically -- typically lay?
8        A.  I would have to look at an annex map,
9   because it changes so much.
10       Q.  Okay.  At the time, who handled calls at
11  1501 Avenue Q, that area?
12       A.  I believe that was in the city.
13       Q.  Okay.  And what was the policy, as you
14  were aware, of St. Lucie County Sheriff's Office at
15  handling those calls?
16       A.  We can respond anywhere if somebody
17  requests a Deputy or asks for a Deputy, but I
18  believe that we cover the schools, we provide for
19  the schools, and I believe the caller was calling
20  from the school across the way, which is why, I
21  think, we got dispatched.
22       Q.  Do you know whether that was a 911 type
23  call or a nonemergency number call or something
24  different?
25       A.  I couldn't tell you.

Page 17

1        Q.  All you know is you got it through
2   dispatch?
3        A.  I was dispatched.
4        Q.  Did your patrol car have any type of
5   camera, dash cam, any recording devices in it?
6        A.  No, sir.
7        Q.  Did St. Lucie County Sheriff's Office, at
8   the time, provide anybody body cams, eye cams, any
9   type of recording devices?
10       A.  No, sir.
11       Q.  Do they now?
12       A.  No, sir.
13       Q.  Do any Officers that you're aware of
14  St. Lucie County Sheriff's Office camera
15  themselves -- let me rephrase that.  Do you know of
16  any Officers locally with the St. Lucie County
17  Sheriff's Office that have personal cameras that
18  they use?
19       A.  That's against policy.
20       Q.  I would suspect, but not everywhere.
21  Okay.  The next set of questions I, kind of, want to
22  get an under -- a personal understanding of your
23  recollection of this, not the detailed recollection,
24  meaning, does this -- do the events of
25  January 14 -- sorry, January 4, 2014 --

Page 18

1             MR. ROBERTS:  14.
2   BY MR. PHILLIPS
3        Q.  -- yeah, January 14, 2014, stand out in
4   your mind?
5        A.  Yes, sir.
6        Q.  Why?
7        A.  It was pretty traumatic.
8        Q.  Have you -- before this had you had to
9   shoot anybody for any reason?
10       A.  No.
11       Q.  Okay.  Since this have you had to shoot
12  anybody for any reason?
13       A.  No.
14       Q.  On duty or off duty.
15       A.  No.
16       Q.  So this is the only time you've shot
17  somebody?
18       A.  Yes.
19       Q.  Okay.  And memories is kind of a funny
20  thing.  People remember the moments of certain
21  moments in their life because they're just kind of
22  burned in.  There was a cartoon, and I can't
23  remember the name of it now, but it actually does a
24  pretty good job about, you know, kind of showing how
25  memory works, and certain things you almost can

Page 19

1   remember the smell of that day; would you agree with
2   that assessment?
3        A.  Yes, sir.
4        Q.  That certain things -- okay.  How much do
5   you remember about January 14, 2014?
6        A.  Bits and pieces.
7        Q.  Okay.  Where do you wear your radio?
8        A.  On my left shoulder.
9        Q.  Okay.  And you would have gotten a call
10  from dispatch through that radio or through your
11  car?
12       A.  I believe when I got that call I was still
13  outside of my car.
14       Q.  Okay.  Were you -- how do you recall --
15  and, again, if the answer is "I don't know" to any
16  of these questions, that's fine.  How do you recall
17  that call coming in?
18       A.  I just remember, as far as I remember, I
19  was getting a call for a Signal 22, which was a
20  noise disturbance in the area FK Sweet at
21  14th and Q.
22       Q.  Okay.  Was there anything other than a
23  Signal 22 communicated?  I know the Sheriff has
24  mentioned, to some extent, that obscene music was --
25       A.  Yes.  That was the complaint, the music

Page 20

```
1    was really loud and vulgar --
2        Q.  Okay.
3        A.  -- and they were worried about the kids.
4        Q.  Okay.  When the call comes through, do
5    they relay it as Signal 22, or did they give the
6    detail?
7        A.  They gave it as a -- as far as I remember,
8    what I recall was that it was a Signal 22 of vulgar
9    music.
10       Q.  Okay.  And what is your understanding, or
11   what was your understanding at the time, either one,
12   of the type of criminal violation that that would
13   be; is that a felony?
14       A.  No.
15       Q.  Is that a misdemeanor?
16       A.  Not that I'm aware of.
17       Q.  Okay.  What is it?
18       A.  Just a complaint.
19       Q.  Okay.  And what did you do?
20       A.  I responded to the call.
21       Q.  We obviously know now that two Officers
22   responded.  Do you know how the other Officer got
23   the call or how they came to respond?
24       A.  Officer Lopez was out with
25   Detective Pearson with me in the 3000 block of
```

Page 21

```
1    Avenue Q because, I believe at the time,
2    Deputy Lopez had a fingerprint reader in his car,
3    which is why he responded.  And then when I got the
4    call for Avenue Q for the loud music, Deputy Lopez
5    just, since he was there with me, responded as a
6    backup.
7        Q.  Okay.  How is it determined who is primary
8    and who is backup?
9        A.  I couldn't tell you.
10       Q.  Is that something official with a call
11   like this, or is it something that just kind of
12   happens; you know, does leadership take over, or do
13   you radio back "I'm taking this call," do you recall
14   how this one happened?
15       A.  Usually if you get a call that's in your
16   zone, if you're assigned to a zone, then you're the
17   primary, and whoever helps, responds, is a backup.
18       Q.  Okay.  Was this Officer Lopez' zone?
19       A.  No, it was not.
20       Q.  This was your zone?
21       A.  I'm not sure if it was my zone.  I know --
22   I could have been a north float.  Without seeing the
23   schedule for the day I don't know where I was
24   typically assigned.
25       Q.  Okay.  The prior call on Avenue Q, was
```

Page 22

```
1    that gentleman detained?
2        A.  When I pulled up there he was talking to
3    the Detective, they were standing on the sidewalk
4    together.
5        Q.  Do you know if he was arrested?
6        A.  No, he was not.
7        Q.  Okay.  As we sit here today, do you know
8    that gentleman's name?
9        A.  No, I don't recall.
10       Q.  Do you know whether -- some of the
11   questions I ask are really dumb.  Do you know if he
12   had any relationship or co-relation with
13   Gregory Hill or his family?
14       A.  I could not tell you.
15       Q.  Okay.  They call this discovery because
16   sometimes we've got to just try to discover whatever
17   facts are out there.
18           Ultimately you went from the
19   3000-ish block to the 1500 block of Avenue Q.  Walk
20   me through -- walk me through that, please.
21       A.  I remember pulling into the area and
22   hearing the music.  My windows were rolled up, and I
23   had the police radio on and I could still hear the
24   music.  And as we were pulling up, I seen that the
25   music was coming from 1501, and I remember radioing
```

Page 23

```
1    that in.  And I pulled farther east, and Lopez
2    pulled -- stayed farther west.
3        Q.  Okay.  Neither one of you pulled in the
4    driveway?
5        A.  No.
6        Q.  Why not?
7        A.  Because just as -- I never pull in the
8    driveway, I always park alongside the road.
9        Q.  Okay.  Is that protocol?  Is there
10   protocol related to that?
11       A.  I don't know if there's protocol, it's
12   just what I've always done.
13       Q.  Okay.  I think it makes sense, but why do
14   you do that?
15       A.  Well, most accidents happen while you're
16   backing.  I don't like to back up -- as little as
17   possible.
18       Q.  Fair enough.  Easier to get out as well.
19   Have you, since this incident, listened to any of
20   the CD that was found that was allegedly playing in
21   Greg Hill's stereo?
22       A.  No, I have not.
23       Q.  Have you heard anybody talk about that CD?
24   In other words, they listened to it and they told
25   you what was on it?
```

tronically signed by Suzanne Badley (301-277-379-1582)

Page 24

1        MS. BARRANCO: I'm just gonna object
2    to the extent you're asking for attorney/client
3    privileged communications.
4        MR. PHILLIPS: Okay. Fair.
5    BY MR. PHILLIPS
6        Q.  Yeah, nothing from your attorney. But
7    other than your attorney, have you had any
8    conversations about that CD since this incident?
9        A.  Not that I recall, no.
10       Q.  Okay. What do you recall hearing?
11       A.  Pretty foul language, really loud.
12       Q.  And foul language is kind of subjective.
13   There's stuff that's played on the radio that to
14   some people is foul. There's stuff that can never
15   make the radio. There's stuff that's just, whether
16   heavy metal hard core or rap hard core, it's just --
17   it's a different -- it's a different level. Can you
18   help me, kind of, in that subjective interpretation
19   of, you know, what you were hearing?
20       A.  I heard the word "fuck" quite a lot --
21       Q.  Okay.
22       A.  -- "bitch," the N word quite a lot.
23       Q.  Okay.
24       A.  I didn't think that was appropriate.
25

Page 25

1        Q.  Particularly across the street from a
2    school.
3        A.  Yes.
4        Q.  Yeah. I understand that. So continue to
5    walk me through about, you know, what you did.
6        A.  We arrived on scene. I logged in with
7    dispatch that we had arrived and told them the house
8    number that the music was coming from.
9        Deputy Lopez and I walked up the driveway
10   where the music seemed to be coming out of the
11   garage. We banged a couple times on the garage, we
12   didn't get response. So the front door was to the
13   east of the garage. I walked up the sidewalk to the
14   front door while Deputy Lopez stayed at the garage,
15   and the middle screen on the front door, I'm trying
16   to remember, it didn't have a handle or something
17   like that, so I pulled it open and I knocked, I
18   didn't hear anything. And because the music was so
19   loud, I took my ASP out and I used the end of my ASP
20   to bang on the door so he could hear me. Then I
21   heard the music get louder, and I looked, and it's
22   because the garage door was opening.
23       Q.  And then what?
24       A.  I saw Mr. Hill standing a couple feet away
25   from Deputy Lopez, and Lopez was in the driveway

Page 26

1    still on the outside of the garage. Mr. Hill had
2    his left hand on the garage door, like this
3    (demonstrating), looking at Mr. Lopez, and he had a
4    gun in his right hand.
5        Q.  Did you see the gun in his right hand?
6        A.  Yes, I did.
7        Q.  Okay. And then what?
8        A.  I yelled "gun" and I drew my gun. I kept
9    yelling for him to drop the gun. The music was so
10   loud, I was screaming at the top of my lungs, "gun,
11   drop the gun."
12       Q.  And then what?
13       A.  At that time I had my service weapon
14   pulled, I was aimed at him. I yelled "gun," I
15   screamed "gun" one more time as loud as I could,
16   "drop the gun". And Mr. Hill kind of looked my way,
17   and then the garage door started coming down as he
18   was raising the gun.
19       Q.  Okay. So the left hand pulled the garage
20   door down, and the right, the gun was raising as the
21   garage door was going down?
22       A.  Yes, sir.
23       Q.  Okay. Then what?
24       A.  I thought, the way the gun was coming up,
25   I thought he was gonna shoot Lopez through the

Page 27

1    garage, and if he missed Lopez, there's 50 kids
2    behind us.
3        Q.  So what did you do?
4        A.  I fired my weapon.
5        Q.  How many times?
6        A.  Four.
7        Q.  There's -- have you seen pictures of the
8    garage door since?
9        A.  Yes, sir.
10       Q.  There's some that are further towards the
11   ground and some -- there's one that's like
12   five-to-six feet up. Do you know the sequence of
13   what -- of how they were fired?
14       A.  Yes, sir.
15       Q.  How?
16       A.  Just counting up from the bottom, the
17   lowest one was the first, and then two, three, four.
18       Q.  Why did you fire like that?
19       A.  I was always trained to track vertically,
20   up.
21       Q.  Okay. Were you shooting to kill?
22       A.  I was shooting to eliminate a threat.
23       Q.  Once the garage door closed, what threat
24   was there?
25       A.  A garage door is just concealment, it's

Page 28

```
 1   not cover.  You can shoot through it.
 2       Q.  What is the difference between concealment
 3   and cover?
 4       A.  Concealment just hides you from view,
 5   while cover provides protection.
 6       Q.  Okay.  Did Mr. Hill ever say anything that
 7   you heard?
 8       A.  If he did, I didn't hear it over the
 9   music.
10       Q.  Okay.  Did Mr -- Officer -- sorry.
11   Deputy Lopez say anything that you heard?
12       A.  Over -- again, over the music, everything
13   I could not hear.
14       Q.  Okay.  So is it fair to say, I mean, I
15   guess one can hear one's own voice.  Did you hear
16   anything else said from the time that garage opened
17   to the time that garage closed; other than what you
18   said, did you hear anybody else say anything?
19       A.  No, I did not.
20       Q.  Okay.  Help me understand, through this
21   sequence, the laws -- before I get there, had you
22   done any background investigation on Mr. Hill before
23   you knocked on the door?
24       A.  I don't understand.
25       Q.  That's probably because it's a -- I think
```

Page 29

```
 1   it assumes that you had.  Did you do any background
 2   investigation on the residence before you --
 3       A.  You mean, like, pull up a call history?
 4       Q.  Correct.  Did you do anything to research
 5   1501 Avenue Q before you knocked on the door?
 6       A.  No, I did not.
 7       Q.  Did you do anything to research the
 8   residents of 1501 Avenue Q before you knocked on the
 9   door?
10       A.  No.
11       Q.  Had you, to your knowledge, encountered
12   Gregory Hill before January 14, 2014?
13       A.  To my knowledge, at that time, no, I did
14   not.
15       Q.  Okay.  Have you since learned that you
16   had?
17       A.  Yes.
18       Q.  Tell us about that.
19       A.  After all this came to light, I,
20   apparently, had arrested Mr. Hill in, I think, it
21   was 2004 during the hurricanes, the aftermath when
22   we had the curfew, for a curfew violation.
23       Q.  Do you have independent recollection of
24   that?
25       A.  I mean, we arrested a couple people during
```

Page 30

```
 1   hurricane violations, so nothing about that arrest
 2   really stands out in my mind.
 3       Q.  Right.  Do you recall what hurricane that
 4   was?
 5       A.  That was Hurricane Frances and Jeanne, I
 6   believe, the year we had the two hurricanes.
 7       Q.  Yeah, that's right.  Do you recall or did
 8   you since learn what he was doing to cause him to be
 9   arrested, what was the probable cause for the
10   arrest?
11       A.  During that time?
12       Q.  Um-hmm.
13       A.  It was he was out past the curfew.  Like I
14   said, I don't really recall the arrest, but it was a
15   curfew violation.
16       Q.  Okay.  Do you recall the terms of the
17   curfew?
18       A.  I would like to say I believe that the
19   curfew violation was in effect that no one was to be
20   on the street after 8:00, it was, 8:00 or 9:00 at
21   night.
22       Q.  And he was, as you recall, he was out
23   after that?
24       A.  Yes, sir.  And I usually gave people like
25   a half-hour leeway to make it home and stuff like
```

Page 31

```
 1   that, so without seeing the arrest I couldn't tell
 2   you exactly what time.
 3       Q.  That's fine.  Do you recall whether he was
 4   doing anything, you know, nefarious or
 5   criminal-like?
 6       A.  Like I said, I really don't recall the
 7   arrest.
 8       Q.  Did you recognize Mr. Hill before you shot
 9   him?
10       A.  No.
11       Q.  That arrest would have been while you were
12   at Fort Pierce Police Department?
13       A.  Yes, sir.
14       Q.  Again, I don't want to know about any
15   conversations with your attorney, but how did you
16   learn, how was that association made?
17       A.  I believe I had, you know, during the
18   interviews the next day, the Detectives asked me if
19   I recalled having any, and I said, "no", and they
20   said, "Well, you had arrested him in 2004 for a
21   curfew violation." and I said, "Well, I don't really
22   remember it."
23       Q.  You said you arrested two people for
24   curfew violation?
25       A.  I arrested more than two during that time.
```

ronically signed by Suzanne Badley (301-277-379-1582)

Page 32

```
1    I think it was like a week-long or almost a
2    month-long curfew.
3         Q.  We started this off where you described
4    Fort Pierce as kind of a -- how did you describe it,
5    I don't want to put words in your mouth.
6         A.  Kind of a low income, high, kind of, crime
7    area.
8         Q.  Okay.  And you have spent most of your law
9    enforcement career working this low-income,
10   high-crime area; is that fair?
11        A.  Yes, sir.
12        Q.  Do you predominantly arrest minorities?
13        A.  I arrest whoever violates the law.
14        Q.  I understand.  The population that you
15   deal with, the people that you're investigating in
16   Fort Pierce during your time in Fort Pierce and
17   St. Lucie County as a whole, I mean, can you
18   estimate what percentage of people that you're
19   investigating or arresting are a minority?
20        A.  No, I really couldn't.  I don't really
21   look at that.
22        Q.  Okay.  From an outsider's standpoint, do
23   you know -- like Jacksonville has 27 percent
24   African American population and, I think,
25   6 or 7 percent Hispanic, just purely objectively,
```

Page 33

```
1    do you know what Fort Pierce is?
2         A.  No, I do not.
3         Q.  Okay.  Do you know what St. Lucie County
4    is?
5         A.  I do not.
6         Q.  During your time with Fort Pierce, did
7    anybody, did any suspect or arrestee make any claims
8    that you used excessive force or were racially
9    biased -- strike that.
10        Any time during your Fort Pierce Police
11   history, did anybody make any accusations against
12   you that you were racially biased in your police
13   work?
14        A.  Not that I recall.
15        Q.  Okay.  Did you have any excessive force
16   complaints lobbied against you during your time at
17   Fort Pierce Police?
18        A.  None that stand out to my mind.  Again,
19   without looking at the record, I couldn't really
20   tell you.
21        Q.  Okay.  Did you review your personnel file
22   before today?
23        A.  No.
24        Q.  Do you recall or has your recollection
25   since been refreshed, meaning did you since look at
```

Page 34

```
1    a report and kind of refresh your memory from 2004
2    about any of the facts of the encounter where
3    Mr. Hill was arrested for a curfew violation by you?
4         A.  No.  I never looked up the arrest, no.
5         Q.  Okay.  Why not?
6         A.  I didn't see a need to.
7         Q.  Tough question.  Do you admit that you
8    shot and killed Gregory Hill?
9         A.  I shot and eliminated a threat.
10        Q.  Did that shooting result in the death of
11   Gregory Hill?
12        A.  Yes, it did, unfortunately.
13        Q.  Okay.  Thank you for that.  Have you ever
14   had to give a deposition in a civil case?  Do you
15   know what a civil case is?
16        A.  Yes, sir.
17        Q.  Have you ever had to give a deposition in
18   a civil case?
19        A.  As far as being in law enforcement?
20        Q.  Yes.
21        A.  No, I don't believe I have.
22        Q.  Have you been under an
23   administrative investigation where statements were
24   taken or depositions held, other than this one?
25             MS. BARRANCO:  Object to the form.
```

Page 35

```
1             MR. PHILLIPS:  I can probably ask
2    that question better.
3             MS. BARRANCO:  I'm just objecting to
4    the use of the word deposition.
5             MR. PHILLIPS:  Yeah.  Yeah.  That's
6    fair.
7    BY MR. PHILLIPS
8         Q.  Have you ever -- have any -- has any of
9    your police work ever been investigated by the FDLE
10   that you're aware of?
11        A.  That I'm aware of?  Not that I'm aware of.
12        Q.  Okay.  Was this ever investigated by the
13   FDLE that you're aware of?
14        A.  I have no clue.
15        Q.  Okay.  You know what the FDLE is?
16        A.  Yes, sir.
17        Q.  Has any of your police work in any
18   department led to, other than this, led to an
19   indefinite suspension?
20        A.  No.
21             MS. BARRANCO:  Object to the form.
22   BY MR. PHILLIPS
23        Q.  Okay.  What did you call the period from
24   the time -- did you go to -- did you go to work the
25   next day after this?
```

Page 36

1      A.  No, I was out for, I believe, nine days.
2      Q.  And what do you call that?  What was that
3  called?
4      A.  I thought you meant other than this.
5      Q.  That's fine.  No.  No.  No.  And I did
6  mean other than this, but what's that called?  I
7  want to make sure I'm using your words.
8      A.  That's an administrative leave, paid
9  administrative leave.
10     Q.  Okay, paid administrative leave.  Had you
11 ever been on paid administrative leave before this?
12     A.  Not to my recollection, no.
13     Q.  Okay.  And you believe your paid
14 administrative leave related to Greg Hill was nine
15 days?
16     A.  It was nine or 10 days.
17     Q.  Okay.  Was Officer Lopez on the same
18 type -- was he placed on paid administrative leave?
19     A.  Yes.
20     Q.  Do you know if it was shorter or longer or
21 the same duration?
22     A.  I believe it was the same duration,
23 because we both went to the psychologist on the same
24 date to get returned.
25     Q.  Okay.  You ask questions as an attorney,

Page 37

1  often times without judgment, but the deponent
2  always feels like there's judgment in that.  But I
3  ask this in all these cases, have you ever been a
4  member of any type of white supremacy group --
5      A.  (Laughter).  No.
6      Q.  -- including, but not limited -- I know --
7  the Ku Klux Klan?
8      A.  No.
9      Q.  Okay.  Has any of your close family been?
10     A.  Not that I'm aware of.
11     Q.  That's good.  Have you ever been
12 arrested for anything?
13     A.  No.
14     Q.  Okay.  So you have eliminated the threat.
15 Do you know that you've eliminated the threat?
16     A.  No, I did not.
17     Q.  Okay.  So, to you, is it fair that you
18 shot four times into the door, you don't know what
19 the result of that is, and the investigation
20 continues; is that a fair summary of where we are
21 with the narrative?
22     A.  Yes, sir.
23     Q.  Okay.  What happened next?
24     A.  I don't remember if it was myself or
25 Deputy Lopez got on the radio that we alerted where

Page 38

1  shots were fired.  And I did not know if I had hit
2  my target, and I didn't want an armed suspect coming
3  around the back and coming out to ambush us, so I
4  left Deputy Lopez in the front of the house as he
5  was retreating back to the cars, and I ran onto, I
6  think it's 15th Street, to cover the back of the
7  house to make sure nobody came out to get behind us,
8  and I called out my position.  And I remember saying
9  that I didn't have any cover and that I needed
10 somebody to come over there.
11     Q.  Okay.  At any point before shots were
12 fired did you walk the perimeter of the house?
13     A.  Other than to the front door, no.
14     Q.  Okay.  There's, and I don't know what a
15 home construction person would call it, but this was
16 kind of a cinder block garage; is that fair, do you
17 recall that?
18     A.  Yes.
19     Q.  And sometimes cinder block has patterns
20 carved out where there's free space in between the
21 aspects of the cinder block, it almost looks like a
22 fan.
23     A.  Yes, sir.
24     Q.  And this house had that --
25     A.  Yes.  I do remember that.

Page 39

1      Q.  Yeah -- on the side, I guess that would be
2  the east side --
3      A.  The west side.
4      Q.  -- the west side.  Do you know if anybody
5  attempted to look?
6      A.  No.  No.  That's -- that's all -- for
7  safety, if you have an armed suspect, to go sticking
8  your head in there --
9      Q.  Sure.  Or use mirrors to look?
10     A.  What SWAT did after that -- but as far as
11 Deputy Lopez and I are there, I would never stick my
12 face in window like that.
13     Q.  Certainly.  You would just -- okay.  It's
14 more like a butterfly than a fan; that's what I'm
15 talking about.
16         (Photos tendered.)
17     A.  Yes, sir.  I remember those.
18     Q.  So at any point did you see -- did
19 yourself -- and I know the answer, but now that I'm
20 showing you the picture, did yourself or any Officer
21 that you saw attempt to look, even from a different
22 escalated location, attempt to look through that to
23 see if Mr. Hill was in there?
24     A.  No.
25     Q.  Okay.  Let's -- before we go to, kind of,

ronically signed by Suzanne Badley (301-277-379-1582)

Page 40

```
 1    the SWAT call-out and all of that response, we kind
 2    of take this frame by frame.  At the time you
 3    knocked on the door of 1901 -- 1501 Avenue Q, what
 4    were you investigating?
 5        A.  Vulgar music.
 6        Q.  Okay.  And what violation of
 7    Florida Municipal Code was that?
 8        A.  Couldn't tell you off the top of my head.
 9        Q.  Okay.  Could you tell --
10        A.  Honestly, with any noise complaint, I
11    usually have to look at the county ordinances on the
12    computer.
13        Q.  Okay.  And what were you intending to do
14    about it?
15        A.  Ask him to turn down the music.
16        Q.  Okay.  Not answering the door, was that
17    any sort of crime or violation?
18        A.  No, sir.
19        Q.  Okay.  At what point during the garage
20    door opening, if any, did you see a crime or
21    attempted crime committed by Mr. Hill?
22        A.  Well, when he opened the door and he had a
23    gun in his hand and began to raise that gun in the
24    direction of a Deputy, I took that as an immediate
25    threat.
```

Page 42

```
 1        A.  I don't know.
 2            MR. PHILLIPS:  Was it .3 -- do you
 3    remember -- .38 --
 4    BY MR. PHILLIPS
 5        Q.  Help me understand this.  Again, you know,
 6    there were two of you there, and I can show you
 7    pictures of the garage or whatever we need to do to
 8    get through this, but was it an automatic or a
 9    manual garage door opener?
10        A.  The way that it came open -- I couldn't
11    tell you for sure, but I assumed by the way it
12    opened, how fast it opened, and with him keeping his
13    hand on it, looked like he was holding it up, I
14    assumed it was manual.
15        Q.  Okay.  Did you ever, to this day, attempt
16    to lift that garage door?
17        A.  No, sir.
18        Q.  To this day, have you -- other than that
19    time where Mr. Hill lifted it, have you seen that
20    garage door lifted?
21        A.  No, sir.  I stay away from that house.
22        Q.  I assume so.  But later at the scene on
23    subsequent -- you didn't do any subsequent
24    investigation of this, I assume?
25        A.  No, sir.
```

Page 41

```
 1        Q.  Okay.  Was the possession -- again, based
 2    upon the knowledge at the time, was the possession
 3    of a firearm in somebody's garage a crime?
 4        A.  Without knowing the specifics of who he
 5    was, no, which is why we told him to drop the gun so
 6    we could figure all that out.
 7        Q.  I understand.  Was -- little bit different
 8    question -- was the garage door opening and you
 9    seeing -- all right, we established there wasn't a
10    crime until it pointed at something.  Was the
11    possession of a firearm by Mr. Hill in his garage a
12    threat to you?
13            MS. BARRANCO:  Object to the form.
14    Go ahead.
15            THE WITNESS:  I took it as a threat.
16    I mean, when you see that you have a uniformed
17    Deputy in front of you and you still have a gun
18    in your hand and then you decide to raise it, a normal
19    person, when they see a Deputy -- I've gone to
20    houses before where people answer the door thinking
21    it's someone else, and when they see the Deputy,
22    they immediately put the gun down and everything is
23    fine.
24        Q.  Certainly.  Have you come to find out how
25    intoxicated Mr. Hill was?
```

Page 43

```
 1        Q.  How long after you fired shots did you
 2    leave the scene?
 3        A.  Without looking at the CAD, which is what
 4    dispatch logs, I don't remember leaving out of there
 5    until 9:00 or after 9:00.
 6        Q.  Okay.  Okay.  So, you know, going back, do
 7    you know how tall that garage door is from the point
 8    where the top of the garage door meets the
 9    foundation of the house or the house structure?
10        A.  I have no idea.
11        Q.  Okay.  Do you know how tall Mr. Hill is?
12        A.  No.
13        Q.  When Mr. Hill opened the garage door, do
14    you recall whether he was bending, stooping or
15    crouching?
16        A.  He was standing upright.  Like I said, his
17    hand was on the door and he was -- kind of had his
18    head down looking at Deputy Lopez.
19        Q.  Okay.  So at the highest point, and what
20    I'm trying to understand, he could -- I kind of want
21    to see where the highest point of the garage door
22    was in relation to the highest point, you know,
23    basically of what you saw with Mr. Hill.  Did the
24    garage door go all the way up at any point and you
25    no longer saw the garage door?
```

Page 44

```
 1        A. I can't -- I couldn't tell you.
 2        Q. Okay. And I'm asking about minor details
 3   of a, you know, pretty quick event, I understand
 4   that.
 5           Do you know where the garage door reached
 6   its apex, meaning where it raised and then lowered?
 7   Do you know at what point off the ground it was when
 8   it was at its highest point before the shooting?
 9        A. It was high enough that I could see in the
10   whole garage.
11        Q. Okay.
12        A. I could see all of him.
13        Q. All of him, even the tiptop of his hair?
14        A. Yeah. Like I said, though he was kind
15   of -- he was standing upright, but he was kind of,
16   like, looking down at Deputy Lopez.
17        Q. Okay. How long were his eyes exposed,
18   meaning for what quantity of time could you actually
19   see Mr. Hills eyes?
20        A. I don't know. I wasn't in front of him.
21        Q. Did you ever see Mr. Hill's eyes?
22        A. Only when he glanced over at me for a
23   second before he closed the door.
24        Q. Okay. Is that what we we're talking
25   about, you know, basically a second, one second of
```

Page 45

```
 1   time from the time that he put it up and put it
 2   down, and he was --
 3        A. I couldn't give you a time frame, but it
 4   was long enough for me to yell three or four times
 5   at him.
 6        Q. Do you know if he could hear you over the
 7   music?
 8        A. I'm assuming he did, but I can't tell you
 9   for sure.
10        Q. Okay. I mean, I would assume, and
11   since -- well, let's not assume. The speakers were
12   in the garage?
13        A. Yes, sir.
14        Q. The garage is made of concrete largely?
15        A. (Witness nods head up and down.)
16        Q. And, so, would you agree with me that the
17   stereo would be louder in the garage than outside?
18        A. I couldn't tell you.
19        Q. Okay. And the speakers would have been to
20   the, I'm going to do it again, east of his ear, the
21   speakers would have been east of him?
22        A. I'm guessing, so I don't know.
23        Q. Okay. Do you know how long Mr. Hill's
24   face was exposed by that garage door from the time
25   that it went up to the time it went down over it?
```

Page 46

```
 1        A. Again, I couldn't tell you.
 2        Q. Less than a second?
 3        A. It was long enough for me to yell at him
 4   three or four times.
 5        Q. Okay. When you yelled three or four
 6   times, were you, I mean, was his -- I know you could
 7   see his body, I know you could see parts of him, but
 8   for all of your, "gun, gun, drop the gun," comments,
 9   do you know if his face was above or below the door,
10   or just his body?
11        A. This was below the door.
12        Q. Okay. For all of that?
13        A. For me yelling at him, yes, his face was
14   below the door. I could see his face.
15        Q. Okay. And where would you have been to
16   him?
17        A. I was, kind of, off at a 45 degree angle
18   to the -- it would be northeast, kind of.
19        Q. And where was Mr -- Deputy Lopez?
20        A. Directly in front of him.
21        Q. Where was Greg Hill -- at all times that
22   it -- well, let me go back. Did Mr. Hill's gun
23   raise -- at what point did Mr. Hill's gun raise?
24        A. From what I recall, I yelled to him
25   several times to drop the gun. I'm assuming he
```

Page 47

```
 1   heard me on the last time, because that's when he
 2   looked over at me. And when he did that, that's
 3   when he started looking back towards Lopez, and he
 4   did, like, a simultaneous bringing the gun up as he
 5   was bringing the garage door down.
 6        Q. Okay. Okay. So it's your testimony,
 7   because we're dealing with the written record as
 8   well as the video, but that left hand on the garage
 9   door was coming down as the right hand was coming
10   up?
11        A. Yes, sir.
12        Q. At some point they would have crossed. Do
13   you know where, kind of, the bottom threshold of the
14   door, at what point the gun was raised when the
15   bottom -- when the garage door, kind of, covered or
16   concealed the gun?
17        A. The garage door came down pretty quick.
18   It was coming down quick. I lost sight of the gun
19   as it was coming up around his hip area, I believe,
20   is where I last saw it, and, yeah --
21        Q. Okay. And what do you mean by, you last
22   saw it as it was coming up around the hip area?
23        A. Because the door was closing. And by the
24   time he was still bringing it up, like, it was a
25   slam on the garage door, that's why I assumed it was
```

Page 48

```
 1    manual --
 2        Q.  Okay.
 3        A.  -- because the door was coming down quick,
 4    and the gun was coming up, and the door blocked my
 5    view of the gun as it was still coming up --
 6        Q.  Okay.
 7        A.  -- around his hip area.
 8        Q.  So when the gun would have reached
 9    parallel with the ground, you wouldn't have seen
10    that because you never saw the gun parallel,
11    perfectly parallel to the ground; does that make
12    sense?
13        A.  Yes.  And, no, I did not.
14        Q.  Okay.  Did you ever see, therefore, the
15    gun aimed at either Officer, either you or
16    Officer Lopez?
17        A.  I did not see it specifically aimed at
18    anybody.
19        Q.  Okay.  Do you know if the gun was loaded?
20        A.  I have no idea.
21        Q.  Do you know who the owner of the gun was?
22        A.  No.
23        Q.  Did you ever make a determination of
24    either of those facts?
25        A.  I was told eventually that the gun was not
```

Page 49

```
 1    loaded, and I was also told that the gun was stolen
 2    out of Port St. Lucie.
 3        Q.  Okay.  The pictures I've seen -- have you
 4    seen the photos of Mr. Hill, the deceased Mr. Hill?
 5        A.  Yes.
 6        Q.  Would you agree with me that there's a gun
 7    in his back pocket?
 8        A.  Yes.
 9        Q.  Was there any other gun that you're aware
10    of that you have seen?
11        A.  No, sir.
12        Q.  Okay.  Was the gun in the back pocket?
13    And you know, I kind of want both certainty and
14    candor here, do you recognize the gun in the back
15    pocket as the gun that he had in his hand, or do you
16    know?
17        A.  It is the gun that was in his hand.
18        Q.  Okay.  Now, the gun that's in his pocket,
19    what part is extruded, what part of the gun is
20    extruding from his pocket?
21        A.  From the pictures, I believe it was the
22    bottom part, butt of the gun, the back end.
23        Q.  Right.  The part that touches --
24        A.  Yes, the back strap --
25        Q.  -- the palm of the hand, which is part of
```

Page 50

```
 1    the gun you would have never seen?
 2        A.  Right.
 3        Q.  But, yet, you can affirmatively identify
 4    that gun as the --
 5        A.  Well, you asked me if I saw the pictures
 6    after it was removed.  Yes, it was the gun that was
 7    in his hand after it was removed, but just seeing it
 8    in his pocket, no, I couldn't tell you.
 9        Q.  Oh, so now you're -- you're -- and I'm not
10    trying to trick you, you also saw pictures of the
11    full gun?
12        A.  Yes.
13        Q.  And that's what you're identifying off of,
14    not the pictures, as we --
15        A.  Not the picture of it in his pocket, no,
16    sir.
17        Q.  Okay.  Okay.  What other photos have you
18    seen?
19        A.  The photos of the house, the garage,
20    Mr. Hill, the firearm.
21        Q.  Who turned off, or how did the stereo come
22    to be turned off?
23        A.  I have no answer for that.  I don't know.
24        Q.  In a press conference, Sheriff Mascara --
25    is that your boss?
```

Page 51

```
 1        A.  That's the boss, yes.
 2        Q.  Yeah.  He's the ultimate supervisor, but
 3    you have lower supervisors?
 4        A.  Yes, sir.
 5        Q.  He said something to the effect of, I
 6    think the Deputies cut off the music, and then he
 7    says, well, who turned it off?  I think he wasn't
 8    sure or he misspoke.
 9            Did you turn off the music?
10            MS. BARRANCO:  Object to the form,
11    but go ahead.
12            THE WITNESS:  No.
13    BY MR. PHILLIPS
14        Q.  Did Officer -- Deputy Lopez turn off the
15    music?
16        A.  No, sir.
17        Q.  Okay.  Neither one of you went back in
18    that garage?
19        A.  No, sir.
20            MS. BARRANCO:  Object to the form.
21    BY MR. PHILLIPS
22        Q.  When you got there, the entire time until
23    Mr. Hill opened it up, that garage door was closed,
24    right?
25        A.  Yes, sir.
```

ronically signed by Suzanne Badley (301-277-379-1582)

Page 52

1    Q.  Are you aware of, when that complaint came
2  in, if the garage door was open or closed?
3    A.  I have no idea.
4    Q.  When did you, and I'm not trying to impute
5  all of the knowledge of St. Lucie County Sheriff's
6  Office to you, but did you become aware or involved
7  that there might have been a child in the building?
8  Did you have personal knowledge of that at any
9  point?
10    A.  Several hours after they had moved us from
11  the front of the house, somebody was saying, I
12  remember being near the command, waiting, after
13  giving statement and getting pictures taken, that
14  somebody said that a family member called and they
15  were concerned there was a child in the house, so
16  they asked me, and I said that, no, I didn't see a
17  child at the time.
18    Q.  Okay.  And we'll come back.  We're gonna
19  go back through, kind of like we did, probably more
20  briefly, the SWAT call-out in a minute.
21        MR. PHILLIPS:  What time is it?
22        MR. ROBERTS:  10:13.
23        MR. PHILLIPS:  Does anybody need a
24  break?  We've been going an hour.
25

Page 53

1        THE WITNESS:  I'm good.
2        MR. PHILLIPS:  Court reporter?
3        COURT REPORTER:  I'm okay.
4  Thank you.
5        MR. PHILLIPS:  Okay.  Sometimes I've
6  been known to make court reporters mad with smoky
7  fingers, so just let me know.
8  BY MR. PHILLIPS
9    Q.  And at some point there was a camera or a
10  robotic camera deployed, were you involved with any
11  aspect of that?
12    A.  No, sir.
13    Q.  Did you go back to that scene after you
14  left it on January 14, 2014; have you been on that
15  property for any reason?
16    A.  The following day I did a walk-through
17  with the Detectives.
18    Q.  To show them what happened?
19    A.  Yes, sir.
20    Q.  Okay.  Who was there with you for the
21  walk-through?
22    A.  I believe Detective LeBeau was there.  I
23  couldn't really tell you anybody else.
24    Q.  What is his role with St. John's County
25  Sheriff's Office -- I'm sorry, St. Lucie County

Page 54

1  Sheriff's Office?
2    A.  At the time he was a Detective.
3    Q.  What is he now?
4    A.  He's a Sergeant.
5    Q.  Who was your supervisor at the time?
6    A.  My immediate supervisor at the time was
7  Sergeant Mark Colangelo.
8    Q.  Who is it now?
9    A.  Now my Sergeant is Suzanne Woodward.
10    Q.  Did Sergeant Colangelo come to the scene?
11    A.  I'm sure he did.  I couldn't tell you.
12    Q.  Did you make any call-outs or seek any
13  permissions from Sergeant Colangelo before firing
14  your gun?
15    A.  No.
16    Q.  Okay.  Other than you and Deputy Lopez,
17  who was the next Officer on the scene?
18    A.  Next on scene, as far as I knew, was
19  Detective Paul Pearson, and I believe it was
20  Detective Blatchford was with him.  Because I was
21  standing, like I said, in the middle of 15th Street,
22  and I called for somebody to bring a car over there.
23  Then when they showed up, I had -- Lopez was still
24  in the front of the house by himself, so when they
25  showed up and they covered the back of the house, I

Page 55

1  went to the front of the house with Mr. Lopez.
2    Q.  At that point, you know, base -- obviously
3  it was you and Deputy Lopez who had the firsthand
4  account of what happened.  How was the incident -- I
5  mean, how did you report to fellow Officers -- what
6  would have been the signal, I guess, at the point
7  the garage door closed and you fired shots?  What
8  did that investigation turn into?  Do those
9  questions make sense?  That's kind of -- let me
10  restate all of that.
11        Once the garage door closed and shots were
12  fired, what did you report to fellow Officers or
13  dispatch?
14    A.  That shots were fired and we had a
15  possible barricaded armed suspect.
16    Q.  Okay.  Can one be barricaded in their own
17  home?  What does barricaded mean?
18    A.  It means, basically, you locked yourself
19  in somewhere and you're not coming out.
20    Q.  He was doing that before you fired shots,
21  ostensibly, meaning he didn't hear you or wasn't
22  coming out?
23    A.  (Pause).
24    Q.  I guess my question is, was there anything
25  any more legal about him not coming to the door

Page 56

1  before shots were fired or after shots were fired?
2      MS. BARRANCO: Object to the form.
3  Go ahead.
4      THE WITNESS: Well, as far as I know,
5  after shots were fired he had committed a crime, so
6  then it was a criminal act.
7  BY MR. PHILLIPS
8      Q. What crime had he committed?
9      A. As far as I was concerned, he committed
10  aggravated assault on a law enforcement Officer.
11      Q. Even though the gun was never pointed at a
12  law enforcement Officer?
13      A. It was an immediate threat that was coming
14  in his vicinity. From my perspective and what I
15  saw, I saw an imminent threat to Deputy Lopez' life.
16      Q. When did the music stop?
17      A. I don't know. It played for a while.
18      Q. Do you recall Officer Lopez making
19  any -- did you see what Officer Lopez was doing as
20  the garage door went up and down?
21      A. No, sir. I did not.
22      Q. Then that's fair. Did Officer Lopez draw
23  his revolver?
24      A. I have no idea.
25      Q. And I said revolver -- his service weapon?

Page 57

1      A. I have no idea.
2      Q. Did you hear, and I think I asked this,
3  did you hear, at any point, any explanation towards
4  Mr. Hill by Deputy Lopez?
5      A. I don't recall.
6      Q. Who was closer to you, Deputy Lopez or
7  Gregory Hill?
8      A. I was about the same distance from them
9  both.
10      Q. Have you gone by any other surnames, have
11  you had any other last names?
12      A. No.
13      Q. Believe it or not, I've had a couple.
14  You're wearing glasses today; what prescription are
15  you?
16      A. I'm nearsighted.
17      Q. Okay.
18      A. I wear contacts at work.
19      Q. Okay. Do you know what your vision is?
20      A. Not off the top of my head.
21      Q. Where do you -- who follows your vision
22  care, who do you see?
23      A. I don't see why my eye doctor has to do
24  anything -- I don't like giving up my doctors and
25  medical unless it's --

Page 58

1      Q. Do you agree that your vision is relevant
2  to this incident, what you saw, what you didn't see,
3  what you could see, what you couldn't see?
4      A. Yeah, but, I mean, I wear my contacts, I
5  wear my glasses, I pass my vision tests every year.
6      Q. Okay. You were wearing your contacts at
7  the time of this incident?
8      A. Yes, sir.
9      Q. Would your -- do you know when you would
10  have last gone to a vision doctor before
11  January 14, 2014?
12      A. I would have to get with my doctor to get
13  my records.
14      Q. Okay. Were you on the scene the next day
15  when somebody had a metal detector; do you recall
16  that?
17      A. Not that I recall.
18      Q. Okay. Did you ever see anybody on scene
19  with one of those kind of metal detectors you take
20  to the beach?
21      A. I couldn't tell you, sir. I was pretty
22  busy.
23      Q. Okay. At the time that you fired your
24  shots, did you have any information that there was
25  anybody in that house at all, did you have any idea

Page 59

1  about how many people, if any, were in that house?
2      A. No.
3      Q. Other than seeing Greg Hill?
4      A. That was all I saw.
5      Q. Okay. I asked if you had ever shot
6  anyone, I said overall, but let me limit it to the
7  line of duty, and you said you never shot anyone.
8  Had you ever -- have you ever shot at anyone in the
9  line of duty other than Mr. Hill?
10      A. No.
11      Q. Let's, kind of, go to the SWAT call-out
12  portion. So there was some degree of a report that
13  an armed person was barricaded in their home, fair?
14      A. Yes, he was barricaded.
15      Q. Okay. Did you request any particular
16  assistance related to that?
17      A. Calling out SWAT and all that is above my
18  pay grade.
19      Q. Certainly. Do you know who made those
20  decisions?
21      A. Couldn't tell you.
22      Q. Was it -- do you know if it was your
23  Sergeant that made any decisions related to that?
24      A. Again, I could not tell you.
25      Q. When did you find out that, for lack of a

17 (Pages 56 to 59)

Page 60

1    better way to put it, SWAT was coming?
2        A.  I didn't know they were coming until they
3    showed up.
4        Q.  What is SWAT?
5        A.  Special Weapons And Tactics team.
6        Q.  Have you ever been a member of SWAT?
7        A.  No, I have not.
8        Q.  Have you sought to be a member of SWAT?
9        A.  No.
10       Q.  Okay.  Who responded to the scene?
11       A.  I couldn't tell you.
12       Q.  Okay.  How many Officers responded to the
13   scene on January 14, 2014?
14       A.  I have no idea.
15       Q.  Were you involved with the decision to
16   fire tear gas into this residence?
17       A.  No, I wasn't.
18       Q.  I guess, then, you didn't fire tear gas
19   into this residence?
20       A.  No, sir.
21       Q.  That's a SWAT thing?
22       A.  Yes, sir.
23       Q.  Okay.  Did anybody from SWAT speak to you
24   about what you saw before they reacted?
25       A.  No, sir, not that I was aware of.

Page 61

1        Q.  Okay.  What statements had you given any
2    fellow Officer, other than what we just talked
3    about, about what was going on at Avenue Q?
4        A.  I don't remember how long Deputy Lopez and
5    I were in front of the house when SWAT responded and
6    they finally got there.  They pulled the armored
7    vehicle up and allowed us to walk behind it as
8    cover.  I gave a statement to Detective Briglia and
9    Detective LeBeau.
10       Q.  Are they with SWAT?
11       A.  No.
12       Q.  Are they with --
13       A.  They're with the Detective Bureau CID.
14       Q.  That's like an Internal Affairs, kind of?
15       A.  No.  It was -- they're not Internal
16   Affairs, they're just regular Detectives.
17       Q.  Okay.  Did ultimately you give a statement
18   with some form of Internal Affairs?
19       A.  I can't remember what day it was, but I
20   did give another statement that was recorded and
21   all.
22       Q.  Okay.  Do you know who that was to?
23       A.  Couldn't tell you.
24       Q.  And some departments call them Integrity,
25   Internal Affairs, I've heard everything.  Do you

Page 62

1    know what St. Lucie County Sheriff's Office refers
2    to that unit?
3        A.  Internal Affairs.
4        Q.  Okay.  Do you know what the -- were you
5    informed at any point that evening of why tear gas
6    was injected into the residence?
7        A.  I'm not on SWAT.  I don't know why they
8    did.  I have no idea.
9        Q.  Was there anything that you have firsthand
10   knowledge of from being there that would have
11   warranted tear gas, multiple canisters of tear gas
12   being injected into the residence?
13       A.  I have no control or anything to do with
14   tear gas.
15       Q.  Okay.  Do you know why the tank was called
16   out, or the armored vehicle?
17       A.  I have no -- I could not tell you the
18   beginnings of working with SWAT.  I've never been a
19   member and I don't want to be a member, and their
20   secret society is theirs.
21       Q.  Okay.  Why do you call it
22   "secret society"?
23       A.  Because they train together and they have
24   their own tactics and their own stuff they do, so
25   I'm not trying to learn it.

Page 63

1        Q.  I understand.  And I am trying to learn
2    it.  I kind of want to understand why -- how this
3    evolved from a noise complaint to a helicopter, an
4    armored vehicle, tear gas and snipers -- did you see
5    snipers at some point?
6        A.  I couldn't tell you.
7        Q.  Okay.  How it escalated to that point, do
8    you have any knowledge about that?
9            MS. BARRANCO:  Object to the form.
10   Go ahead.
11           THE WITNESS:  My belief is that when
12   he brought a handgun to the front door, refused to
13   comply and drop it, and began to raise it at a
14   Deputy, that changed the entire situation from loud
15   music to an armed suspect who was threatening a
16   police Officer.
17   BY MR. PHILLIPS:
18       Q.  Okay.  Do you have any information that
19   Mr. Hill lived past three to four minutes after he
20   was shot?
21       A.  I have no idea.
22       Q.  Okay.  Have you seen or heard of any
23   evidence to that effect, that Mr. Hill lived -- that
24   the bullets you fired didn't kill him?
25       A.  I have no idea.

Page 64

1    Q.   Other than the four shots you fired, did
2  you see or hear anybody else fire any rounds
3  whatsoever on that night at that scene?
4    A.   To be honest with you, after I fired my
5  first shot, I didn't hear anything.
6    Q.   Okay.  But did you see or hear anybody
7  else fire on that premises at any point during that
8  night, other than the tear gas?
9    A.   Not that I recall.
10    Q.   Okay.  Did you see the tear gas get fired
11  in?
12    A.   No, sir, I did not.
13    Q.   Did you interview any witnesses at the
14  scene?
15    A.   No.
16    Q.   Did Deputy Lopez interview any witnesses
17  at the scene?
18    A.   No, sir.
19    Q.   To the extent --
20    A.   Not that I'm aware of, no.  As far as
21  after it happened and we gave statements, we,
22  basically, sat by a patrol car away from everybody.
23    Q.   What is your understanding of a suspect's
24  constitutional rights, if any?
25        MS. BARRANCO:  Object to the form.

Page 65

1        THE WITNESS:  As far as what?
2  BY MR. PHILLIPS
3    Q.   What -- when I say the term
4  "constitutional rights" related to a suspect, what
5  comes to mind?
6    A.   I don't -- I try to uphold the
7  Constitution with everybody.  I'm a very -- I'm a
8  big advocate of the Second Amendment, I'm a big
9  advocate of the First Amendment.  I try to never
10  violate anybody's Fourth Amendment.  I think the
11  Constitution is very important.
12    Q.   What is the Fourth Amendment?
13    A.   Search and seizure.
14    Q.   What does that mean, search and seizure?
15    A.   Excuse me?
16    Q.   I said, "What's the Fourth Amendment" and
17  you said, "Search and seizure" and I said, "What
18  does that mean"?
19    A.   Search and seizure, the Fourth Amendment
20  guarantees you the right to be secure in your
21  property and your comings and goings.
22    Q.   Okay.  Do you feel you violated Mr. Hill's
23  Fourth Amendment rights on January 14, 2014?
24    A.   No, sir.
25    Q.   Why not?

Page 66

1    A.   He committed a crime.
2    Q.   And what crime is that?
3    A.   Aggravated assault.
4    Q.   How?
5    A.   As I said before, I've been to calls where
6  homeowners come to the door with gun, and once
7  they've seen me and I told them to drop it, they put
8  the gun down, they apologize, we talk.  I don't take
9  their gun away.
10        Like I said, I'm a big advocate of the
11  Second Amendment.  When I pull people over and they
12  have a conceal permit and they don't have the gun on
13  them, I ask them why they don't have it.  But when
14  you fail to comply and you see that you're
15  confronted with uniformed Officers, and instead of
16  acting as a responsible citizen and placing the gun
17  on the ground and speaking with the Deputies and
18  just talking it through, when you begin to raise it
19  up and close a door and begin to point it at those
20  Deputies, that you don't have a constitutional right
21  to do that.
22    Q.   Okay.  And what I'm trying to understand
23  is, do you have any evidence that Mr. Hill heard
24  you?  You don't know what he heard.
25    A.   I don't know what he heard.  I couldn't

Page 67

1  testify to that.
2    Q.   Okay.  And you've testified that you don't
3  even know if Deputy Lopez, who was an equal distance
4  away, said anything, because the music was so loud?
5    A.   I can't testify as to what Deputy Lopez
6  did.  I'm assuming he would have, but, like I said,
7  you will have to ask him.
8    Q.   Okay.  If he testified he yelled "gun" and
9  you didn't hear it, is that because the music was so
10  loud?
11        MS. BARRANCO:  Object to the form.
12  Go ahead.
13        THE WITNESS:  It could be the music,
14  and it, actually, sir, it was very stressful.
15  BY MR. PHILLIPS
16    Q.   Okay.
17    A.   I don't know if you've ever been in that
18  situation, but it is very stressful.
19    Q.   I understand.  And I appreciate the line
20  of work that you do; you do put yourself out there
21  for the protection of us.  And what I'm -- my job is
22  to find out the details and determine, or let a jury
23  determine, you know, whether there was a breach of
24  rights based upon this particular set of facts.
25  And, so, I need to know those facts in as much

Page 68

1   detail as possible.
2        And I think what we have is extremely loud
3   music playing during the entire duration of this
4   incident, correct?
5        A.  Yes, sir.
6        Q.  That music would have gotten louder when
7   that door opened to the exterior, to people outside,
8   correct?
9        A.  Yes, sir.
10       Q.  And a gentleman was entirely within his
11  home possessing a firearm at all times during this?
12       A.  Okay.
13       Q.  Is that true?
14       A.  Yes, he did have a firearm the entire
15  time.
16       Q.  And he was in his home entirely for the
17  entire duration of this incident?
18       A.  Yes, sir.
19       Q.  Okay.  He was shot and killed in his home,
20  although you claim justifiable use of force?
21       A.  It's not a claim, it's the truth.
22       Q.  Certainly.  I understand that.  And I
23  don't mean claim as in allegation or something
24  false; that's your defense, right?
25       A.  It's facts.

Page 69

1        Q.  Certainly.  And that gun was never
2   pointed -- that gun was never raised to be parallel
3   with the ground, it was never fully raised?
4        MS. BARRANCO:  Object to the form.
5        THE WITNESS:  Not that I saw.
6   BY MR. PHILLIPS
7        Q.  Okay.  The gun was never pointed at any
8   Officer or human being?
9        MS. BARRANCO:  Object to the form.
10  Go ahead.
11       THE WITNESS:  I did not see it
12  directly pointed.
13  BY MR. PHILLIPS
14       Q.  Okay.  Do you know, you know, at its
15  ultimate point where you lost contact because of the
16  garage door, at what degree it was pointed, or what,
17  you know, kind of level it was aiming, like at the
18  knees or lower, do you have any idea?
19       A.  The muzzle would have been aiming towards
20  Deputy Lopez' thigh area.
21       Q.  Okay.  But I think you indicated it wasn't
22  directly aimed at Lopez --
23       A.  It wasn't at center mass.
24       Q.  Okay.
25       A.  Sorry about that.

Page 70

1        Q.  Did you undergo a drug test after that?
2        A.  I don't recall.
3        Q.  Were you under the influence of any
4   alcohol or drug at the time of this incident?
5        A.  No, sir.
6        Q.  Do you recall what you had done before
7   coming on shift at 3:00 p.m. on January 14, 2014?
8        A.  If I followed my normal routine, I
9   probably would have slept until like 11:00 or 12:00,
10  gotten up, got myself something to eat and come into
11  work.
12       Q.  Okay.  Do you work out before shift?
13       A.  No, I do not, I work out afterwards.
14       Q.  Okay.  Do you take any caffeines, not just
15  like Coke, but like a caffeine supplement or any
16  stimulant before going on shift, or did you that
17  day?
18       A.  No.
19       MR. PHILLIPS:  Let me take a little
20  break, and we should be able to wrap up fairly soon
21  after I come back on.
22       (Break from 10:38 a.m. to 10:52 a.m.)
23  BY MR. PHILLIPS
24       Q.  There's a robot depicted in photos that
25  apparently cut the hole in the door, do you recall

Page 71

1   that?
2        A.  No.
3        Q.  Do you know if you were there for that?
4        A.  I was on scene for that, but I didn't
5   witness it, I did not have anything to do with that.
6   I was actually, at that point, still over by a
7   patrol car being kept away from everything.
8        Q.  Certainly.  Have you ever had any
9   involvement with that robot at any other scenes?
10       A.  Before that, no, sir.
11       Q.  After that or before that.
12       A.  After that I believe they've used it a
13  couple times.
14       Q.  Do you know if that robot does some form
15  of taking pictures or video, do you know?
16       A.  I have no idea.  As -- all I know about
17  that robot is it is part of, I think, the bomb unit
18  that actually runs that, and I have no idea what
19  it's used for or what it's capable of.
20       Q.  Okay.  Did you ever see, other than him
21  opening the door and closing the door, did you ever
22  see Mr. Hill at any point -- well -- strike that.
23       Other than your time with him in 2004
24  related to the curfew incident, and him raising and
25  closing the door in 2014, to your knowledge, have

20  (Pages 68 to 71)

Page 72

1 you ever seen Mr. Hill?
2     A.  Not to my knowledge, no, sir.
3     Q.  Again, some of those questions that I
4 gotta ask.  Were you investigating Mr. Hill before
5 2014, between 2004 and 2014 for anything?
6     A.  Not that I'm aware of, no, sir.
7     Q.  Okay.  Are you aware of whether you or
8 another Officer was conducting any investigation of
9 him or his family?
10     A.  I can't answer for other Officers, but I
11 know I wasn't.
12         (Photograph tendered to witness.)
13     Q.  It's a black and white Google photo of the
14 residence.  Can you hold that up to me and show me
15 where you were when you fired?
16     A.  In this grassy area here, (indicating)
17 kind of towards the corner.
18     Q.  Okay.  And where was Officer Lopez or
19 Deputy Lopez?
20     A.  He would have been where this (indicating)
21 car is towards the front of the garage.
22     Q.  Okay.
23         MS. BARRANCO:  And just for the
24 record, that picture, to clarify, that wasn't taken
25 on the day of the subject incident, right?

Page 73

1         THE WITNESS:  No.
2 BY MR. PHILLIPS:
3     Q.  No.  No.  No.  I think that's a Google
4 photo.  Thank you.
5         I'm going to present a document to you, or
6 I have presented a document to you.  What is that,
7 if you're aware?
8     A.  It appears to be the transcript from a
9 911 tape or digital, whatever they have now.
10     Q.  Okay.  The 911 tape or a dispatch log?
11     A.  It would be dispatch, I'm sorry, the
12 dispatch tape.
13     Q.  Can you, to some extent, translate this
14 into English for us, meaning, where there are
15 numbers, explain what those numbers are, and just
16 kind of run through the first ten or so entries of
17 that.
18     A.  Well, she calls my number, she says: SO
19 280 10 65, means copy a call.  I told her I would be
20 Llima from my call with Paul Pearson, which means I
21 was back in-service.
22     Q.  Okay.  What number are you?
23     A.  280.
24     Q.  Okay.
25     A.  1400 Avenue Q, Signal 22, which is a

Page 74

1 disturbance call, across the street from the school
2 on Avenue Q, it was a brown house.  Subjects have
3 the garage open and are playing obscene music very
4 loud.  No 1025, which means the caller does not want
5 me to make contact with them, the caller.
6     Q.  Okay.  The person who made the complaint.
7     A.  And I said I was 51, which means I was en
8 route.
9     Q.  Okay.
10     A.  And she says -- she repeats 51 to
11 acknowledge.  205, which is Justin Jackson, I
12 believe, said he was gonna be heading that way from
13 Orange, and I don't know, it doesn't say.  She
14 acknowledges that.  And then 217, which is
15 Deputy Lopez, says that he's right with me, that she
16 can 66 the other unit, which means cancel it.
17     Q.  Okay.  Keep going, please.
18     A.  So Justin Jackson says 26, which means he
19 understands, and he says 10 8, he's back in-service.
20 And then I call out that we're both going 97, which
21 is on scene, and then I call out, it's going to be
22 1501 Avenue Q.  She says 10-4.  And then the next
23 thing is, shots fired, and she says that the man is
24 gonna be 1034, which is limited traffic.
25     Q.  What does that mean?

Page 75

1     A.  That means no calling out traffic stops,
2 or checking out with this or -- that's when they
3 reserve channels, so if something serious is going
4 on, that they only want limited traffic of that
5 event on that channel so nobody gets hurt.
6     Q.  Okay.  Let me see that.  What number were
7 you?
8     A.  280.
9     Q.  Okay.  So it was Officer Deputy Lopez that
10 said "shots fired" first, reported it?
11     A.  Yes, sir.
12     Q.  Were you involved, it looks like: 280, can
13 you advise the school they need to get everybody
14 inside; did you do anything else other than, you
15 know --
16     A.  I just told them they need to get the kids
17 inside, just in case, they shouldn't be outside.
18     Q.  Okay.
19     A.  As far as the lockdown goes, I was not
20 involved in the lockdown.
21     Q.  Who is 417?
22     A.  I don't know.
23     Q.  Who was 217?
24     A.  217 is Deputy Lopez.
25     Q.  That's right, sorry.

Page 76

1    A.   What does it say about 417?
2         (Document tendered to witness.)
3         That would probably be, from the context,
4    I would think that would be Deputy Pearson pulling
5    onto 15th Street.
6    Q.   Is there any significance to the numbers?
7    A.   100 numbers are Supervisors, 200 and 300
8    numbers are just regular Deputies, and 400 numbers
9    are Detectives.
10   Q.   Moving for 15:28:14 where you describe the
11   gun, tell us about that.  What was your
12   transmission?
13   A.   Signal 14, which means information, it
14   was -- that's supposed to be little -- I don't know
15   why they misspelled it -- handgun, and I said, maybe
16   like a Kel-Tec model.
17   Q.   How did you know that?  Or what led you to
18   deduce that?
19   A.   When I saw the gun -- the couple nights
20   previously, each night I had been looking at guns
21   for another -- as a backup or on off duty, and I was
22   looking at some of the Kel-Tecs.  And I just
23   remember looking at them, thinking I didn't like
24   them, I didn't like the look of them, so they stuck
25   in my head.

Page 77

1    Q.   So within 24 to 48 hours before this you
2    had been shopping Kel-Tecs?
3    A.   Yes.
4    Q.   And that's how you recognized it?
5    A.   Yes, sir.
6    Q.   Did you purchase one?
7    A.   No, I did not.
8    Q.   Would that have been for personal use?
9    A.   It would have been for personal use, yes.
10   Q.   Okay.  Can you use anything other than a
11   service-issued firearm in conjunction with work?
12   A.   You are allowed to use, but your primary
13   one they assign you is your primary, but you're
14   allowed to carry a backup that meets the
15   requirements.
16   Q.   Okay.  What are the requirements?
17   A.   It has to be of certain caliber, you still
18   have to qualify with it, and there has to be a
19   certain action on the gun.
20   Q.   At this time what was
21   your -- January 14, 2014, what was your service
22   weapon?
23   A.   The same service weapon as now, different
24   gun, of course, but the Glock .45.
25   Q.   Okay.  Moving down to 15:29:06 it looks

Page 78

1    like Officer Lopez disagrees with you what the gun
2    was or looked like, am I reading that correctly?
3         MS. BARRANCO:  Object to the form.
4    Go ahead.
5         THE WITNESS:  Yes, sir.
6    BY MR. PHILLIPS
7    Q.   Just help me understand the, kind of, the
8    dispatch report, any police-ese in there.
9    A.   Just information.  He thought it looked
10   more like a Glock .30 or .22, which is the model, or
11   a .27, which is a small .40.
12   Q.   Do you know what it turned out to be?
13   A.   I believe it was a Kel-Tec.
14   Q.   There's a point where it says take
15   everybody over to TAC 1.  What does that mean?
16   A.   TAC 1, that is an off channel that they
17   would have just specifically used for this event so
18   they could have the main channel back so they could
19   dispatch emergency calls for service.
20   Q.   Okay.  Have you ever been on the T.V. show
21   10-8?
22   A.   No, I have not.
23   Q.   Are you aware of it?
24   A.   Yes, I am.
25   Q.   What is your understanding of it?

Page 79

1    A.   As far as I -- from what I understand what
2    I've seen on YouTube a while ago, I haven't kept up
3    with it, but as far as I know it's like a version of
4    Cops, locally, put on by the police department here.
5    Q.   Who is that gentleman, if you know?
6         (Photograph tendered.)
7    A.   That's Major Rothman.
8    Q.   What is his role with the
9    St. John -- St. Lucie -- good grief, St. Johns is on
10   my mind today -- St. Lucie County Sheriff's Office?
11   A.   Now he is the Major over, I think,
12   administration.
13   Q.   Do you know what he was at the time?
14   A.   At the time I don't know if he was still
15   the Captain over the investigative CI, Criminal
16   Investigations or not, I don't know.
17   Q.   You can't really see all of these three
18   gentlemen (indicating), but to the extent you can
19   identify them from left to right or right to left,
20   just tell me which one you're using.
21   A.   From left to right it looks like
22   Deputy Chief Wilson, Major Thompson, and
23   Captain Scavuzzo.
24   Q.   Okay.  Who are they?
25   A.   That's the Deputy Chief, he's the main

22 (Pages 76 to 79)

Page 80

1  Deputy -- Major Thompson is over law enforcement and
2  Captain Scavuzzo, at the time, was over Road Patrol.
3     Q.  Did you see Sheriff Mascara at the scene
4  on January 14, 2014?
5     A.  Yes, I did.
6     Q.  Did you have any conversations with him
7  that evening?
8     A.  Other than the fact that he just asked if
9  I was okay, if I needed anything, and I said no, and
10  that was it.
11    Q.  Okay.  Do you know what his role was on
12  scene on that evening?
13    A.  I do not know.
14    Q.  Did you see him or hear him giving orders
15  or directives?
16    A.  I did not.
17    Q.  Is that you (indicating)?
18    A.  Yes, sir.
19    Q.  On the night -- do you know if that was
20  the day in question?
21    A.  Yes, that was.
22    Q.  Okay.  Are you right-hand or left-hand
23  dominant?
24    A.  Right-hand.
25    Q.  When you fired your service firearm, did

Page 81

1  you do it with one hand or two hands?
2     A.  Two handed grip.
3        MR. PHILLIPS:  TC, you've got some
4  questions?
5  BY MR. PHILLIPS
6     Q.  We've talked about this a little bit.  Do
7  you know why St. Lucie County Sheriff's Office
8  responded to this incident and not Fort Pierce
9  Police Department?
10    A.  I couldn't tell.  Like I said, my
11  assumption was because it came from the school area,
12  and we cover the schools.
13    Q.  When did you first pull your firearm from
14  your holster, at what point in the sequence of
15  events?
16    A.  When I saw the gun.
17    Q.  Okay.  As the door was coming up?
18    A.  I didn't see the door coming up.  When I
19  turned -- when I -- because I was at the front door,
20  when I had turned, the door was already open and he
21  was standing there.
22    Q.  Okay.  Do you know how long from the time
23  you pulled your firearm out of your holster to the
24  time you shot?
25    A.  I couldn't tell you.  It was not

Page 82

1  immediate.
2     Q.  Why not, or what do you mean?
3     A.  I was giving him orders to place the gun
4  down, I just didn't pull my gun and shoot.
5     Q.  Okay.  Do you know if you'd ever responded
6  to any call of any type at 1501 Avenue Q before
7  this?
8     A.  None that sticks out in my mind.  I'm sure
9  over my course of my career in the City of
10  Fort Pierce I might have been there for one reason
11  or another, or in the area, but nothing that I
12  recall ever being there for.
13    Q.  Okay.  Since this do you recall going
14  there or any neighboring houses?
15    A.  No, sir.
16    Q.  At what point did you feel threatened?
17    A.  At the point he was not placing the
18  firearm down and complying.
19    Q.  You didn't feel threatened when you saw
20  the gun?
21    A.  Not at first, no, sir.
22    Q.  Do your or Deputy Lopez' shoes indicate
23  that you're with St. Johns -- I did it again -- do
24  yours or Deputy Lopez' shoes indicate that you're
25  with St. Lucie Sheriff's Office?

Page 83

1     A.  Mine, do not, no.
2     Q.  Do your pants?
3     A.  My pants?  Not that I'm aware of, they
4  don't say anything.
5     Q.  Does your belt?
6     A.  Belt does not, no.
7     Q.  Does anything below your belt indicate
8  you're an Officer of the law?
9     A.  Nothing specifically says St. Lucie County
10  Sheriff's Office, but it's a typical police-issued
11  uniform, gear, duty belt.
12    Q.  Okay.  Is there, other than it's probably
13  a matching color, on the -- on the -- on the uniform
14  you were wearing January 14, 2014, what is
15  the -- going from bottom up, what's the first thing
16  that shows that you're a member of law enforcement?
17    A.  Badge.
18    Q.  Anything else?
19    A.  We have shoulder patches.
20    Q.  Do you recall or did -- well, we know you
21  didn't hear Officer Lo -- Deputy Lopez say it, but
22  do you recall saying that you were a member of law
23  enforcement or just, "gun, gun, put down the gun"?
24    A.  I'm sure at one point I said,
25  "Sheriff's Office."  I always announce who I am.

ronically signed by Suzanne Badley (301-277-379-1582)

Page 84

1    Q.  Do you have a specific recollection of
2  what you said other than: Gun, gun, put down the
3  gun?
4    A.  I believe I said something like:
5  Sheriff's Office; drop the gun.
6    Q.  Okay.  Every one of the bullets you fired
7  went through the garage door?
8    A.  I assume so.
9    Q.  Did you only fire four?
10    A.  I only fired four.
11    Q.  Who would be the best person to ask about,
12  or who would have been in charge of SWAT that
13  evening?
14    A.  Whoever the SWAT commander is.  I have no
15  idea.
16    Q.  Okay.  Was Officer threat -- was
17  Officer Lopez closer to the threat, closer to
18  Mr. Hill than you were?
19    A.  Yes, sir.
20    Q.  And you don't know if he pulled his gun?
21    A.  I could not testify to that, no.
22    Q.  And I know you said you usually do, but
23  can you testify that you identified, that you yelled
24  that you were a member of law enforcement or the
25  Sheriff's Office before firing at Greg Hill?

Page 85

1    A.  I can testify to that, because even
2  knocking on the doors and I'm yelling,
3  "Sheriff's Office, Sheriff's Office,
4  Sheriff's Office, Sheriff's Office."
5    Q.  Okay.  Certainly, when you were knocking,
6  and I want to -- that's 100 percent fair and I
7  appreciate that.  Now, when the door is coming up
8  and going down, do you have a specific recollection
9  of identifying yourself as law enforcement at that
10  point?
11    A.  I can't recall, but, like I said, that's
12  my standard, is to identify myself and give a
13  command.
14    Q.  Certainly.  Do you guys carry any type of
15  bullhorn or any voice amplification device in your
16  cruisers?
17    A.  No, we do not.  In the, like, handheld,
18  no, there's not, but in your patrol car, as part of
19  your siren bar and light capability, is a PA.
20    Q.  Correct.  You can sit in your car and
21  speak on the microphone and it will come through.  I
22  have had the unfortunate time of hearing that, "pull
23  over."
24        Okay.  Did you use that application at all
25  on January 14, 2014?

Page 86

1    A.  I did not, no.
2    Q.  Did anybody else that you heard?
3    A.  I do not remember.
4    Q.  Did you have any -- again, obvious
5  question, did you have any warrants with you related
6  to Mr. Hill or the occupants on January 14, 2014?
7    A.  No, I didn't.
8    Q.  Was he being investigated for any other
9  criminal activity?
10    A.  Not by me.
11    Q.  Okay.  We have gone about two hours.  Is
12  there anything you want to add to your statement,
13  anything that you feel that I have missed that I
14  need to know?
15    A.  No, sir.
16        MR. PHILLIPS:  Okay.  Thank you.
17  That's all I have.
18        MS. BARRANCO:  I have no questions,
19  and he will read.
20        (Deposition concluded at 11:19 a.m.)
21
22
23
24
25

Page 87

1  STATE OF FLORIDA    )
                        : SS
2  COUNTY OF ST. LUCIE )
3
4        CERTIFICATE OF OATH
5    I, SUZANNE K. BADLEY, a Notary Public of the
6  State of Florida at Large, authorized to administer
7  oaths, certify that Christopher Newman was by me
8  first duly sworn to tell the truth.
9    Dated this 4th day of October, 2016.
10
11        _Suzanne K Badley_
        SUZANNE K. BADLEY
12        My Commission Expires:
        August 16, 2019
13
14
15
16
17
18
19
20
21
22
23
24
25

24  (Pages 84 to 87)

ronically signed by Suzanne Badley (301-277-379-1582)

Page 88

```
 1      STATE OF FLORIDA      )
                              : SS
 2      COUNTY OF ST. LUCIE   )
 3
 4               REPORTER'S CERTIFICATE
 5
 6          I, SUZANNE K. BADLEY, a Shorthand Reporter,
 7      certify that the foregoing deposition, Pages 1
 8      through 86 inclusive, of Christopher Newman was
 9      stenographically reported by me and is a true and
10      accurate transcription of said deposition of
11      Christopher Newman. .
12               I certify further I am neither
13      attorney nor counsel for, nor related to, nor
14      employed by any of the parties to the action
15      in which the deposition is taken and, further,
16      that I am not a relative or an employee
17      of any attorney or counsel employed in this
18      case, nor am I financially interested in the
19      outcome of this action.
20               Dated this 31st day of October, 2016.
21
22                       Suzanne K Badley
                         ————————————————
                         SUZANNE K. BADLEY
23
24
25
```

Page 90

```
 1               October 31, 2016
 2      Christopher Newman c/o
        Summer M. Barranco, Esq.
 3      Purdy, Jolly, Giuffreda & Barranco, P.A.
        2455 East Sunrise Boulevard, Suite 1216
 4      Fort Lauderdale, Fl 33304
 5      In Re:  October 4, 2016 deposition of Christopher Newman
                Viola Bryant, et al v. Sheriff Ken Mascara, et al.
 6
        Dear Sir:
 7
            This letter is to advise that the transcript for the
 8      above-referenced deposition has been completed and is
        available for review.  Please contact our office at
 9      (800)635-9193 to make arrangements for read and sign or
        sign below to waive review of this transcript.
10
            It is suggested that the review of this transcript be
11      completed within 30 days of your receipt of this letter,
        as considered reasonable under Federal Rules*; however,
12      there is no Florida Statute to this regard.
13          The original of this transcript has been forwarded to
        the ordering party and your errata, once received, will be
14      forwarded to all ordering parties for inclusion in the
        transcript.
15
                 Sincerely,
16
17
18               Suzanne K. Badley
                 Court Reporters, Inc.
19      CC:
20      Waiver:
21      I, _____, hereby waive the reading &
        signing of my deposition transcript.
22
23      _____    _____
        Deponent Signature         Date
24      *Federal Civil Procedure 30(e)/Florida Civil
        Procedure Rule 1.310(e).
25
```

Page 89

```
 1      VIOLA BRYANT v. SHERIFF KEN MASCARA
 2      DEPOSITION OF CHRISTOPHER NEWMAN
 3               ERRATA SHEET
 4      PAGE LINE   READS        SHOULD READ
 5      ____ ____ _____ _____
 6      ____ ____ _____ _____
 7      ____ ____ _____ _____
 8      ____ ____ _____ _____
 9      ____ ____ _____ _____
10      ____ ____ _____ _____
11      ____ ____ _____ _____
12      ____ ____ _____ _____
13      ____ ____ _____ _____
14      ____ ____ _____ _____
15      ____ ____ _____ _____
16      ____ ____ _____ _____
17      ____ ____ _____ _____
18      ____ ____ _____ _____
19      ____ ____ _____ _____
20
21      Under penalties of perjury, I declare that I have read the
        foregoing document and that the facts stated in it are
22      true.
23
24      _____
        DATE       CHRISTOPHER NEWMAN
25      CC:
```