EXHIBIT "O"

DEPOSITION OF ROY BEDARD

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

**Page 3**

```
          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA

          CASE NO. 2:16cv14072-Rosenberg/Hopkins

VIOLA BRYANT, as Personal
Representative of the Estate
of GREGORY VAUGHN HILL, JR.,

          Plaintiff,
vs.

SHERIFF KEN MASCARA, in his
official capacity as sheriff
of St. Lucie County and
CHRISTOPHER NEWMAN, an
individual,

          Defendants.
          _____

DEPOSITION OF:        ROY R. BEDARD

TAKEN AT INSTANCE OF:   The Defendants

DATE:                 February 10, 2017

TIME:                 Commenced at 10:00 a.m.
                      Concluded at 12:22 p.m.

LOCATION:             2894 Remington Green Lane
                      Tallahassee, Florida

REPORTED BY:          SANDRA L. NARGIZ
                      Certified Realtime Reporter
                      Certificate of Merit Holder
                      snargiz@comcast.net

     ACCURATE STENOTYPE REPORTERS, INC.
          2894 REMINGTON GREEN LANE
     TALLAHASSEE, FL 32308   850.878.2221
              www.accuratestenotype.com
```

**Page 3**

```
 1                    INDEX
 2   WITNESS                              PAGE
 3   ROY R. BEDARD                          4
 4     Direct Examination by Mr. Jolly      4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   CERTIFICATE OF OATH                   97
     CERTIFICATE OF REPORTER               98
24   ERRATA SHEET                          99
25
```

---

**Page 2**

```
 1   APPEARANCES:
 2
 3        REPRESENTING PLAINTIFF:
 4   JOHN M. PHILLIPS, ESQUIRE
 5   jmp@floridajustice.com
     LAW OFFICE OF JOHN M. PHILLIPS
 6   4230 Ortega Blvd
     Jacksonville, FL  32210
 7   904.444.4444
 8
 9        REPRESENTING DEFENDANTS:
10
     BRUCE W. JOLLY, ESQUIRE
11   bruce@purdylaw.com
     PURDY JOLLY GUIFFREDA BARRANCO
12   2455 East Sunrise Blvd
     Ft. Lauderdale, FL  33304
13   954.462.3200
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

 1          STIPULATIONS
 2       The following deposition of ROY R. BEDARD
 3   was taken on oral examination, pursuant to notice, for
 4   purposes of discovery, and for use as evidence, and for
 5   other uses and purposes as may be permitted by the
 6   applicable and governing rules.  Reading and signing is
 7   not waived.
 8             * * *
 9       **THE COURT REPORTER:** Do you swear or affirm to
10   tell the truth, the whole truth, and nothing but
11   the truth?
12       **THE WITNESS:** I do.
13   Thereupon,
14          ROY R. BEDARD
15   was called as a witness, having been first duly sworn,
16   was examined and testified as follows:
17          **DIRECT EXAMINATION**
18   BY MR. JOLLY:
19    Q   Mr. Bedard, I am Bruce Jolly.  My office
20   represents the sheriff of St. Lucie County and a Deputy
21   Newman who is being sued in this lawsuit.  My
22   understanding is that you issued, and I know this, that
23   you issued a report, that you are the retained
24   litigation consultant on this case and that's why you
25   are here.

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

Page 5

1    I suspect you have been deposed before.
2    A   A few times.
3    Q   I will not waste your time with the rules.
4  And we'll just get into it.
5        Would you state your full name.
6    A   Yes, Roy Raymond Bedard.
7    Q   Mr. Bedard, what your business address?
8    A   3057 Tipperary, T-i-p-p-e-r-a-r-y, Drive, in
9  the great city of Tallahassee, Florida, 32309.
10   Q   In this instance, it's my understanding that
11 you've issued or an expert witness disclosure has been
12 issued dated December 26 of 2016.
13       Did you go to school in Tallahassee?
14   A   Still do.
15   Q   You do?
16   A   Yeah, I am back in school after having a
17 career now behind me.  Do you want to hear about my
18 academic background?
19   Q   Not in particular.
20   A   Okay.  I am in my final year of Ph.D. school.
21   Q   It's all in there?
22   A   It's all in there.  Yeah.
23   Q   Anyway, an expert witness disclosure was
24 issued in this case reciting the materials that you had
25 reviewed.  I'm not going to chronicle them.  I don't

Page 6

1  need to.  My question is:  What materials, if any, have
2  you received or reviewed since that report was issued?
3    A   The only one I -- I received, I received
4  several a couple days ago that I have not reviewed,
5  because I have been outside of the country.
6        I have reviewed, I think the last document I
7  reviewed after the full disclosure -- and I am not even
8  sure if it's in here -- would be the defense expert's
9  report.
10   Q   Do you recall the name of that expert?
11   A   I don't.
12   Q   When did you review it?
13   A   I reviewed it yesterday and finished today, it
14 was fairly lengthy.
15   Q   When did you receive it?
16   A   Yesterday.
17   Q   So you received and reviewed it yesterday?
18   A   Yes.
19   Q   Have you had a chance to review the transcript
20 of his deposition?
21   A   I don't believe so.
22   Q   Is there anything in that report that you've
23 reviewed -- and his name is Lawrence, Mr. Lawrence.
24   A   Yes, I think he is from Canada.
25   Q   Yes.  Is there anything in that review of his

Page 7

1  report that you found significant?
2    A   Significant with respect to this case?  A lot
3  of it seemed apologus to me.  It's written from the
4  perspective of here's what police do in a very general
5  way.  I think that is very significant to any kind of
6  police action.  It seems cut and pasty, much of it.
7    Q   So is yours.  That's how this crap is done and
8  I get that.
9    A   I wasn't trying to make a comparison, but you
10 asked me if there was anything significant, so I am
11 trying to answer your question --
12   Q   I get it.
13   A   -- using the whole truth, as they say.  So
14 there are significant pieces in there, but in terms
15 of --
16   Q   Facts of the incident?
17   A   -- the facts of the incident, I didn't find
18 anything contrarian to my opinion.
19   Q   Is there anything that you recalled in his
20 report that altered your analysis or opinion?
21   A   No.
22   Q   Anything else that you can recall reviewing
23 since your report of December of 2016?
24   A   I am sorry, ask the question again.
25   Q   Sure.  Anything else that you reviewed in

Page 8

1  connection with this matter relevant to this matter that
2  you reviewed, materials, since your report of December
3  of 2016?
4    A   No.
5    Q   Was your report issued the day after
6  Christmas?  I just realized that.
7    A   Probably, yeah, the story of my life.
8    Q   Have you performed any additional workup
9  relevant to this case since December of 2016?
10   A   No.
11   Q   Do you currently anticipate doing any
12 additional workup?
13   A   I don't anticipate any additional workup, but
14 I do anticipate reading what I received most recently;
15 viewing, I think there was a video I got yesterday as
16 well that I haven't looked at.
17   Q   A video of what?
18   A   I don't remember if it was the walk-through.
19 I didn't watch it, so I don't know, but I saw there was
20 a link to it in the Dropbox.  And I did not want to
21 answer questions about it, so I intentionally didn't
22 review it in the short amount of time that I had between
23 getting it yesterday evening --
24   Q   What makes you think it's a video of the
25 walk-through?

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 9

1    A   I think there's an image that pops up of like
2  a screen that I can see that looks like it's starting at
3  the property.  So I am assuming that's what it is,
4  having seen many of them in the past.
5    Q   That was provided to you when?
6    A   Yesterday.
7    Q   So you anticipate at least at this point that
8  you may review that?
9    A   Yes.
10   Q   Any additional workup which you anticipate?
11   A   Excuse me, but with reference to your last
12 question, I just pulled it up.  It's called Hill Bryant
13 site inspection 2-7 of '17.  That's the title of the
14 video, which I haven't looked at.  So it says site
15 inspection.
16   Q   Oh, that was what Mr. Phillips took?
17   A   I don't know.  That's what I received.
18   Q   You will see me on there.
19   A   Okay.  I look forward to it.
20   Q   Then you are going to be disappointed.
21   A   I am sorry, you asked me another question?
22   Q   Any additional workup that you anticipate?
23   A   Not that I anticipate at this moment.
24   Q   Do you recall seeing the video of the
25 walk-through?

---

Page 10

1    A   Yes.
2    Q   Okay.  As you sit here today, do you have a
3  recollection that your review of the walk-through
4  affected any opinion that you have?
5    A   I think that the narrative and description
6  presented in the walk-through is consistent with the
7  documents presented by law enforcement.
8    Q   Are there any materials in connection with
9  this, your retention in this matter that you requested
10 but that was not provided to you?
11   A   Not that I recall.
12   Q   Is there anything else that you have asked for
13 which you anticipate receiving?
14   A   I don't think so.
15   Q   How is your fee being -- how are you charging
16 in this matter?
17   A   I have a fixed schedule.  I charge $200 an
18 hour.  I have a 15-hour retainer.  I generally stick to
19 the 15-hour retainer, oftentimes putting many more hours
20 in than that.  So generally my charges up to this point
21 for the case have been $3,000.
22   Q   Has that been paid?
23   A   Yes.  My deposition fee and my trial rates are
24 day rates.  My trial fee is $1,800 a day and my
25 deposition fee is $1,500 a day.

---

Page 11

1    MR. JOLLY: Off the record.
2    (Discussion off the record.)
3  BY MR. JOLLY:
4    Q   How many hours do you think -- do you keep a
5  chronology of the workup that you have, that you do or
6  did in this case?
7    A   It is my report, that would be my chronology,
8  it's a work in progress.  I change it.  Now, in terms of
9  the time, do you mean?
10   Q   That's what I mean.
11   A   Yes, I roughly keep a chronology.  I don't
12 round it down like, for instance, the Justice
13 Administration Commission would have me do to a tenth of
14 an hour and all that kind of business.  But I do
15 generalize it to say I began -- or I keep notes that I
16 started at, for instance, 8 o'clock, and my review ended
17 at 11:30.
18   Q   Do you log that anywhere so that you can
19 reproduce it if asked?
20   A   Yes, I have it.
21   Q   You brought that with you today?
22   A   I didn't.  I didn't bring anything with me.
23   Q   Okay.  I understand that, but I want you to
24 know that I am going to be seeking that you provide the
25 listing of what it is that you did and when you did it

---

Page 12

1  after the fact and I will get that through Mr. Phillips.
2    A   Okay.
3    Q   As you sit here today, I assume -- can you
4  tell me the number of hours that you have expended in
5  your workup as litigation consultant in this matter?
6    A   I can't.  I don't recall in this particular
7  matter.
8    Q   Is there anyone else -- do you work with
9  anyone else in your office?
10   A   I have a person that comes in from time to
11 time that does mostly office clean up, if you will.
12 They work on sometimes updating my website, sometimes
13 they file for me various cases, that kind of thing, but
14 it's not a regular employee.
15   Q   Is there anyone else that you work with that
16 you participated with in reviewing this matter for input
17 in the report that you issued?
18      I made that complicated, didn't I?
19   A   No.
20   Q   You are the only one?
21   A   Yes.  My employee is more clerical.
22   Q   You don't assign review of materials, of the
23 materials to someone who then reports to you?
24   A   No, that's right.
25   Q   There are some that do, you know that?

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

Page 13

1    A   I do know that.
2    Q   Okay.  Have you ever been retained on behalf
3  of Mr. Phillips or his law firm before?
4    A   Yes.
5    Q   When?
6    A   Two years ago perhaps.
7    Q   What was the case?
8    A   Aviana Bailey versus Volusia County.
9    Q   Wow.
10   A   You know this case?
11   Q   No.  We don't represent Volusia.
12       Can you generally describe the facts?
13   A   There was a couple that was at the airport,
14  somebody reported that the driver had a firearm, law
15  enforcement essentially walked up on him, the vehicle is
16  alleged to have fled, got out --
17   Q   I do know this case.
18   A   Got out on to, I think, the speedway, ended up
19  going around the Embry-Riddle area, shots were exchanged
20  on the roadway; the car eventually crashed, officers
21  chased it, more shots were alleged to have been fired by
22  both the plaintiff as well as the defendants.
23   Q   Was that case tried?
24   A   It has not been tried.
25   Q   So it's still pending?

Page 14

1    A   Still pending.
2    Q   Do you recall who the defense attorneys are in
3  the case?
4    A   I don't.
5        MR. PHILLIPS: Bruce Bogan.
6        THE WITNESS: That's right, Bogan.
7        MR. PHILLIPS: It was a tough QI case, so we
8  just had summary judgment, we are debating whether
9  we are going to appeal.  But it's a tough, tough
10  case, because the driver --
11       MR. JOLLY: He and I must have talked about
12  this.
13       (Discussion off the record.)
14  BY MR. JOLLY:
15   Q   You were retained as an expert on behalf of
16  the plaintiff?
17   A   Yes.
18   Q   Okay.  How do you know Mr. Phillips?  What's
19  the connection?
20   A   I think we met at a conference I was
21  presenting.
22       THE WITNESS: Is that right?
23       MR. PHILLIPS: I think that's right.
24       THE WITNESS: Yeah, I was presenting at a
25  liability conference in Jacksonville, or might

Page 15

1    have -- I have done a couple of them.  I think it
2    was Jacksonville, and it was the first time we
3    crossed paths.
4  BY MR. JOLLY:
5    Q   When were you contacted in connection with
6  this matter?
7    A   If you will give me a moment, I will pull it
8  up.  I hope I have the first e-mail between us.
9    Q   You didn't bring any of those with you, did
10  you?
11   A   What's that?
12   Q   Like e-mails between you and Mr. Phillips.
13   A   No, honestly I got this last night, and I do
14  apologize.
15   Q   It's okay.  But I am going to ask at some
16  point that all of your communications with Mr. Phillips
17  also be --
18   A   With respect to this case?
19   Q   Oh, yeah.  Although I guess I would like to
20  see all your communications, it's just none of my
21  business.
22   A   I want to make sure we are on the record.
23   Q   This case only.
24   A   Yes, okay.  I am not sure if Mr. Phillips
25  called me or I received an e-mail.  It looks like the

Page 16

1  first mention of this case was 12-27, but that would not
2  have been mine.  So if anything, Michelle would have
3  contacted me because she keeps in pretty good contact
4  with me.
5    Q   Well, I guess I should have said with
6  Mr. Phillips or his office.
7    A   Yeah.
8        MR. PHILLIPS: It could have been T.C.
9  Roberts, too.
10       THE WITNESS: As a matter of fact, it was,
11  Roberts, is the one I started this with.  Let me
12  see if I do --
13       MR. PHILLIPS: He only left a couple weeks
14  ago.
15       (Discussion off the record.)
16  BY MR. JOLLY:
17   Q   Back on.
18   A   The initial contact was made by Mr. Roberts
19  and it occurred October 11th, 2016, at 10:57 a.m., is
20  when I received my first written correspondence.  And it
21  would have been prior to that, it would have been the
22  morning.
23   Q   Is that an e-mail or was it a letter that was
24  forwarded to you?
25   A   We spoke.  Mr. Roberts contacted me and then

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

Page 17

1 he turned this over Michelle Atkinson to follow up and
2 start sending the items.
3   Q   Mr. Bedard, do you have any recollection of
4 what he told you in that conversation?  I mean, did you
5 make notes, contemporaneous notes?
6   A   I tell you, I can tell you what I typically do
7 when I get called by an attorney.
8   Q   First let me ask you if you have a
9 recollection --
10   A   No.
11   Q   -- specifically.
12       Okay.  Tell me what you typically do?
13   A   Which I assume would be pretty consistent with
14 what we spoke about.  Typically when an attorney calls
15 me, they present the facts as they understand them, and
16 generally they attempt to find out if it's within my
17 purview of expertise.
18       If it's a use of force cause or if it's a
19 shooting case or if it's some police procedures case, I
20 evaluate it, I say yes, this looks like something that
21 does fall under my wheelhouse of expertise, and I ask
22 them then to begin sending me the items if we can
23 consummate an agreement.  And I do send out an
24 agreement.
25       Typically in a case like this --

Page 18

1   Q   A written agreement?
2   A   It's an agreement; it's not a contract.  It's
3 a description of my services and the costs.  I don't
4 care to litigate with lawyers.  So I say these are my --
5 I say these are my fees, please pay them or we won't do
6 this again.
7       So generally I have an agreement where I send
8 out -- but I don't know in this case if that was -- if
9 that happened because we did have the prior Bailey case,
10 so I think they know the way I am and what I do very
11 well.
12       But I would say that we discussed very briefly
13 the facts of the case, in an effort to determine whether
14 or not it was under my scope of expertise.
15   Q   Do you recall what he told you about the
16 facts?
17   A   I don't, I am sorry.
18   Q   Can I -- did you render an opinion to him at
19 that time?
20   A   I don't do that, no.
21   Q   I don't think you should, but I am not --
22   A   No.  I can tell you -- without knowing what I
23 said, I can tell you I did not render an opinion.
24   Q   Okay.  And ultimately, subsequently, did you
25 receive the written materials that you described in your

Page 19

1 report?
2   A   Yes.
3   Q   Do you know when that was and did they come
4 in -- and I know this is a compound question.  Do you
5 know when it was?  Did you log in the stuff and did it
6 come in like one batch or over a period of time?
7   A   You are like an investigator.  Let's see.  So
8 Michelle sent me something December 5th, it looks like
9 the first time she sent it.  She said, I just tried to
10 share you a link to a shared Dropbox file, which is how
11 I received most of this information.  These contained
12 originally the deposition transcripts that we had
13 previously spoke about.
14       So it looks to me that that is the first bit
15 of information, and I think you recognize that being a
16 work in progress, I am continually getting stuff.  I can
17 go through each thing that I received something, if you
18 wish.  But I can tell you that the start date --
19   Q   If there is a log of that, that's all I need.
20   A   It's generally the e-mail, that's what I
21 generally use as my log.  Because what ends up happening
22 is if it's sent to me in the e-mail, then obviously the
23 e-mail will have that item.  If it's sent to me in a
24 link, I would be notified that the link is there.
25   Q   So within the package of documents that will

Page 20

1 ultimately be downloaded and printed are the e-mails
2 that would list when you received stuff?  No?
3   A   No.
4   Q   Okay.
5   A   No, I don't detail it to that degree.  I never
6 thought it was that important to indicate necessarily
7 what day I received something.  If it's in my report, I
8 reviewed it.
9   Q   Do the e-mails reflect a breakout as to what
10 documents were received?
11   A   Well, that's a good question, and I will tell
12 you, if you've ever used Dropbox, you know it is a
13 shared folder.
14   Q   I have, but I don't know how it works.
15   A   Well, basically the simple description is that
16 it's a folder that you can literally see on your
17 desktop, you open it, and we both share access to the
18 same cloud.  So we are looking into the same file
19 cabinet and that is being updated generally by the
20 attorney's office.  And when something is added to it, I
21 get a notification that it's added to it.
22   Q   But it's one Dropbox?
23   A   It's one Dropbox.
24   Q   Okay.  You can tell me or can you tell me that
25 at least there is nothing in your listing of what you

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 21

1 have reviewed that you received -- let me ask it a
2 different way.
3          Everything that you received in the Dropbox is
4 contained on your listing of materials that you
5 reviewed?
6    A   No.
7    Q   Where am I wrong?
8    A   The Dropbox materials on the date of
9 December 27 may be different than what the Dropbox
10 materials are today because there have been continuously
11 added items subsequent to the disclosure of my report.
12    Q   Do you have any idea what that would be?
13 That's kind of why I asked you if you had reviewed
14 anything since the report was issued.
15    A   I didn't review them, but you asked me if they
16 were in the Dropbox. They could be in the Dropbox. I
17 haven't reviewed them yet. I intend to do that. But as
18 I -- I've only gotten them this last week.
19    Q   I get it.
20         MR. PHILLIPS: I can clarify that. Just it's
21    not his testimony. But I put for myself on into
22    the Dropbox, which may be a different Dropbox
23    because it came from my cell phone -- in fact, I
24    know it would be -- just some photos and videos
25    from the inspection. So I think that's the only

---

Page 22

1    source of materials subsequent to the report.
2         MR. JOLLY: Which would be 12-27 forward.
3         MR. PHILLIPS: Correct.
4 BY MR. JOLLY:
5    Q   You don't have any idea what those are?
6    A   Certainly not off the top of my head. We
7 could do an analysis of the Dropbox and I think we can
8 tell precisely when those files were added. And
9 anything after 12-27 I would say have not been reviewed
10 or included in my opinions.
11         I don't think it's a monstrous feat to do
12 this. I just don't think you want to waste the time to
13 do that now.
14    Q   I don't. So it looks like -- if I've
15 understood what you have said to this point, it looks
16 like your review of materials relevant to your opinions
17 in this case occurred from December 5 until December 26?
18    A   Is that when I received the first bit of
19 information?
20    Q   That's what you said.
21    A   I don't remember the dates, but yes, that
22 would be it.
23    Q   Okay. Merry Christmas.
24    A   Thank you.
25    Q   How would you describe what your field of

---

Page 23

1 expertise is?
2    A   My field of expertise focuses on police
3 procedures, in a very general and broad way. There are
4 many areas of law enforcement procedures as you know.
5 My focus is generally on issues involving use of force
6 and defensive tactics, which are separate but the same;
7 use of force being the philosophy of when to use force;
8 defensive tactics being the technical application, of
9 course, whether it be -- everything from what we would
10 say on a force continuum is the presence to the use of a
11 firearm.
12         I incorporate in use of force other sort of
13 extraneous features of law enforcement like pursuits,
14 canines, things of that -- things that also result
15 oftentimes in injury. So this is my primary focus.
16    Q   What percentage of your litigation consulting
17 would be relating to or would relate to plaintiffs as
18 opposed to the law enforcement agency, the defense?
19    A   It's always changing and I don't know the
20 exact number now. I would probably say I am 60/40
21 plaintiff.
22    Q   Have you previously testified in state court
23 on issues relating to claims involving law enforcement?
24    A   Yes.
25    Q   How many times?

---

Page 24

1    A   I don't recall.
2    Q   I am not talking about depositions. I am
3 talking about live.
4    A   I understand. There has certainly been some
5 grand juries, if you wish to include that.
6    Q   You testified in front of a grand jury?
7    A   Several times.
8    Q   On a criminal case?
9    A   Yeah.
10    Q   On behalf of whom?
11    A   The law enforcement officer, I think three
12 times.
13    Q   Is that here local in Tallahassee?
14    A   No, I testified in front of a grand jury in
15 Volusia County. I testified in front of a grand jury
16 two or three times -- actually I think three times now,
17 in Georgia.
18         Bainbridge and southern Georgia sources me
19 quite often for that because they view me as an
20 outsider. I know it's funny, but true. Nobody likes to
21 testify for or against officers within the local area,
22 so they see me as a Florida officer and I get quite a
23 few calls from them.
24         I have testified a couple -- I don't remember
25 how many times in state. Most of my testimony has

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 25

1 been -- I might be able to pull that up, too -- has been
2 in federal government.
3    Q    You know why that is, don't you?
4    A    I am sure you will tell me.
5    Q    I am going to tell you.  It's because defense
6 lawyers don't like to be in state court, they prefer to
7 be in federal court on these claims.  What a shock.
8    A    Is that right?
9    Q    You did know that?
10   A    I haven't heard that.
11   Q    How would you not have heard that?
12   A    They call me with a case, I provide an
13 opinion, I don't get involved in the minutia of all the
14 strategy and all that.
15   Q    You are aware this case was originally filed
16 in state court, did you know that?
17   A    I did know that.
18   Q    Were you aware the case had been removed to
19 federal court?
20   A    Yes.
21   Q    Have you reviewed the Complaint in this
22 matter?
23   A    Yes.
24   Q    Do you recall what the claims are?
25   A    No, off the top of my head.

---

Page 26

1    Q    Have you reviewed any other pleadings,
2 pleadings other than the Complaint?
3    A    Anything that was sent to me that I have a
4 listing of, I reviewed.
5    Q    Fair enough.  Nothing other than what would be
6 in there?
7    A    Uh-uh.
8    Q    Okay.  I interrupted you.  You were talking
9 about testifying in state court.  A general estimate --
10   A    I think I testified in total in front of a
11 jury 14 times.  That would include both state and
12 federal.  It would include both criminal and civil.
13   Q    Do you have a recollection if you and I have
14 ever met?
15   A    I think we did.  I think you also have a
16 brother; is that right?
17   Q    I do.
18   A    Perhaps it's your brother I met, I don't
19 recall, but --
20   Q    He's much fitter than I am.  I am the short,
21 chubby one.
22   A    I certainly don't recall that.
23   Q    He is the short, fit one.
24   A    Yeah.  I think it might have been your brother
25 that I had spent some time with.

---

Page 27

1    Q    I am sure you have.
2    A    Yes.
3    Q    He's here in Tallahassee.
4    A    Yeah.
5    Q    Have you ever had an opinion excluded, an
6 opinion as to the use of force as being appropriate or
7 inappropriate?
8    A    Yes, I've had it excluded based on relevancy.
9 And you must understand that I also do a lot of
10 stand-your-ground cases.  And this is an area of law
11 that I think is still being forged.
12        Being it's a fairly new law, there have been
13 times where my opinions and my report, I've had motions
14 in limine that have been successful to limit what my
15 testimony is.
16   Q    Do you have a memory of what those cases were?
17   A    No, again, not off the top of my head.  I
18 didn't come prepared for that.
19   Q    That's okay.  If you did, great; if you don't,
20 you don't.
21   A    Okay.
22   Q    You recognize the name Daughtry?
23   A    I do.
24   Q    What's Daughtry?
25   A    A case I did, I think, in South Carolina.

---

Page 28

1    Q    Could be.
2    A    Tennessee.  Tennessee.  So a Tennessee case on
3 a traffic road stop.  Some of the opinions were limited;
4 some of the opinions were allowed.
5    Q    Did you conduct a site inspection in this
6 matter?
7    A    I did not.
8    Q    Do you feel that a site inspection would have
9 been of value?
10   A    Let's pause for a second.  Are you still
11 talking about the Daughtry case?
12   Q    No, I am sorry.  That's my fault.  I am
13 talking about this case.
14   A    In this case I have not either.  I always like
15 to do a site visit.  It becomes a cost issue obviously.
16        Oftentimes if we take to this trial, I will
17 make the effort to go down there to make the site visit,
18 just to get a better understanding of dimensions and
19 things like that.  I don't think it's relevant in my
20 opinion at this point.
21   Q    Have you spoken to any family member about
22 this incident?
23   A    No.
24   Q    Did you listen to the tape of the music?  You
25 know, music is at issue sort of, kind of.

---

Accurate Stenotype Reporters

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

Page 29

1    A   Yes, I did.  I can't tell you I listened to
2  all of it.  I listened to enough of it.
3    Q   I don't know what that means.
4    A   I understood what kind of music it was.  I
5  didn't sit and listen to the entire tape.  I didn't
6  think it was anything of evidentiary value with the
7  exception of validating perhaps the complaint.  And when
8  I say the complaint, I mean the original complaint.
9    Q   Yeah, the people that called.
10    A   The people that called from across the street,
11  yes.
12    Q   Have you relied on any national standard in
13  connection with your analysis that you can point me to?
14    A   Well --
15    Q   Like a document.
16    A   -- I should clarify for you that there is no
17  such thing as a national standard, and I want to say
18  that outright.  But there are things that are -- that
19  have the equivalency of national standards.
20        And to express that point more clearly, today
21  multiple states meet regularly at varieties of
22  conferences.  Certainly we are guided by federal case
23  law; we are going to training sessions throughout the
24  United States in which there are general themes
25  presented time and again to agencies from around the

Page 30

1  country.  So the adoption of these particular standards
2  take on a national feel.  In other words, we are not --
3  there's not so much variance between the way we do
4  things in Florida, believe it or not, in California,
5  certainly when it comes to tactics and use of force.
6        But there is not a national standard that can
7  be pointed to.  But I would say my opinions are grounded
8  in my experience, education, and training and
9  understanding the national use of force and defensive
10  tactics.
11    Q   So the answer is there is no national standard
12  you can point me to?
13    A   One does not exist, yes.
14    Q   Fair enough.  What do you know about the
15  decedent's arrest or criminal -- arrest history or
16  criminal history prior to this incident?
17    A   I know that he had one.  I don't recall what
18  it was.  That question may bear more relevance to my
19  investigation if the officers are there because of the
20  arrest history, for instance, if they are serving a
21  warrant on a robbery, then you'd expect a different kind
22  of approach.  But I know in this case that wasn't the
23  issue.
24    Q   Well, respectfully, that's not why I asked the
25  question.  I just wanted to know what you knew about it,

Page 31

1  if it bears on other stuff we are doing.
2    A   I didn't know if you were heading down that
3  road, I wanted to tell you that's why I don't recall.
4  It didn't seem relevant to me, but I looked at it.
5    Q   Were you aware at the time of this incident
6  that the decedent was on felony probation?
7        MR. PHILLIPS: Objection.
8        THE WITNESS: If I learned that, I learned
9        that the officers, I think, knew that after the
10        fact, not previous.  And I don't recall
11        specifically what document pointed that out, but it
12        certainly sounds familiar to me.
13  BY MR. JOLLY:
14    Q   Do you have a recollection that you reviewed
15  the conditions imposed on the decedent at the time that
16  he was placed on probation as to what he could or should
17  or could do?
18    A   I don't recall looking at the conditions.
19    Q   You're familiar generally that individuals who
20  are on felony probation have conditions imposed on them
21  by the court as to what they cannot do?
22    A   Very familiar.
23    Q   He or she cannot do, as opposed to they.
24    A   Yes.
25    Q   Something my mother was always particular

Page 32

1  about.
2    A   Language is changing, I understood precisely
3  what you meant.
4    Q   Would you generally expect -- would you have a
5  recollection of reviewing the order of probation that
6  was in existence and imposed on the decedent?
7    A   I remember, as you raise this issue it strikes
8  a familiar cord with me.  So I am assuming it was
9  contained in the documents somewhere.  Again, it
10  doesn't -- I couldn't recite it to you.  I don't know
11  exactly what was on it, but I seem to recall he was on
12  probation, had a criminal history.
13    Q   You would expect from your experience, would
14  you not, that one of the conditions would be that the
15  individual probationer not drink alcohol to excess?
16        MR. PHILLIPS: Objection.
17  BY MR. JOLLY:
18    Q   Consume alcoholic beverages to excess.
19    A   You are asking me to assume this?
20    Q   I want to know if you think that, from your
21  experience, that you would expect that to be in such an
22  order?
23        MR. PHILLIPS: Objection.
24        THE WITNESS: I would find it common.  I don't
25        know that I can say that I would expect it since

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 33

1    each of these orders are on a case-by-case basis.
2  **BY MR. JOLLY:**
3    Q    Within a limit -- well, okay.
4        In this instance you are aware that at the
5  time of the incident, Mr. Hill was extremely
6  intoxicated?
7        **MR. PHILLIPS:** Objection.
8        **THE WITNESS:** I don't know even how to define
9    extremely.
10 **BY MR. JOLLY:**
11   Q    Point 3, over the legal limits.
12   A    I would say that -- I don't want to get into
13 the minutiae of what extremely means, but I would say
14 that he was intoxicated, yes.
15   Q    He was intoxicated?
16   A    Yes.
17   Q    You have reason to believe from that that his
18 faculties, his normal faculties were impaired?
19   A    That also is on a case-by-case basis.  Having
20 been a police officer many years, I have seen people
21 function fine with very high levels of alcohol and I
22 have seen those with very low levels of alcohol very
23 much be impaired.  So I don't know if I can answer that
24 with a degree of certainty.
25   Q    I want you to assume his blood alcohol content

---

Page 34

1  approximated .03.
2        **MR. PHILLIPS:** No.
3        **MR. JOLLY:** What was it?
4        **MR. PHILLIPS:** .3.
5        **THE WITNESS:** .03 is probably a beer.
6        **MR. PHILLIPS:** Or less.
7        **THE WITNESS:** .3 strikes me as very high, but
8    it has a lot to do with metabolism and it has a lot
9    to do with history and tolerance and all these
10   different things.
11       So I don't want to -- I think it's important
12   for me to not make those kind of assumptions based
13   on my experience in dealing with alcohol.
14 **BY MR. JOLLY:**
15   Q    I get it.  You did see the toxicology report
16 as a part of your analysis?
17   A    Yes.
18   Q    And do you have a recollection that the
19 toxicology report reflected that he had a blood alcohol
20 level of approximately .3?
21   A    I don't recall the number, but I would submit
22 to you that I have no reason to think you would tell me
23 different.
24   Q    From your experience in reviewing orders of
25 probation, would you typically expect that the

---

Page 35

1  probationer was directed not to possess a firearm?
2        **MR. PHILLIPS:** Objection.
3        **THE WITNESS:** On a felony probation I would
4    say more than likely.
5  **BY MR. JOLLY:**
6    Q    You do not have a recollection of reviewing
7  the order in this instance subjecting Mr. Hill to
8  probation that he was prohibited from possessing a
9  firearm?
10       **MR. PHILLIPS:** Objection.
11       **THE WITNESS:** No, I don't.
12 **BY MR. JOLLY:**
13   Q    I want you to assume that Mr. Hill's blood
14 alcohol level was such that his faculties were impaired
15 and that he was prohibited from possessing a firearm.
16       Does that affect any opinion that you've
17 rendered in this case?
18   A    No.
19   Q    Okay.  My understanding of your history is
20 that you've never been a firearms instructor.  Is that a
21 fair statement?
22   A    That's not a fair statement.
23   Q    Tell me when you did -- when you were a
24 firearms instructor.
25   A    I was a certified firearms instructor back in,

---

Page 36

1  I don't know, 1992, '93, perhaps is when I was first
2  certified as an instructor.
3    Q    Well, certified and doing it are two different
4  things.  Have you been a firearms instructor?
5    A    Yes.  It's not something I continue, but I
6  have done that in my career.
7    Q    And that was when you were employed by --
8    A    Tallahassee Police Department.
9    Q    -- TPD.  At the time of the incident of the
10 shooting, what is your understanding of where Mr. Hill
11 was located?
12   A    When he was seen shot?
13   Q    No, when he was shot.
14   A    When he was shot, he was just to the inside of
15 the garage door, I think positionally more to towards
16 the right of the door if you are looking straight at it.
17   Q    At the instance of the shooting, what is your
18 understanding of the location of the deputies?
19   A    Deputy Lopez was standing closest to the edge
20 of the building on the right-hand side, once again
21 looking at the garage door.
22       And Deputy Newman had just come down from the
23 left side looking out the door from the front door and
24 had moved sort of triangularly into Lopez, more towards
25 the left side of the garage door.

---

Accurate Stenotype Reporters

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 37

1    Q   As you have not been to the scene, you have
2  not taken any measurements?
3    A   I have not, no.
4    Q   Are you able to tell me the distance between
5  the two deputies, their relative positions?
6    A   I cannot.
7    Q   Can you tell me the distance of either
8  deputy -- first Lopez -- from the decedent at the time
9  of the shooting?
10   A   No, I can tell you it was less than, as I
11 understand it, it was probably less than 15 yards.
12   Q   Same question with respect to Newman.
13   A   I think about the same.  I think it formed
14 almost a triangle between the three of them.
15   Q   As you reflect on this incident, will you
16 agree with me that the decedent is not blameless as the
17 incident evolved?
18       MR. PHILLIPS: Objection.
19       THE WITNESS: I don't know how to answer that
20   question.
21 BY MR. JOLLY:
22   Q   Okay.  Why don't you think you can answer
23 that?
24   A   What -- blame for what?
25   Q   Well, did his actions play any role, and then

---

Page 38

1  I get to what actions you think played a role?
2        MR. PHILLIPS: Objection.
3        THE WITNESS: Again, I have to digress to the
4    point of he was home, that played a role.  He was
5    in the garage, that played a role.  He lifted the
6    garage, that played a role.  All these things --
7  BY MR. JOLLY:
8    Q   What about that he was presumably drunk?
9        MR. PHILLIPS: Objection.
10       THE WITNESS: We don't shoot drunk people.
11 BY MR. JOLLY:
12   Q   That's not the point.
13   A   You want me to assign blame to him for this
14 incident because he was drunk?
15   Q   Any blame.  I don't say entirely.  Any blame.
16       Is there anything about -- that what he did,
17 what Hill did, that you attribute blame to as the
18 incident unfolded?
19       MR. PHILLIPS: Objection.
20 BY MR. JOLLY:
21   Q   And I get that blame is a relative concept
22 that --
23   A   That's the problem.
24   Q   -- at least as it relates to negligence.  But
25 I just want to see if you see -- I want to know if you

---

Page 39

1  perceive that anything he did played a role in how this
2  incident evolved.
3        MR. PHILLIPS: Objection.
4  BY MR. JOLLY:
5    Q   Then we'll figure out which ones were good or
6  which ones weren't.
7    A   I think his reaction to law enforcement being
8  there, which we certainly don't know precisely why he
9  decided to lower the garage door, caused a sense of
10 urgency amongst law enforcement, and in that way I think
11 you might blame him for contributing to the event.
12       The issue of the gun being present, we are
13 still not sure about, it's inconclusive.
14   Q   What's inconclusive?
15   A   Whether or not he was standing there with a
16 firearm in his hand.
17   Q   Why would you say that's inconclusive?
18   A   Because the crime scene shows that he took a
19 fatal head shot and the firearm was found in his back
20 pocket.  That's typically not what one would expect to
21 find when a fatal head shot is administered.
22   Q   How much time passed, do you know, from the
23 shooting until the call out by the deputies that the
24 shooting had occurred?
25       MR. PHILLIPS: Objection.

---

Page 40

1        THE WITNESS: It was fairly quick.
2  BY MR. JOLLY:
3    Q   What indication, if any, do you have that
4  after the shooting that the garage door was opened by
5  either Deputy Lopez or Newman?
6    A   I don't have any indication of that.
7    Q   You don't think that happened?
8    A   No.
9    Q   Have you reviewed the CAD in this instance?
10   A   Yes.
11   Q   You do -- do you recall that the CAD recites
12 when Deputy Newman called in, he had identified the
13 weapon as a Kel-Tec?
14   A   Yes.
15   Q   You are aware that when the body was finally
16 recovered, the Kel-Tec was in the back pocket?
17   A   Yes.
18   Q   Unviewable by anyone looking -- like
19 unviewable by Newman as the incident was unfolding --
20       MR. PHILLIPS: Objection.
21 BY MR. JOLLY:
22   Q   -- if it was in his pocket?
23   A   Or if it was in his hand.
24   Q   Well, that's my question.  Doesn't that
25 suggest to you that when Newman called in that it was a

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 41

1   Kel-Tec, that he must have seen it?
2      A   No.  As a matter of fact, I found that more
3   unusual, that he was able to identify the weapon under
4   that set of circumstances.
5          It was not displayed to him.  It was held with
6   the majority of the weapon -- it's a very small
7   weapon -- in the hand of the person in a moment of a
8   second or two, and you can tell me what type it is?
9   That is unusual.  It's not impossible, by the way.  But
10  it speaks to being extraordinary and suspicious.
11     Q   I don't know that I would go that far.
12         MR. PHILLIPS: That's his answer.
13         MR. JOLLY: I get it.  I get to do this.  This
14     is part of what makes this moderately interesting.
15  BY MR. JOLLY:
16     Q   You have no reason to believe that Newman
17  placed the weapon in the decedent's back pocket?
18     A   I don't have any more reason to believe that
19  than I have reason to believe he didn't do that.  I
20  don't know.  It's a factual question that's not left for
21  me to decide.
22     Q   From the evidence that you've seen, what
23  indication is there that Newman returned, opened the
24  garage door after the shooting and returned to the
25  interior of the garage?

---

Page 42

1      A   I am not sure it was Newman.  If it was placed
2   there, I don't know if it was Newman.  There were many
3   people on that site.
4      Q   Here's where I am going with this and I am
5   moderately and certainly easily transparent.
6          The shooting occurs.  They call in the
7   shooting.  The door is shut and nobody else goes in to
8   the house, into the garage, until everybody else is
9   there.  Correct?
10         MR. PHILLIPS: Objection.
11         THE WITNESS: I don't know.
12  BY MR. JOLLY:
13     Q   You reviewed the documents.  What do the
14  materials which you reviewed suggest to you as to
15  whether Newman ever went back into the garage?
16     A   I don't know if he did or not, and I don't
17  want to run down the trail of conspiracy.  But I do know
18  at in some point we have two different officers saying
19  two different things about Newman's position.
20         One says -- Newman says he goes to the back of
21  the house; Lopez says he never leaves the side.
22         So I don't know.  There are many suspicious
23  things about this that I don't think it's the place of
24  an expert to draw conclusions on it.  But it raises
25  questions that for certain triers of the fact will be

---

Page 43

1   interested in seeing.
2      Q   Listen, I will reask it.  I am obviously not
3   doing a very good job.
4          From the materials that you've reviewed, what
5   indication is there that after the garage was closed,
6   Newman had an opportunity to go in before he made the
7   call identifying the weapon as a Kel-Tec?  It's like
8   minutes?
9          MR. PHILLIPS: Objection.
10         THE WITNESS: Is it critical that he went in
11     before he identified the weapon as a Kel-Tec?
12  BY MR. JOLLY:
13     Q   I don't know if it's critical or not.  I am
14  just asking you from the records that you reviewed, what
15  indication is there that he did that?
16         MR. PHILLIPS: Objection.
17         THE WITNESS: There is no indication that he
18     went in the house to be -- I am sorry, into the
19     garage.
20  BY MR. JOLLY:
21     Q   Fair enough.
22     A   Or the house that leads to the garage.
23     Q   I want you to assume that the CAD reflects
24  that the call of shots fired was at 15:24:32.
25     A   Okay.

---

Page 44

1      Q   Does that sound right to you?
2      A   Yeah.
3      Q   I want you to assume that the CAD recites at
4   15:28:14 that Deputy Newman identifies the weapon as a
5   handgun, maybe like a Kel-Tec model.  15:28, four
6   minutes later.
7      A   Right.
8      Q   Straightforward, the question I am asking is:
9   What indication from the materials you reviewed is it
10  that suggests to you that in those four minutes, three
11  and a half minutes, Newman went into the garage and was
12  able to identify the Kel-Tec in the back pocket?
13         MR. PHILLIPS: Objection.
14         THE WITNESS: I think the question is
15     presumptive and --
16  BY MR. JOLLY:
17     Q   What a shock.
18     A   And it presumes that perhaps the weapon wasn't
19  placed on him.  It presumes that it was his weapon and
20  that somebody went and looked at it and perhaps -- and
21  this is strictly speculation -- that could be, and this
22  is in the realm of possibility -- that the weapon had
23  never been on him at any time and was placed on him
24  later, not between the time that he fired the shot and
25  that he said there was a Kel-Tec.

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 45

1    For instance -- and this is not intended to be
2  the position of the expert, but since we are making
3  assumptions -- assume that Deputy Newman had a Kel-Tec
4  in his car, often referred to as something like a
5  throwdown weapon, knew he had a Kel-Tec, fired the shot,
6  knew he made a mistake, and at some point managed to get
7  that weapon in the back pocket of that subject.  Just
8  assume that.
9    That would take away from the presumption of
10 your question, which is that if he thought that it was a
11 Kel-Tec and turned out to be right, that it would have
12 had to have been known within that four-minute time
13 frame.
14   Q   From your review of the materials was there
15 anything suggesting that Hill possessed a weapon prior
16 to this incident?
17   A   No.
18   Q   Have you read the deposition of his uncle,
19 Mr. Stevens?
20   A   Yes.
21   Q   Do you recall Mr. Stevens indicating that he
22 had observed Mr. Hill in possession of a firearm, a
23 handgun?
24   A   In the past, yes.
25   Q   How long in the past?

---

Page 46

1    A   I don't remember exactly how long it was in
2  the past, but I do know when you are talking about this
3  incident, we are talking about a very specific time
4  frame in which his uncle was not there.
5    Q   That's true.
6    A   So if he observed it six months and reported
7  that, yes, he had weapons, or six years and reported,
8  yes, he had weapons, that wouldn't be relevant to the
9  assumption that he had a weapon on that day.
10   Q   Okay.  Of course, the reason I started that
11 with have you ever in any of the materials that you've
12 reviewed, had you ever noted that anyone had seen him
13 possessing a weapon; if I just understood your answer,
14 that would have included Mr. Stephens's deposition
15 testimony.
16   A   I took your question to mean on that -- during
17 this event.
18   Q   No, I am not talking about this event.
19     How about within the last 30 days?
20   A   Yeah, I don't remember what the time frame
21 was.  The answer to your question is yes, Mr. Stevens
22 says he had seen him with a weapon in the past.  Other
23 families said they had not.  People who lived in the
24 house said they had not.
25   Q   I know that, and I specifically did not ask

---

Page 47

1  that question, but I appreciate the answer.
2    You are aware that chemical agents were
3  deployed into the home at some point during this
4  incident?
5    A   Yes.
6    Q   All right.  And I think from your review of
7  the materials, did you note that some like kind of robot
8  arm was utilized at some point --
9    A   Yes.
10   Q   -- to make entry into the garage?
11   A   Not to make entry, but to puncture and
12 observe, yes.
13   Q   My fault.  I am sorry.
14   A   That's okay.
15   Q   What is your understanding of the sequence of
16 those events?
17   A   My understanding is that the arm was inserted
18 previous to the SWAT team actually making entry.  And
19 there was an observation of Mr. Hill on the ground and
20 then the entry was made.
21   Q   If that sequence as you just recited is
22 erroneous, exactly the reverse, does that change any one
23 of your opinions, that the chemical agent was deployed
24 before the arm was able to determine the location of the
25 body?

---

Page 48

1    A   No.
2    Q   Okay.  You are not going to be able to tell me
3  the time that the chemical was deployed as we sit here
4  today?
5    A   I think I saw a time stamp on something about
6  chemical deployment.  I think I recorded it in my
7  report, but I actually assumed we would have this
8  conversation and I went back and tried to find it
9  amongst everything that I have and I wasn't able to
10 pinpoint that specific time.
11     So I will tell you that I will look harder for
12 it if this goes any further, but I did record it at some
13 point in either --
14   Q   Record what, though?
15   A   Record the time frame where --
16   Q   In your report?
17   A   In my report, where the chemical is allegedly
18 deployed.  And I don't know where I got it from, but I
19 am sure I got it from somewhere.
20   Q   But if you have the sequence wrong, you are
21 telling me it wouldn't affect any of the opinions that
22 you've rendered?
23   A   No, because -- you want me to tell you why?
24     It would affect -- it would not affect the
25 opinions I rendered.  It would affect the story that I

---

Page 49

1  tell within my report in terms of sequence. It would
2  just change the sequence.
3      But having a robot, the first thing you should
4  have done is inspected the area where the shooting
5  occurred. If they didn't do that, it would be weird.
6      Q   Did you happen to note that the equipment, the
7  robot with its camera, was not functioning properly at
8  the inception of its use that night?
9      A   Yes.
10     Q   I want to talk generally about your philosophy
11 as a retained expert, as a retained litigation
12 consultant.
13     I want you to describe how you perceive your
14 role as the litigation consultant. What is your job?
15     A   My job is to describe, to clarify, to educate
16 how law enforcement officers conduct their business
17 based on these governing authorities, which include four
18 of them really: U.S. Constitution, state statute, the
19 police policy, and the training that they ought to have
20 received.
21     I present that on the front end to the law
22 enforcement officers, and then I hold them accountable
23 to that on the back end when they use force. So I view
24 my role as being someone who intends to not only
25 contribute to the proper formula of law enforcement, how

Page 50

1  things ought to be done, but also the prescription
2  through training of law enforcement officers and then
3  the accountability through my consultation in weighing
4  on whether or not it was done as it should have been
5  done.
6      Q   I think you will agree with me that you
7  certainly in your analysis try to be objective, even
8  though you are hired by one side as opposed to the
9  other?
10     A   I do.
11     Q   Theoretically, if I get this right, if I
12 understand how this works, your opinions would be the
13 same regardless of who called you first?
14     A   Yes.
15     Q   Fair enough. Will you agree with me that you
16 do not perceive your role, and it certainly wasn't in
17 your description, you do not perceive your role as
18 including telling a jury who it is that they should
19 believe?
20     A   That's right.
21     Q   That's not your function?
22     A   That's not my function.
23     Q   Fair enough. You will agree with me, I think,
24 that you are not participating in this litigation as a
25 litigation consultant hired by the plaintiff to tell the

Page 51

1  jury what evidence is credible?
2      A   That's right.
3      Q   Or what evidence is not credible?
4      A   That's correct.
5      Q   Or what witnesses are credible?
6      A   Not my job.
7      Q   Or what witnesses are not credible?
8      A   That's right.
9      Q   That's beyond your purview, you will agree
10 that's the jury's role?
11     A   Yes.
12     Q   Fair enough. I guess I can go further and say
13 that you do not perceive your role to tell the jury what
14 happened?
15     MR. PHILLIPS: Objection.
16     THE WITNESS: I have to tell the jury my
17 understanding of what happened. Now, I think that
18 I am one slice of a larger pie that's going to be
19 presented in many different forms to them. But
20 obviously when I draw opinions, I have to direct
21 those opinions to my understanding of the case.
22 BY MR. JOLLY:
23     Q   As this incident was unfolding, you cannot
24 determine what it was that Hill's intentions were?
25     A   I don't think anyone can.

Page 52

1      Q   I assume for purposes of this that you will
2  concede that law enforcement officers do not have to be
3  shot before they can use lethal force?
4      A   That's right.
5      Q   You will concede that law enforcement officers
6  do not have to be shot at before they can use lethal
7  force?
8      A   That's right. I should probably clarify that
9  I am thinking of scenarios, and this is actually one of
10 the scenarios.
11     If a law enforcement officer cannot identify
12 that their life is in eminent harm, death or great
13 bodily harm, then they would have to actually be shot at
14 if they can't see the behaviors, the actions, the
15 furtive movements, the expressions of the person that
16 perhaps is pointing the gun at them, then, yes, it would
17 require shots coming at them before they could use
18 deadly force.
19     Q   Did your review of the litigation materials in
20 formulating your opinions suggest -- indicate that the
21 decedent, Mr. Hill, had been ordered to drop the weapon?
22     A   Yes, the officers say they told him to drop
23 the gun.
24     Q   From your review of the materials, what, if
25 any, impediment was there to Mr. Hill dropping the

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 53

1  weapon as ordered?
2      A   Again, we have to assume he had a weapon.  It
3  would be an impediment if he didn't have one to drop it,
4  naturally, so we have to account for that.
5          Other impediments could be the loud music.  He
6  might not have heard them say, taking the command.  I
7  understand this music was extraordinarily loud.
8          Other impediments could be the intoxication
9  that you have raised.  If he was impaired to the point
10  of where he was essentially noncommunicative, that could
11  be an impediment as well.
12     Q   From your review of the materials, were both
13  deputies in uniform?
14     A   Yes.
15         MR. JOLLY: Do you care if we take a real
16  quick break?
17         (A recess took place from  11:09 a.m. to
18  11:16 a.m.)
19  BY MR. JOLLY:
20     Q   You are not a reserve officer?
21     A   No, I stopped December 2015.  I still have my
22  standards.  You keep them five years or if you get
23  reassigned to another agency, then they reactivate.
24     Q   This is sort of kind unfair because you don't
25  have your report in front of you.

---

Page 54

1      A   I do.  I brought one.
2      Q   So it's not as unfair.
3          Go to paragraph Roman Numeral V, it's page 7.
4      A   Are we on the record?
5      Q   Yes.  The first line says, after an exhaustive
6  review.
7      A   Right.
8      Q   In connection with being an expert, would you
9  ever do a review that is not exhaustive?  Here's why I
10  ask this question.
11         I see this more and more with litigation
12  consultants where they have to have modifiers as opposed
13  to just saying after a review, you add exhaustive
14  review.  Do you perceive that that adds anything to your
15  report?
16     A   I can tell you what it means for me.  I can't
17  tell you what it means for all the others you cite.
18     Q   For you.
19     A   For me it means that I read them.  It's not
20  just that I notice they are there, I don't just toss
21  them to the side.  If I get it, I look at it.  I go
22  through all the pages, I dissect it, I make sure I
23  understand what's in it.  Some of it is relevant,
24  obviously, to my opinions; some of it is not.
25         I get a lot of information that finds itself

---

Page 55

1  in the nonrelevant bin, but I looked at it and that's
2  the exhaustive part.  I think you can review documents
3  without being exhaustive.
4      Q   That's why you put that term in there?  You
5  think that helps me?
6      A   I do.  Do you find it offensive?
7      Q   Yeah, I really do.  But there's more here --
8  by the way, who cares what I think?  It's just part of
9  my speechifying.  I am trying to get people to not do
10  this kind of stuff.
11         (Discussion off the record.)
12  BY MR. JOLLY:
13     Q   What is your recollection, understanding from
14  your review, of how the deputies left the scene, Lopez
15  and Newman?
16     A   I don't know if I have a recollection of that.
17  You mean left the immediate scene and then went and got
18  cover back to the car?  I remember that.
19     Q   No.  Left the scene.
20     A   I don't know that I recall that.
21     Q   Okay.  Do you recall from your review of the
22  materials that it was approximately four hours or so
23  before entry into the home was finally made?
24     A   That sounds about right.
25     Q   Do you recall from the materials that during

---

Page 56

1  those four hours, law enforcement deputies, other
2  staffers, were attempting to contact individuals to
3  determine if anybody was inside?
4      A   Yes.
5      Q   Do you recall what the verbiage as reported of
6  the complaint from the mother was, what did she say?
7      A   I certainly don't want to be quoting her
8  because I don't recall it to that degree, but I remember
9  the content of it was that there was a loud music
10  complaint, with obscene music, obscene lyrics and music.
11     Q   Page 10.  Third full paragraph, why did you
12  even put that in there?  What does this -- what does
13  that paragraph add --
14     A   Starting with noise complaints?
15     Q   Yes.  What does that paragraph add to analysis
16  of what the deputies did?
17         MR. PHILLIPS: Objection.
18  BY MR. JOLLY:
19     Q   I am reading this thing going, who cares?
20  What's your answer?
21     A   Let me read it, if you don't mind.
22     Q   Not only do I not mind, you probably should.
23     A   (Examining document.)
24         So the reason I put it in there is because
25  when you are describing police procedures, you have to

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

Page 57

1  have a baseline.  You have to have something to compare
2  the procedure to.  What typically happens when a law
3  enforcement officer is called to a noise complaint?
4        It's fairly low level, we don't do it
5  tactically, we don't run up with tanks and start
6  pointing at houses.  This is the way it's typically
7  done.  And that is just to create a baseline so when we
8  compare it and juxtapose it with what actually happened,
9  we can see where the deviation is.
10     Q   I don't remember seeing that you perceived
11  that there was a deviation in what you recite here and
12  what the deputies did, at least as related to
13  responding.
14     A   The deviation, I think, is intended to assist
15  triers of the fact from understanding that a loud noise
16  complaint is not criminal by nature.  It is something
17  that's typically worked out between a responding law
18  enforcement as a call for service, similar to getting a
19  cat out of the tree, if I can use the common expression.
20        A law enforcement officer is compelled to
21  answer those types of calls, though they are not
22  criminal in nature.
23        So that was my point, was to say this is
24  probably one of the lowest level, lowest types of calls.
25  It's a city or county ordinance.  It's not against state

Page 58

1  law to play music loud.  The law enforcement officer is
2  compelled --
3     Q   Should be.
4     A   Well, it's not.
5        But law enforcement officers are compelled to
6  respond to these incidents and they do it all the time.
7  It's what is often referred to as a routine incident,
8  even though that's a term law enforcement tries to stay
9  away from.
10     Q   Go to the last paragraph, last sentence.  It
11  recites, both deputies recalled that the music was quite
12  loud and implied in their statements.
13        Why would you use the term implied as opposed
14  to that's what they said?
15     A   I don't remember if they said that.  I think
16  it was the way that they said it was very -- for
17  instance, if one of the deputies, and I can't quote him
18  on this, but if one of the deputies said the music was
19  very loud, I am not sure he heard us, that would be an
20  implication that it was too loud to hear.
21     Q   Have you taken any measurements to determine
22  the amount of force necessary to open or close the
23  garage door?
24     A   I was not there.
25     Q   So the answer is you haven't done any

Page 59

1  measurements yourself?
2     A   No.
3     Q   Have you ever been involved in a lethal use of
4  force as a law enforcement officer yourself?
5     A   Yes.
6     Q   Tell me about that.
7     A   We had a call of domestic violence off of
8  Magnolia Drive here in the city of Tallahassee one
9  evening.  An individual was striking his -- at the time
10  I didn't know who she was, but it turned out it was his
11  live-in girlfriend -- in the foyer of a second floor
12  apartment complex.
13        A call in from a witness who was actually
14  looking through a peephole, heard the commotion, saw him
15  beating her, called us.
16        I happened to be right there when the call
17  came out.  It wasn't dispatched to me.  They called it,
18  I called what we refer to as 10-97, meaning I got on the
19  scene.
20        I parked across a yard.  If you can imagine a
21  two-story complex that has grass, a mailbox -- which
22  becomes important later -- and then parking.  So I
23  parked here, so I had quite a ways to go.  And when I
24  parked, there was a lot of people standing around the
25  base of the stairs, nobody on the second floor, pointing

Page 60

1  upstairs, which in police work we call a clue.  So I
2  knew that was where I had --
3     Q   Even nonpolice work, that's a clue.
4     A   I wasn't certain.  I can only speak to my
5  experience.
6        So I ran to the base of the staircase and when
7  I did, a very disheveled individual came out of the
8  second floor apartment, sweaty, torn shirt, another
9  clue; started to come down the stairs and I stopped him
10  at the base of the stairs, knowing that I had to conduct
11  the investigation.
12        I asked him, I don't know, probably who are
13  you, what's going on, something like that.  And the
14  girlfriend came out.  But she came out armed with, not
15  one, but two knives, angry and hysterical.
16        I didn't see the knives, actually, because he
17  was literally in my face.  I continued to talk to him as
18  I then turned my attention to her and told her stay up
19  there, ma'am, stay up there, which had no effect at all.
20        She started to come down the stairs, dropped
21  one of the knives, which is where my auditory sense
22  picked up the sound of metal clinking as it fell between
23  the concrete.  And immediately I looked up and saw that
24  she had now one knife in her hand and was still coming
25  at him.

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

Page 61

1   He saw the knife and he looked over his
2  shoulder and immediately did what they call in football
3  a juke around me, and I was suddenly face to face with a
4  psycho style knife raised position like in the movie.
5   And I started to retreat.  The mailbox comes
6  in here because that was my contact and cover.  I got my
7  cover.  I ordered her to drop the knife, drop the knife.
8  She didn't.
9   Because of her momentum, she was very slowly
10  gaining on him -- actually very quickly gaining, but to
11  me it seemed very slow.  I had that whole weird
12  slow-motion timing.
13   Q   That really does happen.
14   A   It does, it's fascinating.
15   She literally got on his back and I could
16  actually see the knife coming down when I fired my first
17  shot.  I hit her.
18   One of my good friends accuses me of ajading
19  [sic] the record because law enforcement always says we
20  don't shoot guns out of people's hands, or knives, and I
21  did.  I hit her in the shoulder, the knife flew into the
22  air, and it turned out she was so close, it past through
23  her shoulder, out her chest, and into his rear end.  So
24  I got two of them with the single bullet.
25   Q   Whose rear end?

Page 62

1   A   His, the guy that was running from her.  And
2  he continued to run.  She fell.  Neither of them died.
3   Q   How old were you when that happened?
4   A   Gosh, that was '96, so I was 30.
5   Q   How long had you been a cop when that
6  happened?
7   A   Since '86, ten years, '87.
8   Q   Okay.  The only time you had to discharge your
9  firearm at an individual?
10   A   Yes.
11   Q   Okay.
12   MR. PHILLIPS: Ajading? Jading? An officer
13  accused you of what?  You said something that sound
14  like jading.
15   THE WITNESS: No, I said in football they call
16  it juking.
17   MR. JOLLY: After that you said ajading the
18  story, I think is what you said.
19   MR. PHILLIPS: You were talking about shooting
20  the knife out of the hand, so to speak.
21   THE WITNESS: Oh, yeah.  Jading, meaning that
22  whenever the public demands that we shoot a gun out
23  of somebody's hand, we say we don't do that.  Why
24  didn't you shoot the knife out of their hand?
25  Well, we don't do that.

Page 63

1   I have a lot of law enforcement officers
2  saying, now you shot a knife out of the hand, so
3  that's a new bar.  So I jaded the philosophy that
4  we don't do that.
5   Believe me, hitting two people with one bullet
6  also created a lot of television and news and all
7  that stuff.  It turned out to be more lighthearted,
8  I think, than many police shootings because
9  certainly nobody died and that was great, but there
10  were some interesting features about that shooting
11  that were recalled.
12  BY MR. JOLLY:
13   Q   As Hill brought the door back down, you
14  would -- from your experience, you would expect the
15  alarm level to be heightened on the part of the
16  deputies?
17   MR. PHILLIPS: Objection.
18  BY MR. JOLLY:
19   Q   Alarm might not be --
20   A   I have to --
21   Q   Use another term for me.
22   MR. PHILLIPS: Objection.
23  BY MR. JOLLY:
24   Q   The perception of the threat increased.
25   MR. PHILLIPS: Objection.

Page 64

1   THE WITNESS: I disagree with that.
2  BY MR. JOLLY:
3   Q   Okay.  Fair enough.  How tall -- can you
4  describe the plaintiff, the decedent, Mr. Hill?
5   A   I've looked at --
6   Q   How tall?
7   A   I don't recall.
8   Q   Weight?
9   A   I don't recall.  He was thin, he was --
10   Q   I don't think so.
11   A   He seemed to be fairly thin.
12   Q   Okay.  We'll leave it at that.  But you don't
13  know how tall he was or how much he weighed?
14   A   No.
15   Q   Same question with respect to the deputies.
16  Do you know either -- can you describe either?
17   A   I saw their pictures.  I don't recall height
18  and weight.
19   Q   Do you know how high up on the garage door is
20  the highest bullet hole?
21   A   If -- yeah, I did know that.  I don't recall
22  it off the top of my head.
23   Q   The entry wound for Mr. Hill, do you recall
24  that it was on his forehead and not the top of his head?
25   A   I don't know that I would make the

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 65

1   distinction.  I think the forehead is the top of your
2   head.
3        MR. PHILLIPS: Objection, just on form.
4   BY MR. JOLLY:
5        Q    You cannot tell me, as we sit here today, that
6   the entry wound for the wound to the head, where it was,
7   made a difference to you in your analysis?
8        A    No.
9        Q    Okay.  As we sit here today, do you have --
10  from your review of the materials, can you tell me that
11  the garage door was fully shut when any one of the
12  projectiles hit Mr. Hill?
13       A    All of the projectiles went into the garage
14  door, so at any given time, the door was between
15  Mr. Hill and the officer.
16       Q    That was a lousy question.
17       A    So I don't know precisely when it absolutely
18  shot to the point where perhaps light couldn't get
19  through it, I don't know.  But I know that all the shots
20  went through the garage door.
21       Q    From your review of the materials, were you
22  able to determine, so that you can testify before the
23  jury, that the garage door was closed at the time that
24  shots were fired?
25       A    My understanding of the case is it was

---

Page 66

1   closing, it was in motion while the shots are being
2   fired.
3        Q    And can you testify as to the duration of time
4   for the firing by Deputy Newman of his weapon?
5        A    I am sorry?
6        Q    How long did it take?
7        A    For him to fire all the shots?
8        Q    Yes, sir.
9        A    It didn't take long with a semiautomatic.  I
10  would say it was probably done, all four shots, in
11  probably less than a second.
12       Q    Do you recall that Deputy Newman already had
13  his firearm unholstered at the time that the incident
14  began to unfold, in other words, when the door was
15  closing?
16       MR. PHILLIPS: Objection.
17  BY MR. JOLLY:
18       Q    What I am trying to find out is did he have to
19  unholster his firearm before he shot or had it already
20  been unholstered?  Do you know?
21       A    Well, for sure he had to unholster it before
22  it was shot.
23       Q    I get that.  Although he probably could have
24  shot himself in the foot.  But that's not what I meant.
25       A    He didn't, so we know that didn't happen.

---

Page 67

1   Yes, I believe, according to the deputy, based on what
2   he believed he saw, he unholstered his weapon.
3        I am told there were commands given before the
4   weapon unholstered and the weapons were fired, so
5   there's a time frame there.  There's no indication that
6   the deputy walked up to the property with a gun in his
7   hand.
8        Q    Okay.  Page 12, third -- basically the third
9   paragraph begins "either."  Second sentence, information
10  was received from Hill's girlfriend that a handicapped
11  minor child also might be in the home.
12       How, if at all, did that play into any
13  decision that either deputy made?  I am trying to figure
14  out why would you include that?
15       A    I include that because you shouldn't shoot
16  into a blind area.  That's the first order of business
17  when you are talking about making clean shots.  You want
18  to identify your threat.
19       It just so happens that perhaps a handicapped
20  child was in there.  Now we know that in hindsight.  The
21  deputies wouldn't know that.  But the deputies should
22  always assume that there is something they can't see
23  when they can't see.
24       So this exacerbates the point, not only is
25  this a hypothetical possibility that they could have hit

---

Page 68

1   a handicapped child, but a real possibility.  And that's
2   why I put it in there.
3        Q    Were you aware that this garage door was
4   actually a -- what's the word -- like had an electronic
5   garage door opener affixed to it?
6        A    I remember one of the witnesses saying that to
7   them it felt like, in watching it go down, it was on an
8   electronic, but I don't have any evidence that that's
9   the case.
10       Q    Of the two deputies, who is the older?
11       A    I think Newman is, but I can't say absolutely.
12       Q    Were you aware that the garage door opener was
13  unplugged at the time of this incident?
14       A    Yes.  As I said, I wasn't even certain there
15  was a garage door opener, so no.
16       Q    You know --
17       A    What page?
18       Q    15.  You have this language in your report and
19  I am on a crusade to try to get experts to make their
20  reports better.
21       A    Note the chuckle.
22       Q    All right.  On page 15, the second paragraph,
23  the onus for justifying use of force falls upon Deputy
24  Newman who must be able to articulate and establish a
25  reasonable belief that his life or some other person's

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 69

1  life was in eminent danger of suffering death or serious
2  bodily harm from the actions of another.
3         That's basically what you think the standard
4  is?
5     A    That is the standard.
6     Q    And that he, the deputy that uses lethal
7  force, must be able to say why he did what he did.
8     A    That's right.
9     Q    But in this instance, you may not buy what he
10 says, but he does articulate a reasonable belief that
11 his life or someone other's was in eminent danger.
12    A    He does say that.
13    Q    And you are not prepared, nor would you ever
14 say, oh, deputy, your perceptions were not what your
15 perceptions were?
16         MR. PHILLIPS: Objection.
17         THE WITNESS: No, I think that question is
18    left to triers of the fact and that will be
19    presented in the evidence.  And that is a lot of
20    work, I think, for the defense in this respect.
21 BY MR. JOLLY:
22    Q    Not really, but that's my job.
23    A    But that's why I struggled with it, is what I
24 am saying; the plausibility of the some of the evidence
25 was difficult to weigh into my decision because it was

---

Page 70

1  highly implausible that the gun ended up in his back
2  pocket after being head shot, just to clarify the
3  position.
4     Q    Thank you.  I guess if this event unfolded the
5  way Deputy Newman has testified it unfolded, the use of
6  lethal force is justified.
7     A    No.
8     Q    I guess you would agree that if Deputy Newman
9  perceived having -- saw an individual pointing a gun at
10 Deputy Lopez, as he testified he saw Mr. Hill act/do --
11    A    He did not testify to that.
12    Q    He did not?  What's your recollection of what
13 Newman says about what he saw Hill do with respect to
14 his firearm?
15    A    His testimony, as I recall, is that he first
16 saw Mr. Hill with the gun down by his side.  The gun
17 began to lift, and then his vision was obstructed by the
18 door.  He had never seen it leveled or pointed at
19 anyone.  He was shooting blindly into the garage.
20         That was my biggest criticism.  Whether or not
21 this gun was there or not does not jeopardize my opinion
22 in terms of whether or not the deputy had grounds at the
23 moment that he fired to believe that -- to know that his
24 life was in eminent -- or the other deputy's life was in
25 eminent danger or great bodily harm.  I don't think the

---

Page 71

1  deputy can say that.
2         I think the deputy was asked about that.  I
3  think there is -- there was some anticipation of what
4  might happen amongst many possibilities and he chose the
5  very worst one, which is that the deputy's life was in
6  danger.
7     Q    The other deputy?
8     A    The other deputy.
9     Q    Deputy Lopez?
10    A    Yes.
11    Q    Do you recall Deputy Lopez testifying that he
12 thought the gun was pointed at him?
13    A    I do.  I remember that he is the one that did
14 not draw, did not return fire, and so I do remember him
15 saying that, which is not uncommon.
16    Q    That's your recollection, that he did not
17 draw?
18    A    I am sorry, that he drew, he did not fire.
19    Q    Even that's not right, but that's okay.
20         MR. PHILLIPS: Objection, move to strike.
21         MR. JOLLY: I know.  Strike that and punish
22    me.
23         MR. PHILLIPS: Saving that for later.
24 BY MR. JOLLY:
25    Q    You know --

---

Page 72

1     A    What page?
2     Q    17.  You don't see what you are doing here is
3  just Monday morning quarterbacking?
4         MR. PHILLIPS: Objection, move to strike.
5         THE WITNESS: Describe to me what that means
6    to you and I will tell you if that's what I am
7    doing.
8  BY MR. JOLLY:
9     Q    You live in Tallahassee.  You know what Monday
10 morning quarterbacking means.
11         What about second guessing?
12    A    No, that's not what I am doing.
13    Q    Fair enough.  17.  Second paragraph, it is a
14 rule of opportunity, whatever that means, that officers
15 may not create their own exigencies, that is to say,
16 intentionally place themselves or allow themselves to
17 remain in harm's way needlessly and purposelessly, only
18 to later appeal to the idea that their life was in
19 eminent danger.
20         How did what Newman did needlessly place
21 himself in harm's way?  I read this and thought this
22 should have been in somebody else's report on a
23 different case.
24         MR. PHILLIPS: Objection.
25

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 73

BY MR. JOLLY:

1  Q  Like when you jump in front of a car.
3  A  Well, I am glad you asked me that so I can
4  clarify it for you.
5        When the officer is trying to establish that
6  Mr. Hill has opportunity, he is confronted with a
7  problem and that is that he cannot see on the other side
8  of the door that's closing.  That's the biggest problem.
9        Now the officers are not nailed to the ground,
10  they are moving.  Even Deputy Lopez says, he begins his
11  retreat, he begins his unholster as the garage is coming
12  down.
13        We know a couple of things from a practical
14  perspective.  One, the deputies are not pigeonholed.
15  They have the ability to move backwards, move sideways,
16  to get behind cover.  We know that.
17  Q  And Hill can do that, too.
18  A  Not really.  He's more -- but that doesn't
19  matter.  That's not --
20  Q  Fine.  Go on.
21  A  But what we also know is Hill can't see them.
22  When the garage goes down, not only -- not only will
23  bullets truly pass through a sheet metal door, but
24  eyesight cannot.
25        So we know that Hill is blinded; if he chooses

---

Page 74

1  to use deadly force against the deputy, he is blinded to
2  their location.
3        A simple movement puts the likelihood of him
4  being able to hit a deputy in the low, low probability
5  range; not to mention the fact that Lopez actually does
6  have cover very close by, it's the corner of the
7  building.  Now whether he drifts to that or not, I don't
8  know.  But it's there.  We are trained to know that
9  before we even approach the property to look for areas
10  of cover, which is different than areas of concealment.
11  It's different than creating distance.  And he had
12  viable cover.
13        So what happens is as the door drops is that
14  the rule is that officers cannot stand out in the open,
15  bear down on somebody and keep themselves in harm's way,
16  because deadly force is a final decision.  It's not one
17  of many decisions.  It's the last decision.  So you have
18  to account for all of the other variabilities before you
19  rely on the deadly force option, and that's not what
20  happens in this case.
21  Q  And how long do you think this incident took
22  from the time that the door began to close and the
23  decision to fire was made?
24  A  From when it began to close, I think it took a
25  couple seconds.

---

Page 75

1  Q  Page 19, you indicate that it can be -- it can
2  reasonably be assumed that he collapsed nearly
3  instantaneously from the impact.
4        What is the basis for that statement?
5  A  I didn't notice any blood trails anywhere,
6  didn't looked like he wandered around for any length of
7  time.  It looked like where he was hit he dropped.
8  Q  Here's my favorite.  Go to the third
9  paragraph.
10  A  Your favorite in my whole report?
11  Q  I just, as I was going through it, I was
12  looking at this.  Third paragraph begins, based upon the
13  deputies' reports.  Last sentence, instead a firearm was
14  found neatly tucked into his back pocket.
15        And, of course, later on -- this is just a
16  criticism of the writing style.  Then on page --
17  A  Can I ask you what part of that you didn't
18  like?
19  Q  You used the term neatly and then in
20  paragraph --
21  A  Can I defend the language?
22  Q  Let me finish, then you can tell me.
23        Then later you said he did not report seeing a
24  firearm protruding from his back pocket.
25        Well, how could it be protruding if it was

---

Page 76

1  neatly tucked?
2  A  I don't see the inconsistency.
3  Q  You use the term neatly.  Do you perceive that
4  that added to the information that you would provide to
5  a jury in this case?
6        MR. PHILLIPS: Objection.
7        THE WITNESS: Yes.  Yes, I do.
8  BY MR. JOLLY:
9  Q  Okay.
10  A  Do you care to know why?
11  Q  First I am going to answer your question.  No.
12  But you are going to tell me.  So go ahead.
13  A  Because the other variables in this, is the
14  way we found the pants, which I indicate in my report,
15  in what's often referred to as wearing it in a sagging
16  fashion, which means that --
17  Q  Oh, yeah, that was one of my favorite parts.
18  I mean, really?
19        MR. PHILLIPS: Please don't interrupt the
20  witness.
21        MR. JOLLY: I can't help it.  Go ahead.
22        THE WITNESS: It's very clear when your pants
23  are supported around your waist, whether because
24  they fit right or they are with a belt, that a
25  pocket is stable.  You know where your pocket is.

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 77

1    You have muscular coordination to find your wallet,
2  for instance, you know where the pocket is.
3      When you sag, you don't know where your pocket
4  is.  Your pocket is drifting forever around your
5  rear end or sometimes around your thighs, depending
6  on how low you sag.  So to have the accuracy after
7  a head shot, had you wanted to put your gun back
8  inside your pocket, seems implausible, if not
9  entirely improbable.
10 **BY MR. JOLLY:**
11   Q   Not impossible?
12   **A   Not impossible, no.  But to find a weapon in**
13 **there that doesn't look like it's half hanging out or is**
14 **partially placed in there, no, this is neatly tucked in**
15 **there.  This is shoved into a sagging jean with wrinkles**
16 **somewhere drifting around the bottom half of this young**
17 **man's buttocks is highly unusual.**
18   Q   How old was he?  You said young man.
19   **A   He wasn't that old.  I am 50.  Everyone is**
20 **young to that.  He wasn't as old as me.**
21   Q   I'm young?  I don't think so.
22      So anyway, your recollection is he was a young
23 man?
24   **A   Yes, I don't mean to suggest any particular**
25 **age in saying that.**

---

Page 78

1    Q   I just, as I was reading the report, found it
2  interesting that included within your expert consultant
3  report was an explanation for sagging.  But --
4    **A   I think it's important in this case.  It's not**
5  **something I normally would comment on.**
6    Q   The pictures?
7    **A   Well, I did that for you because you probably**
8  **didn't know what that meant.  I don't imagine you watch**
9  **a lot of MTV.**
10   Q   That's true, I don't do.
11     **MR. PHILLIPS:** I don't even know that MTV
12 shows that anymore.
13     **THE WITNESS:** If you are a police officer, you
14 come across it quite often.  And so I am familiar
15 with it from my experience.  But I do think it's
16 something that not everyone may be fully aware of.
17     **MR. PHILLIPS:** That's right.
18 **BY MR. JOLLY:**
19   Q   Have you ever been a member of a SWAT team?  I
20 did not recall.
21   **A   No.**
22   Q   Okay.  Did analysis of ballistics play any
23 role in your opinion?
24   **A   No, it generally doesn't.  I tend to leave**
25 **that to ballistic experts, with the exception of**

---

Page 79

1  **recognizing the severity of the wounds from looking and**
2  **looking at the photos and looking at the autopsy report.**
3    Q   In this instance, are you aware that Newman's
4  ammunition was or was not bonded, or nonbonded?
5    **A   I don't recall.**
6    Q   Do you know what that term is and means?
7    **A   From a legal perspective or are you talking**
8  **about the rounds --**
9    Q   No, the rounds.
10   **A   The rounds themselves, if they are**
11 **armor-piercing?**
12   Q   What's the difference between bonded
13 ammunition and nonbonded ammunition?
14   **A   I don't recall ever having that question asked**
15 **me before.  I don't know.  Bonded ammunition.**
16   Q   I may have asked this, I apologize if I did.
17 Are you an expert in blood spatter comparison?
18   **A   No.**
19   Q   Can you tell me, notwithstanding that, the
20 extent to which Mr. Hill's clothing altered blood
21 spatter as compared to hitting his bare skin?
22   **A   I am not sure I understand the question.**
23     **MR. JOLLY:** Madam Reporter, would you please
24 read that back.
25     (The requested portion was read.)

---

Page 80

1    **MR. PHILLIPS:** I will object.
2    **THE WITNESS:** I guess I still don't understand
3  it.  Can I ask you a question to see --
4  **BY MR. JOLLY:**
5    Q   Of course, you can.  I won't answer, but you
6  can ask.
7    **A   So do you mean the blood pattern postmortem**
8  **stained by the injury, the difference between what got**
9  **on him from perhaps the projectile organic material**
10 **versus what got on him after his shirt fell against his**
11 **body?**
12   Q   No, that's not what I meant.
13   **A   I am not sure I understand.**
14   Q   Can you testify the extent to which his
15 clothing, in this case his shirt, his trousers, and
16 underwear, would alter the blood spatter assuming -- as
17 opposed to it just hitting him bare skin?
18   **A   I am not an expert in that area.  I can draw**
19 **some assumptions based on my experience, but I don't**
20 **think I should be testifying to it.**
21   Q   Okay.  Page 26.
22   **A   Is this your favorite?**
23   Q   It's not my favorite but it's just another
24 one, why do you guys do this?
25   **A   I am reading your expressions.**

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 81

1    Q   Why do you guys do this?
2        Page 26, in light of the -- first paragraph.
3    In light of the several reports that were generated by
4    SWAT team members regarding this case, Johnson's
5    statement seems disingenuous.
6        You don't think that's a characterization of
7    testimony?  Why would you do that?
8    A   You have to read it in context.
9        MR. PHILLIPS: Objection.
10   BY MR. JOLLY:
11   Q   Okay.  I guess that makes a difference.  Why
12   would you make that opinion?
13   A   Here's his statement.
14       "I've never written a report on a SWAT call
15   out."
16       First of all, I've never heard anyone say
17   that.  One of the most critical areas of police work and
18   this guy has never written a report.  Now it turns out
19   everyone has written reports.  It also turns out that if
20   you go back into the file, you can find that every case
21   has reports, but Mr. Johnson has never written one.
22   Q   Why did you put that in there?
23   A   Because I don't believe that that's true.
24   That can't possibly be true.  It seems disingenuous.  I
25   am not drawing a conclusion on it, but it seems

---

Page 82

1    disingenuous.
2    Q   Do you know Johnson?
3    A   I don't.
4    Q   Do you know anything about him?
5    A   No.
6    Q   Can you testify today that in all the SWAT
7    call outs to which Johnson has responded, that he has
8    ever written a report?
9    A   I cannot.  It seems disingenuous.  I am not
10   saying that it's not true.
11   Q   By the way, if Mr. Hill had a firearm -- I am
12   not doing that -- had a firearm in his back pocket and
13   not in his hand and he was on probation which prohibited
14   him from possessing a firearm, you do agree with me
15   that's an arrestable offense?
16       MR. PHILLIPS: Objection.
17       THE WITNESS: You can't shoot him and arrest
18   him, and you can't go into his house and arrest
19   him; so I would agree with you that in the context
20   of being outdoors with a firearm where law
21   enforcement could come in contact, they could
22   arrest him.
23   BY MR. JOLLY:
24   Q   You know -- okay.  So it's an arrestable
25   offense.

---

Page 83

1        MR. PHILLIPS: Objection.
2    BY MR. JOLLY:
3    Q   How it's effected might be a different issue.
4    But theoretically he was not entitled lawfully to
5    possess a firearm?
6    A   Theoretically -- no, actually, if he's on
7    felony probation, he probably cannot have a firearm,
8    that's true.
9    Q   Is it your belief that law enforcement
10   officers should never fire through a partition, a
11   barrier, door, wall?
12   A   No, I would never say never.
13   Q   Do you recognize the term visual occlusion?
14   A   Yes.
15   Q   What is that?
16   A   Well, you didn't ask me about my studies, but
17   I study sports psychology, sport exercise, and
18   performance.  That's a big thing in this area of study.
19   Q   The reason I didn't ask is I know all that
20   stuff.  You've been deposed enough that I didn't have to
21   go through all that stuff.
22   A   Then you've heard me explain it before.
23       So decision-making begins with visual
24   assessment.  And when your vision is occluded, it
25   disrupts your decision-making.  You begin to rely on

---

Page 84

1    guesswork, not actually factual information.
2        So visual occlusion, we actually use quite a
3    bit.  We have occlusion glasses.  We can put you in an
4    environment and suddenly the glasses go black and you
5    can't -- you don't know what's going to happen next, so
6    you have to anticipate.  So it's an area of study that I
7    am very familiar with.
8        Now, in this case, the visual occlusion
9    happens as a result of the garage door coming down.
10   It's unplanned, it's unusual, and yet it's still
11   happens.  So this is what I refer to when I write to
12   visual occlusion, meaning the officer's vision is
13   occluded and, therefore, the decision-making process is
14   interrupted.
15   Q   How does that play a role in this, if at all?
16   A   I think it's the crux of this case, is that
17   the officer is making decisions based on information he
18   doesn't have.
19   Q   What indication, if any, do you have that
20   either deputy was aware that the firearm was not loaded?
21   A   No indication at all.
22   Q   Doesn't play a role in your analysis?
23   A   No.
24   Q   Do you know if there was a dog in the house
25   when this happened?

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

**Page 85**

1  A  I remembered hearing that there was a dog in
2  the house.  I don't recall anybody coming across it.
3  Q  Just curious.
4  A  Yes, I remember that issue being brought up.
5  Q  Page 37.  Middle paragraph, you talk about
6  Detective LeBeau's investigation.
7  A  Okay.
8  Q  You recite in the last sentence, perhaps this
9  is the reason Mr. Hill quickly closed the garage door
10  after seeing the deputies outside.  A postmortem
11  toxicology from Mr. Hill had blood alcohol content of
12  .328.
13  A  Okay.
14  Q  Why would you speculate as to what Hill was --
15  why Hill did what he did?
16  A  Just to demonstrate there was more than one
17  reason, and that was just as good a one as he was going
18  to shoot the deputy through the closed door, probably a
19  better reason, I think, from a reasonable perspective.
20  I think law enforcement officers are naturally
21  a threat to many people, but particularly when you are
22  on probation, particularly when there are conditions on
23  your probation and particularly when you are violating
24  those, you would want to separate yourself from law
25  enforcement.  One of the ideas I think a person would

---

**Page 86**

1  have would be to close the garage door.
2  Q  Are you aware, either personally or from
3  research that you have done, of any circumstance where a
4  person suffered a head wound and, notwithstanding that,
5  has continued to fight?
6  A  Continued to fight?
7  Q  Sure.
8  A  Yeah.
9  Q  It happens?
10  A  It does happen.
11  Q  Are you able to testify for the jury
12  Mr. Hill's body position at the time that he was shot,
13  struck with the bullets, like where he was when the
14  first bullet hit him?
15  A  In location to the geography or his position?
16  Q  Body position.
17  A  So if he is in a pugilistic posture, standing
18  up, or squatting?
19  Q  Sure, could be any one of those.
20  A  No, I cannot.
21  Q  Did you notice in your review of the materials
22  that Mr. Hill fell backward and not forward after being
23  shot?
24  A  I did not, I don't think that I made note of
25  where he was, what position he was in when he was shot,

---

**Page 87**

1  so I don't know if I know if he fell backward or
2  forward.  I don't recall.
3  Q  You are not going to testify, I don't think,
4  you tell me if you are, that the materials you reviewed
5  conclusively demonstrated that Mr. Hill never had the
6  firearm in his hand?
7  A  I don't know if he had a firearm in his hand
8  or not.  I won't testify as to whether he did.
9  Q  You know, I just -- paragraph 8, the use of
10  deadly force founded upon weak speculation was reckless
11  and excessive.
12  First of all, how is speculation better -- why
13  would you say weak speculation as opposed to just using
14  the term speculation?  These modifiers -- well, why did
15  you use the term weak as opposed to just saying founded
16  upon speculation?
17  MR. PHILLIPS: Objection.
18  THE WITNESS: Because speculation does have
19  degrees of certainty.  You can speculate with
20  little information or you can speculate with lots
21  of information.
22  In this particular case, the officer had
23  little information because he was blinded to what
24  was going on on the other side of the door when he
25  fired his first shot.  Therefore, the speculation

---

**Page 88**

1  was weak.
2  I am glad you are asking me these questions
3  because I think it's important.  I think it's
4  important to bring this out.
5  BY MR. JOLLY:
6  Q  I am sorry, I have now reached my favorite.
7  Paragraph 12.  If SWAT members found a firearm
8  on Mr. Hill when they made the initial inquiry, it would
9  have been a sophomoric mistake.
10  Why sophomoric as opposed to just a mistake?
11  Why do you use those terms?
12  MR. PHILLIPS: Objection.
13  BY MR. JOLLY:
14  Q  I am hoping to convince you in the future not
15  to do this.  It gives lawyers like me an opportunity to
16  be a jerk.
17  A  You love that.
18  Q  No, I really don't.
19  A  You are good at it.
20  Q  That does -- I admit, it comes naturally.
21  A  Why did I use the word sophomoric?
22  Q  As opposed to just saying it would have been a
23  mistake.
24  A  I'll tell you why.  Because sophomoric, once
25  again, when you are talking about experience, and I

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 89

1 think this is critical when you are looking at any
2 career, you expect that there are behaviors that
3 more experienced people will do and sophomoric people
4 won't do, or vice versa.
5     And so all of the SWAT team members, none of
6 them report that they see a gun.  So is this their first
7 day on the SWAT team?  If it is, then perhaps we expect
8 it.
9     I don't think that's the case.  I think what
10 we have is a bunch of seasoned SWAT officers that are
11 doing a good job, they are clearing a house, they are
12 doing a dangerous job, and yet they are making a
13 sophomoric mistake as if this is the first day doing
14 this.
15     That's why I put that in there.
16   Q    Paragraph 16, page 42, you indicate that the
17 office, the agency approved SWAT entries -- the SWAT
18 entry after it was determined that Hill was likely
19 deceased.
20     Your understanding is that the SWAT team, at
21 the time of entry, that information was already -- that
22 the information available was that he was dead?
23   A    Bearing in mind -- I think we had this
24 conversation.
25   Q    We did.

---

Page 90

1   A    My understanding of the sequence of events is
2 that they had punctured the door, which they should have
3 done first because they knew where the shooting
4 occurred, to see if he was in there, after identifying,
5 and then they went ahead and deployed the chemical
6 agents for --
7   Q    If that understanding by you is erroneous,
8 that opinion really doesn't have any validity.
9   A    I wouldn't address it the same way, but I
10 would still say that they probably didn't need to deploy
11 chemical agents because they had a robot and could have
12 found out that he was deceased.
13     They should have punctured the door first.
14 There was nobody who was in harm's way doing that.
15 That's what robots are for.  You ride them up to the
16 door, you puncture the door, you have a look around, and
17 in this case they would have seen him laying there.  And
18 that would have been the end of the need to deploy
19 chemical munitions.
20     If you are telling me that they deployed
21 chemical munitions first and then they went up and
22 punctured, that would be out of sequence in the way it
23 should be done.  So my opinion wouldn't change.
24   Q    How about if they punctured but couldn't get
25 the camera to work, so they deployed the chemical agent?

---

Page 91

1   A    I believe that there is a still picture of him
2 laying there from that puncture.
3   Q    After the chemical munitions.
4   A    That creates a whole different problem.  If
5 they are taking pictures much later, then maybe they
6 took them hours later after they put a gun in his
7 pocket.
8   Q    How about minutes later?
9   A    I am not sure.  What I am saying to you --
10   Q    We'll worry about it.
11   A    -- is that it should have been done where they
12 should have made the identification.  I don't know how
13 the robot wouldn't work.
14   Q    Just didn't.
15   A    I come across that a lot in these kind of
16 cases.
17   Q    Oh, don't say stuff like that.  That's so mean
18 spirted.
19   A    I do.
20   Q    Paragraph 15, second sentence, no remedy
21 was -- your next sentence, a thorough investigation was
22 not conducted.
23     What else should have been done by way of
24 investigation that would have made this thorough as
25 opposed to not thorough?

---

Page 92

1   A    There's a lot of unanswered questions still.
2 I think this is the work that you have in front of you,
3 is to try to figure out how this gun gets back in the
4 pocket or gets in the pocket in the first place.  I
5 think that wasn't questioned.
6     I think that the issues that I raise, why are
7 the deputies firing blindly into an area, not knowing
8 what's on the other side or what the intent of the
9 person is on the other side?  That's not been addressed.
10     What the deputies say they take at full value,
11 they don't question it, they don't realize it doesn't
12 comport with the actual evidence, and for that reason,
13 this is not a thorough investigation.
14   Q    That's my question.  What else should they
15 have done?
16   A    I think they should have asked the right
17 questions.  They should have said to the deputy, could
18 you see the threat?  The deputy would have said, no, we
19 couldn't.  That only comes out in deposition.
20     So that's a very important thing to ask when
21 you are using deadly force.  Deadly force is not an
22 option; it's the final option.  It's after all other
23 options have been exhausted.  And they missed that in
24 their investigation.
25   Q    Well, did not the investigative report

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 93

1  indicate that the door was closed at the time that the
2  gun -- deputy -- or closing at the time that Deputy
3  Newman fired?  Isn't that in the reports?
4      A   Right.  So you are making my point.
5      Q   No, sir, I am not.  I am not sure that the
6  deputy -- in addition to that, is it your testimony that
7  the investigator should have asked that additional
8  question even though the reports showed it?
9          MR. PHILLIPS: Object to the form.
10         THE WITNESS: I want to know from an analysis
11     perspective -- the key word is eminent.  Is the
12     threat eminent, where the deputy believed the
13     threat was eminent, when he could not see the
14     threat.
15  BY MR. JOLLY:
16     Q   So in part you have indicated that the
17  investigation after the incident was not thorough
18  because that question was not asked.  What else would
19  you point to as deficiencies in the post-incident
20  investigation?
21     A   I think it's -- there's many strange things
22  about this case.
23         The other thing is, how does the firearm end
24  up staying in the pants after the SWAT team gets there,
25  after they roll him around?  These are pants hanging

---

Page 94

1  down around his legs.  We've got a weapon tucked in,
2  that's neatly tucked in there, at least according to the
3  first picture.  It looks like the same weapon we later
4  see when the crime scene is shot.
5          How does that happen?  How does no SWAT team
6  member write about this?  This is one of the most
7  important issues when you are talking about clearing a
8  scene, is to make sure people are not in possession of
9  weapons, dead or alive.  We handcuff dead people all the
10  time because we don't want -- we do, because we don't
11  know how dead they are.
12     Q   I've got a case with that.
13     A   So you take a weapon, you clear a weapon off
14  of a decedent.  Nobody on this experienced elite SWAT
15  team even mentions it.  It's remarkable to me.
16     Q   It's funny you mention that.  We are involved
17  in litigation where they handcuffed a dead guy and the
18  criticism is why did you handcuff the dead guy.
19     A   Call me, I will tell them.  I am your guy.
20  That's a great question for me to answer.  I'll you why
21  we do it.
22         And this is the same problem that you have
23  with this case.  So we have a SWAT team member -- SWAT
24  team members, no one seize the firearm.
25     Q   Do you have any opinions other than you have

---

Page 95

1  provided today or as articulated in the disclosure?
2      A   At this moment, no.  As I told you, there are
3  still a few things I should review.  I don't anticipate
4  big changes.
5      Q   You do not have an opinion that agency
6  policies were defective.  At least I didn't see it in
7  there.
8      A   I don't believe so.
9      Q   Same question with regard to agency training.
10  You do not have any opinion, at least as of today, that
11  somehow agency training was deficient.
12     A   I haven't looked too deeply into the training
13  of these officers.  I don't particularly have an
14  opinion.  I don't know, once again, as we venture down
15  this path, how far it goes, if I will be asked to look
16  more into the training of that particular officer.  But
17  at this moment, I don't have a specific criticism.
18     Q   You have no information as to Newman and as
19  his background as a law enforcement officer, as a
20  deputy, as impacting this incident?
21     A   No.
22         MR. JOLLY: That's all I have.
23         MR. PHILLIPS: No questions.  Read or waive.
24         THE WITNESS: I will read it.
25         MR. JOLLY: Ordered.

---

Page 96

1          MR. PHILLIPS: Copy.
2          (Proceedings concluded at 12:22 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

---

Page 97

```
 1              CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA        )
 4   COUNTY OF LEON          )
 5
 6
 7
 8          I, the undersigned authority, certify that
 9   the above-named witness personally appeared before me
10   and was duly sworn.
11
12          WITNESS my hand and official seal this
13   14th day of February, 2017.
14
15                    SANDRA L. NARGIZ, RMR, CRR
                      1-800-934-9090
16                    850-878-2221
                      snargiz@comcast.net
17
18
19
20
21
22
23
24
25
```

---

Page 98

```
 1
 2           CERTIFICATE OF REPORTER
 3   STATE OF FLORIDA       )
 4   COUNTY OF LEON         )
 5          I, SANDRA L. NARGIZ, Registered Professional
 6   Reporter, certify that the foregoing proceedings were
 7   taken before me at the time and place therein
 8   designated; that my shorthand notes were thereafter
 9   translated under my supervision; and the foregoing pages
10   numbered 1 through 98 are a true and correct record of
11   the aforesaid proceedings.
12          I further certify that I am not a relative,
13   employee, attorney or counsel of any of the parties, nor
14   am I a relative or employee of any of the parties'
15   attorney or counsel connected with the action, nor am I
16   financially interested in the action.
17          DATED this 14th day of February, 2017.
18
19
20
21                    SANDRA L. NARGIZ, RMR, CRR
                      Notary Public
22                    1-800-934-9090
                      850-878-2221
23                    snargiz@comcast.net
24
25
```

---

Page 99

```
 1
 2               ERRATA SHEET
 3   I have read the transcript of my deposition, pages 1
     through 98 and hereby subscribe to same, including any
 4   corrections and/or amendments listed below.
 5   DATE:_____    _____
 6                    ROY R. BEDARD
 7   PAGE/LINE  CORRECTION or AMENDMENT  REASON FOR CHANGE
 8   _____  _____  _____
 9   _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   DATE OF DEPOSITION: 2-10-17     REPORTER:  Sandi Nargiz
25
```

---

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

**$**

**$1,500 (1)**
10:25
**$1,800 (1)**
10:24
**$200 (1)**
10:17
**$3,000 (1)**
10:21

**[**

**[sic] (1)**
61:19

**A**

**ability (1)**
73:15
**able (12)**
25:1;37:4;41:3;
44:12;47:24;48:2,9;
65:22;68:24;69:7;74:4;
86:11
**absolutely (2)**
65:17;68:11
**academic (1)**
5:18
**access (1)**
20:17
**according (2)**
67:1;94:2
**account (2)**
53:4;74:18
**accountability (1)**
50:3
**accountable (1)**
49:22
**accuracy (1)**
77:6
**accused (1)**
62:13
**accuses (1)**
61:18
**across (5)**
29:10;59:20;78:14;
85:2;91:15
**act/do (1)**
70:10
**action (1)**
7:6
**actions (4)**
37:25;38:1;52:14;
69:2
**actual (1)**
92:12
**actually (15)**
24:16;47:18;48:7;
52:9,13;57:8;59:13;
60:16;61:10,16;68:4;
74:5;83:6;84:1,2

**add (3)**
54:13;56:13,15
**added (5)**
20:20,21;21:11;22:8;
76:4
**addition (1)**
93:6
**additional (6)**
8:8,12,13;9:10,22;
93:7
**address (2)**
5:7;90:9
**addressed (1)**
92:9
**adds (1)**
54:14
**administered (1)**
39:21
**Administration (1)**
11:13
**admit (1)**
88:20
**adoption (1)**
30:1
**affect (5)**
35:16;48:21,24,24,
25
**affected (1)**
10:4
**affirm (1)**
4:9
**affixed (1)**
68:5
**again (10)**
7:24;18:6;27:17;
29:25;32:9;36:20;38:3;
53:2;88:25;95:14
**against (4)**
24:21;57:25;74:1;
80:10
**age (1)**
77:25
**agencies (1)**
29:25
**agency (6)**
23:18;53:23;89:17;
95:5,9,11
**agent (2)**
47:23;90:25
**agents (3)**
47:2;90:6,11
**ago (3)**
6:4;13:6;16:14
**agree (8)**
37:16;50:6,15,23;
51:9;70:8;82:14,19
**agreement (5)**
17:23,24;18:1,2,7
**ahead (3)**
76:12,21;90:5
**air (1)**
61:22
**airport (1)**

13:13
**ajading (3)**
61:18;62:12,17
**alarm (2)**
63:15,19
**alcohol (8)**
32:15;33:21,22,25;
34:13,19;35:14;85:11
**alcoholic (1)**
32:18
**alive (1)**
94:9
**alleged (2)**
13:16,21
**allegedly (1)**
48:17
**allow (1)**
72:16
**allowed (1)**
28:4
**almost (1)**
37:14
**alter (1)**
80:16
**altered (2)**
7:20;79:20
**Although (2)**
15:19;66:23
**always (5)**
23:19;28:14;31:25;
61:19;67:22
**ammunition (4)**
79:4,13,13,15
**amongst (3)**
39:10;48:9;71:4
**amount (2)**
8:22;58:22
**analysis (10)**
7:20;22:7;29:13;
34:16;50:7;56:15;65:7;
78:22;84:22;93:10
**angry (1)**
60:15
**anticipate (10)**
8:11,13,14;9:7,10,22,
23;10:13;84:6;95:3
**anticipation (1)**
71:3
**anymore (1)**
78:12
**apartment (2)**
59:12;60:8
**apologize (2)**
15:14;79:16
**apologus (1)**
7:3
**appeal (2)**
14:9;72:18
**applicable (1)**
4:6
**application (1)**
23:8
**appreciate (1)**

47:1
**approach (2)**
30:22;74:9
**appropriate (1)**
27:6
**approved (1)**
89:17
**approximated (1)**
34:1
**approximately (2)**
34:20;55:22
**area (9)**
13:19;24:21;27:10;
49:4;67:16;80:18;
83:18;84:6;92:7
**areas (4)**
23:4;74:9,10;81:17
**arm (3)**
47:8,17,24
**armed (1)**
60:14
**armor-piercing (1)**
79:11
**around (12)**
13:19;29:25;59:24;
61:3;75:6;76:23;77:4,
5,16;90:16;93:25;94:1
**arrest (6)**
30:15,15,20;82:17,
18,22
**arrestable (2)**
82:15,24
**articulate (2)**
68:24;69:10
**articulated (1)**
95:1
**assessment (1)**
83:24
**assign (2)**
12:22;38:13
**assist (1)**
57:14
**assume (12)**
12:3;17:13;32:19;
33:25;35:13;43:23;
44:3;45:3,8;52:1;53:2;
67:22
**assumed (2)**
48:7;75:2
**assuming (3)**
9:3;32:8;80:16
**assumption (1)**
46:9
**assumptions (3)**
34:12;45:3;80:19
**Atkinson (1)**
17:1
**attempt (1)**
17:16
**attempting (1)**
56:2
**attention (1)**
60:18

**attorney (2)**
17:7,14
**attorneys (1)**
14:2
**attorney's (1)**
20:20
**attribute (1)**
38:17
**auditory (1)**
60:21
**authorities (1)**
49:17
**autopsy (1)**
79:2
**available (1)**
89:22
**Aviana (1)**
13:8
**aware (12)**
25:15,18;31:5;33:4;
40:15;47:2;68:3,12;
78:16;79:3;84:20;86:2
**away (1)**
45:9;58:9

**B**

**back (23)**
5:16;16:17;35:25;
39:19;40:16;41:17;
42:15,20;44:12;45:7;
48:8;49:23;55:18;
61:15;63:13;70:1;
75:14,24;77:7;79:24;
81:20;82:12;92:3
**background (2)**
5:18;95:19
**backward (2)**
86:22;87:1
**backwards (1)**
73:15
**Bailey (2)**
13:8;18:9
**Bainbridge (1)**
24:18
**ballistic (1)**
78:25
**ballistics (1)**
78:22
**bar (1)**
63:3
**bare (2)**
79:21;80:17
**barrier (1)**
83:11
**base (3)**
59:25;60:6,10
**based (7)**
27:8;34:12;49:17;
67:1;75:12;80:19;
84:17
**baseline (2)**
57:1,7

Accurate Stenotype Reporters

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

basically (3)
  20:15;67:8;69:3
basis (3)
  33:1,19;75:4
batch (1)
  19:6
bear (2)
  30:18;74:15
Bearing (1)
  89:23
bears (1)
  31:1
beating (1)
  59:15
becomes (2)
  28:15;59:22
BEDARD (6)
  4:2,14,19;5:6,7;17:3
beer (1)
  34:5
began (5)
  11:15;66:14;70:17;
  74:22,24
begin (2)
  17:22;83:25
begins (5)
  67:9;73:10,11;75:12;
  83:23
behalf (3)
  13:2;14:15;24:10
behaviors (2)
  52:14;89:2
behind (2)
  5:17;73:16
belief (3)
  68:25;69:10;83:9
belt (1)
  76:24
better (4)
  28:18;68:20;85:19;
  87:12
beverages (1)
  32:18
beyond (1)
  51:9
big (2)
  83:18;95:4
biggest (2)
  70:20;73:8
bin (1)
  55:1
bit (3)
  19:14;22:18;84:3
black (1)
  84:4
blame (7)
  37:24;38:13,15,15,
  17,21;39:11
blameless (1)
  37:16
blind (1)
  67:16
blinded (3)

73:25;74:1;87:23
blindly (2)
  70:19;92:7
blood (9)
  33:25;34:19;35:13;
  75:5;79:17,20;80:7,16;
  85:11
bodily (3)
  52:13;69:2;70:25
body (5)
  40:15;47:25;80:11;
  86:12,16
Bogan (2)
  14:5,6
bonded (3)
  79:4,12,15
both (6)
  13:22;20:17;26:11,
  12;53:12;58:11
bottom (1)
  77:16
break (1)
  53:16
breakout (1)
  20:9
briefly (1)
  18:12
bring (3)
  11:22;15:9;88:4
broad (1)
  23:3
brother (3)
  26:16,18,24
brought (4)
  11:21;54:1;63:13;
  85:4
Bruce (2)
  4:19;14:5
Bryant (1)
  9:12
building (2)
  36:20;74:7
bullet (4)
  61:24;63:5;64:20;
  86:14
bullets (2)
  73:23;86:13
bunch (1)
  89:10
business (5)
  5:7;11:14;15:21;
  49:16;67:16
buttocks (1)
  77:17
buy (1)
  69:9

## C

cabinet (1)
  20:19
CAD (4)
  40:9,11;43:23;44:3

California (1)
  30:4
call (15)
  25:12;39:23;42:6;
  43:7,24;57:18;59:7,13,
  16;60:1;61:2;62:15;
  81:14;82:7;94:19
called (13)
  4:15;9:12;15:25;
  17:7;29:9,10;40:12,25;
  50:13;57:3;59:15,17,
  18
calls (4)
  17:14;24:23;57:21,
  24
came (5)
  21:23;59:17;60:7,14,
  14
camera (2)
  49:7;90:25
can (60)
  7:22;9:2;11:18;12:3;
  13:12;17:6,22;18:18,
  22,23;19:16,18;20:16,
  24,24;21:20;22:7;
  29:13;30:6,12;32:25;
  33:23;37:7,10,22;41:8;
  51:12,25;52:3,6;54:16;
  55:2;57:9,19;59:20;
  60:4;64:3,16;65:10,22;
  66:3;71:1;73:3,17;
  75:1,1,17,21,22;79:19;
  80:3,5,6,14,18;81:20;
  82:6;84:3;87:19,20
Canada (1)
  6:24
canines (1)
  23:14
car (4)
  13:20;45:4;55:18;
  73:2
care (3)
  18:4;53:15;76:10
career (3)
  5:17;36:6;89:2
cares (2)
  55:8;56:19
Carolina (1)
  27:25
case (53)
  4:24;5:24;7:2;8:9;
  10:21;11:6;13:7,10,17,
  23;14:3,7,10;15:18,23;
  16:1;17:19,19,25;18:8,
  9,13;22:17;24:8;25:12,
  15,18;27:25;28:2,11,
  13,14;29:22;30:22;
  35:17;51:21;65:25;
  68:9;72:23;74:20;76:5;
  78:4;80:15;81:4,20;
  84:8,16;87:22;89:9;
  90:17;93:22;94:12,23
case-by-case (1)

33:1,19
cases (4)
  12:13;27:10,16;
  91:16
cat (1)
  57:19
cause (1)
  17:18
caused (1)
  39:9
cell (1)
  21:23
certain (4)
  42:25;60:4;68:14;
  89:2
Certainly (12)
  22:6;24:4;26:22;
  29:22;30:5;31:12;39:8;
  42:5;50:7,16;56:7;63:9
certainty (2)
  33:24;87:19
certified (1)
  35:25;36:2,3
chance (1)
  6:19
change (1)
  11:8;47:22;49:2;
  90:23
changes (1)
  95:4
changing (2)
  23:19;32:2
characterization (1)
  81:6
charge (1)
  10:17
charges (1)
  10:20
charging (1)
  10:15
chased (1)
  13:21
chemical (11)
  47:2,23;48:3,6,17;
  90:5,11,19,21,25;91:3
chest (1)
  61:23
child (3)
  67:11,20;68:1
chooses (1)
  73:25
chose (1)
  71:4
Christmas (2)
  8:6;22:23
chronicle (1)
  5:25
chronology (3)
  11:5,7,11
chubby (1)
  26:21
chuckle (1)
  68:21

circumstance (1)
  86:3
circumstances (1)
  41:4
cite (1)
  54:17
city (3)
  5:9;57:25;59:8
civil (1)
  26:12
claims (3)
  23:23;25:7,24
clarify (6)
  21:20;29:16;49:15;
  52:8;70:2;73:4
clean (2)
  12:11;67:17
clear (2)
  76:22;94:13
clearing (1)
  89:11;94:7
clearly (1)
  29:20
clerical (1)
  12:21
clinking (1)
  60:22
close (6)
  58:22;61:22;74:6,22,
  24;86:1
closed (5)
  43:5;65:23;85:9,18;
  93:1
closest (1)
  36:19
closing (4)
  66:1,15;73:8;93:2
clothing (2)
  79:20;80:15
cloud (1)
  20:18
clue (3)
  60:1,3,9
collapsed (1)
  75:2
coming (6)
  52:17;60:24;61:16;
  73:11;84:9;85:2
command (1)
  53:6
commands (1)
  67:3
comment (1)
  78:5
Commission (1)
  11:13
common (2)
  32:24;57:19
commotion (1)
  59:14
communications (2)
  15:16,20
compare (2)

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

57:1,8
compared (1)
  79:21
comparison (2)
  7:9;79:17
compelled (3)
  57:20;58:2,5
Complaint (9)
  25:21;26:2;29:7,8,8;
  56:6,10;57:3,16
complaints (1)
  56:14
complex (2)
  59:12,21
complicated (1)
  12:18
comport (1)
  92:12
compound (1)
  19:4
concealment (1)
  74:10
concede (2)
  52:2,5
concept (1)
  38:21
concluded (1)
  96:2
conclusion (1)
  81:25
conclusions (1)
  42:24
conclusively (1)
  87:5
concrete (1)
  60:23
conditions (5)
  31:15,18,20;32:14;
  85:22
conduct (3)
  28:5;49:16;60:10
conducted (1)
  91:22
conference (2)
  14:20,25
conferences (1)
  29:22
confronted (1)
  73:6
connection (6)
  8:1;10:8;14:19;15:5;
  29:13;54:8
consistent (2)
  10:6;17:13
conspiracy (1)
  42:17
Constitution (1)
  49:18
consultant (6)
  4:24;12:5;49:12,14;
  50:25;78:2
consultants (1)
  54:12

consultation (1)
  50:3
consulting (1)
  23:16
Consume (1)
  32:18
consummate (1)
  17:23
contact (5)
  16:3,18;56:2;61:6;
  82:21
contacted (1)
  15:5;16:3,25
contained (3)
  19:11;21:4;32:9
contemporaneous (1)
  17:5
content (3)
  33:25;56:9;85:11
context (2)
  81:8;82:19
continually (1)
  19:16
continue (1)
  36:5
continued (4)
  60:17;62:2;86:5,6
continuously (1)
  21:10
continuum (1)
  23:10
contract (1)
  18:2
contrarian (1)
  7:18
contribute (1)
  49:25
contributing (1)
  39:11
conversation (3)
  17:4;48:8;89:24
convince (1)
  88:14
coordination (1)
  77:1
cop (1)
  62:5
Copy (1)
  96:1
cord (1)
  32:8
corner (1)
  74:6
correspondence (1)
  16:20
cost (1)
  28:15
costs (1)
  18:3
country (2)
  6:5;30:1
County (4)
  4:20;13:8;24:15;

57:25
couple (7)
  6:4;13:13;15:1;
  16:13;24:24;73:13;
  74:25
course (4)
  23:9;46:10;75:15;
  80:5
COURT (8)
  4:9;23:22;25:6,7,16,
  19;26:9;31:21
cover (7)
  55:18;61:6,7;73:16;
  74:6,10,12
crap (1)
  7:7
crashed (1)
  13:20
create (2)
  57:7;72:15
created (1)
  63:6
creates (1)
  91:4
creating (1)
  74:11
credible (4)
  51:1,3,5,7
crime (2)
  39:18;94:4
criminal (7)
  24:8;26:12;30:15,16;
  32:12;57:16,22
critical (4)
  43:10,13;81:17;89:1
criticism (4)
  70:20;75:16;94:18;
  95:17
crossed (1)
  15:3
crusade (1)
  68:19
crux (1)
  84:16
curious (1)
  85:3
currently (1)
  8:11
cut (1)
  7:6

**D**

danger (5)
  69:1,11;70:25;71:6;
  72:19
dangerous (1)
  89:12
date (2)
  19:18;21:8
dated (1)
  5:12
dates (1)

22:21
Daughtry (3)
  27:22,24;28:11
day (9)
  8:5;10:24,24,25;
  19:17;20:7;46:9;89:7,
  13
days (2)
  6:4;46:19
dead (6)
  89:22;94:9,9,11,17,
  18
deadly (7)
  52:18;74:1,16,19;
  87:10;92:21,21
dealing (1)
  34:13
death (2)
  52:12;69:1
debating (1)
  14:8
deceased (2)
  89:19;90:12
decedent (8)
  31:6,15;32:6;37:8,
  16;52:21;64:4;94:14
decedent's (2)
  30:15;41:17
December (9)
  5:12;7:23;8:2,9;
  19:8;21:9;22:17,17;
  53:21
decide (1)
  41:21
decided (1)
  39:9
decision (5)
  67:13;69:25;74:16,
  17,23
decision-making (3)
  83:23,25;84:13
decisions (2)
  74:17;84:17
deeply (1)
  95:12
defective (1)
  95:6
defend (1)
  75:21
defendants (1)
  13:22
defense (5)
  6:8;14:2;23:18;25:5;
  69:20
defensive (3)
  23:6,8;30:9
deficiencies (1)
  93:19
deficient (1)
  95:11
define (1)
  33:8
degree (3)

20:5;33:24;56:8
degrees (1)
  87:19
demands (1)
  62:22
demonstrate (1)
  85:16
demonstrated (1)
  87:5
Department (1)
  36:8
depending (1)
  77:5
deploy (2)
  90:10,18
deployed (7)
  47:3,23;48:3,18;
  90:5,20,25
deployment (1)
  48:6
deposed (2)
  5:1;83:20
deposition (8)
  4:2;6:20;10:23,25;
  19:12;45:18;46:14;
  92:19
depositions (1)
  24:2
deputies (20)
  36:18;37:5;39:23;
  53:13;55:14;56:1,16;
  57:12;58:11,17,18;
  63:16;64:15;67:21,21;
  68:10;73:14;85:10;
  92:7,10
deputies' (1)
  75:13
Deputy (38)
  4:20;36:19,22;37:8;
  40:5,12;44:4;45:3;
  66:4,12;67:1,6,13;
  68:23;69:6,14;70:5,8,
  10,22;71:1,2,7,8,9,11;
  73:10;74:1,4;84:20;
  85:18;92:17,18;93:2,2,
  6,12;95:20
deputy's (2)
  70:24;71:5
describe (7)
  13:12;22:25;49:13,
  15;64:4,16;72:5
described (1)
  18:25
describing (1)
  56:25
description (4)
  10:5;18:3;20:15;
  50:17
desktop (1)
  20:17
detail (1)
  20:5
Detective (1)

85:6
**determine (6)**
18:13;47:24;51:24;
56:3;58:21;65:22
**determined (1)**
89:18
**deviation (3)**
57:9,11,14
**died (2)**
62:2;63:9
**difference (4)**
65:7;79:12;80:8;
81:11
**different (15)**
21:2,9,22;30:21;
34:10,23;36:3;42:18,
19;51:19;72:23;74:10,
11;83:3;91:4
**difficult (1)**
69:25
**digress (1)**
38:3
**dimensions (1)**
28:18
**DIRECT (2)**
4:17;51:20
**directed (1)**
35:1
**disagree (1)**
64:1
**disappointed (1)**
9:20
**discharge (1)**
62:8
**disclosure (5)**
5:11,23;6:7;21:11;
95:1
**discovery (1)**
4:4
**discussed (1)**
18:12
**Discussion (4)**
11:2;14:13;16:15;
55:11
**disheveled (1)**
60:7
**disingenuous (4)**
81:5,24;82:1,9
**dispatched (1)**
59:17
**displayed (1)**
41:5
**disrupts (1)**
83:25
**dissect (1)**
54:22
**distance (3)**
37:4,7;74:11
**distinction (1)**
65:1
**document (4)**
6:6;29:15;31:11;
56:23

**documents (6)**
10:7;19:25;20:10;
32:9;42:13;55:2
**dog (2)**
84:24;85:1
**domestic (1)**
59:7
**done (16)**
7:7;15:1;36:6;49:4;
50:1,4,5;57:7;58:25;
66:10;86:3;90:3,23;
91:11,23;92:15
**door (39)**
36:15,16,21,23,23,
25;39:9;40:4;41:24;
42:7;58:23;63:13;
64:19;65:11,14,14,20,
23;66:14;68:3,5,12,15;
70:18;73:8,23;74:13,
22;83:11;84:9;85:9,18;
86:1;87:24;90:2,13,16,
16;93:1
**down (17)**
11:12;28:17;31:2;
36:22;42:17;60:9,20;
61:16;63:13;68:7;
70:16;73:12,22;74:15;
84:9;94:1;95:14
**downloaded (1)**
20:1
**draw (5)**
42:24;51:20;71:14,
17;80:18
**drawing (1)**
81:25
**drew (1)**
71:18
**drifting (2)**
77:4,16
**drifts (1)**
74:7
**drink (1)**
32:15
**Drive (2)**
5:8;59:8
**driver (2)**
13:14;14:10
**drop (5)**
52:21,22;53:3;61:7,7
**Dropbox (13)**
8:20;19:10;20:12,22,
23;21:3,8,9,16,16,22,
22;22:7
**dropped (2)**
60:20;75:7
**dropping (1)**
52:25
**drops (1)**
74:13
**drunk (3)**
38:8,10,14
**duly (1)**
4:15

**duration (1)**
66:3
**during (3)**
46:16;47:3;55:25

## E

**easily (1)**
42:5
**edge (1)**
36:19
**educate (1)**
49:15
**education (1)**
30:8
**effect (1)**
60:19
**effected (1)**
83:3
**effort (2)**
18:13;28:17
**either (10)**
28:14;37:7;40:5;
48:13;64:16,16;67:9,
13;84:20;86:2
**electronic (2)**
68:4,8
**elite (1)**
94:14
**else (11)**
7:22,25;10:12;12:8,
9,15;42:7,8;91:23;
92:14;93:18
**else's (1)**
72:22
**e-mail (6)**
15:8,25;16:23;19:20,
22,23
**e-mails (3)**
15:12;20:1,9
**Embry-Riddle (1)**
13:19
**eminent (9)**
52:12;69:1,11;70:24,
25;72:19;93:11,12,13
**employed (1)**
36:7
**employee (2)**
12:14,21
**end (7)**
49:21,23;61:23,25;
77:5;90:18;93:23
**ended (3)**
11:16;13:18;70:1
**ends (1)**
19:21
**enforcement (31)**
10:7;13:15;23:4,13,
18,23;24:11;39:7,10;
49:16,22,25;50:2;52:2,
5,11;56:1;57:3,18,20;
58:1,5,8;59:4;61:19;
63:1;82:21;83:9;85:20,

25;95:19
**enough (10)**
26:5;29:2;30:14;
43:21;50:15,23;51:12;
64:3;72:13;83:20
**entire (1)**
29:5
**entirely (2)**
38:15;77:9
**entitled (1)**
83:4
**entries (1)**
89:17
**entry (9)**
47:10,11,18,20;
55:23;64:23;65:6;
89:18,21
**environment (1)**
84:4
**equipment (1)**
49:6
**equivalency (1)**
29:19
**erroneous (2)**
47:22;90:7
**essentially (2)**
13:15;53:10
**establish (2)**
68:24;73:5
**estimate (1)**
26:9
**evaluate (1)**
17:20
**even (13)**
6:7;33:8;50:7;56:12;
58:8;60:3;68:14;71:19;
73:10;74:9;78:11;93:8;
94:15
**evening (2)**
8:23;59:9
**event (2)**
39:11;46:17,18;70:4
**events (2)**
47:16;90:1
**eventually (1)**
13:20
**everybody (1)**
42:8
**Everyone (3)**
77:19;78:16;81:19
**evidence (8)**
4:4;41:22;51:1,3;
68:8;69:19,24;92:12
**evidentiary (1)**
29:6
**evolved (2)**
37:17;39:2
**exacerbates (1)**
67:24
**exact (1)**
23:20
**exactly (3)**
32:11;46:1;47:22

**examination (2)**
4:3,17
**examined (1)**
4:16
**Examining (1)**
56:23
**exception (2)**
29:7;78:25
**excess (2)**
32:15,18
**excessive (1)**
87:11
**exchanged (1)**
13:19
**excluded (2)**
27:5,8
**Excuse (1)**
9:11
**exercise (1)**
83:17
**exhausted (1)**
92:23
**exhaustive (5)**
54:5,9,13;55:2,3
**exigencies (1)**
72:15
**exist (1)**
30:13
**existence (1)**
32:6
**expect (10)**
30:21;32:4,13,21,25;
34:25;39:20;63:14;
89:2,7
**expended (1)**
12:4
**experience (10)**
30:8;32:13,21;34:13,
24;60:5;63:14;78:15;
80:19;88:25
**experienced (2)**
89:3;94:14
**expert (11)**
5:11,23;6:10;14:15;
42:24;45:2;49:11;54:8;
78:2;79:17;80:18
**expertise (5)**
17:17,21;18:14;23:1,
2
**experts (2)**
68:19;78:25
**expert's (1)**
6:8
**explain (1)**
83:22
**explanation (1)**
78:3
**express (1)**
29:20
**expression (1)**
57:19
**expressions (2)**
52:15;80:25

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

extent (2)
79:20;80:14
extraneous (1)
23:13
extraordinarily (1)
53:7
extraordinary (1)
41:10
extremely (3)
33:5,9,13
eyesight (1)
73:24

**F**

face (3)
60:17;61:3,3
fact (9)
12:1;16:10;21:23;
31:10;41:2;42:25;
57:15;69:18;74:5
Facts (6)
7:16,17;13:12;17:15;
18:13,16
factual (2)
41:20;84:1
faculties (3)
33:18,18;35:14
Fair (10)
26:5;30:14;35:21,22;
43:21;50:15,23;51:12;
64:3;72:13
fairly (5)
6:14;27:12;40:1;
57:4;64:11
fall (1)
17:21
falls (1)
68:23
familiar (6)
31:12,19,22;32:8;
78:14;84:7
families (1)
46:23
family (1)
28:21
far (2)
41:11;95:15
fascinating (1)
61:14
fashion (1)
76:16
fatal (2)
39:19,21
fault (2)
28:12;47:13
favorite (6)
75:8,10;76:17;80:22,
23;88:6
feat (1)
22:11
features (2)
23:13;63:10

federal (5)
25:2,7,19;26:12;
29:22
fee (4)
10:15,23,24,25
feel (2)
28:8;30:2
fees (1)
18:5
fell (5)
60:22;62:2;80:10;
86:22;87:1
felony (4)
31:6,20;35:3;83:7
felt (1)
68:7
few (3)
5:2;24:23;95:3
field (2)
22:25;23:2
fight (2)
86:5,6
figure (3)
39:5;67:13;92:3
file (4)
12:13;19:10;20:18;
81:20
filed (1)
25:15
files (1)
22:8
final (3)
5:20;74:16;92:22
finally (2)
40:15;55:23
find (10)
7:17;17:16;32:24;
39:21;48:8;55:6;66:18;
77:1,12;81:20
finds (1)
54:25
fine (2)
33:21;73:20
finish (1)
75:22
finished (1)
6:13
fire (5)
66:7;71:14,18;74:23;
83:10
firearm (26)
13:14;23:11;35:1,9,
15;39:16,19;45:22;
62:9;66:13,19;70:14;
75:13,24;82:11,12,14,
20;83:5,7;84:20;87:6,
7;88:7;93:23;94:24
firearms (4)
35:20,24,25;36:4
fired (11)
13:21;43:24;44:24;
45:5;61:16;65:24;66:2;
67:4;70:23;87:25;93:3

firing (2)
66:4;92:7
firm (1)
13:3
first (30)
4:15;15:2,8;16:1,20;
17:8;19:9,14;22:18;
36:1;37:8;49:3;50:13;
54:5;61:16;67:16;
70:15;76:11;81:2,16;
86:14;87:12,25;89:6,
13;90:3,13,21;92:4;
94:3
fit (2)
26:23;76:24
fitter (1)
26:20
five (1)
53:22
fixed (1)
10:17
fled (1)
13:16
flew (1)
61:21
floor (3)
59:11,25;60:8
Florida (3)
5:9;24:22;30:4
focus (2)
23:5,15
focuses (1)
23:2
folder (2)
20:13,16
follow (1)
17:1
following (1)
4:2
follows (1)
4:16
foot (1)
66:24
football (2)
61:2;62:15
force (24)
17:18;23:5,7,7,10,
12;27:6;30:5,9;49:23;
52:3,7,18;58:22;59:4;
68:23;69:7;70:6;74:1,
16,19;87:10;92:21,21
forehead (2)
64:24;65:1
forever (1)
77:4
forged (1)
27:11
form (2)
65:3;93:9
formed (1)
37:13
forms (1)
51:19

formula (1)
49:25
formulating (1)
52:20
forward (4)
9:19;22:2;86:22;
87:2
forwarded (1)
16:24
found (8)
7:1;39:19;41:2;
75:14;76:14;78:1;88:7;
90:12
founded (2)
87:10,15
four (6)
44:5,10;49:17;55:22;
56:1;66:10
four-minute (1)
45:12
foyer (1)
59:11
frame (5)
45:13;46:4,20;48:15;
67:5
friends (1)
61:18
front (9)
24:6,14,15;26:10;
36:23;49:21;53:25;
73:2;92:2
full (4)
5:5;6:7;56:11;92:10
fully (2)
65:11;78:16
function (3)
33:21;50:21,22
functioning (1)
49:7
funny (2)
24:20;94:16
further (2)
48:12;51:12
furtive (1)
52:15
future (1)
88:14

**G**

gaining (2)
61:10,10
garage (32)
36:15,21,25;38:5,6;
39:9;40:4;41:24,25;
42:8,15;43:5,19,22;
44:11;47:10;58:23;
64:19;65:11,13,20,23;
68:3,5,12,15;70:19;
73:11,22;84:9;85:9;
86:1
general (4)
7:4;23:3;26:9;29:24

generalize (1)
11:15
generally (13)
10:18,20;13:12;
17:16;18:7;19:20,21;
20:19;23:5;31:19;32:4;
49:10;78:24
generated (1)
81:3
geography (1)
86:15
Georgia (2)
24:17,18
gets (3)
92:3,4;93:24
girlfriend (3)
59:11;60:14;67:10
given (2)
65:14;67:3
gives (1)
88:15
glad (2)
73:3;88:2
glasses (2)
84:3,4
goes (5)
42:7,20;48:12;73:22;
95:15
good (8)
16:3;20:11;39:5;
43:3;61:18;85:17;
88:19;89:11
Gosh (1)
62:4
governing (2)
4:6;49:17
government (1)
25:2
grand (4)
24:5,6,14,15
grass (1)
59:21
great (6)
5:9;27:19;52:12;
63:9;70:25;94:20
ground (2)
47:19;73:9
grounded (1)
30:7
grounds (1)
70:22
guess (7)
15:19;16:5;51:12;
70:4,8;80:2;81:11
guessing (1)
72:11
guesswork (1)
84:1
guided (1)
29:22
gun (16)
39:12;52:16,23;
62:22;67:6;70:1,9,16,

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

16,21;71:12;77:7;89:6;
91:6;92:3;93:2
**guns (1)**
61:20
**guy (1)**
62:1;81:18;94:17,18,
19
**guys (2)**
80:24;81:1

**H**

**half (3)**
44:11;77:13,16
**hand (12)**
39:16;40:23;41:7;
60:24;62:20,23,24;
63:2;67:7;82:13;87:6,7
**handcuff (2)**
94:9,18
**handcuffed (1)**
94:17
**handgun (2)**
44:5;45:23
**handicapped (3)**
67:10,19;68:1
**hands (1)**
61:20
**hanging (2)**
77:13;93:25
**happen (7)**
49:6;61:13;66:25;
71:4;84:5;86:10;94:5
**happened (9)**
18:9;40:7;51:14,17;
57:8;59:16;62:3,6;
84:25
**happening (1)**
19:21
**happens (7)**
57:2;67:19;74:13,20;
84:9,11;86:9
**harder (1)**
48:11
**harm (4)**
52:12,13;69:2;70:25
**harm's (4)**
72:17,21;74:15;
90:14
**head (12)**
22:6;25:25;27:17;
39:19,21;64:22,24;
65:2,6;70:2;77:7;86:4
**heading (1)**
31:2
**hear (2)**
5:17;58:20
**heard (7)**
25:10,11;53:6;58:19;
59:14;81:16;83:22
**hearing (1)**
85:1
**height (1)**

64:17
**heightened (1)**
63:15
**held (1)**
41:5
**help (1)**
76:21
**helps (1)**
55:5
**here's (5)**
7:4;42:4;54:9;75:8;
81:13
**high (3)**
33:21;34:7;64:19
**highest (1)**
64:20
**highly (2)**
70:1;77:17
**Hill (31)**
9:12;33:5;35:7;
36:10;38:17;45:15,22;
47:19;52:21,25;63:13;
64:4,23;65:12,15;
70:10,13,16;73:6,17,
21,25;82:11;85:9,11,
14,15;86:22;87:5;88:8;
89:18
**Hill's (5)**
35:13;51:24;67:10;
79:20;86:12
**himself (2)**
66:24;72:21
**hindsight (1)**
67:20
**hired (2)**
50:8,25
**history (6)**
30:15,16,20;32:12;
34:9;35:19
**hit (7)**
61:17,21;65:12;
67:25;74:4;75:7;86:14
**hitting (3)**
63:5;79:21;80:17
**hold (1)**
49:22
**hole (1)**
64:20
**home (4)**
38:4;47:3;55:23;
67:11
**honestly (1)**
15:13
**hope (1)**
15:8
**hoping (1)**
88:14
**hour (2)**
10:18;11:14
**hours (6)**
10:19;11:4;12:4;
55:22;56:1;91:6
**house (9)**

42:8,21;43:18,22;
46:24;82:18;84:24;
85:2;89:11
**houses (1)**
57:6
**hypothetical (1)**
67:25
**hysterical (1)**
60:15

**I**

**idea (3)**
21:12;22:5;72:18
**ideas (1)**
85:25
**identification (1)**
91:12
**identified (2)**
40:12;43:11
**identifies (1)**
44:4
**identify (4)**
41:3;44:12;52:11;
67:18
**identifying (2)**
43:7;90:4
**image (1)**
9:1
**imagine (2)**
59:20;78:8
**immediate (1)**
55:17
**immediately (2)**
60:23;61:2
**impact (1)**
75:3
**impacting (1)**
95:20
**impaired (4)**
33:18,23;35:14;53:9
**impediment (3)**
52:25;53:3,11
**impediments (2)**
53:5,8
**implausible (2)**
70:1;77:8
**implication (1)**
58:20
**implied (2)**
58:12,13
**important (8)**
20:6;34:11;59:22;
78:4;88:3,4;92:20;94:7
**imposed (3)**
31:15,20;32:6
**impossible (3)**
41:9;77:11,12
**improbable (1)**
77:9
**inappropriate (1)**
27:7
**inception (1)**

49:8
**incident (23)**
7:16,17;28:22;30:16;
31:5;33:5;36:9;37:15,
17;38:14,18;39:2;
40:19;45:16;46:3;47:4;
51:23;58:7;66:13;
68:13;74:21;93:17;
95:20
**incidents (1)**
58:6
**include (6)**
24:5;26:11,12;49:17;
67:14,15
**included (3)**
22:10;46:14;78:2
**including (1)**
50:18
**inconclusive (3)**
39:13,14,17
**inconsistency (1)**
76:2
**incorporate (1)**
23:12
**increased (1)**
63:24
**indicate (6)**
20:6;52:20;75:1;
76:14;89:16;93:1
**indicated (1)**
93:16
**indicating (1)**
45:21
**indication (10)**
40:3,6;41:23;43:5,
15,17;44:9;67:5;84:19,
21
**individual (5)**
32:15;59:9;60:7;
62:9;70:9
**individuals (2)**
31:19;56:2
**information (14)**
19:11,15;22:19;
54:25;67:9;76:4;84:1,
17;87:20,21,23;89:21,
22;95:18
**initial (2)**
16:18;88:8
**injury (2)**
23:15;80:8
**input (1)**
12:16
**inquiry (1)**
88:8
**inserted (1)**
47:17
**inside (3)**
36:14;56:3;77:8
**inspected (1)**
49:4
**inspection (5)**
9:13,15;21:25;28:5,8

**instance (13)**
5:10;11:12,16;30:20;
33:4;35:7;36:17;40:9;
45:1;58:17;69:9;77:2;
79:3
**instantaneously (1)**
75:3
**instead (1)**
75:13
**instructor (5)**
35:20,24,25;36:2,4
**intend (1)**
21:17
**intended (2)**
45:1;57:14
**intends (1)**
49:24
**intent (1)**
92:8
**intentionally (2)**
8:21;72:16
**intentions (1)**
51:24
**interested (1)**
43:1
**interesting (3)**
41:14;63:10;78:2
**interior (1)**
41:25
**interrupt (1)**
76:19
**interrupted (2)**
26:8;84:14
**into (26)**
5:4;20:18;21:21;
33:12;36:24;42:8,15;
43:18;44:11;47:3,10;
55:23;61:21,23;65:13;
67:12,16;69:25;70:19;
75:14;77:15;81:20;
82:18;92:7;95:12,16
**intoxicated (3)**
33:6,14,15
**intoxication (1)**
53:8
**investigation (9)**
30:19;60:11;85:6;
91:21,24;92:13,24;
93:17,20
**investigative (1)**
92:25
**investigator (2)**
19:7;93:7
**involved (3)**
25:13;59:3;94:16
**involving (2)**
23:5,23
**issue (7)**
28:15,25;30:23;32:7;
39:12;83:3;85:8
**issued (9)**
4:22,23;5:11,12,24;
6:2;8:5;12:17;21:14

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

issues (4)
    23:5,23;92:6;94:7
item (1)
    19:23
items (3)
    17:2,22;21:11

**J**

Jacksonville (2)
    14:25;15:2
jaded (1)
    63:3
Jading (3)
    62:12,14,21
jean (1)
    77:15
jeopardize (1)
    70:21
jerk (1)
    88:16
job (7)
    43:3;49:14,15;51:6;
    69:22;89:11,12
Johnson (3)
    81:21;82:2,7
Johnson's (1)
    81:4
JOLLY (62)
    4:18,19;11:1,3;
    14:11,14;15:4;16:16;
    22:2,4;31:13;32:17;
    33:2,10;34:3,14;35:5,
    12;37:21;38:7,11,20;
    39:4;40:2,21;41:13,15;
    42:12;43:12,20;44:16;
    51:22;53:15,19;55:12;
    56:18;62:17;63:12,18,
    23;64:2;65:4;66:17;
    69:21;71:21,24;72:8;
    73:1;76:8,21;77:10;
    78:18;79:23;80:4;
    81:10;82:23;83:2;88:5,
    13;93:15;95:22,25
judgment (1)
    14:8
juke (1)
    61:3
juking (1)
    62:16
jump (1)
    73:2
juries (1)
    24:5
jury (11)
    24:6,14,15;26:11;
    50:18;51:1,13,16;
    65:23;76:5;86:11
jury's (1)
    51:10
Justice (1)
    11:12
justified (1)

70:6
justifying (1)
    68:23
juxtapose (1)
    57:8

**K**

keep (5)
    11:4,11,15;53:22;
    74:15
keeps (1)
    16:3
Kel-Tec (7)
    40:13,16;41:1;43:7,
    11;44:5,12,25;45:3,5,
    11
key (1)
    93:11
kind (12)
    7:5;11:14;12:13;
    21:13;28:25;29:4;
    30:21;34:12;47:7;
    53:24;55:10;91:15
knew (6)
    30:25;31:9;45:5,6;
    60:2;90:3
knife (10)
    60:24;61:1,4,7,7,16,
    21;62:20,24;63:2
knives (4)
    60:15,16,21;61:20
knowing (3)
    18:22;60:10;92:7
known (1)
    45:12

**L**

Language (3)
    32:2;68:18;75:21
larger (1)
    51:18
last (10)
    6:6;9:11;15:13;
    21:18;46:19;58:10,10;
    74:17;75:13;85:8
later (11)
    44:6;24;59:22;71:23;
    72:18;75:15,23;91:5,6,
    8;94:3
law (36)
    10:7;13:3,14;23:4,
    13,18,23;24:11;27:10,
    12;29:23;39:7,10;
    49:16,21,25;50:2;52:2,
    5,11;56:1;57:2,17,20;
    58:1,1,5,8;59:4;61:19;
    63:1;82:20;83:9;85:20,
    24;95:19
lawfully (1)
    83:4
Lawrence (2)

6:23,23
lawsuit (1)
    4:21
lawyers (3)
    18:4;25:6;88:15
laying (2)
    90:17;91:2
leads (1)
    43:22
learned (2)
    31:8,8
least (7)
    9:7;20:25;38:24;
    57:12;94:2;95:6,10
leave (2)
    64:12;78:24
leaves (1)
    42:21
LeBeau's (1)
    85:6
left (8)
    16:13;36:23,25;
    41:20;55:14,17,19;
    69:18
legal (2)
    33:11;79:7
legs (1)
    94:1
length (1)
    75:6
lengthy (1)
    6:14
less (4)
    34:6;37:10,11;66:11
lethal (5)
    52:3,6;59:3;69:6;
    70:6
letter (1)
    16:23
level (5)
    34:20;35:14;57:4,24;
    63:15
leveled (1)
    70:18
levels (2)
    33:21,22
liability (1)
    14:25
life (9)
    8:7;52:12;68:25;
    69:1,11;70:24,24;71:5;
    72:18
lift (1)
    70:17
lifted (1)
    38:5
light (3)
    65:18;81:2,3
lighthearted (1)
    63:7
likelihood (1)
    74:3
likely (1)

35:4;89:18
likes (1)
    24:20
limine (1)
    27:14
limit (2)
    27:14;33:3
limited (1)
    28:3
limits (1)
    33:11
line (1)
    54:5
link (4)
    8:20;19:10,24,24
list (1)
    20:2
listen (3)
    28:24;29:5;43:2
listened (1)
    29:1,2
listing (4)
    11:25;20:25;21:4;
    26:4
literally (3)
    20:16;60:17;61:15
litigate (1)
    18:4
litigation (10)
    4:24;12:5;23:16;
    49:11,14;50:24,25;
    52:19;54:11;94:17
little (2)
    87:20,23
live (2)
    24:3;72:9
lived (1)
    46:23
live-in (1)
    59:11
loaded (1)
    84:20
local (2)
    24:13,21
located (1)
    36:11
location (4)
    36:18;47:24;74:2;
    86:15
log (4)
    11:18;19:5,19,21
long (6)
    45:25;46:1;62:5;
    66:6,9;74:21
look (7)
    9:19;48:11;54:21;
    74:9;77:13;90:16;
    95:15
looked (11)
    8:16;9:14;31:4;
    44:20;55:1;60:23;61:1;
    64:5;75:6,7;95:12
looking (12)

20:18;31:18;36:16,
    21,23;40:18;59:14;
    75:12;79:1,2,2;89:1
looks (8)
    9:2;15:25;17:20;
    19:8,14;22:14,15;94:3
Lopez (11)
    36:19,24;37:8;40:5;
    42:21;55:14;70:10;
    71:9,11;73:10;74:5
lot (12)
    7:2;27:9;34:8,8;
    54:25;59:24;63:1,6;
    69:19;78:9;91:15;92:1
lots (1)
    87:20
loud (8)
    53:5,7;56:9;57:15;
    58:1,12,19,20
lousy (1)
    65:16
love (1)
    88:17
low (5)
    33:22;57:4;74:4,4;
    77:6
lower (1)
    39:9
lowest (2)
    57:24,24
Lucie (1)
    4:20
lyrics (1)
    56:10

**M**

ma'am (1)
    60:19
Madam (1)
    79:23
Magnolia (1)
    59:8
mailbox (2)
    59:21;61:5
majority (1)
    41:6
makes (3)
    8:24;41:14;81:11
making (6)
    45:2;47:18;67:17;
    84:17;89:12;93:4
man (2)
    77:18,23
managed (1)
    45:6
man's (1)
    77:17
many (15)
    9:4;10:19;11:4;23:4,
    25;24:25;33:20;42:2,
    22;51:19;63:8;71:4;
    74:17;85:21;93:21

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

material (1)
80:9
materials (27)
5:24;6:1;8:2;10:8;
12:22,23;18:25;21:4,8,
10;22:1,16;42:14;43:4;
44:9;45:14;46:11;47:7;
52:19,24;53:12;55:22,
25;65:10,21;86:21;
87:4
matter (13)
8:1,1;10:9,16;12:5,7,
16;15:6;16:10;25:22;
28:6;41:2;73:19
may (9)
4:5;9:8;21:9,22;
30:18;69:9;72:15;
78:16;79:16
maybe (2)
44:5;91:5
mean (10)
11:9,10;17:4;29:8;
46:16;55:17;76:18;
77:24;80:7;91:17
meaning (3)
59:18;62:21;84:12
means (10)
29:3;33:13;54:16,17,
19;72:5,10,14;76:16;
79:6
meant (4)
32:3;66:24;78:8;
80:12
measurements (3)
37:2;58:21;59:1
meet (1)
29:21
member (4)
28:21;78:19;94:6,23
members (4)
81:4;88:7;89:5;
94:24
memory (1)
27:16
mention (3)
16:1;74:5;94:16
mentions (1)
94:15
Merry (1)
22:23
met (3)
14:20;26:14,18
metabolism (1)
34:8
metal (2)
60:22;73:23
Michelle (3)
16:2;17:1;19:8
Middle (1)
85:5
might (9)
14:25;25:1;26:24;
39:11;53:6;63:19;

67:11;71:4;83:3
mind (3)
56:21,22;89:23
mine (1)
16:2
minor (1)
67:11
minutes (5)
43:8;44:6,10,11;91:8
minutia (1)
25:13
minutiae (1)
33:13
missed (1)
92:23
mistake (5)
45:6;88:9,10,23;
89:13
model (1)
44:5
moderately (2)
41:14;42:5
modifiers (2)
54:12;87:14
moment (6)
9:23;15:7;41:7;
70:23;95:2,17
momentum (1)
61:9
Monday (2)
72:3,9
monstrous (1)
22:11
months (1)
46:6
more (18)
10:19;12:21;13:21;
29:20;30:18;35:4;
36:15,24;41:2,18;
54:11,11;55:7;63:7;
73:18;85:16;89:3;
95:16
morning (3)
16:22;72:3,10
most (5)
8:14;19:11;24:25;
81:17;94:6
mostly (1)
12:11
mother (2)
31:25;56:6
motion (1)
66:1
motions (1)
27:13
move (4)
71:20;72:4;73:15,15
moved (1)
36:24
movement (1)
74:3
movements (1)
52:15

movie (1)
61:4
moving (1)
73:10
MTV (2)
78:9,11
much (7)
7:6;26:20;30:3;
33:23;39:22;64:13;
91:5
multiple (1)
29:21
munitions (3)
90:19,21;91:3
muscular (1)
77:1
music (11)
28:24,25;29:4;53:5,
7;56:9,10,10;58:1,11,
18
must (5)
14:11;27:9;41:1;
68:24;69:7
myself (1)
21:21

**N**

nailed (1)
73:9
name (4)
5:5;6:10,23;27:22
narrative (1)
10:5
national (7)
29:12,17,19;30:2,6,9,
11
naturally (3)
53:4;85:20;88:20
nature (2)
57:16,22
nearly (1)
75:2
neatly (6)
75:14,19;76:1,3;
77:14;94:2
necessarily (1)
20:6
necessary (1)
58:22
need (4)
6:1;19:19;90:10,18
needlessly (2)
72:17,20
negligence (1)
38:24
Neither (1)
62:2
new (2)
27:12;63:3
Newman (28)
4:21;36:22;37:12;
40:5,12,19,25;41:16,

23;42:1,2,15,20;43:6;
44:4,11;45:3;55:15;
66:4,12;68:11,24;70:5,
8,13;72:20;93:3;95:18
Newman's (2)
42:19;79:3
news (1)
63:6
next (2)
84:5;91:21
night (2)
15:13;49:8
Nobody (1)
24:20;42:7;59:25;
63:9;90:14;94:14
noise (3)
56:14;57:3,15
nonbonded (2)
79:4,13
noncommunicative (1)
53:10
none (2)
15:20;89:5
nonpolice (1)
60:3
nonrelevant (1)
55:1
nor (1)
69:13
normal (1)
33:18
normally (1)
78:5
note (4)
47:7;49:6;68:21;
86:24
noted (1)
46:12
notes (3)
11:15;17:5,5
notice (4)
4:3;54:20;75:5;
86:21
notification (1)
20:21
notified (1)
19:24
notwithstanding (2)
79:19;86:4
number (3)
12:4;23:20;34:21
Numeral (1)
54:3

**O**

object (2)
80:1;93:9
Objection (34)
31:7;32:16,23;33:7;
35:2,10;37:18;38:2,9,
19;39:3,25;40:20;
42:10;43:9,16;44:13;

51:15;56:17;63:17,22,
25;65:3;66:16;69:16;
71:20;72:4,24;76:6;
81:9;82:16;83:1;87:17;
88:12
objective (1)
50:7
obscene (2)
56:10,10
observation (1)
47:19
observe (1)
47:12
observed (2)
45:22;46:6
obstructed (1)
70:17
obviously (5)
19:22;28:15;43:2;
51:20;54:24
occluded (1)
83:24;84:13
occlusion (5)
83:13;84:2,3,8,12
occurred (5)
16:19;22:17;39:24;
49:5;90:4
occurs (1)
42:6
o'clock (1)
11:16
October (1)
16:19
Off (11)
11:1,2;14:13;16:15;
22:6;25:25;27:17;
55:11;59:7;64:22;
94:13
offense (2)
82:15,25
offensive (1)
55:6
office (2)
4:19;12:9,11;16:6;
20:20;89:17
officer (17)
24:11,22;33:20;
52:11;53:20;57:3,20;
58:1;59:4;62:12;65:15;
73:5;78:13;84:17;
87:22;95:16,19
officers (20)
13:20;24:21;30:19;
31:9;42:18;49:16,22;
50:2;52:2,5,22;58:5;
63:1;72:14;73:9;74:14;
83:10;85:20;89:10;
95:13
officer's (1)
84:12
often (5)
24:19;45:4;58:7;
76:15;78:14

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

oftentimes (3)
10:19;23:15;28:16
old (4)
62:3;77:18,19,20
older (1)
68:10
once (3)
36:20;88:24;95:14
one (44)
6:3;12:20;16:11;
19:6;20:22,23;26:21,
23;30:13,17;32:14;
39:20;42:20;47:22;
50:8;51:18;52:9;53:3;
54:1;57:24;58:17,18;
59:8;60:15,21,24;
61:18;63:5;65:11;68:6;
71:5,13;73:14;74:16;
76:17;80:24;81:17,21;
85:16,17,25;86:19;
94:6,24
ones (2)
39:5,6
only (15)
6:3;12:20;15:23;
16:13;21:18,25;49:24;
56:22;60:4;62:8;67:24;
72:17;73:22,22;92:19
onus (1)
68:23
open (3)
20:17;58:22;74:14
opened (2)
40:4;41:23
opener (3)
68:5,12,15
opinion (18)
7:18,20;10:4;18:18,
23;25:13;27:5,6;28:20;
35:16;70:21;78:23;
81:12;90:8,23;95:5,10,
14
opinions (15)
22:10,16;27:13;28:3,
4;30:7;47:23;48:21,25;
50:12;51:20,21;52:20;
54:24;94:25
opportunity (4)
43:6;72:14;73:6;
88:15
opposed (11)
23:18;31:23;50:8;
54:12;58:13;80:17;
87:13,15;88:10,22;
91:25
option (3)
74:19;92:22,22
options (1)
92:23
oral (1)
4:3
order (4)
32:5,22;35:7;67:16

ordered (4)
52:21;53:1;61:7;
95:25
orders (2)
33:1;34:24
ordinance (1)
57:25
organic (1)
80:9
original (1)
29:8
originally (2)
19:12;25:15
others (1)
54:17
other's (1)
69:11
ought (2)
49:19;50:1
out (37)
13:16,18;17:16,23;
18:8;31:11;36:23;39:5,
23;45:11;57:17,19;
59:10,17;60:7,14,14;
61:20,22,23;62:20,22,
24;63:2,7;66:18;67:14;
74:14;77:13;81:15,18,
19;88:4;90:12,22;92:3,
19
outdoors (1)
82:20
outright (1)
29:18
outs (1)
82:7
outside (2)
6:5;85:10
outsider (1)
24:20
over (4)
17:1;19:6;33:11;
61:1
own (1)
72:15

**P**

package (1)
19:25
page (12)
54:3;56:11;67:8;
68:17,22;72:1;75:1,16;
80:21;81:2;85:5;89:16
pages (1)
54:22
paid (1)
10:22
pants (4)
76:14,22;93:24,25
paragraph (17)
54:3;56:11,13,15;
58:10;67:9;68:22;
72:13;75:9,12,20;81:2;

85:5;87:9;88:7;89:16;
91:20
parked (3)
59:20,23,24
parking (1)
59:22
part (7)
34:16;41:14;55:2,8;
63:15;75:17;93:16
partially (1)
77:14
participated (1)
12:16
participating (1)
50:24
particular (7)
5:19;12:6;30:1;
31:25;77:24;87:22;
95:16
particularly (4)
85:21,22,23;95:13
partition (1)
83:10
parts (1)
76:17
pass (1)
73:23
passed (1)
39:22
past (6)
9:4;45:24,25;46:2,
22;61:22
pasty (1)
7:6
path (1)
95:15
paths (1)
15:3
pattern (1)
80:7
pause (1)
28:10
pay (1)
18:5
peephole (1)
59:14
pending (2)
13:25;14:1
people (14)
29:9,10;33:20;38:10;
42:3;46:23;55:9;59:24;
63:5;85:21;89:3,3;
94:8,9
people's (1)
61:20
perceive (7)
39:1;49:13;50:16,17;
51:13;54:14;76:3
perceived (2)
57:10;70:9
percentage (1)
23:16
perception (1)

63:24
perceptions (2)
69:14,15
performance (1)
83:18
performed (1)
8:8
perhaps (12)
13:6;26:18;29:7;
36:1;44:18,20;52:16;
65:18;67:19;80:9;85:8;
89:7
period (1)
19:6
permitted (1)
4:5
person (6)
12:10;41:7;52:15;
85:25;86:4;92:9
personally (1)
86:2
person's (1)
68:25
perspective (5)
7:4;73:14;79:7;
85:19;93:11
PhD (1)
5:20
Phillips (63)
9:16;12:1;13:3;14:5,
7,18,23;15:12,16,24;
16:6,8,13;21:20;22:3;
31:7;32:16,23;33:7;
34:2,4,6;35:2,10;
37:18;38:2,9,19;39:3,
25;40:20;41:12;42:10;
43:9,16;44:13;51:15;
56:17;62:12,19;63:17,
22,25;65:3;66:16;
69:16;71:20,23;72:4,
24;76:6,19;78:11,17;
80:1;81:9;82:16;83:1;
87:17;88:12;93:9;
95:23;96:1
philosophy (3)
23:7;49:10;63:3
phone (1)
21:23
photos (2)
21:24;79:2
picked (1)
60:22
picture (2)
91:1;94:3
pictures (3)
64:17;78:6;91:5
pie (1)
51:18
pieces (1)
7:14
pigeonholed (1)
73:14
pinpoint (1)

48:10
place (5)
42:23;53:17;72:16,
20;92:4
placed (6)
31:16;41:17;42:1;
44:19,23;77:14
plaintiff (5)
13:22;14:16;23:21;
50:25;64:4
plaintiffs (1)
23:17
plausibility (1)
69:24
play (6)
37:25;58:1;67:12;
78:22;84:15,22
played (5)
38:1,4,5,6;39:1
pleadings (2)
26:1,2
please (3)
18:5;76:19;79:23
pm (1)
96:2
pocket (19)
39:20;40:16,22;
41:17;44:12;45:7;70:2;
75:14,24;76:25,25;
77:2,3,4,8;82:12;91:7;
92:4,4
point (22)
9:7;10:20;15:16;
22:15;28:20;29:13,20;
30:12;33:11;38:4,12;
42:18;45:6;47:3,8;
48:13;53:9;57:23;
65:18;67:24;93:4,19
pointed (4)
30:7;31:11;70:18;
71:12
pointing (4)
52:16;57:6;59:25;
70:9
police (12)
7:4,6;17:19;23:2;
33:20;36:8;49:19;
56:25;60:1;63:8;78:13;
81:17
policies (1)
95:6
policy (1)
49:19
pops (1)
9:1
portion (1)
79:25
position (8)
42:19;45:2;61:4;
70:3;86:12,15,16,25
positionally (1)
36:15
positions (1)

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

37:5
**possess (2)**
35:1;83:5
**possessed (1)**
45:15
**possessing (4)**
35:8,15;46:13;82:14
**possession (2)**
45:22;94:8
**possibilities (1)**
71:4
**possibility (3)**
44:22;67:25;68:1
**possibly (1)**
81:24
**post-incident (1)**
93:19
**postmortem (2)**
80:7;85:10
**posture (1)**
86:17
**practical (1)**
73:13
**precisely (4)**
22:8;32:2;39:8;
65:17
**prefer (1)**
25:6
**prepared (2)**
27:18;69:13
**prescription (1)**
50:1
**presence (1)**
23:10
**present (3)**
17:15;39:12;49:21
**presented (5)**
10:6,7;29:25;51:19;
69:19
**presenting (2)**
14:21,24
**presumably (1)**
38:8
**presumes (2)**
44:18,19
**presumption (1)**
45:9
**presumptive (1)**
44:15
**pretty (2)**
16:3;17:13
**previous (2)**
31:10;47:18
**previously (2)**
19:13;23:22
**primary (1)**
23:15
**printed (1)**
20:1
**prior (4)**
16:21;18:9;30:16;
45:15
**probability (1)**

74:4
**Probably (15)**
8:7;23:20;34:5;
37:11;52:8;56:22;
57:24;60:12;66:10,11,
23;78:7;83:7;85:18;
90:10
**probation (12)**
31:6,16,20;32:5,12;
34:25;35:3,8;82:13;
83:7;85:22,23
**probationer (2)**
32:15;35:1
**problem (5)**
38:23;73:7,8;91:4;
94:22
**procedure (1)**
57:2
**procedures (4)**
17:19;23:3,4;56:25
**Proceedings (1)**
96:2
**process (1)**
84:13
**progress (2)**
11:8;19:16
**prohibited (3)**
35:8,15;82:13
**projectile (1)**
80:9
**projectiles (2)**
65:12,13
**proper (1)**
49:25
**properly (1)**
49:7
**property (3)**
9:3;67:6;74:9
**protruding (2)**
75:24,25
**provide (3)**
11:24;25:12;76:4
**provided (3)**
9:5;10:10;95:1
**psycho (1)**
61:4
**psychology (1)**
83:17
**public (1)**
62:22
**pugilistic (1)**
86:17
**pull (2)**
15:7;25:1
**pulled (1)**
9:12
**puncture (3)**
47:11;90:16;91:2
**punctured (4)**
90:2,13,22,24
**punish (1)**
71:21
**purposelessly (1)**

72:17
**purposes (3)**
4:4,5;52:1
**pursuant (1)**
4:3
**pursuits (1)**
23:13
**purview (2)**
17:17;51:9
**put (10)**
21:21;55:4;56:12,24;
68:2;77:7;81:22;84:3;
89:15;91:6
**puts (1)**
74:3
**putting (1)**
10:19

## Q

**QI (1)**
14:7
**quarterbacking (2)**
72:3,10
**quick (2)**
40:1;53:16
**quickly (2)**
61:10;85:9
**quite (6)**
24:19,22;58:11;
59:23;78:14;84:2
**quote (1)**
58:17
**quoting (1)**
56:7

## R

**raise (2)**
32:7;92:6
**raised (2)**
53:9;61:4
**raises (1)**
42:24
**ran (1)**
60:6
**range (1)**
74:5
**rates (2)**
10:23,24
**Raymond (1)**
5:6
**reached (1)**
88:6
**reaction (1)**
39:7
**reactivate (1)**
53:23
**read (9)**
45:18;54:19;56:21;
72:21;79:24,25;81:8;
95:23,24
**Reading (5)**

4:6;8:14;56:19;78:1;
80:25
**real (2)**
53:15;68:1
**realize (1)**
92:11
**realized (1)**
8:6
**really (8)**
49:18;55:7;61:13;
69:22;73:18;76:18;
88:18;90:8
**realm (1)**
44:22
**rear (3)**
61:23,25;77:5
**reask (1)**
43:2
**reason (12)**
33:17;34:22;41:16,
18,19;46:10;56:24;
83:19;85:9,17,19;
92:12
**reasonable (3)**
68:25;69:10;85:19
**reasonably (1)**
75:2
**reassigned (1)**
53:23
**recall (37)**
6:10;7:22;9:24;
10:11;12:6;14:2;18:15;
24:1;25:24;26:19,22;
30:17;31:3,10,18;
32:11;34:21;40:11;
45:21;55:20,21,25;
56:5,8;64:7,9,17,21,23;
66:12;70:11;71:11;
78:20;79:5,14;85:2;
87:2
**recalled (3)**
7:19;58:11;63:11
**receive (2)**
6:15;18:25
**received (18)**
6:2,3,3,17;8:14;9:17;
15:25;16:20;19:11,17;
20:2,7,10;21:1,3;
22:18;49:20;67:10
**receiving (1)**
10:13
**recently (1)**
8:14
**recess (1)**
53:17
**recite (3)**
32:10;57:11;85:8
**recited (1)**
47:21
**recites (3)**
40:11;44:3;58:11
**reciting (1)**
5:24

**reckless (1)**
87:10
**recognize (3)**
19:15;27:22;83:13
**recognizing (1)**
79:1
**recollection (13)**
10:3;17:3,9;26:13;
31:14;32:5;34:18;35:6;
55:13,16;70:12;71:16;
77:22
**record (11)**
11:1,2;14:13;15:22;
16:15;48:12,14,15;
54:4;55:11;61:19
**recorded (1)**
48:6
**records (1)**
43:14
**recovered (1)**
40:16
**refer (2)**
59:18;84:11
**reference (1)**
9:11
**referred (3)**
45:4;58:7;76:15
**reflect (2)**
20:9;37:15
**reflected (1)**
34:19
**reflects (1)**
43:23
**regard (1)**
95:9
**regarding (1)**
81:4
**regardless (1)**
50:13
**regular (1)**
12:14
**regularly (1)**
29:21
**relate (1)**
23:17
**related (1)**
57:12
**relates (1)**
38:24
**relating (2)**
23:17,23
**relative (2)**
37:5;38:21
**relevance (1)**
30:18
**relevancy (1)**
27:8
**relevant (7)**
8:1,9;22:16;28:19;
31:4;46:8;54:23
**relied (1)**
29:12
**rely (2)**

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

74:19;83:25
**remain (1)**
72:17
**remarkable (1)**
94:15
**remedy (1)**
91:20
**remember (14)**
8:18;22:21;24:24;
32:7;46:1,20;55:18;
56:8;57:10;58:15;68:6;
71:13,14;85:4
**remembered (1)**
85:1
**removed (1)**
25:18
**render (2)**
18:18,23
**rendered (1)**
35:17;48:22,25
**report (38)**
4:23;6:2,9,22;7:1,20,
23;8:2,5;11:7;12:17;
19:1;20:7;21:11,14;
22:1;27:13;34:15,19;
48:7,16,17;49:1;53:25;
54:15;68:18;72:22;
75:10,23;76:14;78:1,3;
79:2;81:14,18;82:8;
89:6;92:25
**reported (4)**
13:14;46:6,7;56:5
**REPORTER (2)**
4:9;79:23
**reports (8)**
12:23;68:20;75:13;
81:3,19,21;93:3,8
**represent (1)**
13:11
**represents (1)**
4:20
**reproduce (1)**
11:19
**requested (2)**
10:9;79:25
**require (1)**
52:17
**research (1)**
86:3
**reserve (1)**
53:20
**respect (6)**
7:2;15:18;37:12;
64:15;69:20;70:13
**respectfully (1)**
30:24
**respond (1)**
58:6
**responded (1)**
82:7
**responding (2)**
57:13,17
**result (2)**

23:14;84:9
**retained (5)**
4:23;13:2;14:15;
49:11,11
**retainer (2)**
10:18,19
**retention (1)**
10:9
**retreat (2)**
61:5;73:11
**return (1)**
71:14
**returned (2)**
41:23,24
**reverse (1)**
47:22
**review (26)**
6:12,19,25;8:22;9:8;
10:3;11:16;12:22;
21:15;22:16;45:14;
47:6;52:19,24;53:12;
54:6,9,13,14;55:2,14,
21;65:10,21;86:21;
95:3
**reviewed (28)**
5:25;6:2,4,6,7,13,17,
23;7:25;8:2;20:8;21:1,
5,13,17;22:9;25:21;
26:1,4;31:14;40:9;
42:13,14;43:4,14;44:9;
46:12;87:4
**reviewing (5)**
7:22;12:16;32:5;
34:24;35:6
**ride (1)**
90:15
**right (27)**
12:24;14:6,22,23;
25:8;26:16;36:16;44:1,
7;45:11;47:6;50:11,20;
51:2,8;52:4,8;54:7;
55:24;59:16;68:22;
69:8;71:19;76:24;
78:17;92:16;93:4
**right-hand (1)**
36:20
**road (2)**
28:3;31:3
**roadway (1)**
13:20
**robbery (1)**
30:21
**Roberts (4)**
16:9,11,18,25
**robot (5)**
47:7;49:3,7;90:11;
91:13
**robots (1)**
90:15
**role (15)**
37:25;38:1,4,5,6;
39:1;49:14,24;50:16,
17;51:10,13;78:23;

84:15,22
**roll (1)**
93:25
**Roman (1)**
54:3
**roughly (1)**
11:11
**round (1)**
11:12
**rounds (3)**
79:8,9,10
**routine (1)**
58:7
**ROY (3)**
4:2,14;5:6
**rule (2)**
72:14;74:14
**rules (2)**
4:6;5:3
**run (3)**
42:17;57:5;62:2
**running (1)**
62:1

**S**

**sag (2)**
77:3,6
**sagging (3)**
76:15;77:15;78:3
**same (11)**
20:18,18;23:6;37:12,
13;50:13;64:15;90:9;
94:3,22;95:9
**Saving (1)**
71:23
**saw (11)**
8:19;48:5;59:14;
60:23;61:1;64:17;67:2;
70:9,10,13,16
**saying (11)**
42:18;54:13;63:2;
68:6;69:24;71:15;
77:25;82:10;87:15;
88:22;91:9
**scenarios (2)**
52:9,10
**scene (8)**
37:1;39:18;55:14,17,
19;59:19;94:4,8
**schedule (1)**
10:17
**school (3)**
5:13,16,20
**scope (1)**
18:14
**screen (1)**
9:2
**seasoned (1)**
89:10
**second (11)**
28:10;41:8;59:11,25;
60:8;66:11;67:9;68:22;

72:11,13;91:20
**seconds (1)**
74:25
**seeing (5)**
9:24;43:1;57:10;
75:23;85:10
**seeking (1)**
11:24
**seem (2)**
31:4;32:11
**seemed (3)**
7:3;61:11;64:11
**seems (6)**
7:6;77:8;81:5,24,25;
82:9
**seize (1)**
94:24
**semiautomatic (1)**
66:9
**send (2)**
17:23;18:7
**sending (2)**
17:2,22
**sense (2)**
39:9;60:21
**sent (5)**
19:8,9,22,23;26:3
**sentence (6)**
58:10;67:9;75:13;
85:8;91:20,21
**separate (2)**
23:6;85:24
**sequence (5)**
47:15,21;48:20;49:1,
2;90:1,22
**serious (1)**
69:1
**service (1)**
57:18
**services (1)**
18:3
**serving (1)**
30:20
**sessions (1)**
29:23
**set (1)**
41:4
**several (3)**
6:4;24:7;81:3
**severity (1)**
79:1
**share (1)**
19:10;20:17
**shared (2)**
19:10;20:13
**sheet (1)**
73:23
**sheriff (1)**
4:20
**shirt (3)**
60:8;80:10,15
**shock (2)**
25:7;44:17

**shoot (7)**
38:16;61:20;62:22,
24;67:15;82:17;85:18
**shooting (15)**
17:19;36:10,17;37:9;
39:23,24;40:4;41:24;
42:6,7;49:4;62:19;
63:10;70:19;90:3
**shootings (1)**
63:8
**short (3)**
8:22;26:20,23
**shot (23)**
36:12,13,14;39:19,
21;44:24;45:5;52:3,6,
13;61:17;63:2;65:18;
66:19,22,24;70:2;77:7;
86:12,23,25;87:25;
94:4
**shots (10)**
13:19,21;43:24;
52:17;65:19,24;66:1,7,
10;67:17
**shoulder (3)**
61:2,21,23
**shoved (1)**
77:15
**showed (1)**
93:8
**shows (2)**
39:18;78:12
**shut (2)**
42:7;65:11
**side (11)**
36:20,23,25;42:21;
50:8;54:21;70:16;73:7;
87:24;92:8,9
**sideways (1)**
73:15
**significant (5)**
7:1,2,5,10,14
**signing (1)**
4:6
**similar (1)**
57:18
**simple (2)**
20:15;74:3
**single (1)**
61:24
**sit (6)**
10:2;12:3;29:5;48:3;
65:5,9
**site (7)**
9:13,14;28:5,8,15,
17;42:3
**six (2)**
46:6,7
**skin (2)**
79:21;80:17
**slice (1)**
51:18
**slow (1)**
61:11

slowly (1)
61:9
slow-motion (1)
61:12
small (1)
41:6
somebody (4)
13:14;44:20;72:22;
74:15
somebody's (1)
62:23
somehow (1)
95:11
someone (3)
12:23;49:24;69:11
sometimes (3)
12:12,12;77:5
somewhere (3)
32:9;48:19;77:16
sophomoric (6)
88:9,10,21,24;89:3,
13
sorry (9)
7:24;9:21;18:17;
28:12;43:18;47:13;
66:5;71:18;88:6
sort (4)
23:12;28:25;36:24;
53:24
sound (1)
44:1;60:22;62:13
sounds (2)
31:12;55:24
source (1)
22:1
sources (1)
24:18
South (1)
27:25
southern (1)
24:18
spatter (3)
79:17,21;80:16
speak (2)
60:4;62:20
speaks (1)
41:10
specific (3)
46:3;48:10;95:17
specifically (3)
17:11;31:11;46:25
speculate (3)
85:14;87:19,20
speculation (8)
44:21;87:10,12,13,
14,16,18,25
speechifying (1)
55:9
speedway (1)
13:18
spent (1)
26:25
spirited (1)

91:18
spoke (3)
16:25;17:14;19:13
spoken (1)
28:21
sport (1)
83:17
sports (1)
83:17
squatting (1)
86:18
St (1)
4:20
stable (1)
76:25
staffers (1)
56:2
stained (1)
80:8
staircase (1)
60:6
stairs (4)
59:25;60:9,10,20
stamp (1)
48:5
stand (1)
74:14
standard (6)
29:12,17;30:6,11;
69:3,5
standards (3)
29:19;30:1;53:22
standing (4)
36:19;39:15;59:24;
86:17
stand-your-ground (1)
27:10
start (3)
17:2;19:18;57:5
started (6)
11:16;16:11;46:10;
60:9,20;61:5
starting (2)
9:2;56:14
state (9)
5:5;23:22;24:25;
25:6,16;26:9,11;49:18;
57:25
statement (5)
35:21,22;75:4;81:5,
13
statements (1)
58:12
states (2)
29:21,24
statute (1)
49:18
stay (3)
58:8;60:18,19
staying (1)
93:24
Stephens's (1)
46:14

Stevens (3)
45:19,21;46:21
stick (1)
10:18
Still (14)
5:14;13:25;14:1;
27:11;28:10;39:13;
53:21;60:24;80:2;
84:10;90:10;91:1;92:1;
95:3
STIPULATIONS (1)
4:1
stop (1)
28:3
stopped (2)
53:21;60:9
story (3)
8:7;48:25;62:18
straight (1)
36:16
Straightforward (1)
44:8
strange (1)
93:21
strategy (1)
25:14
street (1)
29:10
strictly (1)
44:21
strike (3)
71:20,21;72:4
strikes (2)
32:7;34:7
striking (1)
59:9
struck (1)
86:13
struggled (1)
69:23
studies (1)
83:16
study (3)
83:17,18;84:6
stuff (9)
19:5,16;20:2;31:1;
55:10;63:7;83:20,21;
91:17
style (2)
61:4;75:16
subject (1)
45:7
subjecting (1)
35:7
submit (1)
34:21
subsequent (2)
21:11;22:1
subsequently (1)
18:24
successful (1)
27:14
suddenly (2)

61:3;84:4
sued (1)
4:21
suffered (1)
86:4
suffering (1)
69:1
suggest (4)
40:25;42:14;52:20;
77:24
suggesting (1)
45:15
suggests (1)
44:10
summary (1)
14:8
supported (1)
76:23
sure (19)
6:8;7:25;15:22,24;
25:4;27:1;39:13;42:1;
48:19;54:22;58:19;
66:21;79:22;80:13;
86:7,19;91:9;93:5;94:8
suspect (1)
5:1
suspicious (2)
41:10;42:22
SWAT (17)
47:18;78:19;81:4,14;
82:6;88:7;89:5,7,10,17,
17,20;93:24;94:5,14,
23,23
swear (1)
4:9
sweaty (1)
60:8
sworn (1)
4:15

T

tactically (1)
57:5
tactics (4)
23:6,8;30:5,10
talk (3)
49:10;60:17;85:5
talked (1)
14:11
talking (13)
24:2,3;26:8;28:11,
13;46:2,3,18;62:19;
67:17;79:7;88:25;94:7
tall (3)
64:3,6,13
Tallahassee (7)
5:9,13;24:13;27:3;
36:8;59:8;72:9
tanks (1)
57:5
tape (2)
28:24;29:5

TC (1)
16:8
team (11)
47:18;78:19;81:4;
89:5,7,20;93:24;94:5,
15,23,24
technical (1)
23:8
television (1)
63:6
telling (3)
48:21;50:18;90:20
ten (1)
62:7
tend (1)
78:24
Tennessee (3)
28:2,2,2
tenth (1)
11:13
term (10)
55:4;58:8,13;63:21;
75:19;76:3;79:6;83:13;
87:14,15
terms (5)
7:14;11:8;49:1;
70:22;88:11
testified (9)
4:16;23:22;24:6,14,
15,24;26:10;70:5,10
testify (9)
24:21;65:22;66:3;
70:11;80:14;82:6;
86:11;87:3,8
testifying (3)
26:9;71:11;80:20
testimony (7)
21:21;24:25;27:15;
46:15;70:15;81:7;93:6
themes (1)
29:24
Theoretically (3)
50:11;83:4,6
therefore (2)
84:13;87:25
Thereupon (1)
4:13
thighs (1)
77:5
thin (2)
64:9,11
thinking (1)
52:9
Third (5)
56:11;67:8,8;75:8,12
thorough (5)
91:21,24,25;92:13;
93:17
though (5)
48:14;50:8;57:21;
58:8;93:8
thought (4)
20:6;45:10;71:12;

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

72:21
**threat (7)**
63:24;67:18;85:21;
92:18;93:12,13,14
**three (5)**
24:11,16,16;37:14;
44:10
**throughout (1)**
29:23
**throwdown (1)**
45:5
**times (9)**
5:2;23:25;24:7,12,
16,16,25;26:11;27:13
**timing (1)**
61:12
**Tipperary (1)**
5:8
**T-i-p-p-e-r-a-r-y (1)**
5:8
**title (1)**
9:13
**today (12)**
6:13;10:2;11:21;
12:3;21:10;29:20;48:4;
65:5,9;82:6;95:1,10
**told (6)**
17:4;18:15;52:22;
60:18;67:3;95:2
**tolerance (1)**
34:9
**took (7)**
9:16;39:18;46:16;
53:17;74:21,24;91:6
**top (6)**
22:6;25:25;27:17;
64:22,24;65:1
**torn (1)**
60:8
**toss (1)**
54:20
**total (1)**
26:10
**tough (3)**
14:7,9,9
**towards (2)**
36:15,24
**toxicology (3)**
34:15,19;85:11
**TPD (1)**
36:9
**traffic (1)**
28:3
**trail (1)**
42:17
**trails (1)**
75:5
**trained (1)**
74:8
**training (8)**
29:23;30:8;49:19;
50:2;95:9,11,12,16
**transcript (1)**

6:19
**transcripts (1)**
19:12
**transparent (1)**
42:5
**tree (1)**
57:19
**trial (3)**
10:23,24;28:16
**triangle (1)**
37:14
**triangularly (1)**
36:24
**tried (4)**
13:23,24;19:9;48:8
**triers (3)**
42:25;57:15;69:18
**tries (1)**
58:8
**trousers (1)**
80:15
**true (7)**
24:20;46:5;78:10;
81:23,24;82:10;83:8
**truly (1)**
73:23
**truth (4)**
4:10,10,11;7:13
**try (3)**
50:7;68:19;92:3
**trying (6)**
7:9,11;55:9;66:18;
67:13;73:5
**tucked (5)**
75:14;76:1;77:14;
94:1,2
**turned (6)**
17:1;45:11;59:10;
60:18;61:22;63:7
**turns (2)**
81:18,19
**Two (11)**
13:6;24:16;36:3;
37:5;41:8;42:18,19;
60:15;61:24;63:5;
68:10
**two-story (1)**
59:21
**type (1)**
41:8
**types (2)**
57:21,24
**typically (9)**
17:6,12,14,25;34:25;
39:20;57:2,6,17

**U**

**Uh-uh (1)**
26:7
**ultimately (2)**
18:24;20:1
**unanswered (1)**

92:1
**uncle (2)**
45:18;46:4
**uncommon (1)**
71:15
**under (3)**
17:21;18:14;41:3
**understood (4)**
22:15;29:4;32:2;
46:13
**underwear (1)**
80:16
**unfair (2)**
53:24;54:2
**unfold (1)**
66:14
**unfolded (3)**
38:18;70:4,5
**unfolding (2)**
40:19;51:23
**unholster (3)**
66:19,21;73:11
**unholstered (4)**
66:13,20;67:2,4
**uniform (1)**
53:13
**United (1)**
29:24
**unplanned (1)**
84:10
**unplugged (1)**
68:13
**unusual (4)**
41:3,9;77:17;84:10
**Unviewable (2)**
40:18,19
**up (23)**
9:1,12;10:20;12:11;
13:15,18;15:8;17:1;
19:21;25:1;57:5;60:18,
19,22,23;64:19;67:6;
70:1;85:4;86:18;90:15,
21;93:24
**updated (1)**
20:19
**updating (1)**
12:12
**upon (4)**
68:23;75:12;87:10,
16
**upstairs (1)**
60:1
**urgency (1)**
39:10
**use (29)**
4:4;17:18;19:21;
23:5,7,7,10,12;27:6;
30:5,9;49:8,23;52:3,6,
17;57:19;58:13;59:3;
63:21;68:23;70:5;74:1;
76:3;84:2;87:9,15;
88:11,21
**used (2)**

20:12;75:19
**uses (2)**
4:5;69:6
**using (3)**
7:13;87:13;92:21
**utilized (1)**
47:8

**V**

**validating (1)**
29:7
**validity (1)**
90:8
**value (3)**
28:9;29:6;92:10
**variabilities (1)**
74:18
**variables (1)**
76:13
**variance (1)**
30:3
**varieties (1)**
29:21
**various (2)**
12:13
**vehicle (1)**
13:15
**venture (1)**
95:14
**verbiage (1)**
56:5
**versa (1)**
89:4
**versus (2)**
13:8;80:10
**viable (1)**
74:12
**vice (1)**
89:4
**video (5)**
8:15,17,24;9:14,24
**videos (1)**
21:24
**view (2)**
24:19;49:23
**viewing (1)**
8:15
**violating (1)**
85:23
**violence (1)**
59:7
**vision (3)**
70:17;83:24;84:12
**visit (2)**
28:15,17
**visual (5)**
83:13,23;84:2,8,12
**Volusia (3)**
13:8,11;24:15

**W**

**waist (1)**
76:23
**waive (1)**
95:23
**waived (1)**
4:7
**walked (2)**
13:15;67:6
**walk-through (5)**
8:18,25;9:25;10:3,6
**wall (1)**
83:11
**wallet (1)**
77:1
**wandered (1)**
75:6
**warrant (1)**
30:21
**waste (2)**
5:3;22:12
**watch (2)**
8:19;78:8
**watching (1)**
68:7
**way (20)**
7:5;18:10;21:2;23:3;
30:3;39:10;41:9;55:8;
57:6;58:16;70:5;72:17,
21;74:15;76:14;82:11;
90:9,14,22;91:23
**ways (1)**
59:23
**weak (4)**
87:10,13,15;88:1
**weapon (28)**
40:13;41:3,6,7,17;
43:7,11;44:4,18,19,22;
45:5,7,15;46:9,13,22;
52:21;53:1,2;66:4;
67:2,4;77:12;94:1,3,13,
13
**weapons (4)**
46:7,8;67:4;94:9
**wearing (1)**
76:15
**website (1)**
12:12
**week (1)**
21:18
**weeks (1)**
16:13
**weigh (1)**
69:25
**weighed (1)**
64:13
**weighing (1)**
50:3
**Weight (2)**
64:8,18
**weird (2)**
49:5;61:11
**weren't (1)**
39:6

Viola Bryant v
Sheriff Ken Mascara

Roy Bedard
February 10, 2017

**What's (13)**
14:18;15:11;27:24;
39:14;54:23;56:20;
60:13;68:4;70:12;
76:15;79:12;84:5;92:8
**wheelhouse (1)**
17:21
**whenever (1)**
62:22
**whole (5)**
4:10;7:13;61:11;
75:10;91:4
**Whose (1)**
61:25
**wish (2)**
19:18;24:5
**within (8)**
17:16;19:25;24:21;
33:3;45:12;46:19;49:1;
78:2
**without (2)**
18:22;55:3
**WITNESS (39)**
4:12,15;5:11,23;
14:6,22,24;16:10;31:8;
32:24;33:8;34:5,7;
35:3,11;37:19;38:3,10;
40:1;42:11;43:10,17;
44:14;51:16;59:13;
62:15,21;64:1;69:17;
72:5;76:7,20,22;78:13;
80:2;82:17;87:18;
93:10;95:24
**witnesses (3)**
51:5,7;68:6
**word (3)**
68:4;88:21;93:11
**words (2)**
30:2;66:14
**work (12)**
11:8;12:8,12,15;
19:16;60:1,3;69:20;
81:17;90:25;91:13;
92:2
**worked (1)**
57:17
**works (2)**
20:14;50:12
**workup (7)**
8:8,12,13;9:10,22;
11:5;12:5
**worry (1)**
91:10
**worst (1)**
71:5
**wound (4)**
64:23;65:6,6;86:4
**wounds (1)**
79:1
**Wow (1)**
13:9
**wrinkles (1)**
77:15

**write (2)**
84:11;94:6
**writing (1)**
75:16
**written (9)**
7:3;16:20;18:1,25;
81:14,18,19,21;82:8
**wrong (2)**
21:7;48:20

**Y**

**yard (1)**
59:20
**yards (1)**
37:11
**year (1)**
5:20
**years (5)**
13:6;33:20;46:7;
53:22;62:7
**yesterday (6)**
6:13,16,17;8:15,23;
9:6
**young (5)**
77:16,18,20,21,22

**0**

**03 (2)**
34:1,5

**1**

**10 (1)**
56:11
**10:57 (1)**
16:19
**10-97 (1)**
59:18
**11:09 (1)**
53:17
**11:16 (1)**
53:18
**11:30 (1)**
11:17
**11th (1)**
16:19
**12 (2)**
67:8;88:7
**12:22 (1)**
96:2
**12-27 (3)**
16:1;22:2,9
**14 (1)**
26:11
**15 (4)**
37:11;68:18,22;
91:20
**15:24:32 (1)**
43:24
**15:28 (1)**
44:5

**15:28:14 (1)**
44:4
**15-hour (2)**
10:18,19
**16 (1)**
89:16
**17 (3)**
9:13;72:2,13
**19 (1)**
75:1
**1992 (1)**
36:1

**2**

**2015 (1)**
53:21
**2016 (5)**
5:12;7:23;8:3,9;
16:19
**26 (4)**
5:12;22:17;80:21;
81:2
**27 (1)**
21:9
**2-7 (1)**
9:13

**3**

**3 (4)**
33:11;34:4,7,20
**30 (2)**
46:19;62:4
**3057 (1)**
5:8
**32309 (1)**
5:9
**328 (1)**
85:12
**37 (1)**
85:5

**4**

**42 (1)**
89:16

**5**

**5 (1)**
22:17
**50 (1)**
77:19
**5th (1)**
19:8

**6**

**60/40 (1)**
23:20

**7**

**7 (1)**
54:3

**8**

**8 (2)**
11:16;87:9
**86 (1)**
62:7
**87 (1)**
62:7

**9**

**93 (1)**
36:1
**96 (1)**
62:4