**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 2:16-CV-14072-ROSENBERG/LYNCH**

VIOLA BRYANT, as Personal Representative
of the Estate of GREGORY VAUGHN HILL, JR.,

        Plaintiff,

v.

SHERIFF KEN MASCARA, in his Official
Capacity as Sheriff of St. Lucie County and
CHRISTOPHER NEWMAN,

        Defendants.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY
JUDGMENT FILED BY DEFENDANT MASCARA AND DENYING MOTION FOR
SUMMARY JUDGMENT FILED BY DEFENDANT NEWMAN**

Defendant Christopher Newman—a Sheriff's Deputy—fatally shot Gregory Vaughn Hill,

Jr. through Mr. Hill's garage door while responding to a noise complaint. This case, which arises

out of Mr. Hill's death, was brought by Mr. Hill's estate through Ms. Viola Bryant. The

Complaint contains claims against Defendant Newman in his individual capacity and against

Sheriff Ken Mascara in his official capacity as Sheriff of St. Lucie County. Both Defendants

have moved for summary judgment. The summary judgment motions are ripe for ruling. The

Court has considered all relevant filings and the argument heard in this matter on May 4, 2017.

Defendant Newman's Motion for Summary Judgment is **DENIED** and Defendant Mascara's

Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48).  A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).  Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the non-moving

party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

## II.    BACKGROUND

### A.  Events Preceding the Shooting.

The Court begins with the undisputed facts leading up to Gregory Hill's death: On January 14, 2014, Ms. Stefani Mills was picking up her son and her nieces from Francis K. Sweet elementary school. DE 68-2 at 9:11-25, 10:19-24. Ms. Mills phoned in a noise complaint about music emanating from the garage of a home near the school. *Id.* at 12:1-9, 20:1-5.  Deputy Sheriff Newman and Deputy Sheriff Lopez responded to the complaint. DE 68-1 at 20:19-25, 21:1-6. At approximately 3:00 p.m., Deputy Newman and Deputy Lopez arrived at 1501 Avenue Q, Ft. Pierce, Florida, Gregory Hill's residence. *Id.* at 22:21-25. When the officers arrived, the garage door was closed. *Id.* at 51:22-25. Deputy Newman and Deputy Lopez banged on the garage door. DE 68-1 at 25:9-11.

Here, however, factual conflicts begin to emerge. The only two individuals able to offer a comprehensive account of the events that followed are Deputy Newman, one of the Defendants, and Deputy Lopez, who accompanied Deputy Newman to the residence. The only other witness to the entire series of events, Mr. Hill, was killed. Accordingly, the Court begins by laying out Deputy Newman's account of the shooting. The Court then addresses record evidence creating genuine disputes of material fact with regard to Deputy Newman's account and discusses the inferences the Court must draw in Plaintiff's favor in light of those disputes.

### B. Deputy Newman's Account of the Shooting.

When no one responded, Deputy Newman walked to the front door. *Id.* at 25:13-14. Deputy Lopez remained near the garage. *Id.* at 25:13-15. Deputy Newman pulled the screen over the door open and knocked. *Id.* at 25:17-20. Deputy Newman "didn't hear anything." *Id.* at 25:17-18. He then took out his "ASP"—a baton—and "used the end . . . to bang on the door so [Gregory Hill] could hear . . ." *Id.* at 25:18-20. The music got louder. *Id.* at 25:20-22.

At that point, the garage door opened, *id.* at 25:20-22, revealing Gregory Hill—who was "a couple feet away from Deputy Lopez"—holding a gun in his right hand, *id.* at 25:22-25, 26:1-6. According to Deputy Newman, the garage door opened high enough that he could he could see "the whole garage" and "all of" Mr. Hill, who was "standing upright." *Id.* at 44:2-16.

Deputy Newman yelled "gun" and drew his service weapon. *Id.* at 27:8-11. He was "screaming at the top of his lungs, "gun, drop the gun" in an effort to make himself heard over the music. *Id.* at 26:8-11. Deputy Newman's service weapon was aimed at Mr. Hill. *Id.* at 27:13-14. Deputy Newman yelled "gun." *Id.* at 26:14-15. Then "[he] screamed 'gun' one more time as loud as [he] could, 'drop the gun.'" *Id.* at 26:14-16. Deputy Newman testified that while he was yelling these commands, Mr. Hill's face was visible. *Id.* at 45:23-25; 46:1-14.

Mr. Hill then began pulling the garage door down with his left hand as he raised the gun in his right hand. *Id.* at 27:16-22. Deputy Newman, fearing that Mr. Hill intended to shoot through the garage, fired his weapon. *Id.* at 26:24-25, 27:1-6. Deputy Newman fired four times through the garage door. *Id.* at 27:3-6. He fired the lowest shot first, tracking vertically. *Id.* at 27:10-20. Deputy Newman did not hear either Gregory Hill or Deputy Lopez say anything, *id.* at 28:14-19, a fact Deputy Newman attributed to the loud music, *id.* at 28:12-23. The only gun recovered from within the garage was found in Mr. Hill's back pocket. DE 71-16 at 49:3-11.

Deputy Newman identified the gun found in Mr. Hill's back pocket as the same gun he had seen in Mr. Hill's right hand as the garage door was closing. *Id.* at 49:12-17.

### C. Evidence Giving Rise to Genuine Disputes of Material Fact with Regard to Deputy Newman's Account of the Shooting.

According to Deputy Newman, when the garage door opened, *id.* at 25:20-22, it revealed Mr. Hill—who was "a couple feet away from Deputy Lopez"—holding a gun in his right hand, *id.* at 25:22-25, 26:1-6. Deputy Lopez also testified that when Mr. Hill raised the garage door he was holding the garage door up with his left hand and holding a gun in his right hand. DE 71-1-at 38:2-6. But Mr. Hill's daughter Destiny, who was sitting on a bench outside of Francis K. Sweet elementary school looking at the house, DE 71-12 at 22:6-13, testified that Mr. Hill was holding "[n]othing" besides the garage door. DE 71-12 at 21:22-25, 22:1-7.[1] Defendant urges to Court to "disregard" the "standalone testimony of this young child," DE 74 at 6, arguing that her account is not supported by reasonable inferences that can be drawn from the forensic evidence when it is viewed in the light most favorable to Plaintiff. Not so.

The only gun recovered from the scene was found in Mr. Hill's right back pocket. Mr. Hill was shot twice in the abdomen and once in the head. DE 71-3 at 5-7. Dr. Anderson, M.D.—

---

[1] Plaintiff also cites the testimony of several others who were standing nearby as creating a dispute of material fact about whether Mr. Hill was holding a gun in his right hand. DE 80 at 3, ¶ 14. The Court does not agree that this additional testimony creates such a conflict. Several of the witnesses simply testified that they could not see anyone in the garage: Ms. Mills could not see anyone in the garage and further acknowledged that it would be fair to say that she did not, therefore, see a gun in the hand of someone inside the garage. DE 80-5 at 51:9-22; Ms. Ruiz could not see anything inside of the garage. DE 80-6 at 22:6-8; Mr. Hall did not see anyone in the garage. DE 16 at 16:19-22; and Ms. Hellums did not see anything inside the garage. DE 80-10. The fact that witnesses who could not see Mr. Hill could not see a gun does not support the reasonable inference that Mr. Hill was not, in fact, holding a gun. The witnesses who did testify to seeing a person in the garage did not testify to the absence of a gun. Ms. McGuire testified to seeing an individual who was holding the garage door open with one hand and whose other hand was down. DE 80-9 at 6:17-19. However, Ms. McGuire directly stated that she could not see whether the person inside the garage was holding a gun. *Id.* at 16:11-13. Mr. Morales directly stated that he did not know whether the person in the garage was holding a gun. DE 80-11 at 11:12-20.

Plaintiff's expert—had no opinion as to the order in which the shots were fired. DE 71-14 at 47. But he did testify, based on the blow-back from the head wound and the path of the bullet, that Mr. Hill "was upright by the garage door when the bullet to the head occurred." *Id.* at 46-47. The only record testimony about the sequence of the shots is Deputy Newman's testimony that "the lowest one was the first, and then two, three, four" because Deputy Newman had been "trained to track vertically, up" when firing. DE 68-1 at 27:10-20. Thus, the record supports the inference that the shot to the head was delivered last.

According to Dr. Anderson, the shot to the head "perforat[ed] the brain through the right frontoparietal cerebrum, basal ganglia, and left temporal cerebrum." *Id.* at 5. Dr. Anderson testified that because "the basal ganglia are where most of the motor fibers are coming through to connect the spinal cord from the brain itself . . ." this wound would have "cut all motor function, sensory function out immediately." DE 71-14 at 41-42. Following the infliction of the head wound, Dr. Anderson opined that Mr. Hill "would not have had any motor activity"—"[h]e couldn't have done any purposeful movement . . ." *Id.* at 42. But until the head wound was inflicted, Plaintiff's expert agreed Mr. Hill would have been "capable, assuming he had a weapon in his hand, of putting it in his pocket." *Id.* at 48. Defendant asks the Court to conclude that the gun having been found in Mr. Hill's back pocket is not inconsistent with Defendant Newman's testimony that Mr. Hill was holding it in his right hand as the garage door closed. Defendant emphasizes Dr. Anderson's testimony that Mr. Hill would have been physically capable of getting the gun into his pocket even after sustaining two gunshot wounds to the abdomen. DE 74 at 7. But that would require drawing an inference against Plaintiff, which this Court cannot do when considering Defendants' motions for summary judgment.

The forensic evidence—viewed in the light most favorable to Plaintiff—supports the inference that the gun was never in Mr. Hill's right hand. Defendant does not dispute that Mr. Hill was highly intoxicated. *See* DE 74 at 7. The Medical Examiner's Report indicates an ethanol level of .328—for reference, the legal limit for operating a motor vehicle is .08. DE 71-3. Plaintiff's expert testified to the serious potential impact on Mr. Hill's motor function. *See* DE 71-14 at 60. And the shooting happened extremely quickly. At 15:23:24, the officers confirmed the address. DE 71-2. At 15:24:32 Deputy Lopez reported: "Shots fired. Shots fired. Black Male, Dreads, Armed with, with a Handgun . . ." *Id.* The entire incident spanned sixty-eight seconds, including the time it took for the officers to approach the house from their patrol cars (which were parked at the curb), knock on the garage and front doors, shoot Mr. Hill, and return to their patrol cars to call-in the incident. Finally, although "Gregory Hill could not be excluded as a contributor" to the mixture of DNA found on the gun, the examination was "negative for the identification of nucleated epithelial cells." DE 71-13.  In light of these facts, it is reasonable to infer (even assuming the shot to the head was delivered last) that the heavily intoxicated Mr. Hill did not move the handgun into his back pocket after the garage door closed. No evidence in the record indicates that either Deputy Newman or Deputy Lopez saw a gun anywhere other than in Mr. Hill's right hand before the shooting occurred. Thus, viewed in the light most favorable to Plaintiff, the record supports the inference that neither officer had reason to believe Hill was armed.[2]

The Court now turns to whether Mr. Hill was ever ordered to drop the gun he was allegedly holding. The record supports the reasonable inference that he was not. Deputy

---

[2] The Court notes that the officers identified the gun Mr. Hill was allegedly holding as "maybe like a Kel-Tec model" when they called in the shooting. *See* DE 71-2 at 3. The gun ultimately found in Mr. Hill's pocket was, indeed, a Kel-Tec model. But this evidence does not neutralize the record evidence supporting the Court's inference in Plaintiff's favor.

Newman testified to yelling "gun" and drawing his service weapon. *Id.* at 27:8-11. He recounted "screaming at the top of his lungs, "gun, drop the gun" in an effort to be heard over the music. *Id.* at 26:8-11. Deputy Newman also recalled that after his service weapon was aimed at Mr. Hill, *id.* at 27:13-14, he yelled "gun" again. *Id.* at 26:14-15. Then "[he] screamed 'gun' one more time as loud as [he] could, 'drop the gun.'" *Id.* at 26:14-16. But none of the other witnesses heard Deputy Newman yell anything regarding a gun, despite the fact that some were clearly within earshot. For example, Destiny Hill heard an officer tell Mr. Hill to "cut down the music." DE 71-12 at 23:16-23. And Joseph Hall, who was closest to the scene, heard an officer tell Mr. Hill to "get on the floor." DE 71-7 at 10:20-22. Although he was standing nearby, Deputy Lopez only recalled hearing Deputy Newman say the word "hey." DE 80-1 at 51:18-20. Deputy Lopez also testified to instructing Mr. Hill to drop the gun. *See* DE 80-1 at 40:3-10. But Deputy Newman did not hear Deputy Lopez say anything on the scene. Deputy Newman attributed difficulty hearing Deputy Lopez to loud music. DE 68-1 at 28:10-11. However, Joseph Hall testified that he did not recall hearing any loud music. DE 71-7 at 16:15-18. Moreover, even if music had been playing at a high volume, the fact that Joseph Hall and Destiny Hill could nonetheless hear statements made by the officers lends support to the reasonable inference that the music would not have prevented Deputy Lopez from hearing a command that Deputy Newman allegedly screamed at the top of his lungs.[3]

Thus, the Court finds that the record evidence about the shooting itself, construed in the light most favorable to Mr. Hill, supports two key inferences: First, that neither officer had

---

[3] Plaintiff also emphasizes the existence of a factual dispute about how high Mr. Hill opened the garage door. However, only genuine disputes of *material* fact are significant at summary judgment. A fact is material if "it would affect the outcome of the suit under the governing law." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (internal citation omitted). The Court does not address this factual dispute because its materiality is not apparent.

reason to believe Mr. Hill was armed and, second, that Mr. Hill was never ordered to drop the gun he was allegedly holding.[4]

**D. Events Following the Shooting.**

As noted above, when Deputy Lopez called in the shooting he reported: "Shots fired. Shots fired. Black Male, Dreads, Armed with, with a Handgun . . ." DE 71-2. The SWAT team responded to the scene, DE 71-17 at 7:7-10, after receiving a report of a "barricaded subject" following the earlier incident "with two Deputies at the front door where [Mr. Hill] had pulled a gun on them and shots were fired." DE 80-19 at 17:21-23, 18:1-2; *see also* DE 80-20 at 28:20-24 ("Q: [W]hen you arrived at the scene, what information did you have about what was going on? A: That it was a police shooting and that the individual may be still inside armed."); DE 68-4 ("I was told that the incident involved a barricaded subject with shots fired."). After setting up a perimeter, the SWAT team deployed a Crisis Negotiation team. DE 71-17 at 12:9-12. Receiving no response, *id.* at 13:17-10, the SWAT team dispersed chemical agents into the home, *id.* at 15 at 15-24. A robot was then used to pierce the garage door and photograph the inside of the garage. *Id.* at 17:7-25. Officer Brian Hester testified that the SWAT team had intended to use the robot earlier, but that "it wasn't working for whatever reason." *Id.* at 17:17-20. After the robot's camera revealed Mr. Hill lying on the garage floor, the SWAT team entered the garage. *Id.* at 18:1-24. The only gun recovered from the scene was found in Mr. Hill's right back pocket. *See id.* at 26:3-4.

This case, which arises out of Mr. Hill's death, was brought by Mr. Hill's estate through Ms. Viola Bryant. The Complaint was removed on March 9, 2016. DE 1. It contains five counts:

---

[4] According to Plaintiff, the record evidence also supports the reasonable inference that the officers planted the gun found in Mr. Hill's back pocket. The Court need not address this argument because the reasonable inferences discussed in this Section suffice to support its conclusion that Deputy Newman is not entitled to summary judgment.

Count I: 42 U.S.C. § 1983 Claim Against Sheriff Mascara grounded in the Fourth and Fourteenth Amendments; Count II: 42 U.S.C. § 1983 Claim Against Deputy Sheriff Newman grounded in the Fourth and Fourteenth Amendments; Count III: State Law Negligence Claim Against Sheriff Mascara; Count IV: State Law Battery Claim Against Deputy Sheriff Newman; and Count V: Negligence Resulting in Damage to Real Property Claim Against Sheriff Mascara. *Id.*

## III.  ANALYSIS

### A.  Motion for Summary Judgment by Deputy Sheriff Christopher Newman.

#### i.  Count II: 42 U.S.C. § 1983 Claim Against Deputy Sheriff Newman.

The question before the Court is whether Deputy Newman is entitled to qualified immunity. Qualified immunity "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Defendant must, first, establish that he was acting within the scope of his discretionary authority when the allegedly wrongful act occurred. There is no dispute that Deputy Newman, who shot Mr. Hill in the course of responding to a noise complaint, was acting within the scope of his discretionary authority when the shooting occurred. Plaintiff must, therefore, "show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation and internal quotation marks omitted). This requires showing both that Defendant violated a constitutional right and that the constitutional right was either clearly established at the time or—more rarely—that the constitutional violation falls within the ambit of the "obvious clarity" exception.

When considering qualified immunity on Defendant's motion for summary judgment, the Court must "consider the record in the light most favorable to [P]laintiff, eliminating all issues of fact." *Wate v. Kubler*, 839 F.3d 1012, 1019 (11th Cir. 2016). "At summary judgment, [the Court] cannot simply accept the officers' subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Fils v. City of Aventura*, 647 F.3d 1272, 1291-92 (11th Cir. 2011). Approaching the record in this manner puts Plaintiff's "best case" before the Court. *Id.* (citing *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005)). However, the Court may only draw inferences in favor of the nonmoving party "*to the extent supportable by the record.*" *Penley*, 605 F.3d at 848-49 (quoting *Scott v. Harris*, 550 U.S. 372 at 381 n.8 (2007)). As noted above, the Court finds that when considered in the light most favorable to Plaintiff, the record supports the reasonable inferences that neither officer had reason to believe Mr. Hill was armed and that Mr. Hill was never ordered to drop the gun he was allegedly holding.

### 1. There was a Constitutional Violation.

Plaintiff advances a § 1983 claim for the unlawful use of excessive force grounded in both the Fourth and Fourteenth Amendments. *See* DE 1 at ¶ 33. But "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim *must* be analyzed under the standard appropriate to that specific provision, *not* under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citing *Graham*, 490 U.S. at 394) (emphasis added).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[A]ll claims that law

enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 394-95; *see also West v. Davis*, 767 F.3d 1063, 1070 (11th Cir. 2014) (reversing the district court's grant of summary judgment in favor of Defendant because the district court erred by analyzing Plaintiff's claim under the rubric of substantive due process rather than applying the "objective reasonableness standard under the Fourth Amendment"); *Carr v. Tatangelo*, 338 F.3d 1259, 1268 n.15 (11th Cir. 2003) (noting that although "Carr maintained his excessive-force claim as to his being shot under the Fourteenth Amendment in the district court . . . the Fourth Amendment is the proper basis for this claim"). The question before the Court is whether excessive force was used against Plaintiff during "the course of an arrest, investigatory stop or other 'seizure' of a free citizen." *Graham*, 490 U.S. at 394-95.

The answer to that question is yes. Therefore, the Fourth Amendment applies to the exclusion of substantive due process. *Id.* Both alleged constitutional violations are grounded in "the wrongful acts [sic] of using deadly force against [Mr.] Hill and intentionally shooting him." DE 1-1 at ¶ 33. Seizure "readily bears the meaning of a laying on of hands or the application of physical force to restrain movement, even when it is ultimately unsuccessful." *California v. Hodari D.*, 449 U.S. 621 (1991). "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner*, 471 U.S. at 7 (internal citation omitted). In *Carr v. Tatangelo*, the Eleventh Circuit held that a seizure had occurred where one officer, intending to save the life of another, struck one of the plaintiffs with a bullet. 338 F.3d 1259, 1268 (11th Cir. 2003) ("Officer Fortson had shot to kill to save the life of Officer Tatangelo, and it is his intent and the physical contact of the bullet

from his gun that governs our Fourth Amendment, seizure analysis."). Here, Defendant Newman stated that he shot at Mr. Hill to protect Deputy Lopez, and several of the bullets made physical contact. Indeed, the seizure here is even plainer than in *Carr* because Mr. Hill was, in fact, stopped by the bullet—the plaintiff in *Carr* continued to run after being struck. 338 F.3d at 1268.

The standard for whether the use of force was excessive under the Fourth Amendment is one of "objective reasonableness." *See Graham*, 490 U.S. at 386. The Court notes that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 1872. It also recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* Circumstances relevant to the reasonableness of a particular use of deadly force include: "the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." *Jean Baptiste v. Guttierrez*, 627 F.3d 816, 821 (11th Cir. 2010). "Because this situation does not involve a criminal arrest, [the] facts do not fit neatly within the *Graham* framework"—but these factors have utility nonetheless. *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005).

The factors articulated in *Graham* weigh in favor of Plaintiff. First, taking the record in the light most favorable to Plaintiff, there is no indication that Mr. Hill posed an immediate danger to himself, Deputy Lopez, or others. As discussed above, the Court must assume that Mr. Hill did not have a weapon in his right hand. And although a weapon was ultimately recovered from Mr. Hill's back pocket, nothing in the record indicates that either officer believed there was a weapon anywhere but in Mr. Hill's right hand before the shooting occurred. Although Mr. Hill

did raise his empty right hand, he did so as he was closing his own garage door. Second, no serious crime was taking place. The officers responded to a noise complaint—a municipal ordinance violation. True, Defendant Newman testified that Plaintiff committed a serious crime when he raised the gun in his right hand in the direction of Deputy Lopez, but construing the record as the Court must, there was no such gun. Third, Defendants point to no record evidence showing that Mr. Hill shut the door in an effort to resist or evade arrest. Fourth, and finally, there is no indication when the facts are viewed in Plaintiff's favor that Defendant Newman attempted to warn Mr. Hill before employing lethal force.

### 2. The Law was Clearly Established.

Although a reasonable jury could find that Defendant Newman's use of lethal force violated Mr. Hill's Fourth Amendment rights, Defendant Newman would nonetheless be entitled to qualified immunity unless Mr. Hill's right to be free of such force was clearly established when the shooting occurred. A right is not clearly established unless its contours are sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Typically, the law is clearly established where there is materially similar precedent from the Supreme Court, the Eleventh Circuit, or the highest state court in which the case arose. *See Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012). But "judicial precedent with materially similar facts is not essential . . ." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). A case "directly on point" is not required, provided "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

When the shooting occurred on January 14, 2014, using deadly force against Mr. Hill, who was neither armed, threatening, nor fleeing, was clearly unconstitutional. In *Adams v. Sheriff of Palm Beach County, Fla.*, 658 Fed. App'x 557, 564 (11th Circuit 2016), the Eleventh Circuit held that this proposition was established as of May 16, 2012. Although *Adams* is unpublished and is, therefore, non-binding, it cites to a range of published precedent in support of its conclusion:

> *See*, *e.g.*, [*Tennessee v.*] *Garner*, 471 U.S. [1] at 11 [1985] ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."); *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005) (intentionally shooting a non-threatening individual in the head at close range with a non-lethal round was clearly-established excessive force); *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987) ("[S]hooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was—even in July, 1983—an unreasonable seizure and clearly violated [F]ourth [A]mendment law.") (internal footnote omitted); *Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir. 1985) (shooting an unarmed burglary suspect who posed no risk of harm to police or others was unconstitutional).

Accordingly, the Court concludes Defendant Newman is not entitled to qualified immunity on Plaintiff's § 1983 claim.

### ii. Count IV: State Law Battery Claim Against Deputy Sheriff Newman.

Defendant advances two arguments that he is entitled to summary judgment on Plaintiff's state law battery claim. First, Defendant argues that the Court should grant summary judgment on Plaintiff's state law battery claim if it elects to grant summary judgment on Plaintiff's § 1983 claim in light of Florida Statute § 776.012. Having determined Defendant is not entitled to summary judgment on Plaintiff's § 1983 claim, the Court need not consider this argument further.

Next, Defendant argues that he is not a proper party to this suit in light of Florida Statute § 768.28(9)(a), which provides:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the government entity, or heads of such entity in his or her official capacity, or the constitutional officer of which the officer, employee or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a matter exhibiting wanton and willful disregard of human rights, safety, or property . . ."

Defendant Newman's conduct clearly falls within the scope of his employment. *See Hill v. DeKalb Reg'l Youth Det. Crt.*, 40 F.3d 1176, 1185 n.17 (11th Cir. 2004) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the officials duties and within the scope of this authority.") (overruled on other grounds). The question, therefore, is whether Defendant Newman acted with malice, bad faith, or wanton and willful disregard of human rights, safety or property. "[C]onduct committed in bad faith has been characterized as conduct acted out with actual malice. Conduct meeting the 'wanton and willful' standard . . . must be 'worse than gross negligence,' and 'more reprehensible and unacceptable than mere intentional conduct.'" *Harris v. Debellis*, No. 2:14-CV-14342, 2015 WL 12927885, at *6 (S.D. Fla. Sept. 23, 2015), *aff'd,* 658 F. App'x 940 (11th Cir. 2016) (quoting *Kastritis v. City of Daytona Beach Shores*, 835 F. Supp. 2d 1200, 1225 (M.D. Fla. 2011) (citations omitted)). "In determining whether an officer is entitled to summary judgment as a result of the immunity provided by § 768.28(9)(a), the relevant inquiry is 'whether a reasonable trier of fact could possibly conclude that the [officer's] conduct was willful and wanton, or would otherwise fall within the exceptions to the statute.'" *Claridy v. Golub*, 632 F. App'x 565, 571 (11th Cir. 2015) (quoting *Furtado v. Yun Chung Law,* 51 So.3d 1269, 1277 (Fla. 4th DCA 2011) (citation and quotation marks omitted)).

Here, there is sufficient evidence to raise a question of fact as to whether Defendant Newman acted willfully or with malice. As discussed above, Plaintiff argues—citing record

evidence—that Mr. Hill was unarmed when he was shot through his garage door and that no warning was given. Because a reasonable jury "could possibly conclude" that Defendant Newman's conduct falls within the exceptions to §768.28(9)(a), Defendant Newman is not entitled to summary judgment on Count IV.

### B. Motion for Summary Judgment by Sheriff Ken Mascara.

### i. Count I: 42 U.S.C. § 1983 Claim Against Sheriff Mascara.

Suing a municipal official is the functional equivalent of suing the municipality. *Owens v. Fulton Cnty.*, 877 F.2d 947, 951 n.5 (11th Cir. 1989) ("For liability purposes, a suit against a public official in his official capacity is a suit against the local government entity he represents."). In a suit filed pursuant to 42 U.S.C. § 1983, a municipality cannot be held liable under a theory of *respondeat superior. See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978). Instead, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 386). Because Plaintiff has not satisfied the summary judgment standard with regard to any of the three theories of municipal liability in her Complaint, Defendant Mascara is entitled to summary judgment on Count I.

First is the "custom or policy" theory of municipal liability, which has three elements: "(i) that [plaintiff's] constitutional rights were violated; (ii) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (iii) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality . . . A custom is a practice that is so settled and

permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998). These requirements ensure a municipality will not be held liable "*solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691.

The Complaint alleges several policies or customs. First, the Complaint alleges a "policy and custom of encouraging, tolerating, permitting, and ratifying the use of improper and excessive deadly force . . ." DE 1-1 at ¶ 25. Second, the Complaint alleges a "custom" of "routinely ignoring violations of the Fourth and Fourteenth Amendments." DE 1-1 at ¶ 26. And, finally, the Complaint alleges a "*de facto* policy or custom" of failing to "identify constitutional violations by [law enforcement personnel] and employees and [to] subject the offending employees and law enforcement personnel to discipline, close supervision, or restraining." DE 1-1 at ¶ 30.

Defendant has shouldered his initial burden of showing the absence of a genuine dispute of material fact as to the existence of these three customs or policies. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Where the first alleged policy and custom is concerned, Defendants' Statement of Material Facts establishes, by reference to record evidence, that Deputy Sheriffs employed with the St. Lucie County Sheriff's Office, including Defendant Newman, "are trained that they are only authorized to use that amount of force which is objectively reasonable and necessary under the totality of the circumstances and are otherwise not authorized to use excessive or unnecessary force." DE 68 at ¶ 49 (citing DE 68-10 at ¶ 5) (referring to specific force-related policies in effect at the time of the subject incident). Where the remaining two alleged policies and customs are concerned, Defendants' Statement of Material Facts also establishes, by reference to record evidence, the existence of policies in effect

at the time of the subject incident relating to "training, discipline, internal affairs including handling of citizen complaints, and conducting investigations." DE 68-10 at ¶ 7.

Accordingly, Plaintiff "must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Plaintiff must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in his favor. *See Shiver*, 549 F.3d at 1343. Plaintiff argues "that the circumstances here, these officers being here for 60 seconds on the scene from the time they got the correct address to the time the shots were fired, there were some issues with violation of ordinary custom, policies, and procedures, even those by the department." Hearing Trans. 8:5-10. But "[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality." *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1311 (11th Cir. 2011). Plaintiff acknowledged on the record during the hearing held on May 4, 2017 that there is no other record evidence supporting the existence of the three policies and customs discussed above. Hearing Trans. 9:9-25; 10:1-11.

Plaintiff's Complaint also asserts a second, narrower theory of municipal liability: the failure to train theory. A municipality may be held liable for failure to train or supervise its employees, but only where "the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton*, 489 U.S. at 389-91). Because a municipality will rarely have a written or oral policy of inadequately training or supervising employees, liability also attaches "where a municipality's failure to train its employees in a relevant respect evidences a deliberate

indifference to the rights of its inhabitants such that the failure to train can properly be thought of as a city policy or custom . . ." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489-90 (11th Cir. 1997) (quoting *City of Canton*, 489 U.S. at 389) (internal quotation omitted). To show deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1351. The Eleventh Circuit has "repeatedly [ ] held that without notice of a need to train or supervise in a *particular area*, a municipality is not liable as a matter of law for any failure to train or supervise." *Id.*

Here, Plaintiff is pursuing the single incident variation of the failure to train theory. Hearing Trans. 12:2-9. Although "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary'" to provide such notice, the Supreme Court has "hypothesized" that a municipality may also be held liable when a single incident is the "obvious" consequence of a failure to train or supervise. *Connick v. Thompson*, 563 U.S. 51, 61-63 (2011) (quoting *Bd. of Cnty Com'rs v. Brown*, 520 U.S. 397, 403 (1997)). In *City of Canton*, the Supreme Court presented, as an example, the obvious need to train police officers on the constitutional limitations on the use of deadly force when the city provides the officers with firearms and knows the officers will be required to arrest fleeing felons. 489 U.S. 378, 390 n.10 (1989). However, Defendants' Statement of Material Facts establishes, by reference to record evidence, that Deputy Sheriffs employed with the St. Lucie County Sheriff's Office, including Defendant Newman, "are trained that they are only authorized to use that amount of force which is objectively reasonable and necessary under the totality of the circumstances and are otherwise not authorized to use excessive or unnecessary force." DE 68 at ¶ 49 (citing DE 68-10 at ¶ 5) (referring to specific force-related policies in effect at the time of the subject incident). Plaintiff

has no record evidence showing Deputy Newman was not trained in the use of lethal force. Hearing Trans. 12:18-23.

Third, and finally, Plaintiff advances the ratification theory of municipal liability. As the Supreme Court has recognized, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). But to "cause" a constitutional violation within the meaning of § 1983, the policymaker must "officially sanction [] or order [] the action." *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (citing *Praprotnik*, 485 U.S. at 123). Moreover, "when plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory." *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1174 n.12 (11th Cir. 2001), *cert. granted*, *judgment vacated sub nom. Thomas v. Roberts*, 536 U.S. 953 (2002), *opinion reinstated*, 323 F.3d 950 (11th Cir. 2003).

Here, Plaintiff is pursuing the single incident variation of the ratification theory. Hearing Trans. 11:6-13. However, Plaintiff acknowledged the absence of any record evidence supporting the conclusion that Defendant Mascara had an opportunity to review the decisions made by his subordinates in this case and agreed with both the decision and the decision's basis. Hearing Trans. 11:20-25; 12:1. Accordingly, the Court concludes that Defendant is entitled to summary judgment on Count I.

At the hearing, Plaintiff argued that it would be unfair for the Court to grant summary judgment in favor of Defendant Mascara on Count I because Plaintiff was not afforded an

adequate opportunity to conduct discovery relevant to establishing municipal liability. On September 26, 2016, Defendant filed a Motion for Protective Order, arguing Plaintiff ought not be allowed to take Sheriff Mascara's deposition. DE 30. Magistrate Judge Hopkins granted Defendant's Motion for Protective Order on the record following a hearing. *See* DE 34.

The Eleventh Circuit has addressed this argument (albeit in an unpublished opinion). In *Rocker v. City of Ocala, Florida*, the Eleventh Circuit rejected Plaintiff-Appellant's argument that the district court abused its discretion by refusing to allow her to depose the Sheriff. 355 F. App'x 312, 314 (11th Cir. 2009). The opinion emphasizes that "[t]he court granted the protective order on the condition that [Plaintiff-Appellant] could depose the Sheriff upon establishing that he had unique knowledge about the case." *Id.* It also notes that other officers were made available for depositions. *Id.*

Just so here. Judge Hopkins explicitly left open the possibility that Plaintiff could seek to depose Sheriff Mascara if Plaintiff could establish that the Sheriff had personal knowledge about the case. Judge Hopkins stated: "If [Sheriff Mascara] had some direct involvement in the case that's one thing. You've shown me nothing so far. There's a lot of other people to be deposed who might provide you a predicate, but you don't have it at the moment." DE 35, Digital Hearing Recording at 12:00:00-14:09:36. At the hearing, Defendant Mascara's counsel represented that Plaintiff's counsel never again sought leave to take Sheriff Mascara's deposition—a point Plaintiff's counsel did not contest. *See* Hearing Trans. 27:1-12.

### ii. Count III: State Law Negligence Against Sheriff Mascara.

Defendant presents two arguments for the proposition that he is entitled to summary judgment on the state law negligence claim contained in Count III.[5] First, Defendant asserts Plaintiff is advancing a non-existent cause of action: negligent use of excessive force. "Florida courts have consistently and unambiguously held that 'it is not possible to have a cause of action for negligent use of excessive force because there is no such thing as the negligent commission of an intentional tort.'" *Secondo v. Campbell*, 327 Fed. App'x. 126, 131 (11th Cir. 2009) (quoting *City of Miami v. Sanders*, 672 So. 2d 46, 48 (quotation marks omitted), *review denied*, 683 So. 2d 484 (Fla. 1996)). However, "a separate negligence claim based upon a distinct act of negligence may be brought against a police officer in conjunction with a claim for excessive use of force," with the caveat that "the negligence component *must pertain to something other than the actual application of force during the course of the arrest.*" *Sanders*, 672 So. 2d at 46 (emphasis added). Plaintiff asserts that she has brought a claim for negligent handling of a firearm and the negligent decision to use a firearm, which is distinct from an excessive force claim under Florida state law. *See Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (outlining state court cases).

Second, Defendant asserts such a claim is not properly before the Court because it was not raised in the Complaint. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint in a brief opposing summary judgment."). The Court disagrees.

---

[5] Unlike § 1983, Florida law allows a plaintiff to recover against a municipality for tortious acts of its employees based upon a theory of *respondeat superior*. *Brown v. City of Clewiston*, 848 F.2d 1534, 1543 n.18 (11th Cir. 1988).

The relevant portion of the Complaint reads:

40. Defendant Newman owed a duty to Hill to refrain from firing in an unsafe or unreasonable manner and to act as a reasonable law enforcement officer under [sic] same or similar circumstances."

41. Defendant Newman breached the aforementioned duty in the following ways:
   a. By unreasonably firing his firearm in the direction of Hill;
   b. By unreasonably firing his firearm when it was apparent no forcible felony was being committed or life threatening situation existed.

42. Defendant Newman's actions were negligent and were the direct and proximate cause of the death of Hill.

DE 1-1 at 9-10. According to Defendant, this passage "does not point to any action other than the actual application of force (*i.e.* the firing of his firearm) . . ." DE 73 at 8. The Court disagrees. As noted above, the Florida law claim for negligent use of a firearm encompasses negligently deciding to use a firearm. A common sense reading of Paragraph 41(b), which refers to the unreasonableness of firing a firearm absent some circumstance (*e.g.* the existence of a life threatening situation) that would support employing lethal force, shows that Plaintiff has pleaded that Defendant Newman's decision to use his firearm was negligent. This is a claim separate from a claim for excessive force. Therefore, Defendant is not entitled to summary judgment on Count III of Plaintiff's Complaint.

### iii. Count V: Negligence Resulting in Damage to Real Property Against Sheriff Mascara.

Defendant is entitled to summary judgment on Count V, which asserts a state law claim for negligence resulting in damage to Mr. Hill's home. The damage at issue was caused by the SWAT team response following the shooting. Defendant argues that there is no record evidence showing that the steps taken by the Sheriff's Office and its employees were negligent in light of the information in their possession. Plaintiff responds that "[t]he facts clearly indicate that the St.

Lucie Sheriff's Office responded to the noise complaint in an excessive fashion and employed the use of destructive instrumentalities." DE 69 at 20. But the undisputed evidence shows that the SWAT team was not responding to a noise complaint. Rather, the team was responding to a report of a "barricaded subject" following an earlier incident "with two Deputies at the front door where [Mr. Hill] had pulled a gun on them and shots were fired." DE 80-19 at 17:21-23, 18:1-2; *see also* DE 80-20 at 28:20-24 ("Q: [W]hen you arrived at the scene, what information did you have about what was going on? A: That it was a police shooting and that the individual may be still inside armed."). Even assuming that this information was, in fact, false, there is no record evidence that anyone besides Defendant Newman and Deputy Lopez knew that to be the case. Because Plaintiff cannot show that the SWAT team's actions amounted to a breach of Florida's traditional standard of reasonable care (*i.e.* that which a reasonably careful person would use under like circumstances), Defendant is entitled to summary judgment on Count V of Plaintiff's Complaint. The Court notes that it is deploying the traditional standard of care as opposed to some more tailored duty because a thorough search revealed no illuminating case law.

**IV.     CONCLUSION**

For the reasons discussed above, Defendant Newman's Motion for Summary Judgment as to Counts II and IV is **DENIED**. Defendant Mascara's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. Defendant Mascara's Motion is **GRANTED** as to Counts I and V, but **DENIED** as to Count III. The Court hereby requires that the parties jointly contact Judge Brannon's chambers by calling (561) 803-3470 on or before Thursday May 18, 2017 at 5:00pm to schedule a settlement conference in this matter. The settlement conference is to be held no later than June 2, 2017.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 16th day of May, 2017.

Copies furnished to:                              ROBIN L. ROSENBERG
Counsel of Record                              DISTRICT COURT JUDGE